**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| GILEAD SCIENCES, INC.; GILEAD SCIENCES IRELAND UC, | |
| Plaintiffs, | |
| | Civil Action No. __ |
| v. | |
| AJC MEDICAL GROUP, INC.; ALLIANCE MEDICAL CENTER, INC.; ALLIED HEALTH ORGANIZATION, INC.; BAIKAL MARKETING GROUP, INC.; A BETTER YOU WELLNESS CENTER, LLC; 3RD STEP RECOVERY GROUP, INC. D/B/A CONTINENTAL WELLNESS CENTER; COMMUNITY HEALTH MEDICAL CENTER LLC; DOCTORS UNITED, INC. D/B/A DOCTORS UNITED GROUP; FLORIMED MEDICAL CENTER CORP.; JUAN JESUS SALINA, M.D. CORP.; LABS4LESS LLC; PHYSICIAN PREFERRED PHARMACY, INC.; POSITIVE HEALTH ALLIANCE, INC.; PRIORITY HEALTH MEDICAL CENTER, INC.; TESTING MATTERS INC.; UNITED CLINICAL LABORATORY LLC; UNITED PHARMACY LLC; WELL CARE LLC; TAMARA ALONSO; JEAN ALEXANDRE; CHENARA ANDERSON; MYRIAM AUGUSTINE; TWIGGI BATISTA; ARSEN BAZYLENKO; MICHAEL BOGDAN; BARBARA BRYANT; AUGUSTINE CARBON; JENNIFER JOHN CARBON; KHADIJAH CARBON; ALEJANDRO CASTRO; JOHN CATANO; JEAN CHARLOT; SHONTA DARDEN; ALEXANDER EVANS; MARIA FREEMAN; JESULA GABO; SHAJUANDRINE GARCIA; BARBARA GIBSON; KERLINE JOSEPH; VIERGELA JOSEPH; ANDRE KERR; GARY KOGAN; CASSANDRA LOUISSAINT; CORA MANN; NICK MYRTIL; IFEOMA NWOFOR; ERIK JOSEPH PAVAO; WILLIE PEACOCK; MICHAEL PIERCE; MICHEL POITEVIEN; JEAN RODNEY; TATIANA ROZENBLYUM; JUAN JESUS SALINA; DIMITRY SHAPOSHNIKOV; ROMAN SHEKHET; KIRILL VESSELOV; MIKHAIL VESSELOV; TOMAS WHARTON, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead"), by and through their attorneys, Patterson Belknap Webb & Tyler LLP and Squire Patton Boggs (US), LLP, file their complaint against Defendants AJC Medical Group, Inc.; Alliance Medical Center, Inc.; Allied Health Organization, Inc.; A Better You Wellness Center, LLC; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Doctors United, Inc. d/b/a Doctors United Group; Florimed Medical Center Corp.; Juan Jesus Salina, M.D. Corp.; Labs4Less LLC; Physician Preferred Pharmacy, Inc.; Positive Health Alliance, Inc.; Priority Health Medical Center, Inc.; Testing Matters Inc.; United Clinical Laboratory LLC; United Pharmacy LLC; Well Care LLC; Tamara Alonso; Jean Alexandre; Chenara Anderson; Myriam Augustine; Twiggi Batista; Arsen Bazylenko; Michael Bogdan; Barbara Bryant; Augustine Carbon; Jennifer John Carbon; Khadijah Carbon; Alejandro Castro; John Catano; Jean Charlot; Shonta Darden; Alexander Evans; Maria Freeman; Jesula Gabo; Shajuandrine Garcia; Barbara Gibson; Kerline Joseph; Viergela Joseph; Andre Kerr; Gary Kogan; Cassandra Louissaint; Cora Mann; Nick Myrtil; Ifeoma Nwofor; Erik Joseph Pavao; Willie Peacock; Michael Pierce; Michel Poitevien; Jean Rodney; Tatiana Rozenblyum; Juan Jesus Salina; Dimitry Shaposhnikov; Roman Shekhet; Kirill Vesselov; Mikhail Vesselov; and Tomas Wharton (collectively, "Defendants")[1] and allege as follows:

---

[1] For purposes of this complaint, the term "Clinic Defendants" refers to Defendants AJC Medical Group, Inc.; Alliance Medical Center, Inc.; Allied Health Organization, Inc.; A Better You Wellness Center, LLC; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Doctors United, Inc. d/b/a Doctors United Group; Florimed Medical Center Corp.; Juan Jesus Salina, M.D. Corp.; Positive Health Alliance, Inc.; Priority Health

## INTRODUCTION

1.      In this action, Gilead seeks an injunction to immediately halt Defendants'

dangerous and fraudulent schemes to steal tens of millions of dollars from Gilead's Advancing

Access® Medication Assistance Program ("MAP"), a charitable endeavor funded by Gilead that

provides eligible uninsured persons with free medication to help protect them from becoming

infected with HIV.  Defendants' schemes are not just a colossal financial fraud; they also

actively endanger the health and safety of Floridians, placing the public at risk of serious illness

or death.  In addition to halting the schemes, Gilead further seeks to recoup the reimbursements

and fees Defendants have wrongfully obtained from Gilead, as well as other expenses Gilead has

wrongly been made to pay because of Defendants' fraud.

2.      Gilead is a global pharmaceutical company and the leader in developing and

manufacturing medication for the treatment and prevention of HIV and AIDS.  It is the first, and

until recently, the only company that manufactures FDA-approved therapies for the protection of

individuals who are at risk of being exposed to HIV but have not yet contracted the virus—a

drug regimen known as pre-exposure prophylaxis, or PrEP.  Gilead's groundbreaking FDA-

approved PrEP medications are called TRUVADA for PrEP® and DESCOVY for PrEP®

---

Medical Center, Inc.; and Well Care LLC.  The term "Pharmacy Defendants" refers to Physician
Preferred Pharmacy, Inc., and United Pharmacy LLC.  The term "Lab Defendants" refers to Labs4Less
LLC; Testing Matters Inc.; and United Clinical Laboratory LLC.  The term "Officer Defendants" refers to
Jean Alexandre; Chenara Anderson; Myriam Augustine; Twiggi Batista; Arsen Bazylenko; Michael
Bogdan; Augustine Carbon; Jennifer John Carbon; Khadijah Carbon; Alejandro Castro; Jean Charlot;
Shonta Darden; Maria Freeman; Shajuandrine Garcia; Barbara Gibson; Gary Kogan; Cora Mann; Nick
Myrtil; Erik Joseph Pavao; Willie Peacock; Jean Rodney; Tatiana Rozenblyum; Juan Jesus Salina;
Dimitry Shaposhnikov; Roman Shekhet; Kirill Vesselov; Mikhail Vesselov; and Tomas Wharton.  The
term "Prescriber Defendants" refers to Tamara Alonso, Barbara Bryant, John Catano, Alexander Evans,
Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Ifeoma Nwofor,
Michael Pierce, Michel Poitevien, and Jean Rodney.

(together, "PrEP medication"). These Gilead therapies have prevented untold suffering and saved countless lives.

3.    Through the MAP, Gilead provides free PrEP medication to eligible, uninsured individuals who are unable to afford it and cannot access alternative funding sources. The MAP has been able to help tens of thousands of individuals receive free, potentially life-saving medication since TRUVADA for PrEP® was first approved by the FDA in 2012. Although Gilead has operated multiple free-drug programs, such as the MAP, for decades, the company has never had to exclude a healthcare provider from these patient support programs because of fraud—until now.

4.    The Defendants in this case are two interconnected and growing networks of healthcare clinics, pharmacies, and lab testing facilities throughout Florida, together with the individuals who own and operate them and certain doctors, nurse practitioners, and physician assistants whom they employ. These entities purport to be separate businesses, but Gilead's investigation has revealed copious connections among them, including shared addresses, officers, and employees.

5.    Defendants have deliberately deployed these complex networks of companies to carry out and grow their fraudulent schemes without detection. Indeed, Defendants include a number of experienced fraudsters, such as Defendant Jennifer John Carbon, who was recently convicted by a court in this District of a healthcare fraud scheme that shares many similarities with the ones alleged here.

6.    Defendants' two criminal networks operate parallel schemes, which share a common modus operandi that includes: recruiting individuals who earn low incomes or are

homeless to serve as placeholder "patients"; prescribing those "patients" medically unnecessary, inappropriate, and often unwanted PrEP medication; falsely certifying to Gilead's representatives that the prescriptions are medically necessary and appropriate; seeking reimbursement from Gilead, under false pretenses, for the cost of those fraudulently dispensed medications; unlawfully removing PrEP medication from its original, FDA-approved packaging and separating it from its original, FDA-approved labeling; repackaging PrEP medication in an unlawful, trademark-infringing, and potentially dangerous manner for dispensation to the recruited "patients"; and unlawfully repurchasing those medications back from "patients" for pennies on the dollar so they can be resold at a higher price on the black market.  In addition to defrauding Gilead out of tens of millions of dollars and jeopardizing Gilead's hard-earned goodwill, Defendants' schemes have placed at risk the health—and even the lives—of Floridians who are economically challenged.

7.     Concerns about Defendants' conduct first emerged when Gilead noticed that certain Prescriber Defendants and other prescribers associated with the Clinic Defendants were prescribing enormous volumes of PrEP medication to a suspiciously large number of individuals whom they had enrolled in the MAP.  This output was grossly disproportionate relative to other healthcare providers in Florida and elsewhere.  But it was only after receiving credible and consistent reports of fraud from multiple whistleblowers, including some of the Clinic Defendants' own current and former employees, that Gilead learned the true nature and scope of Defendants' fraudulent schemes.

8.     These reports brought to light elaborate fraudulent schemes whereby Defendants shamelessly exploit the most vulnerable and needy for their own financial gain.  To perpetrate

their fraud, the Clinic and Officer Defendants employ crews of van drivers who stalk the streets of Florida, searching for people who earn low incomes or are homeless whom they can recruit to bring to Defendants' clinics for so-called "wellness checks" in exchange for a $10 payment or other similarly small payments.  Defendants deliberately target vulnerable individuals who earn low incomes or are homeless in connection with their schemes because they know these individuals are likely to qualify for enrollment in Gilead's MAP and can be easily pressured to participate in the scheme due to their circumstances.

9.      Once the van drivers bring these "recruits" to Defendants' clinics, the recruits are subjected to blood tests and a cursory consultation with a doctor or nurse practitioner, which one recruit whistleblower described to Gilead as "a joke."  During these pretextual "wellness checks," the Prescriber Defendants and other employees of the Clinic Defendants indiscriminately prescribe PrEP medication to the recruits—including those who are not at risk of being infected with HIV, and even those who expressly tell Defendants and their employees that they do not need or want PrEP medication.  Defendants do not undertake even a basic assessment of whether a PrEP prescription is safe or appropriate for these recruits.

10.     The Clinic and Prescriber Defendants then submit to Gilead fraudulent MAP enrollments for these recruits.  As part of these enrollments, the Clinic and Prescriber Defendants falsely certify to Gilead that (i) the prescribed medication is for the recruit, and not someone else; (ii) the prescribed medication is medically necessary for the recruit; (iii) the prescribed medication will be used by the recruit as directed; and (iv) the prescriber will be supervising the recruit's treatments.  Defendants know that these certifications are false when the Clinic and Prescriber Defendants make them, and that Gilead will rely on these false certifications in

6

approving the recruits' enrollment in the MAP and in agreeing to reimburse the cost of their PrEP medication. Indeed, inducing such reliance is the very linchpin of Defendants' fraudulent schemes.

11.     The Clinic Defendants arrange for recruits' PrEP medication to be sent directly to their clinics, and they offer recruits an additional $10 or similarly small payment each time they return to retrieve the prescribed medication. They offer this inducement to encourage recruits to pick up PrEP medication dispensed by Defendants' pharmacies, thereby enabling Defendants to secure additional reimbursements from Gilead for these "refills" and to create a misleading audit trail. In many instances, the recruits do not return to pick up their medication; yet the Prescriber, Clinic, and Pharmacy Defendants continue to fill refills anyway, and instead stockpile the medication or fraudulently redispense it to obtain a second wrongful reimbursement. As a result, one whistleblower told Gilead, there is a "room full of medication that [the originally recruited] patients don't want."

12.     As part of the schemes, the Clinic and Pharmacy Defendants unlawfully repackage the PrEP medication that they distribute. Federal laws and regulations provide that TRUVADA® and DESCOVY® must be dispensed only in their original, FDA-approved packaging and must be accompanied by their approved labeling and package insert, which includes important instructions for use. This is no mere formality: the original, tamper-proof packaging is specially designed to prevent degradation or contamination of the tablets; the original labeling and package insert contain important warnings that may be necessary to avoid serious adverse reactions; and the manufacturing lot numbers printed on each bottle are crucial for quality control and recalls. In violation of federal law and regulations, the Clinic and

Pharmacy Defendants remove the TRUVADA® and DESCOVY® tablets from their specially designed packaging, separate them from their FDA-approved instructions for use, and place them in generic bottles.  This renders them "misbranded drugs" under federal law, which are unlawful to possess, sell, or distribute.  In addition to jeopardizing the public health, the Clinic and Pharmacy Defendants' sale and distribution of these repackaged pharmaceuticals also violates Gilead's valuable trademarks and trade dress.

13.     After recruits finish their sham "wellness checks," are enrolled in the MAP, and receive a bottle containing PrEP tablets, the Clinic Defendants and their affiliates offer to buy the medication back from the recruit for as little as $10.  The Clinic Defendants encourage recruits to sell their medication, attempting to dissuade them from keeping the medication by claiming that it may have dangerous side effects.  Many recruits, who earn little income and need the money, accept the offer.  For those recruits who actually have a bona fide need for PrEP medication, this illegal practice deprives them of important preventative medication and risks exposing both them and the broader community to HIV infection.  Once they have bought back the PrEP medication from recruits, the Clinic Defendants either (i) return the dispensed medication to the Pharmacy Defendants to be redispensed to someone else for additional reimbursements, or (ii) sell the medication on the black market.  Both of these acts are dangerous and unlawful.

14.     After recruits have been shuttled through this unlawful and exploitative process, the Clinic Defendants' van drivers offer the recruits an additional $10 to go to another of Defendants' clinics and repeat the same process from the beginning.  In doing so, Defendants seek to further defraud Gilead by generating duplicative MAP enrollments for the same recruit,

8

thereby enabling Defendants to submit even more claims for reimbursement and increase exponentially the illicit profits from the schemes.

15. Defendants have wrongfully captured tens of millions of dollars in profits through these fraudulent enrollments and reimbursement claims, which are referred to as redemptions. Each such redemption nets Defendants a handsome profit because Gilead reimburses medication dispensed to MAP participants based on the wholesale acquisition cost ("wholesale price") of TRUVADA for PrEP® or DESCOVY for PrEP®, which is currently more than $1,800 per bottle, and also pays the dispensing pharmacy a dispensing fee. Defendants, however, do not pay that wholesale price when they purchase the PrEP medication that they purport to dispense. Instead, by virtue of certain Clinic Defendants' participation in the U.S. government's 340B Drug Pricing Program ("340B Program")—which is designed to expand patient access to essential medication at reduced costs—Defendants pay a steeply discounted price for each bottle of PrEP medication that they buy. Accordingly, Defendants are able to secure over $1,000 in profit for each bottle of PrEP medication purportedly dispensed to a MAP enrollee. The per-bottle profit is even greater when Defendants obtain reimbursement from Gilead for dispensing PrEP medication that they illicitly repurchased from their recruits for as little as $10; when they do not actually dispense the prescribed medication at all; or when they illegally resell the already-dispensed PrEP medication on the black market.

16. Each Defendant plays an instrumental role in carrying out Defendants' schemes. In particular, the Clinic Defendants (i) identify and fraudulently enroll recruits in the MAP, (ii) acquire heavily discounted PrEP medication for the Pharmacy Defendants to dispense, and (iii) purchase already-dispensed PrEP medication back from recruits so it can be redispensed or

9

resold.  The Prescriber Defendants, working for the Clinic Defendants, (i) perform sham "wellness checks" on recruits, (ii) fraudulently enroll recruits in the MAP on behalf of the Clinic Defendants, and (iii) use their credentials to improperly write PrEP medication prescriptions and refills for recruits.  The Lab Defendants, knowing their work is being done to further the fraudulent schemes, provide blood testing servicers in connection with the Clinic and Prescriber Defendants' fraudulent MAP enrollments, which require prescribers to confirm that MAP applicants are HIV negative.  The Pharmacy Defendants dispense repackaged PrEP medication, submit fraudulent redemptions, and receive significant fees and reimbursements from Gilead, which the Pharmacy Defendants share with the other Defendants to secure their participation in the fraudulent scheme and fund its expansion.  And the Officer Defendants, by virtue of their control of the entity Defendants, devise, implement, and enforce policies and business practices that enable the other Defendants to carry out the fraud.

17.    In Spring 2020, Gilead began implementing additional safeguards in an attempt to put a stop to the ongoing fraud.  Defendants have responded by adopting countermeasures to evade further scrutiny and perpetuate their fraudulent schemes.  For example, Gilead started blocking certain prescribers responsible for Defendants' fraudulent MAP enrollments—including the Prescriber Defendants—from enrolling additional persons through Gilead's online enrollment portal.  In response, Defendants have begun using new, unblocked prescribers to fraudulently enroll new recruits in the MAP while continuing to rely on blocked prescribers—including many of the Prescriber Defendants—to actually write the new recruits' prescriptions.  Furthermore, Defendants have shifted their fraudulent MAP enrollment operations to new clinics and companies that employ prescribers who are not subject to Gilead's enrollment blocks.

18.     Gilead has also implemented additional validation checks to stop Defendants' fraud, such as requiring MAP applicants being enrolled by prescribers associated with the Clinic Defendants, including the Prescriber Defendants, to provide a photo ID and speak with Gilead's agents by telephone to confirm their identities and that they have a bona fide desire to take PrEP medication.  In response, the Clinic Defendants' employees have begun coaching MAP applicants during validation phone calls and at times have even falsely posed on those calls as the putative individuals for whom the prescriptions are being written.  They have also begun manufacturing fake ID cards for recruits, which falsely claim that the Clinic Defendants operate homeless shelters.

19.     As Defendants' increasingly brazen tactics demonstrate, Gilead cannot stop these dangerous and fraudulent schemes through its own efforts alone.  Gilead is now left with no choice but to seek an injunction that, among other things, prohibits Defendants and their affiliates from participating in the MAP, and from continuing their dangerous and unlawful practice of redispensing, purchasing, and selling PrEP medication that has already been dispensed.  Gilead is compelled to take these actions to preserve the integrity of the MAP, which Gilead operates at great expense as part of its commitment to eradicating HIV and to ensuring that individuals can access Gilead's life-saving therapies without regard to their ability to pay.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1332(a)(1) (diversity jurisdiction).

21.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

22.     The Court has personal jurisdiction over Defendants because each of the Defendants (except Defendant Roman Shekhet) is a citizen of Florida, and is therefore subject to general personal jurisdiction in the courts of the State of Florida.  The Court further has personal jurisdiction over all Defendants (including Defendant Roman Shekhet) because each of them committed the acts giving rise to this lawsuit within the State of Florida, and/or purposely availed themselves of Florida's laws, and/or knowingly and specifically targeted the State of Florida when committing the acts giving rise to this lawsuit.

23.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

**PARTIES**

**I.     Plaintiffs**

24.     Plaintiff Gilead Sciences, Inc. is a public corporation organized under the laws of the State of Delaware, with more than 12,000 employees and a market value of more than $70 billion.  Its principal place of business is 333 Lakeside Drive, Foster City, California 94404. Gilead develops and markets a large portfolio of lifesaving medications.  These include drugs for the treatment or prevention of HIV, hepatitis B, and hepatitis C.  Gilead is the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and package inserts of certain genuine PrEP medications.

25.     Plaintiff Gilead Sciences Ireland UC ("Gilead Ireland") is a private unlimited company organized under the laws of Ireland, with its principal place of business at IDA Business & Technology Park, Carrigtohill, Co. Cork, Ireland.  Gilead Ireland is a wholly owned

subsidiary of Gilead Sciences, Inc. and the registered owner of certain well-established and famous registered trademarks that appear on the packaging, tablets, and instructional inserts of certain genuine PrEP medications.

26.     Gilead Sciences, Inc. and Gilead Ireland (together, "Gilead") are the collective owners of a number of well-established and famous registered trademarks (the "Gilead Marks") that appear on genuine PrEP products.  A complete list of these trademarks is depicted at Exhibit A hereto.  Gilead also owns and uses distinctive packaging (the "Gilead Trade Dress") to distinguish its PrEP products in the marketplace, which is depicted at Exhibit B hereto.

27.     Gilead has used and is currently using these Gilead Marks and this Gilead Trade Dress in commerce in connection with its sale of PrEP medication, and plans to continue such use in the future.  Gilead prominently displays the Gilead Marks in its advertising and promotional materials.

28.     Gilead has engaged and continues to engage in activities designed to promote PrEP medication and the business and goodwill associated with its trademarks, and to expand the use and reputation of its trademarks, trade dress, logos, copyrights, and property throughout the United States.  All of these trademarks and trade dress symbolize business goodwill of Gilead and are invaluable assets to Gilead.

29.     For more than three decades, Gilead has strived to create a healthier world for all by delivering innovative therapeutics that aim to prevent, treat, or cure life-threatening diseases. Gilead relentlessly pursues advancements in science with the goal of bringing to patients treatments that improve care in areas of unmet medical needs around the world.

30.     Gilead has transformed care for people living with HIV and hepatitis C, developing pioneering medicines including the world's first single tablet regimen to treat HIV, the first medicine to prevent HIV infection, and four hepatitis C therapies.

## II.     Defendants

31.     The Defendants here consist of two groups of affiliated and aligned clinics, prescribers, laboratories, and pharmacies: the Doctors United Defendants and the Positive Health Defendants.

32.     The Doctors United Defendants include (a) six clinics: Defendants Doctors United, Inc. d/b/a Doctors United Group; AJC Medical Group, Inc.; Allied Health Organization Inc.; A Better You Wellness Center, LLC; Florimed Medical Center Corp.; and Juan Jesus Salina, M.D. Corp. ("Doctors United Clinic Defendants"); (b) four prescribers: Defendants Tamara Alonso, John Catano, Alexander Evans, and Ifeoma Nwofor ("Doctors United Prescriber Defendants"); (c) one lab testing facility, Testing Matters Inc. ("Doctors United Lab Defendant"); (d) one pharmacy: Physician Preferred Pharmacy, Inc. ("Doctors United Pharmacy Defendant"); and (e) principals and officers of the Doctors United Clinic, Laboratory, and Pharmacy Defendants ("Doctors United Officer Defendants").

33.     The Positive Health Defendants include (a) seven clinics: Defendants Alliance Medical Center, Inc.; Baikal Marketing Group, Inc.; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center; Community Health Medical Center LLC; Positive Health Alliance, Inc.; Priority Health Medical Center, Inc.; and Well Care LLC ("Positive Health Clinic Defendants"); (b) nine prescribers: Defendants Barbara Bryant, Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Michael Pierce, Michel Poitevien, and Jean

14

Rodney ("Positive Health Prescriber Defendants")[2]; (c) two lab testing facilities, Defendants Labs4Less LLC and United Clinical Laboratory LLC ("Positive Health Lab Defendants"); (d) one pharmacy, Defendant United Pharmacy LLC ("Positive Health Pharmacy Defendant"); and (e) principals and officers of the Positive Health Clinic, Laboratory, and Pharmacy Defendants ("Positive Health Officer Defendants").[3]

34.     The individuals and entities within each group of Defendants are linked through a complex web of connections in their operations and in their schemes to defraud Gilead.  These overlapping and concealed connections are a telltale sign that the entity Defendants were created to perpetrate fraud.  Unlike a legitimate business, which typically seeks to leverage the synergies of a shared business name, Defendants have instead sought to obscure the true nature of their relationships with their affiliates and subsidiaries through these convoluted links.  The nature and scope of those connections will be further revealed through discovery.

35.     Below is a visual representation of the Doctors United Defendants and the Positive Health Defendants, based on information currently known to Gilead.

---

[2] As alleged below, Positive Health Prescriber Defendants Barbara Bryant and Michel Poitevien have also enrolled individuals in the MAP on behalf of the Doctors United Clinic Defendants.

[3] As alleged above, Defendant Jean Rodney is both a Positive Health Prescriber Defendant and Officer Defendant.  *See* note 1, *supra*.

# The Conspiracies

| | Doctors United Defendants | Positive Health Defendants |
|---|---|---|
| **Clinic Defendants** | ▪ AJC Medical Group (AJC)<br>▪ Allied Health Organization* (AHO)<br>▪ Doctors United Group* (DUG)<br>▪ Florimed Medical Center* (FMC)<br>▪ Juan Jesus Salina, M.D. Corp. (JJS)<br>▪ Better You Wellness Center (BYWC) | ▪ Alliance Medical Center (AMC)<br>▪ Baikal Marketing Group  (BMG)<br>▪ Continental Wellness Center* (CWC)<br>▪ Community Health Medical Center (CHM)<br>▪ Positive Health Alliance* (PHA)<br>▪ Priority Health Medical Center (PHMC)<br>▪ Well Care (WC) |
| **Pharmacy Defendants** | ▪ Physician Preferred Pharmacy (PPP) | ▪ United Pharmacy (UP) |
| **Lab Defendants** | ▪ Testing Matters (TM) | ▪ Labs4Less (L4L)<br>▪ United Clinical Laboratory (UCL) |
| **Officer Defendants** | ▪ Myriam Augustine (BYWC)<br>▪ Twiggi Batista (PPP)<br>▪ Michael Bogdan (TM & DUG)<br>▪ Augustine Carbon (DUG)<br>▪ Jennifer John Carbon (DUG & AJC)<br>▪ Khadijah Carbon (DUG)<br>▪ Alejandro Castro (AHO)<br>▪ Jean Charlot (AJC)<br>▪ Juan Jesus Salina (JJS)<br>▪ Tomas Wharton (FMC & DUG) | ▪ Jean Alexandre (AMC)<br>▪ Chenara Anderson (CWC)<br>▪ Arsen Bazylenko (BMG)<br>▪ Shonta Darden (PHA)<br>▪ Maria Freeman (CWC)<br>▪ Shajuandrine Garcia (WC)<br>▪ Barbara Gibson (CWC)<br>▪ Gary Kogan (L4L & PHA)<br>▪ Cora Mann (PHA)<br>▪ Nick Myrtil (PHMC)<br>▪ Erik Joseph Pavao (CHM)<br>▪ Willie Peacock (WC)<br>▪ Tatiana Rozenblyum (BMG)<br>▪ Dimitry Shaposhnikov (PHA)<br>▪ Roman Shekhet (UP)<br>▪ Kirill Vesselov (CHM & UCL)<br>▪ Mikhail Vesselov (UP, UCL, & L4L) |
| **Prescriber Defendants**<br><br>*340B Clinic | ▪ Tamara Alonso (DUG)<br>▪ John Catano (DUG)<br>▪ Alexander Evans (AHO)<br>▪ Ifeoma Nwofor (AJC) | ▪ Barbara Bryant (BMG, CWC, PHA)<br>▪ Jesula Gabo (PHA)<br>▪ Kerline Joseph (BMG, PHA)<br>▪ Viergela Joseph (PHA)<br>▪ Andre Kerr (BMG, CWC, PHA)<br>▪ Cassandra Louissaint (PHMC)<br>▪ Michael Pierce (CWC)<br>▪ Michel Poitevien (AMC, PHMC)<br>▪ Jean Rodney (AMC, BMG) |

A.      **Doctors United and Its Affiliates**

1.      **The Doctors United Defendants**

36.      Defendant Doctors United, Inc. d/b/a Doctors United Group ("Doctors United") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 1498 NW 54 Street, Suite C, Miami, Florida 33142.  Doctors United operates a network of clinics throughout Florida and is enrolled in the 340B Program administered by the United States Health Resources & Services Administration ("HRSA").[4]  Through the 340B Program, drug manufacturers participating in Medicaid agree to make their drugs available at significantly reduced prices to entities eligible for participation in the 340B Program ("covered entities").

37.      Defendant AJC Medical Group, Inc. ("AJC Medical") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider. According to records from the Florida Division of Corporations ("Division of Corporations"), AJC Medical's principal place of business is 1498 NW 54 Street, Suite C, Miami, Florida 33142. Division of Corporations records state that AJC Medical filed for dissolution in June 2019; however, AJC Medical is still listed as an actively operating entity according to NPI Profile, a searchable public database of healthcare providers maintained by the U.S. Government.

38.      Defendant Allied Health Organization Inc. ("Allied Health") is a nonprofit corporation organized under the laws of the State of Florida, with its principal place of business

---

[4] HRSA maintains a searchable public database, which lists the covered entities that are actively participating in the 340B Program, their locations, and their contract pharmacies.  Contract pharmacies are third-party pharmacies that contract with specific 340B covered entities to provide pharmacy services to the 340B entity and the eligible individuals to whom the 340B entity provides healthcare services.

17

at 14001 NW 4 Street, Suite B, Sunrise, Florida 33325.  Allied Health also operates a network of clinics throughout Florida and is enrolled in the 340B Program.

39.     Defendant A Better You Wellness Center, LLC ("Better You Wellness Center") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 3529 N. Pine Island Road, Sunrise, Florida 33351.

40.     Defendant Florimed Medical Center Corp. ("Florimed") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 311 NE 8 Street, Homestead, Florida 33030.  Florimed operates a clinic in Homestead, Florida and is enrolled in the 340B Program.

41.     Defendant Juan Jesus Salina, M.D. Corp. ("Salina M.D. Corp.") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 4212 W. 16th Avenue, Hialeah, Florida 33012.

42.     Defendant Physician Preferred Pharmacy, Inc. ("Physician Preferred") is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business at 2700 North State Road 7, Margate, Florida 33063.  Physician Preferred dispenses prescription drugs, including PrEP medication.

43.      Defendant Testing Matters Inc. ("Testing Matters") is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility.  Its principal place of business is 14001 NW 4 Street, Sunrise, Florida 33325.

44.     Defendant Jennifer John Carbon is a Florida citizen residing in Miramar, Florida. She is a co-founder of Defendant Doctors United and its former President.  She is also the co-

18

founder and current Registered Agent for Defendant AJC Medical.  She remains involved in overseeing, supervising, and/or directing the affairs of Doctors United and AJC Medical.  In June 2018, federal prosecutors filed a criminal complaint against her charging her with conspiracy to commit healthcare fraud against TRICARE, the Department of Defense's health insurance program, through her role as an officer of Comfort Medical Center LLC ("Comfort Medical"), a limited liability company organized under the laws of the State of Florida.

45.     Thereafter, Jennifer John Carbon pleaded guilty to one count of conspiracy to receive healthcare kickbacks.  In the factual proffer accompanying that plea, she admitted that, in exchange for kickbacks, she "***agreed to arrange for and provide medically unnecessary prescriptions*** for compounded medications to TRICARE beneficiaries" who were referred to Comfort Medical by her co-conspirators.  Mrs. Carbon further admitted that, in exchange for kickbacks, she "arranged for and provided prescriptions" to a co-conspirator who would then dispense medically unnecessary medication to TRICARE beneficiaries that Mrs. Carbon had "personally recruited."  Mrs. Carbon was sentenced to a prison term in connection with her conviction and was released from federal custody in September 2020.

46.     Defendant Augustine Carbon is a Florida citizen residing in Miramar, Florida.  He is the President and CEO of Defendant Doctors United, and he oversees, supervises, and/or directs Doctors United's affairs.  He is married to Defendant Jennifer John Carbon.  Augustine Carbon is also a Manager of Comfort Medical, and held that same position when his wife, Jennifer John Carbon, used the company to commit healthcare fraud.

47.     Defendant Khadija Carbon is a Florida citizen residing in Miami, Florida.  She is the Vice President of Defendant Doctors United, and she oversees, supervises, and/or directs

19

Doctors United's affairs.  She is the daughter of Defendants Jennifer John Carbon and Augustine Carbon.

48.     Defendant Alejandro Castro is a Florida citizen residing in Davie, Florida.  Mr. Castro is the President of Defendant Allied Health, and he oversees, supervises, and/or directs Allied Health's affairs.

49.     Defendant Jean Charlot is a Florida citizen believed to have last resided in Weston, Florida.  According to NPI Profile, Dr. Charlot is listed as the Medical Director of Defendant AJC Medical, and he oversees, supervises, and/or directs AJC Medical's affairs.

50.     Defendant Myriam Augustine is a Florida citizen residing in Plantation, Florida.  Ms. Augustine is the Authorized Member, President, CEO, and CFO of Defendant Better You Wellness Center.  She oversees, supervises, and/or directs Better You Wellness Center's affairs.

51.     Defendant Tomas Wharton is a Florida citizen residing in Miami, Florida.  Mr. Wharton is the President, Secretary, Treasurer, and Director of Defendant Florimed.  He oversees, supervises, and/or directs Florimed's affairs.

52.     Defendant Juan Jesus Salina is a Florida citizen residing in Miami Lakes, Florida.  Dr. Salina is the President of Defendant Salina M.D. Corp. and he oversees, supervises, and/or directs Salina M.D. Corp.'s affairs.

53.     Defendant Twiggi Batista is a Florida citizen residing in Davie, Florida.  Ms. Batista is the President of Defendant Physician Preferred, and she oversees, supervises, and/or directs Physician Preferred's affairs.

54.     Defendant Michael Bogdan is a Florida citizen residing in Davie, Florida.  Mr. Bogdan is the CEO and Manager of Defendant Testing Matters, and he oversees, supervises,

20

and/or directs Testing Matters' affairs.  Mr. Bogdan is also a former manager at a clinic operated by Defendant Doctors United, and he oversaw, supervised, and/or directed Doctors United's affairs at that clinic.

55.     Defendant Tamara Alonso is a Florida citizen residing in Miami, Florida.  Ms. Alonso is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Doctors United.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical Center, Inc. ("Alliance Medical"); Allied Health; 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center ("Continental Wellness"), Doctors United; Florimed; Positive Health Alliance, Inc. ("Positive Health"), and Priority Health Medical Center, Inc. ("Priority Health").

56.     Defendant John Catano is a Florida citizen residing in Coral Springs, Florida.  Dr. Catano is a licensed physician who has enrolled recruits in the MAP on behalf of Defendant Doctors United.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical; Allied Health; Continental Wellness; Doctors United; Florimed; Positive Health; and Baikal Marketing Group, Inc. ("Baikal Marketing").

57.     Defendant Alexander Evans is a Florida citizen residing in either Sanford, Florida, or Longwood, Florida.  Dr. Evans is a licensed surgeon who has enrolled recruits in the MAP on behalf of Defendant Allied Health.

58.     Defendant Ifeoma Nwofor is a Florida citizen residing in Miramar, Florida.  Ms. Nwofor is a licensed nurse practitioner.  She is the listed prescriber on redemptions submitted to

21

Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Doctors United Clinic Defendants AJC Medical, Allied Health, and Doctors United. Ms. Nwofor is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical and Positive Health.

**2.    Connections Among the Doctors United Defendants**

59.    The Doctors United Defendants are linked to one another through a web of overlapping connections, evidencing their mutual cooperation in the fraudulent scheme at issue.

60.    Defendant Physician Preferred is a "contract pharmacy" for Defendants Doctors United, Allied Health, and Florimed, each of which is a registered 340B covered entity.  As such, Physician Preferred receives and dispenses drugs purchased by Doctors United, Allied Health, and Florimed at discounted 340B Program prices.

61.    Defendant AJC Medical's principal place of business is 1498 NW 54 Street, Suite C, Miami, Florida 33142.  This address is identical to the principal address for Defendant Doctors United.  Comfort Medical, the company through which Defendant Jennifer John Carbon committed healthcare fraud, also lists its principal place of business at this same address.

62.    Two former websites for Defendant Doctors United (www.mydug.org and www.doctorsunitedgroup.com) currently redirect to the website for Defendant Allied Health (https://alliedhealth.org/).

63.    The current website for Defendant Doctors United (https://www.dughealth.org/) lists Defendant Salina M.D. Corp. as an affiliate.

64.     The current website for Defendant Allied Health lists the headquarters of Defendant Better You Wellness Center as an Allied Health location.

65.     The current Director of Communications for Allied Health is Mario Schauer. Before joining Allied Health, Mr. Schauer was a Marketing and Public Relations Specialist at Doctors United.  In that role, Mr. Schauer managed Doctors United's marketing team.

66.     Defendant Tomas Wharton is the current President, Secretary, Treasurer, and Director of Florimed.  He also served as the President of Doctors United between June 2018 and December 2018.

67.     Defendants Tamara Alonso and John Catano are the listed prescribers on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by several of the Doctors United Clinic Defendants, and in particular Allied Health, Doctors United, and Florimed.

68.     The principal place of business for Defendant Testing Matters is 14001 NW 4 Street, Sunrise, Florida 33325.  This address corresponds to the address of an Allied Health 340B clinic registered with HRSA.  The website for Testing Matters also lists a location at 2150 W. 76th Street, Suite 100, Hialeah, Florida 33016.  This address is identical to the address listed on the Doctors United website for one of its clinics.

69.     According to HRSA records, Defendant Michael Bogdan, the current CEO and Manager of Testing Matters, is the primary contact for a former Doctors United clinic in Pompano Beach, Florida that was enrolled in the 340B Program.  In addition, Mr. Bogdan and Defendant Twiggi Batista of Physician Preferred live together at the same address in Davie, Florida.

23

70.     The following is a visual representation of the connections among the Doctors

United Defendants, based on information currently known to Gilead.



24

B.      **Positive Health and Its Affiliates**

1.      **The Positive Health Defendants**

71.      Defendant Positive Health Alliance is a nonprofit corporation organized under the laws of the State of Florida, with its principal place of business at 730 West Hallandale Beach Boulevard, Suite #109, Hallandale, Florida 33009.  Positive Health operates a network of health clinics throughout Florida and is enrolled in the 340B Program.

72.      Defendant United Pharmacy LLC ("United Pharmacy") is a limited liability company organized under the laws of the State of Florida, with its principal place of business at 3951 N. Haverhill Road, Suite 120-121, West Palm Beach, Florida 33417.  United Pharmacy dispenses prescription drugs, including PrEP medication.

73.      Defendant 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center is a nonprofit corporation organized under the laws of the State of Florida.  According to records from the Division of Corporations, Continental Wellness's principal address is 3400 NW 9th Avenue, Suite A, Oakland Park, Florida 33309.  Continental Wellness operates a clinic at that location that is registered with the 340B Program.  According to NPI Profile, Continental Wellness also operates clinics at 450 E. Prospect Road, Oakland Park, Florida 33334 and 4055 N. Andrews Avenue, Oakland Park, Florida 33309.

74.      Defendant Alliance Medical Center, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 6245 Miramar Parkway, Suite 101, Miramar, Florida 33023.

75.      Defendant Baikal Marketing Group, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  According to

Division of Corporations records, Baikal Marketing's principal address is 3029 NE 188 Street, #319, Miami Florida 33180.  This address corresponds to a residential condominium.  According to NPI Profile, Baikal Marketing's principal place of business is 2500 Metrocentre Boulevard, Suite 7, West Palm Beach, Florida 33407.

76.     Defendant Community Health Medical Center, LLC ("Community Health") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 3951 North Haverhill Road, Suite 120, West Palm Beach, Florida 33417.  NPI Profile records list Community Health's primary location as 3951 North Haverhill Road, Suite 117, West Palm Beach, Florida 33417.  According to Division of Corporations records, Community Health was administratively dissolved on September 25, 2020; however, according to NPI Profile, Community Health is still an actively operating entity.

77.     Defendant Labs4Less LLC ("Labs4Less") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility.  Its principal place of business is 730 W. Hallandale Beach Boulevard, Suite #109, Hallandale Beach, Florida 33009.

78.     Defendant Priority Health Medical Center, Inc. is a for-profit corporation organized under the laws of the State of Florida that holds itself out as a healthcare provider.  Its principal place of business is 3660 Central Avenue, #6, Fort Myers, Florida 33901.  Priority Health also operates a medical clinic at 1900 Nebraska Avenue, Suite 1, Fort Pierce, Florida 34950.

79.     Defendant United Clinical Laboratory LLC ("United Labs") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare lab testing facility.  Its principal place of business is 2257 Vista Parkway, #2, West Palm Beach, Florida 33411.  United Labs provides blood testing services for the Positive Health Defendants.

80.     Defendant Well Care LLC ("Well Care") is a limited liability company organized under the laws of the State of Florida that holds itself out as a healthcare provider.  According to Division of Corporations records, Well Care's principal address is 309 NE Marion Street, Madison, Florida 32340.  According to NPI Profile, Well Care's principal place of business is 720 N. Ocean Street, Jacksonville, Florida 32202.

81.     Defendant Cora Mann is a Florida citizen residing in Miami Gardens, Florida.  Ms. Mann is a Director and the President of Defendant Positive Health, and she oversees, supervises, and/or directs Positive Health's affairs.

82.     Defendant Dimitry Shaposhnikov is a Florida citizen residing in Hallandale Beach, Florida.  Mr. Shaposhnikov is a Director and the Treasurer of Defendant Positive Health, and he oversees, supervises, and/or directs Positive Health's affairs.

83.     Defendant Shonta Darden is a Florida citizen residing in Miami, Florida.  Ms. Darden is a Director and the Secretary of Defendant Positive Health, and she oversees, supervises, and/or directs Positive Health's affairs.

84.     Defendant Mikhail Vesselov is a Florida citizen residing in Highland Beach, Florida.  Mr. Vesselov is a Managing Member of Defendants United Pharmacy and United Labs, and he oversees, supervises, and/or directs the affairs of those companies.  Mr. Vesselov operates a number of healthcare companies—including pharmacies, lab testing facilities, clinics, and drug

27

treatment centers—in Florida and other states.  He operates many of these other companies with his son, Defendant Kirill Vesselov.

85.     Defendant Kirill Vesselov is a Florida citizen residing in Highland Beach, Florida.  He is the Manager of Defendant Community Health and a Managing Member of Defendant United Labs, and oversees, supervises, and/or directs the affairs of those companies. Mr. Vesselov is the son of Defendant Mikhail Vesselov.  With his father, Kirill Vesselov operates a number of other healthcare companies in Florida and other states.

86.     Defendant Erik Joseph Pavao is a Florida citizen residing in Loxahatchee, Florida. According to NPI Profile, he is the Manager of Defendant Community Health and oversees, supervises, and/or directs Community Health's affairs.  Mr. Pavao has a long record of criminal offenses, including conversion, burglary, and grand theft auto.

87.     Defendant Roman Shekhet is a New York citizen residing in Brooklyn, New York.  Mr. Shekhet is a Managing Member of Defendant United Pharmacy, and he oversees, supervises, and/or directs United Pharmacy's affairs.

88.     Defendant Maria Freeman is a Florida citizen residing in Fort Lauderdale, Florida.  She is the President of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness's affairs.

89.     Defendant Barbara Gibson is a Florida citizen residing in Plantation, Florida.  She is the Vice President and Treasurer of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness's affairs.

90.     Defendant Chenara Anderson is a Florida citizen residing in Tamarac, Florida. She is the Secretary of Defendant Continental Wellness and oversees, supervises, and/or directs Continental Wellness' affairs.

91.     Defendant Jean Alexandre is a Florida citizen residing in Miami, Florida.  He is the President of Defendant Alliance Medical and oversees, supervises, and/or directs Alliance Medical's affairs.

92.     Defendant Arsen Bazylenko is a Florida citizen residing in Aventura, Florida.  He is the President of Defendant Baikal Marketing and oversees, supervises, and/or directs Baikal Marketing's affairs.  He is married to Defendant Tatiana Rozenblyum.

93.     Defendant Tatiana Rozenblyum is a Florida citizen residing in Aventura, Florida. She is the Secretary of Defendant Baikal Marketing and oversees, supervises, and/or directs Baikal Marketing's affairs.  She is married to Defendant Arsen Bazylenko.

94.     Defendant Gary Kogan is a Florida citizen residing in Aventura, Florida.  He is the Manager of Defendant Labs4Less and oversees, supervises, and/or directs Labs4Less's affairs.  Mr. Kogan is also an Executive Director of Positive Health and he oversees, supervises, and/or directs Positive Health's affairs.

95.     Defendant Nick Myrtil is a Florida citizen residing in Boynton Beach, Florida. He is the President of Defendant Priority Health and oversees, supervises, and/or directs Priority Health's affairs.

96.     Defendant Shajuandrine Garcia is a Florida citizen residing in Madison, Florida. She is the Manager of Defendant Well Care and oversees, supervises, and/or directs Well Care's affairs.

97.     Defendant Willie Peacock is a Florida citizen residing in Madison, Florida.  He is an Authorized Member of Defendant Well Care and oversees, supervises, and/or directs Well Care's affairs.

98.     Defendant Barbara Bryant is a Florida citizen residing in West Palm Beach, Florida.  Ms. Bryant is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Baikal Marketing, Continental Wellness, Positive Health, and Doctors United.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, Florimed, and Positive Health.

99.     Defendant Jesula Gabo is a Florida citizen residing in Tamarac, Florida.  Ms. Gabo is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendant Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, and Positive Health.

100.     Defendant Kerline Joseph is a Florida citizen residing in Deerfield Beach, Florida.  Ms. Joseph is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Baikal Marketing and Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, and Positive Health.

30

101.     Defendant Viergela Joseph is a Florida citizen residing in Lehigh Acres, Florida.
Ms. Joseph is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of
Defendant Positive Health.  She is also the listed prescriber on redemptions submitted to Gilead
in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by
Defendants Alliance Medical, Allied Health, Positive Health, Priority Health, and Well Care.

102.     Defendant Andre Kerr is a Florida citizen residing in Sunrise, Florida.  Mr. Kerr
is a licensed physician assistant who has enrolled recruits in the MAP on behalf of Defendants
Baikal Marketing, Continental Wellness, and Positive Health.  He is also the listed prescriber on
redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to
individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal
Marketing, Continental Wellness, Doctors United, Positive Health, and Well Care.

103.     Defendant Cassandra Louissaint is a Florida citizen residing in Tampa, Florida.
Ms. Louissaint is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of
Defendant Priority Health.  She is also the listed prescriber on redemptions submitted to Gilead
in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by
Defendants Alliance Medical, Allied Health, Baikal Marketing, Doctors United, Positive Health,
and Well Care.

104.     Defendant Michael Pierce is a Florida citizen residing in Wilton Manors, Florida.
Dr. Pierce is a licensed physician who has enrolled recruits in the MAP on behalf of Defendant
Continental Wellness.  He is also the listed prescriber on redemptions submitted to Gilead in
connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by

Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, and Positive Health.

105.    Defendant Michel Poitevien is a Florida citizen residing in North Miami Beach, Florida.  Mr. Poitevien is a licensed nurse practitioner who has enrolled recruits in the MAP on behalf of Defendants Alliance Medical, Allied Health, and Priority Health.  He is also the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Baikal Marketing, Continental Wellness, Doctors United, Positive Health, and Priority Health.

106.    Defendant Jean Rodney is a Florida citizen residing in Orlando, Florida.  Dr. Rodney is a licensed physician.  He is the listed prescriber on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by Defendants Alliance Medical, Allied Health, Continental Wellness, Doctors United, Positive Health, and Priority Health.

## 2.    Connections Among the Positive Health Defendants

107.    Like the Doctors United Defendants, the Positive Health Defendants are linked to one another through a web of overlapping connections, evidencing their mutual cooperation in the fraudulent scheme.

108.    According to records from Division of Corporations, NPI Profile, and HRSA, along with Defendants' own websites, many of the Positive Health Defendants operate out of the same premises:

32

a.      Alliance Medical has a mailing address of 6245 Miramar Parkway, Suite
        102, Miramar, Florida 33023.  This address is identical to the address of a
        Positive Health clinic.

b.      The principal place of business for Baikal Marketing is 2500 Metrocentre
        Boulevard, Suite 7, West Palm Beach, Florida 33407.  This address is
        identical to the address of a Positive Health clinic.

c.      The principal place of business for Community Health is listed as both
        3951 North Haverhill Road, Suite 120, West Palm Beach, Florida 33417,
        and 3951 North Haverhill Road, Suite 117, West Palm Beach, Florida
        33417.  These addresses are identical to locations for United Pharmacy
        and a Positive Health clinic, respectively.

d.      Continental Wellness purports to operate a clinic at 4055 N. Andrews
        Avenue, Oakland Park, Florida 33309.  This location corresponds to the
        address of a Positive Health clinic that participated in the 340B Program
        from January 1, 2020, to April 1, 2020.

e.      The principal place of business for Labs4Less is 730 W. Hallandale Beach
        Boulevard, Suite #109, Hallandale Beach, Florida 33009.  This address is
        identical to the address of a Positive Health clinic.

f.      The principal place of business for Priority Health is 3660 Central
        Avenue, #6, Fort Myers, Florida 33901.  This address is identical to the
        address of a Positive Health clinic that participated in the 340B Program
        from May 8, 2020, to October 1, 2020.

33

g.   The principal place of business for Well Care is 720 N. Ocean Street, Jacksonville, Florida 32202.  This address is identical to the address of a Positive Health clinic.

109.   United Pharmacy is a contract pharmacy for all of the Positive Health clinics registered with HRSA, including each of the clinics listed in Paragraph 108 above.

110.   Defendant Jean Rodney is an officer or license-holder for several of the Positive Health Defendants.  For example, NPI Profile states that Dr. Rodney is the Medical Director of both Alliance Medical and Baikal Marketing.  In addition, the Fort Pierce clinic operated by Priority Health is registered under Dr. Rodney's medical license.

111.   Defendant Mikhail Vesselov is the Managing Member of United Pharmacy and United Labs, as well as the co-founder and former Manager of Defendant Labs4Less.

112.   As alleged above, Defendant Gary Kogan is both the Manager of Labs4Less and, according to NPI Profile and HRSA records, the Executive Director of Positive Health.

113.   The Positive Health Prescriber Defendants are the listed prescribers on redemptions submitted to Gilead in connection with PrEP medication purportedly dispensed to individuals enrolled in the MAP by several Positive Health Clinic Defendants.  For example, as alleged above, Defendant Barbara Bryant is the listed prescriber for PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Baikal Marketing, Continental Wellness, and Positive Health.  Similarly, Defendant Andre Kerr is the listed prescriber for PrEP medication purportedly dispensed to individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Baikal Marketing, Continental Wellness, Positive Health, and Well Care.

114.    The Positive Health Defendants are also heavily connected through social media. For instance, Labs4Less maintains a public social media account on Instagram, which includes a number of posts referencing the public Instagram account for Positive Health.  For example, the Labs4Less Instagram account includes a post from December 24, 2019, which purports to show photos taken at a Positive Health Christmas Party.



Similarly, Well Care expressly claims an affiliation with Positive Health (also known as "PHA") on its public Facebook page, referring to itself as "Well Care LLC – PHA" and using Positive Health's logo.



115.   These social media connections extend to the individual Positive Health Defendants as well.  For example, Defendant Arsen Bazylenko's Facebook account is "friends" with the Facebook accounts associated with Defendant Dimitry Shaposhnikov of Positive Health and Defendant Erik Joseph Pavao, a Manager of Community Health.

36

116.     Several of the individual Positive Health Defendants are also connected through a common non-party employer: the North Miami Police Department.  In particular, the President and Secretary of Positive Health (Defendants Cora Mann and Shonta Darden, respectively) are both employed by the North Miami Police Department, as is Defendant Gary Kogan, the Manager of Defendant Labs4Less and Executive Director of Positive Health.

117.     The following is a visual representation of the connections among the Positive Health Defendants, based on information currently known to Gilead.



### C.      Connections Among the Doctors United and Positive Health Defendants

118.      As alleged above, the Doctors United Defendants are all closely linked with one another, and the same is true of the Positive Health Defendants.  These groups of Defendants also share common contact points with one another, indicating that both groups of Defendants are working in concert to defraud Gilead.

119.      For example, Doctors United and Positive Health work with a common pharmacy to carry out their fraudulent schemes: As one Doctors United employee told the Recruit Whistleblower,[5] a whistleblower who contacted Gilead about the schemes, ***Doctors United and Positive Health and everybody else all use the same Pharmacy that delivers directly to their offices.***"

120.      In addition, the Doctors United Prescriber Defendants are the listed prescribers on a substantial number of redemptions associated with individuals enrolled in the MAP by the Positive Health Clinic Defendants.  For instance, Doctors United Prescriber Defendant Tamara Alonso is the listed prescriber on redemptions associated with individuals enrolled in the MAP by Positive Health Clinic Defendants Alliance Medical, Continental Wellness, Positive Health, and Priority Health.

121.      Similarly, the Positive Health Prescriber Defendants are the listed prescribers on a substantial number of redemptions associated with individuals enrolled in the MAP by the Doctors United Clinic Defendants.  For instance, Positive Health Prescriber Defendant Jesula

---

[5] In light of the criminal nature of Defendants' scheme, this complaint uses pseudonyms in certain instances to protect the safety of whistleblowers.  Where individual MAP enrollees are discussed, pseudonyms are also used to protect the enrollee's protected health information.

Gabo is the listed prescriber on redemptions associated with individuals enrolled in the MAP by Doctors United Clinic Defendants Allied Health and Doctors United.

122.    The overlap between the Doctors United Defendants and Positive Health Defendants also extends to MAP enrollments.  For example, Positive Health Prescriber Defendants Barbara Bryant and Michel Poitevien have enrolled individuals in the MAP on behalf of *both* the Doctors United Clinic Defendants (i.e., Allied Health and Doctors United) and the Positive Health Clinic Defendants (Alliance Medical, Baikal Marketing, Continental Wellness, Positive Health, and Priority Health).

123.    Defendants' social media accounts further corroborate the connections between the Doctors United Defendants and Positive Health Defendants.  For example, Defendant Arsen Bazylenko of Baikal Marketing (a Positive Health affiliate) is a Facebook "friend" of Defendants Augustine and Khadijah Carbon, the two corporate officers of Doctors United.

124.    Discovery will reveal further connections and coordination between the Doctors United Defendants and Positive Health Defendants.

## FACTUAL ALLEGATIONS

**I.      The Impact of HIV and AIDS in the United States**

125.    Human immunodeficiency virus, or HIV, is a deadly virus that has caused the deaths of hundreds of thousands of Americans since the AIDS epidemic broke out in the United

States in the 1980s.[6]  Its impact has been even more devastating across the globe.  In 2019 alone,

approximately 690,000 people died from AIDS-related illnesses worldwide.[7]

126.    The virus significantly affects the health and welfare of Americans.  According to

estimates published by the U.S. Centers for Disease Control and Prevention ("CDC"),

approximately 1.2 million people in the United States were living with HIV by the end of 2018,

the last reported year of data.[8]  In 2018 alone, 37,968 people received a new HIV diagnosis in the

United States and dependent areas.[9]  Virtually all of these infections were due to sexual contact

or injection drug use.[10]

127.    While the numbers of individuals receiving an HIV diagnosis and living with HIV

remain significant, the overall infection rate nevertheless reflects progress in the fight against the

virus.  For example, the CDC reports that the annual number of new HIV diagnoses decreased

7% from 2014 to 2018.

---

[6] *See* The HIV/AIDS Epidemic in the United States: The Basics, Kaiser Family Foundation (Mar. 25, 2019), https://www.kff.org/hivaids/fact-sheet/the-hivaids-epidemic-in-the-united-states-the-basics/#endnote_link_391348-2.

[7] *See* Global HIV/AIDS Overview, Minority HIV/AIDS Fund, https://www.hiv.gov/federal-response/pepfar-global-aids/global-hiv-aids-overview#:~:text=Further%2C%20the%20HIV%20epidemic%20not,insecurity%2C%20and%20other%20serious%20problems (last updated July 7, 2020).

[8] Basic Statistics, CDC, https://www.cdc.gov/hiv/basics/statistics.html (last updated July 1, 2020).

[9] Dependent areas include American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the Republic of Palau, and the US Virgin Islands.

[10] Basic Statistics, CDC, https://www.cdc.gov/hiv/basics/statistics.html (last updated July 1, 2020).

## II.      Gilead's Pre-Exposure Prophylaxis ("PrEP") for HIV Prevention

128.     One of the most significant developments in the fight against HIV is the development of drugs that can be taken for PrEP—a method of HIV prevention whereby individuals who are HIV-negative but at-risk for HIV infection proactively take medication on an ongoing basis to decrease their risk of contracting HIV through sex.

129.     TRUVADA® and DESCOVY® are two therapies developed and manufactured by Gilead that can be taken for PrEP.  Both drugs come in the form of a tablet.  The FDA-recommended dosage for both is one tablet per day.

130.     When taken as indicated, each drug is highly effective at preventing HIV infection in individuals exposed to the virus.  Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%.[11]

131.     TRUVADA® was approved by the FDA for PrEP in 2012,[12] and DESCOVY® was approved by the FDA for PrEP in 2019.[13]  These two medications are the first, and until recently, the only FDA-approved PrEP medications in the United States.  They have been instrumental in preventing the spread of HIV in areas in the United States where there is a high prevalence of HIV.

---

[11] PrEP, CDC, https://www.cdc.gov/hiv/basics/prep.html (last reviewed Sept. 18, 2020).

[12] TRUVADA® contains, as its active ingredients, 200 mg of emtricitabine and 300 mg of tenofovir disoproxil fumarate.

[13] DESCOVY® contains, as its active ingredients 200 mg of emtricitabine and 25 mg of tenofovir alafenamide.

III.   **The Gilead Advancing Access® Patient Support Program and Gilead's Provision of Free Medication to Individuals in Need**

132.   To help support individuals who have been prescribed Gilead medications, Gilead operates a number of Patient Support Programs that facilitate access to critical, life-saving therapies.

133.   Gilead's Patient Support Programs accomplish this objective in several ways. The programs provide information to individuals regarding insurance coverage for Gilead therapies.  They help to identify sources of financial support for uninsured persons in need of those therapies.  And, most relevant here, they provide free medication to eligible individuals who lack insurance and are otherwise unable to access alternative funding sources.

134.   Gilead Advancing Access® ("Advancing Access®") is the Patient Support Program that is specifically designed for persons who have been prescribed Gilead therapies for the treatment or prevention of HIV, such as TRUVADA® and DESCOVY®, or the treatment of hepatitis B.[14]

A.   **The Advancing Access® Patient Assistance Program and Medication Assistance Program**

135.   Gilead created Advancing Access® in 2004.  Among other things, Advancing Access® operates a free-drug program.  Eligible individuals who lack insurance for a particular Gilead HIV or hepatitis B therapy and are otherwise unable to access alternative funding sources can enroll in the free-drug program and receive their medication at no charge.  Gilead voluntarily bears the cost of the medication.

---

[14] Gilead operates other Patient Support Programs for other therapies.  For example, Gilead's Support Path® program covers Gilead's hepatitis C therapies.

136.     The Advancing Access® free-drug program for *treatment* medication (i.e., for patients who have already contracted HIV or hepatitis B) is called the Patient Assistance Program ("PAP").  Gilead's free-drug program for TRUVADA® or DESCOVY® for HIV *prevention* (i.e., TRUVADA for PrEP® or DESCOVY for PrEP®) is called the Medication Assistance Program ("MAP").[15]

137.     Gilead voluntarily created the MAP to ensure that low-income individuals at risk of HIV infection, who lack insurance coverage and are otherwise unable to access other financial support, can successfully obtain PrEP medication.

**B.      Gilead Expends Substantial Resources on the PAP and MAP Because of Its Commitment to Help Those in Need and Prevent the Spread of HIV**

138.     Since 2005, the MAP and PAP programs have helped tens of thousands of uninsured eligible individuals obtain for free, billions of dollars of potentially life-saving Gilead medications that they need.

139.     In addition to giving away free medication to PAP and MAP enrollees, Gilead has paid hundreds of millions of dollars to third parties to administer various aspects of the Advancing Access® program, such as processing enrollments and managing the cards that enrollees present to pharmacies to obtain their free medication.  In 2019 alone, Gilead paid tens of millions of dollars in dispensing and administrative fees and costs to these third parties in connection with operating Advancing Access.

---

[15] Gilead Patient Support Programs other than Advancing Access® also have PAPs that provide eligible individuals with access to free medication.  Unless otherwise specified, all references in this complaint to the PAP and MAP are to the Advancing Access® PAP and MAP.

140.    Gilead is proud of and committed to the PAP and MAP.  They are crucial components of Gilead's mission to prevent the spread of HIV, and help to further Gilead's goal of ensuring that as many individuals as possible can access Gilead's life-saving therapies.  These programs exemplify Gilead's vision "[t]o create a better, healthier world for all people," and embody the company's credo of "doing what's right."

### C.    Qualifying for the PAP or MAP

141.    Gilead has implemented eligibility criteria to ensure that the PAP and MAP serve U.S. residents who need free medication the most.

142.    To qualify for the PAP or MAP, an applicant generally must meet four criteria: (1) the applicant must be uninsured; (2) the applicant's annual household income must be less than or equal to 500% of the federal poverty level; (3) the applicant must be a resident of the U.S. or a U.S. territory; and (4) the applicant must be treated by a physician in the U.S. or a U.S. territory.

143.    If an applicant satisfies these four criteria, he or she is eligible to enroll in the PAP or MAP for a 12-month period.  After 12 months, the enrollee may reapply and reenroll indefinitely for subsequent 12-month periods so long as he or she continues to meet the eligibility requirements.

144.    Individuals can either enroll themselves in the PAP or MAP, or their healthcare providers can do so for them.  Enrollment can be accomplished by calling the Advancing Access® call center, by fax, or through an online portal.  Through these enrollment mechanisms, Gilead's agents are able to quickly determine whether an applicant meets the PAP or MAP eligibility criteria and immediately enroll eligible applicants in the program.

**D.    The Essential Role of Healthcare Providers in Ensuring PrEP Medication is Medically Necessary and Appropriate**

145.    An individual's enrollment in and receipt of medication through the MAP also requires the participation and careful oversight of a healthcare provider to ensure that PrEP medication is and remains appropriate and medically necessary for the individual.

146.    Like all prescription drugs, PrEP medication is not appropriate for everyone. Thus, before prescribing PrEP medication, a healthcare provider must carefully determine that the medication is medically necessary.  The CDC has issued guidelines to assist healthcare providers in determining whether and under what circumstances to prescribe PrEP medication so that it can used safely and effectively.

147.    According to CDC guidance, before prescribing PrEP medication, a healthcare provider must assess whether an individual is at risk of acquiring HIV through sex or injection drug use.  If that assessment indicates that an individual is not at risk of HIV infection, PrEP medication is not medically necessary, and the provider should not prescribe PrEP medication. If, on the other hand, the healthcare provider determines that PrEP medication is appropriate, she will ordinarily prescribe a 30-day supply along with two refills.

148.    Before prescribing PrEP medication, the FDA also advises healthcare providers to conduct certain tests to determine whether taking PrEP medication might pose risks to the potential candidate for the medication.  For example, healthcare providers should assess whether an individual is HIV negative before prescribing PrEP medication because an HIV-positive individual who takes either TRUVADA® or DESCOVY® alone risks allowing the virus to develop resistance to drugs used to treat HIV, thereby limiting potential treatment options for the individual.  In addition, the FDA instructs prescribers to test individuals for chronic hepatitis B

46

and to assess their kidney function, including creatinine clearance, before, when initiating, or during use of PrEP medication, per the prescribing information for each drug.  While PrEP is generally safe for individuals with chronic hepatitis B or low creatinine levels to take, their use of PrEP medication could implicate other risks that their healthcare provider will want to closely monitor.  And before prescribing PrEP medication, it is also essential that healthcare providers ascertain what other medications the individual is taking, as well as whether he or she has any pre-existing health issues that could cause an adverse reaction in conjunction with PrEP medication.

149.    After prescribing PrEP medication, the CDC advises that healthcare providers should follow up with the individual prescribed the drug approximately every three months (and more frequently at the outset of treatment) to conduct any necessary tests, assess the individual's continued risk of HIV infection, and answer any questions.

150.    The CDC instructs that the healthcare provider should continue prescribing PrEP medication so long as the individual remains at risk of HIV infection, is willing and able to adhere to the prescribed dosing regimen, and shows no signs of medical risk to continued usage. But the individual's prescription should be discontinued if the PrEP recipient is no longer at risk of HIV infection.  Therefore, throughout the process from initiation through use or discontinuation, it remains critical that the healthcare provider be closely involved in PrEP care.

**E.    Prescriber Certifications Confirming that MAP Applicants Have Been Appropriately Prescribed Gilead Medication**

151.    Consistent with the healthcare provider's vital role in ensuring that PrEP medication is and remains medically appropriate for each individual to whom it is prescribed, when an individual applies for enrollment in the MAP, his or her healthcare provider must

provide specific information and certify to Gilead that certain facts about the applicant's need for the medication, and the provider's role in monitoring and overseeing the applicant's treatment, are true.

152.     In particular, the MAP applicant's healthcare provider must certify that (1) the prescribed medication is for the applicant, (2) the prescribed medication is medically necessary for the applicant, (3) the prescribed medication will be used as directed, (4) the prescriber will be supervising the applicant's treatment, (5) the applicant has been tested for HIV infection and found to be HIV negative, (6) the applicant will be regularly tested for HIV as part of her care plan, and (7) the prescriber will periodically verify continued use of Gilead medication and resubmit current prescriptions.

153.     These certifications are crucial aspects of a MAP application, as they provide assurances to Gilead that there is a bona fide need for free PrEP medication and that the applicant will be taking the prescribed medication under the supervision of a credentialed healthcare provider.

154.     Gilead relies on the truth of these representations when it enrolls a new applicant in the MAP, and it would not permit anyone to remain enrolled absent his or her healthcare provider's certification of these representations.

**F.     Gilead's Efforts to Ensure Qualified Enrollees Get Immediate and Uninterrupted Access to Their Medication**

155.     Because the medications covered by Advancing Access® provide life-saving treatment and protection against lethal viruses, the PAP and MAP are designed to ensure that eligible individuals can quickly enroll and obtain immediate access to medication.

48

156.    Once Gilead's agents approve their applications and enroll them in the PAP or MAP, enrollees are entitled to receive PAP or MAP cards generated by TrialCard, one of the third-party vendors with which Gilead has contracted to administer Advancing Access®.  These cards contain BIN and PCN numbers[16] and a member identification number that enrollees can use at any retail pharmacy in the United States to obtain their medication for free.

157.    Consistent with Gilead's goal of ensuring that enrollees can immediately access their medication, these BIN, PCN, and member identification numbers are generated and provided to PAP or MAP enrollees as soon as their applications are approved, meaning that the enrollees do not need to wait to receive their PAP or MAP cards before obtaining their medication for free from a retail pharmacy.  Enrollees can simply provide the three numbers associated with their PAP or MAP cards to the pharmacy to receive their medication without charge.

158.    Gilead uses this retail pharmacy dispensing model for the Advancing Access® PAP and MAP to ensure that program participants can obtain quick and convenient access to their medication.  Through the retail pharmacy model, Gilead effectively enlists all U.S. retail pharmacies in the distribution of Gilead medication to PAP and MAP enrollees.

159.    In the MAP, PrEP medication is dispensed in bottles containing a 30-day supply; however, MAP enrollees are able to pick up a prescribed refill 21 days after receiving their original medication.  The program permits this early dispensing to ensure that enrollees have

---

[16] BIN and PCN numbers are necessary to process a prescription drug claim.  *See* National Council for Prescription Drug Programs (NCPDP), *NCPDP Health Care Identification Card Fact Sheet*, https://www.ncpdp.org/NCPDP/media/pdf/NCPDP_pharmacy_id_card_fact_sheet.pdf (last revised Aug. 2014).

continuous access to their medication and do not need to wait until they run out before seeking a refill.

### G.  Gilead Pays Reimbursements Equal to Its Wholesale Prices

160.   When a PAP or MAP enrollee presents his or her card at a retail pharmacy to obtain medication, the pharmacy submits the enrollment information to TrialCard to receive an approval to dispense the medication to the enrollee.  If the claim (known as a "redemption") is approved, Gilead pays to the pharmacy a reimbursement for the medication that has been dispensed, along with a dispensing fee.

161.   In addition to the dispensing fee, Gilead reimburses the dispensed medication at Gilead's wholesale price—currently more than $1,800 per 30-tablet bottle of TRUVADA® or DESCOVY®—even if, as is often the case, the dispensed medication was purchased at a lower price from an authorized wholesaler.  This is a function of practical necessity due to the retail pharmacy dispensing model:  Gilead could not efficiently or effectively administer the MAP if it had to calculate each individual reimbursement payment based on the actual price the purchasing entity paid for a particular dispensed bottle of PrEP medication (information to which Gilead does not have access).

162.   The structure of the PAP and MAP has been effective in ensuring that uninsured individuals with a bona fide need for medication and financial assistance are able to access their prescribed Gilead therapies without delay.

163.   Until Defendants' fraud was uncovered, Gilead had never excluded a healthcare provider from participating in the PAP or MAP because of fraudulent conduct.

IV.     **Enrollment and Redemption Data Reveals Defendants' Fraud**

164.    Gilead has discovered that Defendants are engaged in wide-ranging schemes to defraud Gilead's charitable free-drug program by enrolling large numbers of individuals in the MAP, irrespective of the enrollees' need for PrEP medication; prescribing enrollees unneeded bottles of PrEP medication, often multiple bottles at a time; and, in turn, submitting redemptions and receiving reimbursement from Gilead for these fraudulent prescriptions at a staggering pace. Advancing Access® enrollment and redemption data illustrates the remarkable scope of Defendants' fraudulent schemes and some of the tactics they have deployed to maximize their reimbursements and wrongfully profit at Gilead's expense.

A.     **Defendants Enroll a Disproportionate Number of People in the MAP and Submit an Anomalous Number of Redemptions**

165.    Advancing Access® records show that since 2019, the Clinic and Pharmacy Defendants have enrolled individuals in the MAP and made redemption claims at rates that significantly exceed the enrollment and prescribing activity of all other healthcare providers in Florida.

166.    By way of illustration, between January 2019 and August 2020, the average MAP prescriber in Florida prescribed approximately 10 bottles of PrEP medication per month.  But certain prescribers employed by the Clinic Defendants—including Prescriber Defendants Tamara Alonso, Cassandra Louissaint, and Michel Poitevien—prescribed ***between 30 and 50 times that amount*** in multiple months during the same time period.

51

**Bottles of Medication Prescribed by High-Volume Prescriber Defendants**



167.    Due to the disproportionate number of individuals that the Clinic Defendants have enrolled in the MAP and prescribed PrEP medication, during the first five months of 2020, Defendants Positive Health and Doctors United accounted for ***approximately 45 percent of all MAP redemptions originating from the State of Florida***.



168.    The Clinic Defendants are also responsible for some of the highest monthly MAP redemption numbers among all prescribers nationwide.  In March 2020, for example, the Clinic Defendants alone were responsible for more than 15% percent of the nationwide redemptions paid under the MAP.

**B.**    **Advancing Access® Data Shows Defendants Dispensing Duplicative Prescriptions to Recruits**

169.    In view of Defendants' prodigious volume of MAP enrollments and redemptions, Gilead investigated further to better understand the activity underlying these numbers.  That investigation uncovered numerous instances of fraudulent enrollment and redemption practices on the part of Defendants and their prescribers.

170.    As alleged above, in the MAP, PrEP medication is dispensed in bottles containing a 30-day supply of tablets.  Because MAP enrollees can pick up a refill as soon as 21 days after receiving a bottle, redemptions should occur every 21 to 30 days for a MAP enrollee who is consistently taking their medication, as it is intended to be taken.  However, Gilead identified many instances where the Clinic and Prescriber Defendants have prescribed PrEP medication and submitted redemptions for a particular MAP enrollee only days apart, and much sooner than 21 days after the preceding redemption.  For purposes of this complaint, this improper practice is referred to as "fraudulent multi-fill."

171.    For example, between January and April 2020, Defendant Tamara Alonso (of Defendant Doctors United) and Defendant Ifeoma Nwofor (of Defendant AJC Medical) purportedly dispensed PrEP medication through the MAP *seven times to the same individual over a period of less than three months*.

53

**TABLE 1**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 6-Apr-20 | 24 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 14-Apr-20 | 8 | Tamara Alonso | Doctors United |

172.     The Positive Health Defendants have engaged in this same practice.  For instance, in November and December 2019, Defendant Barbara Bryant of Defendant Positive Health purportedly dispensed PrEP medication through the MAP *four times to the same individual over a period of six weeks.*

**TABLE 2**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98846759309 | 1-Nov-19 | n/a | Barbara Bryant | Positive Health |
| 98846759309 | 20-Nov-19 | 19 | Barbara Bryant | Positive Health |
| 98846759309 | 4-Dec-19 | 14 | Barbara Bryant | Positive Health |
| 98846759309 | 13-Dec-19 | 9 | Barbara Bryant | Positive Health |

173.     Defendants have sought to avoid scrutiny of this improper practice by alternating prescribers and pharmacies when purportedly dispensing multiple bottles of PrEP medication over a short time period to a single MAP enrollee.  For instance, when prescribing and dispensing four refills over the course of 42 days to a single individual [ID #98853569809] (an average rate of refill every 14 days), Defendant Andre Kerr (of Defendant Baikal Marketing) and

54

a prescriber at Defendant Doctors United alternated prescriptions, and Defendants United

Pharmacy and Physician Preferred took turns submitting redemptions for purportedly dispensed

PrEP medication:

**TABLE 3**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Pharmacy |
|---|---|---|---|---|---|
| 98853569809 | 6-Dec-19 | n/a | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 11-Dec-19 | 5 | Andre Kerr | Baikal Marketing | United Pharmacy |
| 98853569809 | 30-Dec-19 | 19 | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 17-Jan-20 | 18 | Andre Kerr | Baikal Marketing | United Pharmacy |

174.    Defendants have also alternated between prescribing TRUVADA for PrEP® and

DESCOVY for PrEP® for the same MAP enrollee, allowing them to accelerate the rate of refills

of PrEP medication.  For example, redemption data shows that Defendant Michael Pierce (of

Defendant Continental Wellness) and Defendant Michel Poitevien (of Defendant Alliance

Medical) alternated between prescribing TRUVADA for PrEP® and DESCOVY for PrEP® for a

single individual four times over the course of a six-week period.

**TABLE 4**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 96228786408 | 11-Feb-20 | n/a | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 24-Feb-20 | 13 | Michel Poitevien | Alliance Medical | DESCOVY® |
| 96228786408 | 10-Mar-20 | 15 | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 20-Mar-20 | 10 | Michel Poitevien | Alliance Medical | DESCOVY® |

175.    Redemption data also shows that Defendant Tamara Alonso (of Doctors United) and Defendant Ifeoma Nwofor (of Defendant AJC Medical) alternated between prescribing TRUVADA® and DESCOVY® for a single individual five times over the course of a six-week period.

**TABLE 5**

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United | DESCOVY® |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical | DESCOVY® |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |

176.    There is no valid medical reason for a healthcare provider to prescribe an individual both TRUVADA® and DESCOVY® at the same time.  Indeed, doing so is potentially dangerous.  Taking TRUVADA® and DESCOVY® simultaneously will cause an individual to

56

consume more than the FDA-approved daily dosage of tenofovir, which can cause life-threatening side effects.

**V.     Gilead's Investigation Confirms the Details of Defendants' Schemes to Use Vulnerable Persons to Defraud Gilead and Compromise the Integrity of the MAP**

177.    Through whistleblower reports and Gilead's own investigation, the mechanics of Defendants' schemes have come to light.  Defendants have been able to manufacture their extraordinary volume of enrollments, prescriptions, and redemptions by preying on individuals who earn low incomes or are homeless, offering them a few dollars in exchange for submitting to "wellness checks," allowing their names to be used for MAP enrollments, and picking up prescriptions of PrEP medication that they neither want nor need.  Each prescription enables Defendants to claim and collect massive profits from Gilead in reimbursement and fees, while endangering the health and safety of the vulnerable individuals Defendants recruit.

178.    Moreover, after dispensing PrEP medication to these individuals, the Clinic Defendants are illegally buying back the medication for a few additional dollars.  In turn, the Clinic and Pharmacy Defendants illegally redispense the bought-back medication to claim additional payments through the MAP without incurring the corresponding costs of purchasing new drugs, or they illegally sell the repurchased medication on the black market, thereby displacing Gilead's commercial stock.  Through these illegal tactics, Defendants maximize and multiply their illegal profits at Gilead's expense—while once again endangering the public health and safety.

179.    The description of Defendants' schemes that follows is based on Gilead's own investigation along with numerous, mutually corroborating whistleblower reports to Gilead—including from a Doctors United employee (the "Doctors United Whistleblower"), a former

employee of Priority Health (the "Priority Health Whistleblower"), and a homeless MAP

enrollee recruited by Defendants (the "Recruit Whistleblower").

     **A.**    **The Clinic Defendants Scour the Streets of Florida Searching for Vulnerable Persons Willing to Be Brought to Their Clinics in Exchange for Payment**

    180.    The Clinic Defendants employ a number of individuals as van drivers who are

instructed to drive around South Florida every day to soup kitchens, public libraries, bus

terminals, churches, and other locations where Defendants believe individuals who earn low

incomes or are homeless are likely to be found.  Gilead's investigation has uncovered that many

of these van drivers have extensive criminal records.  For example, a records search indicates

that a Positive Health van driver identified by the Recruit Whistleblower has prior convictions

for aggravated battery and robbery.  Defendant Erik Joseph Pavao, the van driver's supervisor

and a Manager of Defendant Community Health, has prior convictions for burglary, grand theft,

and conversion.

    181.    Photos taken by a Gilead investigator of some of Defendants' vans at recruiting

locations are shown below.[17]  As the photos show, Defendants' vans often bear the Positive

Health logo:

---

[17] Defendants devote considerable resources to this van operation.  For example, Defendant Positive Health owns at least nine large passenger vans that are used by the company's drivers.





182.    These van drivers offer the people they identify small items—such as gift cards, food, and cigarettes—on the condition that they agree to enter the vans and be brought to one of Defendants' clinics for a "wellness check" that includes an HIV test.  The following picture was taken of one of the gift cards Defendants gave to the Recruit Whistleblower in connection with one of these "wellness checks."  The card bears the message "THANK YOU 10 DOLLARS":

59



183.    The Clinic Defendants deliberately target individuals who earn low incomes or are homeless in their recruitment efforts because they know such persons are likely to qualify for the MAP if they are prescribed PrEP medication, and because they know those persons' dire personal situations make them more likely to go along with the scheme.

184.    The Clinic Defendants pay the van drivers a bounty for each person that they bring to Defendants' clinics for these "wellness checks."  As the Recruit Whistleblower reported, the van drivers "go everywhere looking for people they haven't brought" yet to Defendants' clinics.

185.    The van drivers place particular emphasis on identifying new people who have not yet been to one of Defendants' clinics, and they travel great distances to identify new "recruits."  For example, one of Defendants' van drivers traveled approximately 50 miles from West Palm Beach to Fort Lauderdale to draw in new recruits.  As this van driver told the Recruit

60

Whistleblower, the Clinic Defendants have already recruited all of the individuals who earn low incomes or are homeless they could identify in West Palm Beach, and they now need "to go outside our jurisdiction to pick more people up."

186.    The Clinic Defendants' van drivers also used recruits to assist in identifying new persons willing to go to Defendants' clinics in exchange for payment.  On one occasion, a van driver told the Recruit Whistleblower, "If you find me people, I'll give you $5 a head for everyone you put in this van."  The van driver subsequently paid the Recruit Whistleblower $45 after he identified nine people who were willing to be brought by the driver to a clinic.

187.    The Clinic Defendants' recruitment efforts are not limited to persons whom they recruit off the street.  The Clinic Defendants also task their employees with identifying other individuals who may be willing to go to Defendants' clinics in exchange for compensation.  As a result, the Clinic Defendants' employees have recruited family, friends, and acquaintances to come to Defendants' clinics for "wellness checks," irrespective of medical need.

**B.    Defendants Prescribe and Dispense PrEP Medication to Recruits Without Regard to Whether They Want or Need It**

188.    When recruits arrive at Defendants' clinics, they are given paperwork to complete, including a MAP enrollment form.  Clinic staff direct the recruits to fill out and sign the enrollment forms.

189.    Clinic staff also make copies of the recruits' identification and collect their personal information, such as social security numbers.  This documentation and information enables the Clinic and Prescriber Defendants to enroll recruits in the MAP, even without the recruits' knowledge or consent.

190.     After new recruits fill out the paperwork the Clinic Defendants provide to them, they are subjected to a blood test and a cursory consultation with a doctor or nurse practitioner, which the Recruit Whistleblower described as a "joke."  These "wellness checks" are merely a pretext for the Clinic Defendants' real reason for bringing in recruits—to prescribe them PrEP medication and enroll them in the MAP.  Moreover, the doctor or nurse nominally running the wellness check generally does not ask the recruit about preexisting medical conditions that could be exacerbated by taking PrEP medication, or whether the recruit is taking other medications that interact with PrEP in potentially harmful and unsafe ways.

191.     The Clinic and Prescriber Defendants prescribe PrEP medication to ***all*** recruits without regard to whether the recruits want or believe they need the medication.

192.     In many instances, recruits unequivocally tell the Prescriber Defendants and the Clinic Defendants' other personnel that they do not want PrEP medication.  As the Doctors United Whistleblower reported, recruits inform the Clinic Defendants' personnel, "I did the lab work because you guys are offering me a $10 gift card, but I don't want the meds." Nevertheless, the Clinic and Prescriber Defendants enroll recruits in the MAP even if the recruits make clear they do not plan to take PrEP medication.

193.     As the Recruit Whistleblower explained, when he was first enrolled in the MAP by Defendants, he told the examining nurse practitioner that he did not fall into any of the risk groups for HIV, and did not intend to take the PrEP medication that was being prescribed.  In response, however, the nurse practitioner told the Recruit Whistleblower that he would not receive the $10 he had been promised if he did not sign up for the MAP and asked the Recruit Whistleblower whether he was going to be a "good patient and comply."  Only at this point did

62

the Recruit Whistleblower, a man who is homeless and desperately in need of money, agree to enroll.

194.    In an effort to gain the recruits' compliance, the Clinic Defendants will repeatedly tell the recruits that the prescribed PrEP medication is "free."  They also advise recruits that they do not have to take the PrEP medication prescribed to them at all, and that if they do, they are not required to take the tablets daily.  The latter advice is contrary to CDC guidelines for safe and effective use of PrEP medication.

195.    For each recruit, the Clinic and Prescriber Defendants submit a MAP application to Gilead's agents.  In doing so, the Clinic and Prescriber Defendants falsely certify to Gilead that (1) the prescribed medication is medically necessary for the recruit, (2) the prescribed medication will be used by the recruit as directed, (3) the prescriber will be supervising the recruit's use of PrEP medication, and (4) the prescriber will verify continued use of the medication being prescribed.  As explained further below, the Clinic Defendants also seek to purchase dispensed PrEP medication back from the recruit, rendering false the Clinic and Prescriber Defendants' certifications to Gilead that the prescribed medication is actually for the recruit, and not someone else.

196.    In some instances, the Clinic Defendants enroll recruits in the MAP or PAP and make the false certifications referenced above without even going through the formality of subjecting recruits to a "wellness check" at one of their clinics.  For example, in October 2020 the Recruit Whistleblower was recruited at a bus terminal by an employee of Defendants Better You Wellness and Allied Health, who offered the Recruit Whistleblower $10 if he agreed to provide a name, social security number, and birth date to the employee and also agreed to have

his photograph taken. The Recruit Whistleblower agreed to do so and provided a false identity. Later that day, Defendant Allied Health submitted an application to enroll the Recruit Whistleblower—using the alias that he had provided—in the PAP in connection with a prescription for DESCOVY® for HIV treatment. The application form bore a forged signature for the Recruit Whistleblower and included a fake photo identification that had been manufactured by Better You Wellness—which the identification card falsely represented as operating a homeless shelter—using the photograph the recruiter had taken of the Recruit Whistleblower.[18]

197.    Once a recruit has been enrolled in the MAP, the Clinic and Prescriber Defendants arrange for the recruit's prescriptions to be sent directly to one of Defendants' clinics. The Clinic Defendants encourage recruits to return to their clinics to pick up additional bottles of PrEP medication in the future, reminding them that the Clinic Defendants will pay them $10 each time they return. The Clinic Defendants offer this payment to ensure that the Clinic and Pharmacy Defendants can continue to dispense PrEP medication to the recruits, thereby allowing the Pharmacy Defendants to seek additional reimbursements from Gilead for dispensing that medication. This practice also enables Defendants to create a misleading audit trail that would suggest recruits are actually taking the prescribed PrEP medication when they are not.

198.    The Clinic Defendants also record the BIN, PCN, and member identification numbers associated with the recruits' MAP cards. This allows the Clinic and Pharmacy

---

[18] As alleged below, this false identification care was created to circumvent certain anti-fraud measures Gilead has adopted in response to Defendants' fraudulent schemes.

Defendants to claim they are dispensing PrEP medication, and seek reimbursement from Gilead, without the recruits' involvement.

199.    When recruits do receive PrEP medication from the Clinic and Pharmacy Defendants, the tablets—which bear multiple Gilead Marks depicted in Exhibit A—are dispensed in generic plastic pharmacy bottles with labels that also bear Gilead Marks depicted in Exhibit A.  These generic bottles lack important features that accompany the FDA-required packaging in which authentic PrEP medication is dispensed, such as desiccants and seals that protect the tablets against exposure to moisture.  Defendants also dispense PrEP medication to recruits without including the FDA-required labeling and package insert, which provide crucial information for individuals who are prescribed PrEP medication.  As alleged above, it is unlawful and potentially dangerous to remove TRUVADA® and DESCOVY® from their specially designed, FDA-approved packaging and to dispense the drugs without the FDA-required package insert.

200.    The following images show a bottle of DESCOVY® dispensed to the Recruit Whistleblower as well as the FDA-approved packaging for authentic DESCOVY®:

**DESCOVY® Dispensed to the Recruit Whistleblower**



**FDA-Approved Bottle with Package insert**

  

### C.  The Clinic Defendants Forge Prescriber Signatures to Enroll Recruits in the MAP

201.    According to the Doctors United and Priority Health Whistleblowers, the Clinic Defendants have also forged *prescriber* signatures to enroll recruits in the MAP and write their prescriptions.

202.    For example, the Doctors United Whistleblower reported to Gilead that Doctors United retained an otherwise blank MAP enrollment form that had been signed by a nurse practitioner who was subsequently terminated.  According to the whistleblower, Doctors United staff made copies of that form and used them to try to enroll recruits in the MAP even after the nurse practitioner had been terminated.

203.    These fraudulent practices are strikingly similar to those alleged by the United States government when it charged Defendant Jennifer John Carbon—Doctors United's co-

founder and former President, and the wife and mother of Doctors United's two current officers—with conspiracy to commit healthcare fraud.  In particular, the government alleged that Mrs. Carbon had forged prescriptions and fraudulently represented that a certain doctor had prescribed medication when, in fact, that was not true.

204.    In addition, the Priority Health Whistleblower reported that the Priority Health clinic where she had worked had no doctors on site.  Instead, the clinic had office staff who are not lawfully authorized to prescribe PrEP medication writing out prescriptions for recruits.

**D.     The Clinic and Prescriber Defendants Enroll Recruits in the MAP Without Their Knowledge or Consent**

205.    If necessary, the Clinic and Prescriber Defendants also enroll recruits in the MAP without their knowledge or consent.  This allows Defendants to generate an even greater pool of recruits to whom they can purportedly prescribe and dispense PrEP medication, thereby increasing the amount they are reimbursed by Gilead.

206.    For example, when recruits refuse to go along with Defendants' scheme, the Clinic and Prescriber Defendants enroll them in the MAP anyway, often forging the recruits' signatures on the enrollment paperwork in the process.  Gilead's investigation has uncovered numerous instances where the Clinic Defendants have forged enrollee signatures on sections of the MAP application concerning (1) the applicant's financial and insurance information, which Gilead relies on to determine MAP eligibility; and (2) the applicant's release pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") authorizing Gilead to use and disclose the applicant's personal health information, which Gilead also relies on to process MAP applications.  These forged applications include several purportedly signed by the Recruit Whistleblower, which the Recruit Whistleblower has confirmed he did not authorize and do not

68

bear his actual signature.  By forging recruits' signatures in this manner, the Clinic and Prescriber Defendants not only make additional false certifications to Gilead; they also commit criminal violations of HIPAA.

207.    The Clinic and Prescriber Defendants' practice of forging enrollee signatures was further evidenced by a recorded call to Advancing Access® from an employee of Defendant Positive Health, who sought to enroll a recruit in the MAP.  When the recruit was put on the line, the Advancing Access® program specialist asked her whether she was still seeing Defendant Viergela Joseph, who had previously prescribed the recruit TRUVADA for PrEP® through the MAP.  The recruit answered: ***"I don't know who that is.  No.  Never seen him in my life.  I know Jojo, the driver in the van that runs around looking for people standing around with nothing better to do than go get tested."***

208.    Similarly, when the Priority Health Whistleblower called the Advancing Access® call center to report Defendants' fraud, she explained that she had learned Defendant Priority Health had prescribed her TRUVADA for PrEP® and enrolled her in the MAP without her knowledge or consent.  Based on Gilead's records, Defendant Cassandra Louissaint was the prescriber who enrolled the Priority Health Whistleblower in the MAP.

**E.** **The Clinic Defendants Purchase PrEP Medication Back from Recruits After It Has Been Dispensed**

209.    After recruits receive their PrEP medication, the Clinic Defendants' van drivers introduce the recruits to associates who offer between $10 and $40 to purchase the bottle of medication back from the recruit.  In some instances, the van drivers themselves offer to purchase the medication back from recruits.

210.    The van drivers encourage recruits to sell their PrEP tablets, telling them: "You probably don't want to take that medication, but if you want to sell it, I'll buy it."  They also discourage recruits from taking the medication by suggesting that doing so could cause them to experience dangerous side effects.

211.    The Clinic Defendants' van drivers often preview this offer for recruits before they enter the clinic for their "wellness checks," telling the recruits that when they return to the van, someone will be there to buy back the medication the Clinic and Prescriber Defendants prescribe to them.

212.    Because most recruits either do not have an actual medical need for the PrEP medication prescribed to them, or are dissuaded by the Clinic Defendants' van drivers from taking them, they (a) sell their medication to the van drivers or their associates, (b) keep the medication to sell later for a higher price, or (c) discard the medication that they have received.

213.    Defendants' practice of repurchasing dispensed PrEP medication allows them to further perpetuate their fraud and increase their profits.  When recruits sell PrEP medication back to the Clinic Defendants, the Clinic and Pharmacy Defendants often repackage and dispense it to other recruits or persons who obtain PrEP medication from Defendants.  By purchasing the medication back from recruits rather than procuring it through legitimate channels, Defendants

minimize their acquisition costs while continuing to claim reimbursements from Gilead, as if they were seeking reimbursement for a legitimately acquired bottle of PrEP medication.  In other instances, the Clinic Defendants sell the dispensed medication to individuals seeking to acquire PrEP medication at less than the wholesale price through the black market.

214.    Not only does this buy-back practice defraud Gilead; it is also illegal.  Under federal law, the purchase and resale of already-dispensed prescription drugs is an unlawful post-consumer sale that corrupts the medication's pedigree, which is supposed to record each distribution of a prescription drug after it has been sold by the manufacturer.  The pedigree plays an important role in protecting end users from the potential harm that might result from consuming counterfeit drugs or medication that has been tampered with or contaminated. Defendants undermine the pedigree of the PrEP medication they purchase from recruits, as the pedigree of this re-sold medication will not reflect Defendants' unlawful post-consumer sale when the medication is ultimately dispensed to its actual end user.

215.    To keep the cycle of fraud in motion, after recruits have been subjected to their "wellness checks" and return to the van, the Clinic Defendants' drivers offer recruits an additional $10 if they agree to be brought to another of Defendants' clinics and receive another "wellness check."  At the next clinic, Defendants will again prescribe medically unnecessary PrEP medication for these same recruits and submit additional fraudulent MAP enrollments to Gilead.

F.    **The Clinic Defendants Pay Recruits to Return to Their Clinics and Pick Up Additional Bottles of PrEP Medication That Have Been Dispensed**

216.    The Clinic and Pharmacy Defendants' practice is to regularly "dispense" refills to recruits and seek reimbursement from Gilead for the PrEP medication that has purportedly been

dispensed.  The Clinic and Pharmacy Defendants are able to do this without a recruit's direct involvement because, as alleged above, they retain the MAP card information for each recruit that they enroll.

217.    The Clinic, Prescriber, and Pharmacy Defendants follow this refill practice without regard to whether the recruit is actually taking the prescribed Gilead medication.  Indeed, the Clinic and Pharmacy Defendants will purport to "dispense" these refills and submit redemptions to Gilead even when recruits refuse to return to the Pharmacy Defendants' clinics to pick up their prescriptions.

218.    The Doctors United Whistleblower described this practice to Gilead in detail.  As she explained, the Clinic Defendants "keep doing the renewal" even for recruits who do not want PrEP medication and refuse to return to Defendants' clinics to pick up their prescriptions.

219.    Because many recruits are not returning to the Clinic Defendants' clinics to pick up the refills that have purportedly been dispensed, the Clinic and Pharmacy Defendants have amassed a stockpile of unused PrEP medication.  As the Doctors United whistleblower reported, her clinic had a "room full of medication that patients don't want."  Left with this cache of unused medication, the Clinic and Pharmacy Defendants dispense the excess to other recruits and fraudulently claim reimbursements for each such dispense—even though Gilead has already reimbursed these same bottles of PrEP medication—or sell the medications on the black market.

220.    To induce recruits to return to their clinics to pick up refills, the Clinic Defendants pay recruits an additional $10 or a similarly small amount each time they return to Defendants' clinics to pick up another bottle of PrEP medication.  The Clinic Defendants provide this

inducement to generate additional redemptions and to create the false appearance that recruits are actually taking the prescribed medication.

### G.   Defendants Discipline or Terminate Prescribers Who Are Unwilling to Improperly Prescribe PrEP Medication

221.   Recognizing that Defendants' schemes are illegal, fraudulent, and dangerous, a handful of Defendants' employees have tried to speak out against or complain to management about Defendants' practices.  Defendants have sought to silence them by disciplining or terminating employees who do not go along with the schemes.

222.   For example, the Doctors United Whistleblower reported that a nurse practitioner at Doctors United expressed her reluctance to prescribe PrEP medication to recruits who did not want it.  She told management that she was concerned that she might lose her license for improperly prescribing medication.

223.   In response, Defendant Augustine Carbon, Doctors United's President and CEO, summarily fired the nurse practitioner.

224.   In other instances, certain of the Clinic Defendants' prescribers have quit because of Defendants' business practices.  The Priority Health Whistleblower, for one, told Gilead that she quit in part because she knew the "Feds [were] going to come in sooner or later."

## VI.   Defendants Have Reaped Enormous Profits from Their Fraud

225.   Defendants go to these extraordinary lengths to identify recruits, prescribe and dispense them medically unnecessary PrEP medication, repurchase their medications, and redispense those medications to new recruits, because their fraudulent schemes are enormously lucrative.

73

226.     The primary reason why the schemes are so profitable is that Defendants pay significantly less to acquire PrEP medication than they are reimbursed by Gilead for purportedly dispensing PrEP to MAP enrollees.  Defendants acquire PrEP medication at a significantly reduced price by taking advantage of certain Clinic Defendants' participation in the 340B Program, which allows these Defendants to purchase PrEP medication at an amount far below the wholesale price.  In turn, however, Defendants obtain from Gilead reimbursement equal to the wholesale price each time they purport to dispense PrEP medication to a MAP enrollee.

227.     Issuing prescriptions to individuals who neither want nor need PrEP medication as a pretext to collect this profit is not just improper; it is also fraudulent and illegal.

228.     Indeed, because of the difference between the reimbursement Gilead pays to Defendants and the 340B price that Defendants pay to acquire PrEP medication, as well as the dispensing fee that the Pharmacy Defendants receive, ***Defendants make more than $1,000 for each bottle of PrEP medication that they purportedly dispense*** to a MAP enrollee.  Based on the significant amount of PrEP medication that the Clinic and Pharmacy Defendants have purportedly dispensed to individuals whom they have improperly enrolled in the MAP, Defendants have made at least ***$43 million in profits*** from their schemes since February 2018.

229.     And this measure of profits is just the beginning.  As alleged above, Defendants are securing even greater profits at Gilead's expense through their practice of repurchasing bottles of PrEP medication worth more than $1,800 from their recruits for just a few dollars, and then (i) redispensing those same bottles to other recruits, while claiming additional reimbursements from Gilead at the wholesale price; or (ii) reselling them to others on the black

market for amounts that substantially exceed the few dollars the Clinic Defendants pay to recruits to buy back PrEP medication.

### A.   The U.S. Government's 340B Drug Pricing Program

230.   Under the federal 340B Drug Pricing Program, drug manufacturers participating in Medicaid—such as Gilead—agree to make their drugs available at significantly reduced prices to covered entities enrolled in the 340B Program.  The program, which is administered by the U.S. Health Resources and Services Administration ("HRSA"), is designed to expand patient access to essential medication at reduced costs.[19]

231.   As alleged above, Defendants Allied Health, Continental Wellness, Doctors United, Florimed, and Positive Health are all registered 340B covered entities and, as such, are able to procure Gilead medications at significantly discounted 340B prices.  The Pharmacy Defendants are contract pharmacies for these Defendants.  By virtue of this relationship, Allied Health, Continental Wellness, Doctors United, Florimed, and Positive Health can all purchase PrEP medication and other prescription drugs from a wholesaler at the discounted 340B price for delivery to the Pharmacy Defendants,[20] which then dispense the medication to eligible 340B patients and collect any payments from an insurer or other third party that covers the cost of the patient's medication.

---

[19] 340B Drug Pricing Program, HRSA, https://www.hrsa.gov/opa/index.html (last reviewed Sept. 2020).

[20] Neither of the Pharmacy Defendants is registered as a contract pharmacy for the sole Continental Wellness clinic that is registered with the 340B Program.  However, as alleged above, Continental Wellness has been operating a clinic at the same address as a former 340B-registered Positive Health clinic for which United Pharmacy served as a contract pharmacy.  Continental Wellness operated the clinic at this location at the time when Positive Health registered the clinic as a 340B site.

232.     When the Pharmacy Defendants purportedly dispense PrEP medication to MAP enrollees recruited by the Clinic Defendants—whom the Clinic and Prescriber Defendants have represented have a bona bide need for the medication, and will be subject to constant medical supervision—Gilead pays those pharmacies a dispensing fee, and also reimburses the pharmacies for the purportedly dispensed PrEP medication at the wholesale price.

233.     The Pharmacy Defendants are able to retain the dispensing fee.  Under the 340B Program, they are supposed to remit the amount they were reimbursed for the medication to the 340B covered entity Defendants.

**B.     Defendants' Exploitation of the 340B Program to Reap Millions in Illicit Gains at Gilead's Expense**

234.     For each bottle of PrEP medication dispensed and reimbursed in the manner described above, Defendants secure a profit of more than $1,000.  This profit reflects (i) the difference between the reimbursement from Gilead and the discounted 340B price that the 340B covered entity Defendants pay to order PrEP medication for delivery to the Pharmacy Defendants, plus (ii) the dispensing fee Gilead pays to the Pharmacy Defendants.

### Defendants Capture Most of the Payment from Gilead as Profit After Subtracting Their Cost of Acquiring the PrEP Medication They Dispense



235.    As the Doctors United Whistleblower reported, this clinic–pharmacy relationship is the linchpin underlying Defendants' schemes to profit from improper enrollments, prescriptions, and redemptions, explaining: ***"Well this is how Doctors United makes their money, off the pharmacy."***

236.    In the period spanning February 2018 through mid-October 2020, Defendants have prescribed and purportedly dispensed tens of thousands of bottles of PrEP medication through the MAP.  In particular:

a.    Defendant Positive Health has bought 18,997 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

b.    Defendant Doctors United has bought 10,191 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

c.    Defendant Allied Health has bought 1,687 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

d.    Defendant Florimed has bought 766 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

e.    Defendant Continental Wellness has bought 717 bottles of PrEP medication at the discounted 340B price, which were then purportedly dispensed through the MAP.

237.    By leveraging the heavily discounted 340B acquisition price that they pay to acquire PrEP medication and fraudulently claiming reimbursements through the MAP, Defendants have corruptly amassed profits totaling ***more than $43 million***.

238.    In addition, Defendants have secured even greater profits from PrEP medication that they illegally repurchased from their recruits and then either (a) redispensed to other recruits in connection with a duplicative reimbursement claim to Gilead for that same bottle, or (b) sold on the black market.  The amount of these additional profits will be determined through discovery.

**VII.    Each Defendant Plays an Important Role in the Fraudulent Schemes**

239.    Each Defendant is indispensable to the fraudulent schemes and provides substantial assistance to the other Defendants in carrying out the fraud.

240.    The Clinic Defendants play several critical roles in Defendants' fraudulent schemes.  First, they identify recruits for enrollment in the MAP and submit fraudulent MAP enrollments on behalf of those recruits, thereby creating an ever-growing pool of MAP enrollees to whom the Pharmacy Defendants can purportedly dispense PrEP medication in exchange for reimbursements and fees from Gilead.  Second, the Clinic Defendants take advantage of their

78

participation in the 340B Program to purchase heavily discounted PrEP medication for the Pharmacy Defendants, which the Pharmacy Defendants can then purport to dispense to recruits and seek reimbursement from Gilead at the wholesale price.  Third, the Clinic Defendants and their affiliates purchase already-dispensed PrEP medication from recruits and either (i) return the medication to the Pharmacy Defendants to be illegally redispensed to other recruits in exchange for additional reimbursements from Gilead, or (ii) illegally sell the medication for profit on the black market.

241.    The Prescriber Defendants are also indispensable participants in Defendants' schemes.  They perform the sham "wellness checks" that serve as the Clinic Defendants' pretext for recruiting individuals who earn low incomes or are homeless to enroll in the MAP.  They also use their medical licenses and prescribing credentials to fraudulently enroll recruits in the MAP and improperly prescribe recruits prescriptions (and refills) for PrEP medication.

242.    The Lab Defendants provide substantial assistance to the Clinic Defendants in processing fraudulent MAP enrollments by providing blood testing services in connection with the "wellness checks" that are performed on recruits, which the Lab Defendants know are merely a pretext for fraudulently enrolling recruits in the MAP.  The Lab Defendants know that these blood tests are an essential precursor to enrollment in the MAP, as healthcare providers are required to determine that an individual is HIV negative before prescribing PrEP medication and enrolling that individual in the MAP.  The Lab Defendants are compensated by the other Defendants for the assistance they provide the Clinic and Prescriber Defendants in fraudulently enrolling recruits in the MAP.

243.    The Pharmacy Defendants similarly play a key role in carrying out the fraud.  In particular, they submit redemptions to Advancing Access® for purportedly dispensing PrEP medication to recruits whom they know the Clinic and Prescriber Defendants have fraudulently enrolled in the MAP, thereby securing fees and reimbursements from Gilead.  The Pharmacy Defendants distribute this ill-gotten revenue among the Defendants, thereby enabling all Defendants to profit from the fraud.  The proceeds secured by the Pharmacy Defendants are also used to expand Defendants' criminal operations, including by financing the opening of new clinics in Florida and elsewhere.  Moreover, as alleged further below, the Pharmacy Defendants also dispense unlawfully repackaged PrEP medication to recruits.

244.    As principals of, and by virtue of their control over, the entity Defendants, the Officer Defendants are personally involved in devising and carrying out Defendants' fraudulent scheme.  They have also used their authority to ensure that the entity Defendants' employees— including the Prescriber Defendants—carry out the fraudulent scheme, such as by establishing and enforcing policies and business practices that facilitate the fraud.

245.    Each Defendant's involvement in the fraudulent schemes is set forth in detail in Exhibit C hereto, and will be further developed through discovery.

## VIII.   The Financial Impact of Defendants' Fraud on Gilead

246.    The financial harm that Defendants have inflicted on Gilead exceeds even the tens of millions of dollars Defendants have stolen.  Gilead has also wrongfully been made to pay millions of dollars in administrative costs associated with Defendants' fraudulent prescriptions and purported dispensations of PrEP medication through the MAP.  Each fraudulent redemption

submitted by Defendants ultimately costs Gilead well over $2,000 per bottle of PrEP medication when these administrative fees are taken into account.

247.    In addition, as alleged above, the Clinic Defendants are also repurchasing dispensed PrEP medication from recruits and (a) sending it back to the Pharmacy Defendants to be unlawfully redispensed, or (b) unlawfully reselling it on the black market.  These practices cause Gilead substantial additional financial harm by displacing commercial stock of PrEP medication that would otherwise be purchased at market prices through authorized and lawful distribution channels.

## IX.    Defendants' Infringement of Gilead's Intellectual Property and Harm to Gilead's Goodwill

248.    In addition to the tens of millions of dollars in direct financial losses they have inflicted on Gilead, Defendants' schemes have also caused, and continue to cause, significant damage to Gilead's protected trademarks and goodwill.  Gilead therefore seeks to put an immediate and permanent stop to Defendants' sale and dispensation of diverted, altered, and misbranded PrEP medication.

249.    Gilead distributes its PrEP medication through a closely vetted and scrutinized set of authorized distributors.  Its products and distributors are subjected to rigorous, ongoing quality control measures that ensure PrEP medication remains in its FDA-approved packaging throughout its chain of distribution and use.  This ensures that consumers can rely on products bearing Gilead's name and trademarks to be safe and effective.

250.    Through these controls and monitoring, Gilead has sought to safeguard the reputation that its products have developed since Truvada® was first approved by the FDA in 2004 for HIV-1 treatment.  As a result of Gilead's extensive branding, marketing, sales, and

quality control efforts in the United States and around the world, consumers expect from Gilead products of the highest safety, reliability, and quality.

251.    As alleged above, a key component of Defendants' schemes includes dispensing unlawfully repackaged PrEP medication, bearing certain of the Gilead Marks, that is materially different from the PrEP medication that Gilead manufactures and intends for dispensing in the United States.  In particular, Defendants are dispensing PrEP medication that is misbranded because it has been removed from its FDA-required packaging, stripped of its FDA-required labeling and package insert, and exposed to suboptimal conditions, such as exposure to moisture and handling in a non-sterile environment by non-medical professionals.  As a result, Defendants are dispensing PrEP medication that, in numerous respects, does not comply with critical FDA regulations and causes confusion among consumers, who, based on Gilead's sterling reputation and product quality, expect the medication to be safe and reliable because it bears certain Gilead Marks.  Defendants thereby put PrEP medication recipients at risk, undermine Gilead's quality control, and tarnish Gilead's reputation and trademarks.  They also violate federal law, which makes it unlawful to possess, sell, or distribute misbranded drugs.  *See* 21 U.S.C. §§ 331, 333(a), 352, and 21 C.F.R. Part 201 and § 314.170.

252.    *First*, Defendants are dispensing PrEP tablets that have been repackaged in unauthorized bottles that pose a substantial risk to product quality and integrity.

253.    In particular, PrEP tablets are susceptible to hydrolytic degradation, which means they degrade in the presence of moisture.  Exposure to unexpected moisture, including by opening a bottle before final dispensation, can reduce the shelf life of PrEP tablets and render

82

them ineffective.  This concern is particularly acute with respect to PrEP tablets that are dispensed in regions with hot, humid climates, such as Florida.

254.    To minimize this risk of degradation, TRUVADA® and DESCOVY® are dispensed only in specially designed, FDA-approved containers that are engineered to reduce moisture intake.  The walls of TRUVADA® and DESCOVY® bottles are thicker than off-the-shelf pill bottles used by other suppliers, which prevents the transmission of moisture through the bottle itself.[21]  Each bottle also contains a silica gel desiccant canister or sachet that absorbs any unwanted moisture in the bottle.  In addition, the mouth of every authentic bottle is sealed with a polyethylene aluminum foil seal that is intended to remain in place until the moment the end user begins taking the medication.  The seal prevents premature degradation, and ensures that the bottle both has not been tampered with and contains the correct number of authentic PrEP tablets.  The bottle, desiccant, and seal all undergo stringent testing to make sure the medication is and will remain safe to use.

255.    Moreover, authentic PrEP bottles each have a cap that prevents children from opening the bottle and ingesting the tablets.  This cap is specially designed and tested by Gilead for its PrEP medication, and PrEP tablets may only be sold in bottles with this child-resistant cap.  These caps are also part of the FDA-approved container closure system.

256.    The PrEP tablets that Defendants are labeling and dispensing as TRUVADA® and DESCOVY®, however, have been removed from their authorized original containers, handled by

---

[21] Gilead also distributes DESCOVY® in an FDA-approved blister pack, which is not available through Gilead's free-drug programs.

unknown individuals, and placed in plain bottles that lack the protective container and lid features described above.

257.    **Second**, Defendants are dispensing PrEP tablets without FDA-required information, including warnings and instructions for use.

258.    In compliance with FDA regulations, Gilead packages its PrEP tablets with vital information on the bottle and in the package insert that accompanies each bottle. This ensures proper use by the recipient of PrEP medication.

259.    Each authentic bottle of PrEP medication has a label that provides unique, critical information for the intended recipient. These labels are required by and comply with FDA regulations. The bottle label sets forth the manufacturing lot number, expiration date, storage temperature limitations, and the number of tablets in the bottle and contents of each tablet.

260.    In further compliance with FDA requirements, and to ensure safe and proper use, Gilead provides printed instructions for use to recipients of PrEP medication by way of an instructional package insert that accompanies every bottle of PrEP tablets. Neither the FDA nor Gilead permits PrEP medication to be sold or dispensed without the accompanying FDA-approved package insert. Every individual prescribed PrEP medication must have the package insert to guide and inform him or her on the safe and effective use of the medication. The printed instructions provide the recipient with PrEP medication's indications for usage, side effects, and critical warnings. The instructions also inform the recipient how to take and store PrEP medication, what to do if the recipient takes too much, what precautions to take while taking the medication, and what the recipient should discuss with his or her healthcare provider before taking the medication.

261.     But Defendants are dispensing PrEP tablets—embossed with certain of the Gilead Marks—that have been removed from their FDA-approved and FDA-required packaging and therefore lack the FDA-mandated labeling and package insert.  By dispensing PrEP medication in bottles without any of the necessary labels or instructions for use, Defendants are depriving recipients of critical warnings and indications for use, which puts their health at risk.

262.     ***Third***, Defendants are dispensing bottles of PrEP medication without critical tracking information, which is essential in the event of a product recall.  This information includes the lot number and serialization number of the medication.

263.     Defendants' sale of PrEP medication without lot and serialization numbers undermines Gilead's quality control measures.  The failure to provide the consumer with the lot number interferes with and disrupts Gilead's ability to effectively track and recall products. Because recalled PrEP medication can pose significant risks to the health of consumers, the continued dispensing of PrEP medication without lot numbers and serialization numbers is detrimental to the public health and causes consumer confusion and injury to Gilead's reputation and its trademarks.

264.     ***Fourth***, Defendants are dispensing PrEP medication that has already been dispensed and handled by non-medical professionals.

265.     Because PrEP medication is a prescription drug, the FDA and Gilead both require that it be dispensed only pursuant to a legitimate prescription.  Gilead also requires that returned product or product that has already been dispensed to a consumer not be redispensed to another consumer.

85

266.     Defendants, however, do not follow these restrictions in connection with their schemes.  Instead, they purchase dispensed PrEP medication; repackage it in generic bottles that are not designed, tested, or approved for PrEP tablets; and redispense it to unsuspecting individuals without regard to the tablets' lot numbers or serialization numbers.

267.     In the course of Defendants' illegal buyback and redispensing operations, the PrEP tablets that Defendants resell and label as TRUVADA® and DESCOVY® are handled by numerous unknown individuals under uncontrolled conditions.  At a minimum, this includes recruits who are homeless; Defendants' van drivers and/or their associates who purchase dispensed PrEP medication from the recruits; and non-medical professionals handling individual tablets and repacking them in unauthorized bottles to be dispensed again.  Additionally, between the time when the Gilead medication was initially dispensed and the time it was repurchased, Defendants do not know who else handled the medication, how it was handled, whether it was tampered with, or how it was stored.

268.     Defendants' unlawful sale and dispensation of misbranded PrEP medication that is materially different from Gilead's authentic product has caused and will continue to cause Gilead to suffer substantial and irreparable injury, loss, and damage.

## X.     Defendants' Efforts to Circumvent Safeguards Implemented to Prevent Fraud and Abuse of the MAP

269.     Based on whistleblower reports and Gilead's own investigation of Defendants' fraud, Gilead has adopted numerous measures intended to stop Defendants' schemes, while at the same time ensuring that eligible MAP enrollees who have a bona fide need for PrEP medication are able to continue accessing their Gilead medication.

270.     However, there is growing evidence that Defendants are pivoting their operations and tactics in an attempt to overcome the safeguards that Gilead has implemented.  In many instances, it appears that Defendants have successfully deployed these new tactics to ensure that their fraudulent schemes remain profitable.

271.     As a result, Gilead is left with no choice but to file this lawsuit and seek judicial intervention to, among other things, prohibit Defendants and their affiliates from participating in the PAP and MAP.

**A.     Gilead Implements Measures to Stop Defendants' Fraud and Abuse**

272.     After uncovering evidence of Defendants' fraud, Gilead has taken the steps within its control in an attempt to curb Defendants' abuse of the MAP and separate fraudulent enrollments from legitimate enrollments.

273.     First, Advancing Access® program specialists attempted to contact PAP and MAP enrollees who had been prescribed Gilead medication at Defendants' clinics.  The purpose of this outreach was to perform additional validation checks and confirm that these PAP and MAP enrollees are real people who had a bona fide need for Gilead medication.  In most instances, however, the program specialists were not able to contact the enrollees in question.

274.     As a result, between May and September 2020 Gilead suspended approximately 10,800 PAP and MAP cards associated with individuals who had been enrolled by the Clinic and Prescriber Defendants.  These enrollees were eligible to have their cards reactivated, but only after contacting Gilead and going through additional validation checks.

275.     As part of this enhanced validation process, enrollees seeking to reactivate their cards were required to provide proof of identification and speak directly with an Advancing

Access® program specialist who would confirm with the enrollee that he or she wanted the medication that had been prescribed.

276.    Gilead expected that enrollees with a bona fide need for Gilead medication would contact Advancing Access® to reactivate their cards so they could continue receiving financial assistance to access Gilead therapies.  However, only about 1,400 of the 10,800 suspended cards (less than 13%) have been reactivated to date.  This strongly suggests that the overwhelming majority of these enrollees do not have a bona fide need for their prescribed Gilead medication and were improperly enrolled in the PAP and/or MAP.

277.    Second, Gilead also implemented enhanced validation checks for new PAP and MAP applicants being enrolled in the programs by healthcare providers known to be affiliated with Defendants.  As a result, these individuals could enroll in the PAP and MAP only if they provided Gilead with valid identification and spoke with an Advancing Access® program specialist who would verbally confirm the applicant's identity and whether he or she wanted to take the prescribed Gilead medication.

278.    Third, Gilead started blocking certain suspicious prescribers affiliated with Defendants—including the Prescriber Defendants—from enrolling new individuals in the PAP and MAP through the online enrollment portal.  The blocked prescribers associated with Defendants can now enroll an applicant in the PAP or MAP only by contacting the Advancing Access® call center, speaking to a program specialist, and meeting the enhanced validation checks.

**B.      Defendants Adopt New Tactics and Pivot Their Operations to Overcome the Safeguards Implemented by Gilead**

279.    Since these safeguards were implemented, Gilead has learned that Defendants have adopted a variety of new tactics to circumvent them.

280.    *First*, the Clinic Defendants have begun coaching recruits through the enhanced validation checks when they speak on the phone to Advancing Access® program specialists.

281.    For instance, the Recruit Whistleblower has reported observing employees of Defendant Positive Health coaching recruits, including by instructing recruits to tell the program specialists that they want to take PrEP medication and that they have not already been prescribed the medication by any other healthcare provider, even when one or both of those statements is not true.

282.    The Clinic Defendants' coaching practice also was starkly captured on a recorded October 16, 2020 telephone call to the Advancing Access® call center from an individual who identified herself as an employee of "A Better You Wellness Center of Allied Health."[22]  Over the course of the phone call, which lasted approximately three hours, the employee sought to validate the enrollments of seven different recruits.  Each time the employee was put on hold with Advancing Access®, she coached the recruits through the validation process by feeding them answers and writing down the correct responses.  While on hold, the recruits admitted to having no familiarity with PrEP medication, its intended use, or with the doctors who were purportedly prescribing them PrEP medication.

----

[22] As alleged above, the website for Defendant Allied Health expressly refers to Defendant Better You Wellness Center as an affiliate.

283.     *Second*, employees of the Clinic Defendants are falsely posing as MAP applicants on calls with Advancing Access® program specialists.

284.     The Priority Health Whistleblower observed this conduct at the clinic where she had worked.  As she told an Advancing Access® program specialist, "When I heard them get on the phone and act like they [were] the patient I was like, oh no, . . . this bad.  The Feds are coming in on that.  People go to jail behind that, that's fraud.  That's medical fraud."

285.     Defendant Priority Health used this tactic to enroll the Priority Health Whistleblower herself in the MAP without her knowledge or consent.

286.     *Third*, the Clinic Defendants have also sought to overcome the enhanced validation process by creating fake shelter identification cards for recruits.  In particular, Defendant Better You Wellness is taking pictures of recruits and then manufacturing identification cards for those recruits that falsely claim that Better You Wellness operates a "shelter."  Homeless shelter identification cards are one form of acceptable identification for recruits seeking to validate their MAP enrollment.  By forging these identification cards, Defendants have been able to fabricate applicants' proofs of identification needed for enrollment in the MAP.

287.     *Fourth,* after Gilead blocked certain high-volume prescribers, including many of the Prescriber Defendants, from enrolling individuals in the PAP and MAP through the online enrollment portal, Defendants began using new, unblocked prescribers to process large volumes of new MAP enrollments—even though the blocked prescribers ultimately write those new enrollees' prescriptions for PrEP medication.

288.     For instance, Defendant Alexander Evans, a prescriber for Defendant Allied Health, *enrolled 1,177 individuals in the MAP* between May 2020 (when Gilead first began blocking high-volume prescribers, not including Evans, associated with the Clinic Defendants) and August 2020 (when Evans himself was blocked from enrolling individuals in the PAP and MAP through the online portal).  This sudden spike in enrollments was remarkable, as Evans had enrolled only 157 individuals in the MAP in the sixteen months preceding May 2020.  And after Evans was blocked from enrolling individuals through the online portal, his enrollment figures plummeted, with only nine enrollments processed in September 2020.[23]

289.     Despite enrolling more than 1,000 individuals in the MAP through Allied Health, Dr. Evans has never written a single prescription for PrEP medication dispensed to any of those enrollees.  Instead, the prescriptions have been written by *dozens* of different prescribers.  These prescribers, who include several of the Prescriber Defendants and other prescribers who were blocked from enrolling new applicants in the MAP through the online portal, were affiliated with Clinic Defendants Doctors United, Positive Health, Alliance Medical, Baikal Marketing, Continental Wellness, and Priority Health.

290.     This practice is not only an improper circumvention tactic; it is also a direct violation of the certifications the listed prescriber makes in connection with each MAP enrollment.  To enroll someone in the MAP, the enrolling prescriber must expressly certify that he or she has supervised the enrollee's treatments; has confirmed that the medication is medically necessary for the enrollee; that the medication will be used as directed; and that he or she will periodically verify the enrollee's continued use of PrEP medication.  If the prescriber

---

[23] These enrollments were processed outside of the online portal.

who makes these certifications is not himself or herself the physician writing prescriptions to the enrolled individuals, then these certifications are necessarily false: the certifying physician has <u>not</u> supervised their treatments, has <u>not</u> confirmed that the medication is medically necessary for the enrollee or that it will be used as directed, and will <u>not</u> periodically verify the continued use of Gilead medication.  Gilead is defrauded every time an enrollment and related redemptions are premised on these false certifications.

291.    ***Fifth***, Defendants who have attracted scrutiny from Gilead appear to have shifted their enrollment activity to other Defendants.  For example, after Gilead took steps to restrict certain prescribers associated with Defendant Doctors United from enrolling individuals in the PAP and MAP through the online portal, the volume of enrollments from Allied Health skyrocketed, largely due to the enrollments processed by Defendant Alexander Evans.



PAP and MAP Enrollments February-July 2020

292.    Defendants' brazen attempts to evade Gilead's countermeasures make clear that

Gilead cannot stop Defendants' fraudulent schemes on its own.  Accordingly, Gilead seeks an

injunction to exclude Defendants from further participation in the PAP and MAP, halt their

dispensing of materially different and misbranded PrEP medication, and put an end to their practice of illegally diverting Gilead medication.

**XI.     Halting Defendants' Wrongful Conduct Is Vital to the Public Interest**

293.    Beyond causing harm to Gilead, Defendants' schemes jeopardize the public health every day they are allowed to continue.

294.    *First*, the fraud perpetrated by Defendants significantly undermines the integrity of the MAP and wrongly takes resources from a charitable program operated by Gilead in an effort to expand access to life-saving medication and stop the spread of HIV.  In doing so, Defendants divert resources and medication away from uninsured low-income Americans who are actually in need of PrEP medication to prevent HIV infection, thereby exacerbating the spread of HIV nationwide.

295.    *Second*, to the extent the Clinic and Prescriber Defendants are actually enrolling individuals in the MAP who have a bona fide need for PrEP, Defendants' repurchasing schemes deprive those individuals of crucial medication that would otherwise protect them against contracting HIV.  Accordingly, Defendants' schemes increase the risk of the spread of HIV in these individuals' Florida communities.

296.    *Third*, the Clinic and Pharmacy Defendants' practice of dispensing misbranded PrEP medication threatens the safety of those individuals who actually end up taking that medication.  The Clinic and Pharmacy Defendants' practice increases the likelihood that the end user will consume tablets that have been degraded by moisture, and their practice of dispensing PrEP medication without FDA-required labeling and package inserts increases the likelihood of improper use and adverse side effects.

297.    ***Fourth***, the Clinic and Prescriber Defendants are prescribing PrEP medication in a manner that is potentially unsafe.  As evidenced by the fraudulent multi-fill prescribing patterns described above, the Clinic and Prescriber Defendants are simultaneously prescribing individuals both TRUVADA® and DESCOVY® in an effort to maximize their redemptions. However, taking both medications simultaneously will cause an individual to exceed the FDA-recommended daily dosage of tenofovir, which can cause life-threatening side effects.  In addition, Advancing Access® data indicates that the Clinic and Prescriber Defendants are prescribing DESCOVY® to cisgender females, even though the FDA-approved indication for DESCOVY for PrEP® specifically excludes individuals at risk of HIV from receptive vaginal sex since effectiveness in this population has not been evaluated.

298.    Putting an immediate stop to Defendants' schemes is particularly important given the evidence that Defendants are aggressively expanding their operations in Florida and increasing the scope of their fraud by seeking to open clinics in other states.  Indeed, the Positive Health website currently announces that Positive Health will soon be expanding to new locations in Florida and Georgia.  If left unchecked, Defendants' schemes, and the harm they inflict on Gilead and on Florida communities and the nation, will only grow.

## FIRST CLAIM FOR RELIEF

### Common Law Fraud
### (Against the Clinic Defendants, Pharmacy Defendants, and Prescriber Defendants)

299.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

300.    The Clinic Defendants, Pharmacy Defendants, and Prescriber Defendants have knowingly and intentionally made and caused to be made thousands of false statements of material fact from February 2018 to the present.

301.    In connection with thousands of MAP enrollments, the Clinic and Prescriber Defendants have knowingly and intentionally submitted and caused to be submitted false certifications, including that (i) the prescribed PrEP medication is for the applicant, (ii) the prescribed medication is medically necessary for the applicant, (iii) the prescribed medication will be used by the applicant as directed, (iv) the prescriber will be supervising the applicant's use of PrEP medication, and (v) the prescriber will periodically verify continued use of Gilead medication

302.    The Clinic Defendants' employees have knowingly, intentionally, and falsely represented themselves to be MAP applicants on calls with Gilead agents to enroll other persons in the MAP.

303.    The Clinic Defendants' employees have knowingly, intentionally, and falsely forged the signatures of prescribers and recruits on MAP applications that were submitted to Gilead.

304.    The Pharmacy Defendants have knowingly, intentionally, and falsely submitted claims for reimbursement to Gilead agents for purportedly dispensing PrEP medication to MAP

96

enrollees who have not actually received the dispensed medication. In submitting those claims for reimbursement to Gilead's agents, the Pharmacy Defendants have falsely implied that they have in fact dispensed PrEP medication to the MAP enrollee in question.

305. The Pharmacy Defendants have also knowingly, intentionally, and falsely submitted claims for reimbursement to Gilead agents for purportedly dispensing PrEP medication to individuals whom the Pharmacy Defendants knew had been fraudulently enrolled in the MAP by the Clinic Defendants and without disclosing that fact to Gilead. The omission of these material facts, which the Pharmacy Defendants had a duty to disclose and which Gilead had a right to know, was tantamount to supplying false information, because the affirmative submission of a claim for reimbursement through the MAP implies that the prescription was in fact dispensed to a legitimate enrollee consistent with the initial certifications accompanying enrollment.

306. The Clinic, Pharmacy, and Prescriber Defendants knew that their statements to Gilead's agents were false at the time they were made, and knew that their failure to disclose those false statements to Gilead was material to Gilead.

307. The Clinic, Pharmacy, and Prescriber Defendants further made those false statements and omissions with the intent of defrauding Gilead. Specifically, the Clinic, Pharmacy, and Prescriber Defendants made or caused others to make these false representations and omissions to profit from the reimbursement amounts that Gilead pays for PrEP medication that is purportedly dispensed to MAP enrollees.

308.    The Clinic, Pharmacy, and Prescriber Defendants made or caused others to make these false statements and omissions for the purpose of inducing Gilead to act in reliance thereon.

309.    Gilead and its agents justifiably and reasonably relied on the Clinic, Pharmacy, and Prescriber Defendants' false statements and omissions to Gilead's detriment.  Specifically, as a direct and proximate result of the false statements and omissions of the Clinic and Prescriber Defendants, Gilead's agents approved or reinstated the enrollment of thousands of individuals who did not in fact satisfy eligibility criteria for participation in the MAP.  In turn, as a direct and proximate result of the false statements and omissions of the Pharmacy Defendants, Gilead paid reimbursements totaling tens of millions of dollars for tens of thousands of bottles of Gilead PrEP medication purportedly dispensed to individuals fraudulently enrolled in the MAP, in addition to millions of dollars in associated administrative fees.

310.    The Clinic, Pharmacy, and Prescriber Defendants' fraud was gross, oppressive, and malicious, and as a result of these Defendants' conduct, Gilead was injured in an amount to be determined at trial.

311.    Furthermore, Gilead continues to be injured by the Clinic, Pharmacy, and Prescriber Defendants' fraudulent conduct, which continues to cause irreparable and monetary harm to Gilead to this day.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Fraud
### (Against the Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants)

312.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

313.    As described in Paragraphs 1 through 247, 269 through 298, and Exhibit C, the Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants knowingly and intentionally defrauded Gilead.  Each of these Defendants had actual knowledge of the fraudulent scheme and actively and substantially assisted it.

314.    Each Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendant intentionally provided substantial assistance to the other Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants in advancing the fraud against Gilead.

315.    The Doctors United Clinic Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least three ways.  First, the Doctors United Clinic Defendants made thousands of false statements of material fact to enroll individuals in the MAP, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  These false statements of material fact included forging the signatures of prescribers and recruits on MAP applications that were submitted to Gilead. Second, Defendants Doctors United, Allied Health, and Florimed took advantage of their participation in the 340B Program to secure heavily discounted PrEP medication for Defendant Physician Preferred, which allowed Defendant Physician Preferred to dispense discounted PrEP

99

medication to MAP enrollees that was reimbursed at the wholesale price.  Third, to fund the operations and expansion of the fraudulent scheme, employees and affiliates of the Doctors United Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to Defendant Physician Preferred to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market.

316.    The Doctors United Prescriber Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least two ways.  First, they performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  Second, they made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

317.    Defendant Testing Matters knowingly and intentionally provided substantial assistance to the fraudulent scheme by providing blood testing services in connection with the sham "wellness checks" the Doctors United Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP.  The Doctors United Clinic and Prescriber Defendants could not have fraudulently

100

enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

318.    Defendant Physician Preferred provided substantial assistance to the fraudulent scheme by submitting thousands of fraudulent redemptions to Gilead's agents and wrongfully obtaining fees and reimbursement for PrEP medication Defendant Physician Preferred purportedly dispensed to recruits whom the Doctors United Clinic and Prescriber Defendants had fraudulently enrolled in the MAP.  As a contract pharmacy for Defendants Doctors United, Allied Health, and Florimed, Defendant Physician Preferred remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendants Doctors United, Allied Health, and Florimed.  These reimbursements, as well as the dispensing fees paid to Defendant Physician Preferred, were shared among the Doctors United Defendants to ensure that each Doctors United Defendant profited from the fraud and to fund the expansion of the Doctors United Defendants' criminal operation.

319.    The Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants substantially assisted the fraudulent scheme by knowingly and intentionally concealing it from Gilead and Gilead's agents.  Moreover, the Doctors United Clinic Defendants knowingly and intentionally implemented countermeasures to circumvent safeguards that Gilead implemented to stop the fraudulent activity.

320.    The Doctors United Defendants could not have perpetrated and expanded their fraud without the substantial and material assistance of each other Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant.  Each Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant benefitted from the success of the fraud.

101

321.     As a result of the conduct of the Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

### **THIRD CLAIM FOR RELIEF**

**Aiding and Abetting Fraud**
**(Against the Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants)**

322.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

323.     As described in Paragraphs 1 through 247, 269 through 298, and Exhibit C, the Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants knowingly and intentionally defrauded Gilead.  Each of these Defendants had actual knowledge of the fraudulent scheme and actively and substantially assisted it.

324.     Each Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendant intentionally provided substantial assistance to the other Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants in advancing the fraud against Gilead.

325.     The Positive Health Clinic Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least three ways.  First, the Positive Health Clinic Defendants made thousands of false statements of material fact to enroll individuals in the MAP, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  These false statements of material fact included forging the signatures of prescribers and recruits on MAP applications that were submitted to Gilead.

Second, Defendant Positive Health took advantage of its participation in the 340B Program to secure heavily discounted PrEP medication for Defendant United Pharmacy, which allowed Defendant United Pharmacy to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price. Third, to fund the operations and expansion of the fraudulent scheme, employees and affiliates of the Positive Health Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to Defendant United Pharmacy to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market.

326.    The Positive Health Prescriber Defendants knowingly and intentionally provided substantial assistance to the fraudulent scheme in at least two ways. First, they performed sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for recruiting individuals to enroll in the MAP. Second, they made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

327.    Defendants Labs4Less and United Labs knowingly and intentionally provided substantial assistance to the fraudulent scheme by providing blood testing services in connection with the sham "wellness checks" the Positive Health Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendants Labs4Less and United Labs performed blood tests to determine whether recruits were HIV negative, which the Positive Health Clinic and Prescriber Defendants were required to assess before enrolling

103

each recruit in the MAP.  The Positive Health Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

328.    Defendant United Pharmacy provided substantial assistance to the fraudulent scheme by submitting thousands of fraudulent redemptions to Gilead's agents and wrongfully obtaining fees and reimbursement for PrEP medication Defendant United Pharmacy purportedly dispensed to recruits whom the Positive Health Clinic and Prescriber Defendants fraudulently enrolled in the MAP.  As a contract pharmacy for Defendant Positive Health, Defendant United Pharmacy remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendant Positive Health.  These reimbursements, as well as the dispensing fees paid to Defendant United Pharmacy, were shared among the Positive Health Defendants to ensure that each Positive Health Defendant profited from the fraud and to fund the expansion of the Positive Health Defendants' criminal operation.

329.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants substantially assisted the fraudulent scheme by knowingly and intentionally concealing it from Gilead and Gilead's agents.  Moreover, the Positive Health Clinic Defendants knowingly and intentionally implemented countermeasures to circumvent safeguards that Gilead implemented to stop the fraudulent activity.

330.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants could not have perpetrated and expanded their fraud without the substantial and material assistance of each other Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant.  Each Positive Health Defendant benefitted from the success of the fraud.

104

331.     As a result of the conduct of the Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

**Civil Conspiracy to Commit Fraud**
**(Against the Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants)**

332.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

333.     The Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to defraud Gilead.  Each Doctors United Prescriber, Clinic, Lab, and Pharmacy Defendant played an indispensable role in carrying out the fraudulent scheme.

334.     The Doctors United Clinic Defendants recruited individuals who earn low incomes or are homeless to fraudulently enroll them in the MAP, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  Defendants Doctors United, Allied Health, and Florimed also took advantage of their participation in the 340B Program to secure heavily discounted PrEP medication for Defendant Physician Preferred, which allowed Defendant Physician Preferred to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price.  Furthermore, the Doctors United Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to

Defendant Physician Preferred to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market.  This was done to fund the operations and expansion of the fraudulent scheme.

335.    The Doctors United Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

336.    Defendant Testing Matters knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Doctors United Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP.  The Doctors United Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

337.    Defendant Physician Preferred submitted thousands of fraudulent redemptions to Gilead's agents and wrongfully obtained fees and reimbursement for PrEP medication Defendant Physician Preferred purportedly dispensed to recruits whom the Doctors United Clinic and Prescriber Defendants fraudulently enrolled in the MAP.  As a contract pharmacy for Defendants

Doctors United, Allied Health, and Florimed, Defendant Physician Preferred remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendants Doctors United, Allied Health, and Florimed.  These reimbursements, as well as the dispensing fees paid to Defendant Physician Preferred, were shared among the Doctors United Defendants to ensure that each Doctors United Defendant profited from the fraud and to fund the expansion of the Doctors United Defendants' criminal operation.

338.    Each Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

339.    Gilead and its agents justifiably and reasonably relied on the Doctors United Clinic, Prescriber, and Pharmacy Defendants' underlying misrepresentations to their detriment.

340.    As a result of the conduct of the Doctors United Clinic, Prescriber, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Civil Conspiracy to Commit Fraud
### (Against the Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants)

341.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 247, 269 through 298, and Exhibit C as if set forth fully herein.

342.    The Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to

defraud Gilead.  Each Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant played an indispensable role in carrying out the fraudulent scheme.

343.    The Positive Health Clinic Defendants recruited individuals who earn low incomes or are homeless to fraudulently enroll them in the MAP, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.  Defendant Positive Health also took advantage of its participation in the 340B Program to secure heavily discounted PrEP medication for Defendant United Pharmacy, which allowed Defendant United Pharmacy to dispense discounted PrEP medication to MAP enrollees that was reimbursed at the wholesale price.  Furthermore, the Positive Health Clinic Defendants purchased already-dispensed PrEP medication from MAP enrollees at a fraction of the wholesale price, and then either returned the medication to the Defendant United Pharmacy to be redispensed to other MAP enrollees for greater profit, or sold it to others on the black market. This was done to fund the operations and expansion of the fraudulent scheme.

344.    The Positive Health Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements from Gilead for purportedly dispensing PrEP medication to those MAP enrollees.

108

345.    Defendants Labs4Less and United Labs knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Positive Health Clinic and Prescriber Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendants Labs4Less and United Labs performed blood tests to determine whether recruits were HIV negative, which the Positive Health Clinic and Prescriber Defendants were required to assess before enrolling each recruit in the MAP.  The Positive Health Clinic and Prescriber Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

346.    Defendant United Pharmacy submitted thousands of fraudulent redemptions to Gilead's agents and wrongfully obtained fees and reimbursement for PrEP medication Defendant United Pharmacy purportedly dispensed to recruits whom the Positive Health Clinic and Prescriber Defendants fraudulently enrolled in the MAP.  As a contract pharmacy for Defendant Positive Health, Defendant United Pharmacy remitted the reimbursements Gilead paid in connection with the fraudulent redemptions to Defendant Positive Health.  These reimbursements, as well as the dispensing fees paid to Defendant United Pharmacy, were shared among the Positive Health Defendants to ensure that each Positive Health Defendant profited from the fraud and to fund the expansion of the Positive Health Defendants' criminal operation.

347.    Each Positive Health Clinic, Prescriber, Lab, and Pharmacy Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

348.    Gilead and its agents justifiably and reasonably relied on the Positive Health Clinic, Prescriber, and Pharmacy Defendants' underlying misrepresentations to their detriment.

349.    As a result of the conduct of the Positive Health Prescriber, Clinic, Lab, and Pharmacy Defendants, Gilead has suffered significant injury in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

**Florida Deceptive and Unfair Trade Practices Act**
**(Against the Clinic, Prescriber, Pharmacy, and Lab Defendants)**

350.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

351.    The Clinic, Prescriber, Pharmacy, and Lab Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 502.201 *et seq*.

352.    The practices in which Clinic, Prescriber, Pharmacy, and Lab Defendants have engaged include the following *per se* unfair and deceptive acts:

    (a) offering and/or paying a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, to induce the referral of patients to or patronage to or from a health care provider or health care facility, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(a);

    (b) soliciting and/or receiving a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in return for referring a patient to or patronage to or from a health care provider, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(b); and

(c) aiding, abetting, advising or otherwise participating in the conduct identified in subparagraphs (a) and (b) above, in violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505(1)(c);

(d) offering, paying, soliciting, and/or receiving a kickback, directly or indirectly, for referring and/or soliciting patients, in violation of Florida's Anti-Kickback Statute, Fla. Stat. § 456.054(2);

(e) knowingly writing false prescriptions and holding out such false prescriptions as true, in violation of Florida Statute § 831.30.

(f) knowingly dispensing medication pursuant to prescriptions that are not based upon a valid practitioner-patient relationship and/or that are intended for third parties, in violation of Florida Statute § 465.016(s) and Florida Administrative Code 64B16-27.1001(4);

(g) dispensing medication without interpreting and assessing the prescription order for potential adverse reactions, interactions, and dosage regimen, in violation of Florida Statute § 465.003(6)

353. The Clinic, Pharmacy, and Lab Defendants have engaged in the aforementioned *per se* unfair and deceptive acts by, among other things, (a) providing financial or other compensation to recruits to induce them to enroll (and recruit others to enroll) in the MAP and return to clinics operated by Defendants to pick up refills of PrEP medication, and (b) sharing the proceeds from fraudulent Gilead PrEP prescriptions and MAP redemptions among the Defendants in exchange for each Clinic, Prescriber, Pharmacy, and Lab Defendant's assistance in facilitating the fraudulent schemes.

111

354.    The Clinic, Prescriber, and Pharmacy Defendants have also engaged in *per se* unfair and deceptive acts by, among other things, (a) writing and holding out as true fraudulent prescriptions for PrEP medication; (b) dispensing PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties; and (c) failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication.

355.    Moreover, the Clinic, Prescriber, Pharmacy, and Lab Defendants have engaged in *per se* unfair and deceptive acts by, among other things, aiding, abetting, advising or otherwise participating in the conduct referenced in the preceding two paragraphs.

356.    In addition, the Clinic and Pharmacy Defendants have also engaged in unfair and deceptive acts by unlawfully repurchasing, reselling, offering for resale, and/or distributing low-quality, potentially dangerous, diverted PrEP medication bearing the Gilead Marks and Trade Dress.

357.    Furthermore, the Clinic and Prescriber Defendants have engaged in unfair and deceptive acts by forging the signatures of recruits on MAP enrollment forms to allow the release of protected information under HIPAA, and forging identification cards for recruits to enable their enrollment in the MAP.

358.    The Clinic, Prescriber, Pharmacy, and Lab Defendants' conduct described herein is deceptive to ordinary members of the public, unfair, and harmful to the public interest.  The conduct is also contrary to Florida public policy and is unconscionable, immoral, unethical, oppressive, and unscrupulous. This conduct cannot be avoided by Gilead and produces no benefits to consumers or competition.

359.     As a direct and proximate result of the Clinic, Prescriber, Pharmacy, and Lab Defendants' deceptive and unfair practices, Gilead was aggrieved and suffered and continues to suffer actual damages.

360.     In addition, as a direct and proximate result of the Clinic and Pharmacy Defendants' deceptive and unfair practices, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and to its public and industry reputation.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

361.     Gilead has no adequate remedy at law that will compensate it for the continued and irreparable harm it will suffer if the Clinic, Prescriber, Pharmacy, and Lab Defendants' deceptive and unfair practices are allowed to continue.

362.     Because of the Clinic, Prescriber, Pharmacy, and Lab Defendants' unfair and deceptive conduct, Gilead is entitled to an award of attorney's fees and costs pursuant to Fla. Stat. § 501.2105(1).

**SEVENTH CLAIM FOR RELIEF**

**Civil Conspiracy to Violate FDUTPA**
**(Against the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants)**

363.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

364.     The Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate FDUTPA through several deceptive and unfair acts.  Each Doctors United Clinic,

Prescriber, Pharmacy, and Lab Defendant played an indispensable role in carrying out the unlawful conspiracy.

365.    The Doctors United Clinic Defendants unlawfully induced recruits to subject themselves to "wellness checks," enroll in the MAP, and return to Doctors United clinics to obtain unwanted refills of PrEP medication by offering and giving them various incentives, including money, gift cards, food, and cigarettes.  That conduct, which violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(a), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), is *per se* unlawful under FDUTPA.

366.    Furthermore, the Doctors United Clinic Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation Fla. Stat. § 831.30, which is also *per se* unlawful under FDUTPA.

367.    The Doctors United Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Doctors United Clinic Defendants' pretext for recruiting individuals to enroll in the MAP.  They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling the Defendant Physician Preferred to submit fraudulent redemptions to Gilead's agents and receive reimbursements and fees from Gilead for purportedly dispensing PrEP medication to those MAP enrollees, with those proceeds being shared among the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants in exchange for each their assistance in facilitating the scheme.  Furthermore, the Doctors United Prescriber Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation of Fla. Stat. § 831.30.  These acts are *per se* unlawful under FDUTPA.

114

368.     Defendant Testing Matters knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Doctors United Clinic Defendants performed on recruits as a pretext for enrolling recruits in the MAP.  In particular, Defendant Testing Matters performed blood tests to determine whether recruits were HIV negative, which the Doctors United Clinic Defendants were required to assess before enrolling each recruit in the MAP.  The Doctors United Clinic Defendants could not have fraudulently enrolled recruits in the MAP without the substantial assistance that Defendant Testing Matters knowingly provided.

369.     After fraudulently enrolling recruits in the MAP, the Doctors United Clinic Defendants referred the recruits' prescriptions to Defendant Physician Preferred for filling. Defendant Physician Preferred then filled the referred prescriptions, claimed fraudulent MAP reimbursements and dispensing fees from Gilead, and ultimately shared the proceeds of with the other Doctors United Defendants.  This conduct, which required cooperation and coordination among the Doctors United Defendants, violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(b), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), rendering it *per se* unlawful under FDUTPA as well.  In addition, Defendant Physician Preferred dispensed PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties, in violation of Fla. Stat. § 465.016(s) and Fla. Admin. Code 64B16-27.1001(4); and knowingly failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication, in violation of Fla. Stat. § 465.003(6).  All of these acts are *per se* unlawful under FDUTPA.

370.     Moreover, as alleged in Paragraphs 248 through 268, the Doctors United Clinic and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired,

confederated, and agreed together to violate Gilead's rights under the Lanham Act.  Violation of the Lanham Act is unlawful under FDUTPA as well.

371.    Each Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

372.    As a result of the Doctors United Clinic, Prescriber, Pharmacy, and Lab Defendants' conspiracy to violate FDUTPA, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Civil Conspiracy to Violate FDUTPA
### (Against the Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants)

373.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

374.    The Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate FDUTPA through several deceptive and unfair acts.  Each Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendant played an indispensable role in carrying out the unlawful conspiracy.

375.    The Positive Health Clinic Defendants unlawfully induced recruits to subject themselves to "wellness checks," enroll in the MAP, and return to Positive Health clinics to obtain unwanted refills of PrEP medication by offering and giving them various incentives, including money, gift cards, food, and cigarettes.  That conduct, which violates the Patient

116

Brokering Act, Fla. Stat. § 817.505(1)(a), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), is *per se* unlawful under FDUTPA. Furthermore, the Positive Health Clinic Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation of Fla. Stat. § 831.30, which is also *per se* unlawful under FDUTPA.

376. The Positive Health Prescriber Defendants knowingly and intentionally performed sham "wellness checks" that served as the Positive Health Clinic Defendants' pretext for recruiting individuals to enroll in the MAP. They also made false statements of material fact to enroll individuals in the MAP and improperly prescribed those individuals prescriptions (and refills) for PrEP medication, thereby enabling the Defendant United Pharmacy to submit fraudulent redemptions to Gilead's agents and receive reimbursements and fees from Gilead for purportedly dispensing PrEP medication to those MAP enrollees, with those proceeds being shared among the Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendants in exchange for each their assistance in facilitating the scheme. Furthermore, the Positive Health Prescriber Defendants knowingly and unlawfully wrote fraudulent prescriptions and held them out as true, in violation of Florida Statute § 831.30. These acts are *per se* unlawful under FDUTPA.

377. Defendants Labs4Less and United Labs knowingly and intentionally provided blood testing services in connection with the sham "wellness checks" the Positive Health Clinic Defendants performed on recruits as a pretext for enrolling recruits in the MAP. In particular, Defendants Labs4Less and United Labs performed blood tests to determine whether recruits were HIV negative, which the Positive Health Clinic Defendants were required to assess before enrolling each recruit in the MAP. The Positive Health Clinic Defendants could not have

fraudulently enrolled recruits in the MAP without the substantial assistance that Defendants Labs4Less and United Labs knowingly provided.

378.     After fraudulently enrolling recruits in the MAP, the Positive Health Clinic Defendants referred the recruits' prescriptions to Defendant United Pharmacy for filling. Defendant United Pharmacy then filled the referred prescriptions, claimed fraudulent MAP reimbursements and fees from Gilead, and ultimately shared the proceeds with the other Positive Health Defendants.  This conduct, which required cooperation and coordination among the Positive Health Defendants, violates the Patient Brokering Act, Fla. Stat. § 817.505(1)(b), and the Anti-Kickback Statute, Fla. Stat. § 456.054(2), rendering it *per se* unlawful under FDUTPA as well.  In addition, Defendant United Pharmacy unlawfully dispensed PrEP medication pursuant to prescriptions known to be invalid, medically unnecessary, and/or intended for third parties, in violation of Fla. Stat. § 465.016(s) and Fla. Admin. Code 64B16-27.1001(4); and knowingly failing to assess prescription orders for potential adverse reactions and reactions before dispensing PrEP medication, in violation of Fla. Stat. § 465.003(6). All of these acts are *per se* unlawful under FDUTPA.

379.     Moreover, as alleged in Paragraphs 248 through 268, the Positive Health Clinic and Pharmacy Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate Gilead's rights under the Lanham Act.  Violation of the Lanham Act is unlawful under FDUTPA as well.

380.     Each Positive Health Clinic, Prescriber, Pharmacy, and Lab Defendant committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

118

381.     As a result of the Positive Health Clinic, Prescriber, Pharmacy, and Lab

Defendants' conspiracy to violate FDUTPA, Gilead has suffered and continues to suffer

significant injury in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### Federal Trademark Infringement (15 U.S.C. § 1114(1)(a))
### (Against the Clinic and Pharmacy Defendants)

382.     Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through

298 and Exhibit C as if set forth fully herein.

383.     In violation of 15 U.S.C. § 1114(1)(a), the Clinic and Pharmacy Defendants,

independently and in conspiracy with one another, used in commerce, without Gilead's consent,

either a reproduction, counterfeit, copy, or colorable imitation of the Gilead Marks and Trade

Dress in connection with the sale, offering for sale, distribution, or advertising of diverted and/or

altered PrEP medication that is materially different from authentic PrEP medication authorized

for sale by Gilead in the United States.

384.      This materially different PrEP medication is not subject to and subverts Gilead's

quality-control measures.

385.     The Clinic and Pharmacy Defendants' use and sale of PrEP medication bearing

certain of Gilead's Marks and Trade Dress, which is materially different from authentic PrEP

medication, and/or that is not subject to Gilead's quality control measures, is likely to cause

confusion, or to cause mistake, or to deceive.

386.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of

Gilead's exclusive rights in the Gilead Marks and Trade Dress.

119

387.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

388.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their consumer and industry reputation.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

389.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

390.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## TENTH CLAIM FOR RELIEF

### Federal Trademark Infringement (15 U.S.C. § 1114(1)(b))
### (Against the Clinic and Pharmacy Defendants)

391.     Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

392.     In violation of 15 U.S.C. § 1114(1)(b), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, reproduced, counterfeited, copied, or colorably imitated the registered Gilead Marks and Trade Dress belonging to Gilead and applied such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles, or advertisements intended to be used in commerce upon or in connection

120

with the sale, offering for sale, distribution, or advertising of diverted PrEP medication that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States.

393.   This materially different PrEP medication, which bears certain of Gilead's Marks and Trade Dress, is not subject to and subverts Gilead's quality-control measures.

394.   The Clinic and Pharmacy Defendants' use and sale of PrEP medication that is materially different from authentic PrEP medication, and/or that is not subject to Gilead's quality control measures, is likely to cause confusion, or to cause mistake, or to deceive.

395.   The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

396.   Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

397.   As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and to their reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

398.   Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

399.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

### ELEVENTH CLAIM FOR RELIEF

**False Description and Designation of Origin in Commerce
(Against the Clinic and Pharmacy Defendants)**

400.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

401.    In violation of 15 U.S.C. § 1125(a)(1)(A), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, in connection with the dispensing, repurchase, and sale of diverted PrEP medication that is materially different from authentic Gilead products authorized for sale by Gilead in the United States and that is not subject to and subverts Gilead's quality-control measures, used in commerce a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which was or is likely to cause confusion or to cause mistake, or to deceive as to an affiliation, connection, or association with Gilead.

402.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

403.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

404.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their

reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

405.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

406.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress.

## <u>TWELFTH CLAIM FOR RELIEF</u>

**Federal False Advertising**
**(Against the Clinic and Pharmacy Defendants)**

407.    Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

408.    In violation of 15 U.S.C. § 1125(a)(1)(B), the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, in connection with the dispensation and sale of diverted PrEP medication that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States and that is not subject to and subverts Gilead's quality-control measures, used a slogan, trade dress, word, term, name, symbol, or device, or any combination thereof, or a false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, and qualities of PrEP medication that is materially different from authentic PrEP medication.

123

409.     The Clinic and Pharmacy Defendants advertised, marketed, and promoted diverted PrEP medication, which bears certain of Gilead's Marks and Trade Dress, that is materially different from authentic PrEP medication authorized for sale by Gilead in the United States and that is not subject to Gilead's quality-control measures, to the public, and/or to specific segments of the public, using the Gilead Marks and Trade Dress, as well as other intellectual property belonging to Gilead.

410.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

411.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

412.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

413.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

414.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## THIRTEENTH CLAIM FOR RELIEF

**Federal Dilution of Mark**
**(Against the Clinic and Pharmacy All Defendants)**

415.     Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

416.     The Gilead Marks and Trade Dress are famous and distinctive within the meaning of 15 U.S.C. § 1125(c).

417.     The Clinic and Pharmacy Defendants are dispensing, selling, and/or have dispensed and sold diverted PrEP medication bearing certain Gilead Marks and Trade Dress after such trademarks and trade dress became famous.

418.     By dispensing and selling these diverted products, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have diluted, tarnished, and are diluting and tarnishing the distinctive quality of a mark or trade name owned by Gilead in violation of 15 U.S.C. § 1125(c).

419.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

420.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

421.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

422.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

423.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FOURTEENTH CLAIM FOR RELIEF

### Florida Dilution and Tarnishment of Mark and Injury to Business Reputation
### (Against the Clinic and Pharmacy Defendants)

424.     Gilead hereby repeats and realleges the allegations in the Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

425.     All of the Gilead Marks and Trade Dress are individually distinctive within the meaning of Florida Statute § 495.151.

426.     By dispensing and selling diverted PrEP medication bearing the Gilead Marks and Trade Dress, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have injured and are continuing to injure Gilead's business reputation and/or have diluted, tarnished, and are continuing to dilute and tarnish the distinctive quality of a mark or trade name owned by Gilead, in violation of Florida Statute § 495.151.

427.     The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

428.     Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

126

429.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

430.     Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

431.     As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## FIFTEENTH CLAIM FOR RELIEF

**Civil Conspiracy to Violate the Lanham Act**
**(Against the Doctors United Clinic, Pharmacy, and Officer Defendants)**

432.     Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

433.     The Doctors United Clinic, Pharmacy, and Officer Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate the Lanham Act.  Each played an indispensable role in carrying out this scheme.

434.     In accordance with their agreement, the Doctors United Clinic Defendants recruited individuals who earn low incomes or are homeless whom they could prescribe PrEP medication and fraudulently enroll in the MAP.  Defendant Physician Preferred then filled those prescriptions by dispensing PrEP medication bearing certain Gilead Marks that was materially different from authentic PrEP medication authorized for sale by Gilead in the United States.

Defendant Physician Preferred caused that materially different PrEP medication to be sent to the Doctors United Clinic Defendants, which then delivered the materially different PrEP medication to MAP enrollees.  After delivering the materially different PrEP medication to MAP enrollees, the Doctors United Clinic Defendants repurchased the medication to be redispensed unlawfully to other MAP enrollees, or sold on the black market

435.    The Doctors United Officer Defendants were personally involved in and approved of the scheme to violate the Lanham Act, and the Doctors United Clinic Defendants and Defendant Physician Preferred carried it out at their direction.  Further, the Doctors United Officer Defendants devised, implemented, and enforced policies and business practices that enabled the Doctors United Clinic Defendants and Defendant Physician Preferred to carry out the scheme and conceal it from Gilead.

436.    The agreement among the Doctors United Clinic, Pharmacy, and Officer Defendants to dispense and distribute materially different PrEP medication in violation of the Lanham Act benefitted the Doctors United Clinic, Pharmacy, and Officer Defendants.

437.    Each of the Doctors United Clinic, Pharmacy, and Officer Defendants committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

438.    As a result of the conspiracy to violate the Lanham Act, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

## SIXTEENTH CLAIM FOR RELIEF

**Civil Conspiracy to Violate the Lanham Act**
**(Against the Positive Health Clinic, Pharmacy, and Officer Defendants)**

439.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

440.    The Positive Health Clinic, Pharmacy, and Officer Defendants unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together to violate the Lanham Act.  Each played an indispensable role in carrying out this scheme.

441.    In accordance with their agreement, the Positive Health Clinic Defendants recruited individuals who earn low incomes or are homeless whom they could prescribe PrEP medication and fraudulently enroll in the MAP.  Defendant United Pharmacy then filled those prescriptions by dispensing PrEP medication bearing certain Gilead Marks that was materially different from authentic PrEP medication authorized for sale by Gilead in the United States. Defendant United Pharmacy caused that materially different PrEP medication to be sent to the Positive Health Clinic Defendants, which then delivered the materially different PrEP medication to MAP enrollees.  After delivering the materially different PrEP medication to MAP enrollees, the Positive Health Clinic Defendants repurchased the medication to be redispensed unlawfully to other MAP enrollees, or sold on the black market.

442.    The Positive Health Officer Defendants were personally involved in and approved of the scheme to violate the Lanham Act, and the Positive Health Clinic Defendants and Defendant United Pharmacy carried it out at their direction.  Further, the Positive Health Officer Defendants devised, implemented, and enforced policies and business practices that enabled the

Positive Health Clinic Defendants and Defendant United Pharmacy to carry out the scheme and conceal it from Gilead.

443.    The agreement among the Positive Health Clinic, Pharmacy, and Officer Defendants to dispense and distribute materially different PrEP medication in violation of the Lanham Act benefitted the Positive Health Clinic, Pharmacy, and Officer Defendants.

444.    Each of the Positive Health Clinic, Pharmacy, and Officer Defendants committed and caused to be committed a series of overt acts pursuant to and in furtherance of the conspiracy, including but not limited to the acts set forth above.

445.    As a result of the conspiracy to violate the Lanham Act, Gilead has suffered and continues to suffer significant injury in an amount to be determined at trial.

<u>SEVENTEENTH CLAIM FOR RELIE</u>

**Common Law Unfair Competition**
**(Against the Clinic and Pharmacy Defendants)**

446.    Gilead realleges and incorporates by reference paragraphs 1 through 298 of this Complaint and Exhibit C as if fully set forth herein.

447.    In violation of the common law and public policy of the State of Florida and elsewhere, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, have unfairly competed with Gilead by dispensing diverted PrEP medication and selling diverted PrEP medication to others outside of authorized distribution channels.

448.    As a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has sold less PrEP medication than it otherwise would have, had the Clinic and Pharmacy Defendants not sold diverted PrEP medication outside of authorized distribution channels.

130

449.    In addition, as a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants' conduct is restrained, Gilead will continue to be irreparably harmed.

450.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

451.    As a direct and proximate result of the Clinic and Pharmacy Defendants' unfair competition, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## EIGHTEENTH CAUSE OF ACTION

### Trademark Infringement Under Florida Trademark Registration and Protection Act
### (Against the Clinic and Pharmacy Defendants)

452.    Gilead realleges and incorporates by reference paragraphs 1 through 298 of this Complaint and Exhibit C as if fully set forth herein.

453.    In violation of Florida Statute § 495.001 *et seq.*, the Clinic and Pharmacy Defendants, independently and in conspiracy with one another, used in commerce, without Gilead's consent, either a reproduction, counterfeit, copy, or colorable imitation of the Gilead Marks and Trade Dress in connection with the sale, offering for sale, distribution, or advertising of diverted Gilead products that are materially different from authentic Gilead products authorized for sale by Gilead in the United States

454.    This materially different PrEP medication, which bears certain of Gilead's Marks and Trade Dress, is not subject to and subverts Gilead's quality-control measures.

455.    The Clinic and Pharmacy Defendants' use and sale of PrEP medication that is materially different from authentic PrEP medication, and/or that is not subject to Gilead's quality control measures, is likely to cause confusion, or to cause mistake, or to deceive.

456.    The Clinic and Pharmacy Defendants' actions constitute willful infringement of Gilead's exclusive rights in the Gilead Marks and Trade Dress.

457.    Each Clinic and Pharmacy Defendant is directly, contributorily, and vicariously liable for the infringement of every other Clinic and Pharmacy Defendant.

458.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered irreparable harm to the valuable Gilead Marks and Trade Dress and their reputation in the industry.  Unless the Clinic and Pharmacy Defendants are restrained from further infringement of the Gilead Marks and Trade Dress, Gilead will continue to be irreparably harmed.

459.    Gilead has no adequate remedy at law that will compensate for the continued and irreparable harm it will suffer if the Clinic and Pharmacy Defendants' acts are allowed to continue.

460.    As a direct and proximate result of the Clinic and Pharmacy Defendants' conduct, Gilead has suffered damages to the valuable Gilead Marks and Trade Dress and other damages in an amount to be proved at trial.

## NINETEENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against All Defendants)

461.    Gilead hereby repeats and realleges the allegations in Paragraphs 1 through 298 and Exhibit C as if set forth fully herein.

132

462.     As set forth above, Defendants have acted in concert to (a) fraudulently enroll recruits in the MAP, including by forging the signatures of prescribers and recruits on MAP applications; (b) submit fraudulent redemptions to Advancing Access® to obtain reimbursement and fees from Gilead for PrEP medication purportedly dispensed to these recruits; (c) purchase already-dispensed PrEP medication from recruits to be redispensed in connection with future MAP redemptions; and (d) sell dispensed PrEP medication to others seeking to purchase PrEP medication at less than the wholesale price.

463.     As a result, all Defendants wrongfully obtained a direct monetary benefit to which they were not entitled.  This monetary benefit includes the reimbursements and fees Defendants received in connection with fraudulent MAP redemptions and the proceeds from Defendants' sale of diverted PrEP medication to other healthcare providers.

464.     In addition, by selling diverted PrEP medication bearing Gilead's valuable trademarks independently and in conspiracy with one another, Defendants have been unjustly enriched at Gilead's direct expense in violation of the common law of Florida and elsewhere.

465.     Defendants voluntarily and knowingly accepted and retained these benefits from Gilead.

466.     Defendants have no right to retain these unjust gains, as they were obtained through unlawful, fraudulent, and improper means.

467.     If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

468.     Gilead is therefore entitled to the remedies of disgorgement and restitution in the amount by which Defendants were unjustly enriched, or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of that benefit.

## PRAYER FOR RELIEF

WHEREFORE, Gilead demands judgment against all Defendants as follows:

(a)     an order entering judgment in favor of Gilead against Defendants, jointly and severally;

(b)     an order temporarily restraining, and preliminarily and permanently enjoining Defendants and their subsidiaries, parents, affiliates, agents, servants, employees, members, directors, officers, and attorneys, and those persons in active concert or participation with them (the "Restrained Parties") from:

(i)     enrolling or seeking to enroll in Gilead's Advancing Access® PAP or MAP any patient who has been prescribed TRUVADA® or DESCOVY®;

(ii)    seeking or accepting reimbursements, either directly or indirectly, for any TRUVADA® or DESCOVY® dispensed to any individual enrolled in Gilead's PAP or MAP;

(iii)   dispensing TRUVADA® or DESCOVY® to patients in containers other than original, unopened containers from the manufacturer;

(iv)    dispensing TRUVADA® or DESCOVY® to patients unaccompanied by its FDA-approved labeling, package insert, lot number, serialization number, or expiration date;

(v)     selling, purchasing, or otherwise obtaining, TRUVADA® or DESCOVY® that had previously been filled or dispensed;

(vi)    removing from their premises, or discarding, destroying, transferring or disposing in any manner, any information, computer files, electronic files,

135

WhatsApp or text messages, business records (including but not limited to e-mail communications) or other documents relating to Defendants' assets and operations or relating in any way to any of the activities referred to in subparagraphs (i) through (v) above; and

(vii)   assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (vi) above;

(c)   an order requiring the Restrained Parties to turn over to Gilead, or any person or entity designated by Gilead, all TRUVADA® or DESCOVY® that is in the Restrained Parties' possession, custody or control and that either (i) is no longer in its original, unopened container from the manufacturer, or (ii) had previously been filled or dispensed, to be held by Gilead until further order of this Court;

(d)   an order awarding Gilead damages in an amount to be determined;

(e)   an order awarding Gilead pre-judgment and post-judgment interest;

(f)   an order awarding Gilead punitive damages;

(g)   an order awarding Gilead reasonable attorneys' fees and other costs; and

(h)   for such additional relief as the Court finds just, equitable, and appropriate.

DATED:       Miami, Florida
             November 2, 2020

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

/s/ P. Jan Kubicz
P. Jan Kubicz (FBN 84405)
jan.kubicz@squirepb.com
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
T.: (305) 577-7000
F.: (305) 577-7001

/s/ Franklin G. Monsour
Franklin G. Monsour (*pro hac vice pending*)
franklin.monsour@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
T.:  (212) 872-9800


PATTERSON BELKNAP WEBB & TYLER LLP

/s/ Geoffrey Potter
Geoffrey Potter (*pro hac vice pending*)
Jonah Knobler (*pro hac vice pending*)
Joshua Kipnees (*pro hac vice pending*)
Timothy A. Waters (*pro hac vice pending*)
R. James Madigan III (*pro hac vice pending*)
Jared S. Buszin (*pro hac vice pending*)
Devon Hercher (*pro hac vice pending*)
Jacob Chefitz (*pro hac vice pending*)
gpotter@pbwt.com
jknobler@pbwt.com
jkipnees@pbwt.com
twaters@pbwt.com
jmadigan@pbwt.com
jbuszin@pbwt.com
dhercher@pbwt.com
jchefitz@pbwt.com

137

1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc. and
Gilead Sciences Ireland UC*