**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| GILEAD SCIENCES, INC.; GILEAD SCIENCES IRELAND UC, <br><br> Plaintiffs, <br><br> v. <br><br> AJC MEDICAL GROUP, INC.; ALLIANCE MEDICAL CENTER, INC.; ALLIED HEALTH ORGANIZATION, INC.; BAIKAL MARKETING GROUP, INC.; A BETTER YOU WELLNESS CENTER, LLC; 3RD STEP RECOVERY GROUP, INC. D/B/A CONTINENTAL WELLNESS CENTER; COMMUNITY HEALTH MEDICAL CENTER LLC; DOCTORS UNITED, INC. D/B/A DOCTORS UNITED GROUP; FLORIMED MEDICAL CENTER CORP.; JUAN JESUS SALINA, M.D. CORP.; LABS4LESS LLC; PHYSICIAN PREFERRED PHARMACY, INC.; POSITIVE HEALTH ALLIANCE, INC.; PRIORITY HEALTH MEDICAL CENTER, INC.; TESTING MATTERS INC.; UNITED CLINICAL LABORATORY LLC; UNITED PHARMACY LLC; WELL CARE LLC; TAMARA ALONSO; JEAN ALEXANDRE; CHENARA ANDERSON; MYRIAM AUGUSTINE; TWIGGI BATISTA; ARSEN BAZYLENKO; MICHAEL BOGDAN; BARBARA BRYANT; AUGUSTINE CARBON; JENNIFER JOHN CARBON; KHADIJAH CARBON; ALEJANDRO CASTRO; JOHN CATANO; JEAN CHARLOT; SHONTA DARDEN; ALEXANDER EVANS; MARIA FREEMAN; JESULA GABO; SHAJUANDRINE GARCIA; BARBARA GIBSON; KERLINE JOSEPH; VIERGELA JOSEPH; ANDRE KERR; GARY KOGAN; CASSANDRA LOUISSAINT; CORA MANN; NICK MYRTIL; IFEOMA NWOFOR; ERIK JOSEPH PAVAO; WILLIE PEACOCK; MICHAEL PIERCE; MICHEL POITEVIEN; JEAN RODNEY; TATIANA ROZENBLYUM; JUAN JESUS SALINA; DIMITRY SHAPOSHNIKOV; ROMAN SHEKHET; KIRILL VESSELOV; MIKHAIL VESSELOV; TOMAS WHARTON, <br><br> Defendants. | Civil Action No. __ <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EXPEDITED MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, EXPEDITED DISCOVERY ORDER, AND HIPAA PROTECTIVE AND CONFIDENTIALITY ORDER** |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 5

    A.    Gilead's Life-Saving HIV Medication and Related Intellectual Property .............. 5

    B.    Gilead's Advancing Access® Patient Support Program ......................................... 6

        1.    Gilead Provides Free HIV Medication to Individuals in Need .................. 6

        2.    Healthcare Providers Play an Essential Role in Prescribing PrEP Medication and Enrolling Individuals in the MAP .................................... 7

        3.    Gilead Pays Retail Pharmacies Fees and a Significant Reimbursement for Dispensing Free PrEP Medication to MAP Enrollees ................................................................................................. 9

    C.    Defendants' Schemes to Defraud Gilead by Abusing the MAP .......................... 10

        1.    The Defendants And Their Relationships ............................................... 11

            a.    Doctors United Defendants ......................................................... 11

            b.    The Positive Health Defendants .................................................. 13

            c.    Connections Between the Doctors United and Positive Health Defendants .................................................................... 15

        2.    Enrollment and Redemption Data Tips Gilead Off to Defendants' Fraud ...................................................................................................... 15

        3.    Subsequent Investigation Confirms the Mechanics of Defendants' Fraudulent Schemes .............................................................................. 20

        4.    Defendants' Ability to Profit from Their Fraudulent Schemes ............... 31

        5.    The Role Each Defendant Plays in the Schemes ..................................... 34

    D.    Defendants Circumvent Gilead's Anti-Fraud Safeguards .................................... 35

        1.    Gilead's Efforts to Stop Defendants' Fraud ........................................... 35

        2.    Defendants' Countermeasures to Overcome Gilead's Anti-Fraud Safeguards .............................................................................................. 37

    E.    Defendants Are Actively Expanding Their Fraudulent Schemes ......................... 40

    F.    Defendants' Schemes Threaten Public Health and Safety .................................... 40

    G.    Defendants' Schemes Injure Gilead's Intellectual Property Rights and Consumer Goodwill ........................................................................................... 42

ARGUMENT ............................................................................................................... 43

I.    GILEAD IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ........................................................................ 43

# <u>TABLE OF CONTENTS</u>
## <u>(continued)</u>

**Page**

    A.    Gilead Has a Substantial Likelihood of Success on the Merits ............................44

        1.    Fraud Claims (First Claim for Relief).......................................45

            a.    Defendants' Knowingly False Statements of Fact Intended to Induce Gilead's Reliance ...........................................45

            b.    Gilead's Reasonable Reliance to its Detriment .............................50

        2.    Aiding and Abetting Fraud Claims (Second and Third Claims for Relief) ...............................................................................51

        3.    Trademark Claims (Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Seventeenth, and Eighteenth Claims for Relief) ...................53

            a.    Gilead Has Legally Protectable Trademarks ................................54

            b.    Defendants' Use of Gilead's Marks Is Likely to Cause Consumer Confusion ...............................................54

        4.    Deceptive and Unfair Practices Claims (Sixth Claim for Relief).............64

        5.    Unjust Enrichment Claim (Nineteenth Claim for Relief)........................70

        6.    Civil Conspiracy Claims (Fourth, Fifth, Seventh, Eighth, Fifteenth, and Sixteenth Claims for Relief)........................................71

    B.    Injunctive Relief Is Necessary to Prevent Irreparable Harm to Gilead ................75

        1.    Defendants are Irreparably Harming Gilead's Reputation and Goodwill .......................................................................75

        2.    Defendants Continue to Conceal and Expand Their Ongoing Fraud ........77

    C.    The Balance of Equities Weighs Decisively in Gilead's Favor............................78

    D.    An Injunction Is In The Public Interest.................................................81

II.    A $25,000 TRO BOND IS ADEQUATE ........................................................84

III.    EXPEDITED DISCOVERY IS NECESSARY AND APPROPRIATE ..........................85

IV.    ENTRY OF A HIPAA PROTECTIVE AND CONFIDENTIALITY ORDER IS NECESSARY AND APPROPRIATE.................................................................88

CONCLUSION....................................................................................90

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC*,
    458 F. Supp. 3d 181 (S.D.N.Y. 2020).......................................................................83

*Abbott Labs. v. Adelphia Supply USA*,
    No. 15-CV-05826, 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) .........................60

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*,
    486 F. Supp. 131 (D. Colo. 1980)............................................................................64

*Alarm Grid, Inc. v. Alarm Club.com, Inc.*,
    No. 17-80305-CV, 2018 WL 1175254 (S.D. Fla. Mar. 5, 2018)..............................90

*In re Alexander Grant & Co. Litig.*,
    820 F.2d 352 (11th Cir. 1987) .................................................................................89

*Am. LegalNet, Inc. v. Davis*,
    673 F. Supp. 2d 1063 (C.D. Cal. 2009) ...................................................................85

*ATP Sci. Proprietary, Ltd. v. Bacarella*,
    No. 20-CV-60827, 2020 WL 3868701 (S.D. Fla. July 9, 2020)...............................68

*Bel Canto Design Ltd. v. MSS HiFi, Inc.*,
    837 F. Supp. 2d 208 (S.D.N.Y. 2011)......................................................................62

*BellSouth Telecommunications, Inc. v. Mintz*,
    No. 04-CV-3586-CC, 2005 WL 8155198 (N.D. Ga. Mar. 4, 2005).........................78

*Bulgari, S.p.A. v. P'ships & Unincorporated Ass'ns Identified On Schedule "A,"*
    No. 14-CV-4819, 2014 WL 3749132 (N.D. Ill. July 18, 2014)...............................77

*Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*,
    112 F.3d 1125 (11th Cir. 1997) ...............................................................................84

*Caterpillar, Inc. v. Nationwide Equip.*,
    877 F. Supp. 611 (M.D. Fla. 1994).....................................................................54, 61

*Chanel, Inc. v. Replicachanelbag*,
    362 F. Supp. 3d 1256 (S.D. Fla. 2019) ....................................................................76

*Chang v. JPMorgan Chase Bank, N.A.*,
    845 F.3d 1087 (11th Cir. 2017) ...............................................................................51

*Charles Schwab & Co. v. Aviles*,
    2007 WL 9702744 (S.D. Fla. Aug. 23, 2007)..........................................................44

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Chastain v. Nw. Ga. Hous. Auth.*,
  2011 WL 5979428 (N.D. Ga. Apr. 28, 2011) .........................................................................81

*Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*,
  263 F.3d 1304 (11th Cir. 2001) ............................................................................................89

*Colacicco v. Apotex, Inc.*,
  521 F.3d 253 (3d Cir. 2008), *vacated on other grounds*, 556 U.S. 1101 (2009) ...................59

*In re Computer Personalities Sys., Inc.*,
  No. 01-14231DWS, 2003 WL 22844863 (Bankr. E.D. Pa. Nov. 18, 2003) ...........................50

*Conopco, Inc. v. Campbell Soup Co.*,
  95 F.3d 187 (2d Cir. 1996) ...................................................................................................82

*Corcel Corp. v. Ferguson Enterprises, Inc.*,
  291 F.R.D. 680 (S.D. Fla. 2013) ..........................................................................................89

*CWELT-2008 Series 1045 LLC v. PHH Corp.*,
  No. 1:20-CV-20334, 2020 WL 2744191 (S.D. Fla. May 27, 2020) .......................................64

*Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Name Beds, LLC*,
  500 F. Supp. 2d 296 (S.D.N.Y. 2007) ...................................................................................55

*Davidoff & Cie., S.A. v. PLD Int'l Corp.*,
  263 F.3d 1297 (11th Cir. 2001) ...........................................................................54, 55, 56, 81

*Day v. Le–Jo Enters., Inc.*,
  521 So. 2d 175 (Fla. 3d DCA 1988) .....................................................................................65

*Democratic Repub. of Congo v. Air Capital Grp., LLC*,
  2013 WL 3223688 (S.D. Fla. June 24, 2013) ........................................................................65

*Dentsply Sirona, Inc. v. L I K Supply, Corp.*,
  2016 WL 3920241 (N.D.N.Y. July 15, 2016) ........................................................................87

*Dieter v. B & H Ind. of Southwest Fla., Inc.*,
  880 F.2d 322 (11th Cir. 1989) ..............................................................................................53

*Donofrio v. Matassini*,
  503 So. 2d 1278 (Fla. 2d DCA 1987) ....................................................................................71

*Ecolab, Inc. v. Paolo*,
  753 F. Supp. 1100 (E.D.N.Y. 1991) ......................................................................................78

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
  806 F.2d 392 (2d Cir. 1986) ..................................................................................................61

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Energy Prof'ls, LLC v. Pomella*,
2015 WL 10960876 (M.D. Fla. Oct. 29, 2015) ........................................................43

*Faculty Senate of Fla. Int'l Univ. v. Winn*,
477 F. Supp. 2d 1198 (S.D. Fla. 2007) ....................................................................43

*Federal Express Corp. v. Federal Espresso, Inc.*,
No. 97 CV 1219, 1997 WL736530 (N.D.N.Y. Nov. 24, 1997)..............................86

*Ferrellgas Partners, L.P. v. Barrow*,
143 F. App'x 180 (11th Cir. 2005) .........................................................................75

*Ferrero v. Associated Materials Inc.*,
923 F.2d 1441 (11th Cir. 1991) ...............................................................................75

*Fla. Bar v. Rose*,
607 So. 2d 394 (Fla. 1992)........................................................................................46

*Fla. Power Corp. v. City of Winter Park*,
887 So. 2d 1237 (Fla. 2004)......................................................................................70

*Four Seasons Hotels & Resorts BV v. Consorcio Barr, SA.*,
267 F. Supp. 2d 1268 (S.D. Fla. 2003), *rev'd in part without opinion*, 138 F.
App'x 297 (11th Cir. 2005) ......................................................................................61

*Friedman v. Am. Guardian Warranty Servs., Inc.*,
837 So. 2d 1165 (Fla. 4th DCA 2003)......................................................................49

*Gandy v. Trans World Comput. Tech. Grp.*,
787 So. 2d 116 (Fla. 2d DCA 2001).........................................................................45

*Garnett v. Zellinger*,
313 F. Supp. 3d 147 (D.D.C. 2018)..........................................................................80

*Gilison v. Flagler Bank*,
No. 4D19-3379, 2020 WL 5033316 (Fla. 4th DCA Aug. 26, 2020) .......................52

*Gonzalez v. Reno*,
2000 WL 381901 (11th Cir. Apr. 19, 2000) ............................................................43

*In re Harper*,
No. 06-40567 LMK, 2007 WL 853334 (Bankr. N.D. Fla. Feb. 16, 2007)..............79

*Hetrick v. Ideal Image Dev. Corp.*,
372 F. App'x 985 (11th Cir. 2010) ..........................................................................65

vi

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*,
   2020 WL 3078531 (S.D. Fla. June 10, 2020) .......................................................................54

*Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*,
   No. 20-cv-3471, 2020 WL 6119516 (N.D. Ill. Oct. 16, 2020) .........................................58, 60

*Johnson & Johnson Vision Care, Inc., v. Ciba Vision Corp.*,
   348 F. Supp. 2d 165 (S.D.N.Y. 2004).....................................................................................86

*Kee v. Nat'l Reserve Life Ins. Co.*,
   918 F.2d 1538 (11th Cir. Fla. 1990) .......................................................................................71

*Kerruish v. Essex Holdings, Inc.*,
   777 F. App'x 285 (11th Cir. 2019) ..........................................................................................45

*Kettle v. California Pub. Utilities Comm'n*,
   No. C-98-1638-CAL, 1999 WL 96014 (N.D. Cal. Feb. 5, 1999)............................................79

*Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*,
   No. 13-23998-CIV, 2017 WL 11103938 (S.D. Fla. June 26, 2017)........................................49

*Kos Pharms., Inc. v. Andrx Corp.*,
   369 F.3d 700 (3d Cir. 2004)....................................................................................................81

*In re Larose*,
   2008 WL 5636385 (Bankr. M.D. Fla. Oct. 14, 2008)............................................................46

*Louis v. Meissner*,
   530 F. Supp. 924 (S.D. Fla. 1981) ..........................................................................................43

*Mary Kay, Inc. v. Weber*,
   661 F. Supp. 2d 632 (N.D. Tex. 2009) ...................................................................................63

*Mavilia v. Stoeger Indus.*,
   574 F. Supp. 107 (D. Mass. 1983) ..........................................................................................50

*McDonald's Corp. v. Robertson*,
   147 F.3d 1301 (11th Cir. 1998) ..............................................................................................76

*McGraw-Hill Global Educ. Holdings, LLC v. Khan*,
   323 F. Supp. 3d 488 (S.D.N.Y. 2018)......................................................................................87

*Mitchell Grp. USA LLC v. Udeh*,
   14-cv-5745, 2014 WL 12837548 (E.D.N.Y. Oct. 7, 2014) ....................................................80

*Modern Pharmacy, LLC v. McKesson Corp.*,
   No. 18-22242-CIV, 2018 WL 3413037 (S.D. Fla. June 12, 2018).........................................44

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Morgenstern Chem. Co. v. G. D. Searle & Co.*,
    253 F.2d 390 (3d Cir. 1958)..........................................................................................82

*Moroccanoil, Inc. v. Perfumes World Com, Inc.*,
    234 F. Supp. 3d 1026 (C.D. Cal. 2017) ...............................................................55, 60

*Nazario v. Prof'l Account Servs.*,
    2017 WL 1179917 (M.D. Fla. Mar. 29, 2017) ............................................................69

*Neelu Aviation, LLC v. Boca Aircraft Maint., LLC*,
    No. 18-CV-81445, 2019 WL 3532024 (S.D. Fla. Aug. 2, 2019) ...........................69

*Niko Petroleum Retailers of Fla., LLC v. Miami VIP Tours LLC*,
    No. 14-21770-CIV, 2014 WL 12862297 (S.D. Fla. May 29, 2014)......................81

*Novartis Animal Health US, Inc. v. Abbeyvet Exprt Ltd.*,
    409 F. Supp. 2d 264 (S.D.N.Y. 2005).........................................................................60

*Off Lease Only, Inc. v. Lakeland Motors, LLC*,
    --- F. App'x ----, 2020 WL 5553301 (11th Cir. Sept. 17, 2020)...........................53

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
    816 F.2d 68 (2d Cir. 1987)............................................................................................56

*PepsiCo, Inc. v. F & H Kosher Supermarket, Inc.*,
    11-CV-0425, 2011 WL 6181907 (E.D.N.Y. Aug. 26, 2011), *adopted*, 2011
    WL 6179269 (E.D.N.Y. Dec. 12, 2011) ..............................................................63, 77

*Pezold Air Charters v. Phoenix Corp.*,
    192 F.R.D. 721 (M.D. Fla. 2000)..................................................................................71

*Philip Morris USA, Inc. v. 5 Bros. Grocery Corp.*,
    13-CV-2451, 2014 WL 3887515 (E.D.N.Y. Aug. 5, 2014) .....................................80

*Pincus v. Speedpay, Inc.*,
    161 F. Supp. 3d 1150 (S.D. Fla. 2015) .......................................................................65

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*,
    842 So. 2d 773 (Fla. 2003).....................................................................................65, 69

*Popular Bank of Florida v. Banco Popular de Puerto Rico*,
    180 F.R.D. 461 (S.D. Fla. 1998)...................................................................................84

*Queen's Harbour Yacht & Country Club Assoc., Inc. v. Lee*,
    No. 3:09-CV-1256, 2010 WL 11623421 (M.D. Fla. Aug. 25, 2010).....................54

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*,
No. 99-CV-1174, 2004 WL 1613563 (N.D. Ill. July 19, 2004).............................................56

*Re/Max N. Cent., Inc. v. Cook*,
272 F.3d 424 (7th Cir. 2001) ................................................................................................76

*River Light V, L.P. v. Tanaka*,
2018 WL 5778234 (S.D. Fla. Nov. 2, 2018)..........................................................................54

*Rockwell Automation, Inc. v. Radwell Int'l, Inc.*,
2016 WL 7018531 (D.N.J. Nov. 30, 2016) ...........................................................................58

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) ............................................................................................43

*Seagood Trading Corp. v. Jerrico, Inc.*,
924 F.2d 1555 (11th Cir. 1991) ......................................................................................71, 72

*Semitool, Inc. v. Tokyo Electron Am., Inc.*,
208 F.R.D. 273 (N.D. Cal. 2002)..........................................................................................85

*SimplexGrinnell, L.P. v. Quality Commc'ns of Fla., Inc.*,
No. 05-61309-CIV, 2005 WL 8154701 (S.D. Fla. Aug. 25, 2005) ........................................86

*Solar City, Inc. v. Crystal Clear Concepts, LLC*,
No. 8:19-CV-2538-T-33TGW, 2020 WL 127567 (M.D. Fla. Jan. 10, 2020) ........................72

*Souran v. Travelers Ins. Co.*,
982 F.2d 1497 (11th Cir. 1993) ............................................................................................47

*Standard Process, Inc. v. AVC Infinite, LLC*,
2020 WL 103841 (W.D. Wisc. Jan. 9, 2020) ........................................................................64

*State Farm Mut. Auto. Ins. Co. v. Kugler*,
840 F. Supp. 2d 1323 (S.D. Fla. 2011) .................................................................................88

*State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*,
103 F. Supp. 3d 1343 (S.D. Fla. 2015) ...............................................................65, 66, 68, 69

*State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*,
315 F. Supp. 3d 1291 (S.D. Fla. 2018) .................................................................................65

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
278 F. Supp. 3d 1307 (S.D. Fla. 2017) .................................................................................65

ix

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin.*,
    LLC, 904 F.3d 1197 (11th Cir. 2018) ........................................................................52

*Tiramisu Int'l LLC v. Clever Imps. LLC*,
    741 F. Supp. 2d 1279 (S.D. Fla. 2010) ....................................................................81

*TracFone Wireless, Inc. v. Adams*,
    304 F.R.D. 672 (S.D. Fla. 2015) ..............................................................................85

*TracFone Wireless, Inc. v. GSM Grp., Inc.*,
    555 F. Supp. 2d 1331 (S.D. Fla. 2008) ..............................................................68, 69

*TracFone Wireless, Inc. v. Pak China Group Co. Ltd.*,
    843 F. Supp. 2d 1284 (S.D. Fla. 2012) ........................................................56, 58, 85

*Trudell Med. Int'l v. D R Burton Healthcare LLC*,
    No. 4:18-CV-9-H-KS, 2020 WL 4372133 (E.D.N.C. Mar. 23, 2020) ....................72

*United States Stepe v. RS Compounding LLC*,
    325 F.R.D. 699 (M.D. Fla. 2017)..............................................................................70

*United States v. Carbon*,
    No. 1:18-cr-20690, ECF No. 27 (S.D. Fla. Filed Aug. 20, 2018)...........................35

*United States v. Patel*,
    17 F. Supp. 3d 814 (N.D. Ill. 2014), *aff'd*, 778 F.3d 607 (7th Cir. 2015) ..............67

*United States v. Schwartz*,
    541 F.3d 1331 (11th Cir. 2008) ................................................................................72

*United States v. Vernon*,
    723 F.3d 1234 (11th Cir. 2013) ................................................................................67

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,
    402 F. Supp. 3d 427 (N.D. Ill. 2019) .......................................................................76

*Utts v. Bristol-Myers Squibb Co.*,
    251 F. Supp. 3d 644 (S.D.N.Y. 2017).......................................................................59

*Valderrama v. Rousseau*,
    No. 11-CIV-24637, 2012 WL 12925174 (S.D. Fla. Sept. 18, 2012).......................73

*Virgilio v. Ryland Grp., Inc.*,
    680 F.3d 1329 (11th Cir. 2012) ................................................................................70

*In re Vizcay*,
    No. 8:15-MC-122-T-33, 2015 WL 5522011 (M.D. Fla. Sept. 17, 2015)................70

x

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Warner-Lambert Co. v. Northside Dev. Corp.*,
  86 F.3d 3 (2d Cir. 1996)..................................................................................61, 63

*Wilkins v. Arthur J. Gallagher & Co.*,
  No. MO-10-CV-40, 2010 WL 11652139 (W.D. Tex. Apr. 20, 2010)....................87

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...........................................................................................78

*Woods v. On Baldwin Pond, LLC*,
  634 F. App'x 296 (11th Cir. 2015) ..................................................................48

*ZC Ins. Co. v. Brooks*,
  847 So. 2d 547 (Fla. 4th DCA 2003) ...............................................................48

*Zino Davidoff SA v. CVS Corp.*,
  571 F.3d 238 (2d Cir. 2009).................................................................56, 58, 61, 62

*Zip Int'l Grp., LLC v. Trilini Imports, Inc.*,
  09-CV-2437 (JG)(VVP), 2010 WL 648696 (E.D.N.Y. Feb. 22, 2010)...................55

*Zlotnick v. Premier Sales Grp., Inc.*,
  480 F.3d 1281 (11th Cir. 2007) ..................................................................65, 69

**Statutes**

15 U.S.C. § 1057(b) ..............................................................................................54

15 U.S.C. § 1114...............................................................................................53, 54

15 U.S.C. § 1125...............................................................................................53, 54

21 U.S.C. § 331..............................................................................................29, 60, 80

21 U.S.C. § 333................................................................................................60, 80

21 U.S.C. § 352................................................................................................60, 80

28 U.S.C. 1657 .....................................................................................................85

Fla. Admin. Code 64B16-27.1001(4) ...............................................................48, 68

Fla. Stat. § 456.054(2)..........................................................................................66

Fla. Stat. § 465.003(6).....................................................................................48, 67

Fla. Stat. § 465.016(s).....................................................................................48, 67

### TABLE OF AUTHORITIES
#### (continued)

**Page(s)**

Fla. Stat. § 495.001 ...................................................................................................53

Fla. Stat. § 499.005 ......................................................................................29, 31, 60

Fla. Stat. § 499.0051 ....................................................................................29, 31, 60

Fla. Stat. § 501.203(3)(c) ..........................................................................................68

Fla. Stat. § 501.204(1) ...............................................................................................64

Fla. Stat. § 817.505 ......................................................................................65, 66, 67

Fla. Stat. § 831.30 ......................................................................................................67

**Other Authorities**

45 C.F.R. § 160.103 ....................................................................................................88

45 C.F.R. § 164.512(e)(1)(ii) ....................................................................................88

Fed. R. Civ. P. 26 ..............................................................................................85, 89

Fed. R. Civ. P. 30(a)(2)(A)(iii) .................................................................................85

Fed. R. Civ. P. 34(b)(2)(A) ........................................................................................85

Fed. R. Civ. P. 65 ..............................................................................................84, 88

J. Thomas McCarthy, McCarthy on Trademarks § 30:47 (4th ed. 2015) ......................77

Restatement (Second) of Torts § 526 ........................................................................47

Restatement (Second) of Torts § 551 ........................................................................48

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (collectively, "Gilead") submit this memorandum of law in support of their expedited motions seeking immediate relief against the above-captioned defendants (collectively, "Defendants").  Gilead seeks entry of (1) a temporary restraining order ("TRO"), to be followed by a preliminary injunction; (2) an expedited discovery order; and (3) a Health Insurance Portability and Accountability Act ("HIPAA") protective and confidentiality order.  The proposed orders, the complaint, this memorandum, and the eight moving declarations filed herewith have been provided to Defendants in advance of filing.  (Potter Decl. ¶ 2.)  Given the expedited nature of these motions and the immediate relief sought, Gilead respectfully requests that its motions be heard on Tuesday, November 3, 2020, or as soon as possible thereafter, appreciating the burden this places on the Court in light of the current pandemic and national election.[1]

## **INTRODUCTION**

Gilead brings this action to immediately halt Defendants' massive and rapidly growing healthcare fraud schemes, which are stealing tens of millions of dollars from Gilead while putting at grave risk the health—and even the lives—of thousands of Floridians who are economically challenged.

Gilead developed and manufactures two groundbreaking HIV medications used for pre-exposure prophylaxis ("PrEP")—*i.e.*, preventing HIV infections in advance of exposure to the virus.  Gilead gives those medications away through its Advancing Access® Medication

---

[1] Counsel for Gilead are available to appear before this Court at any time to address Gilead's motions ether in person or by telephone or video.  Geoffrey Potter, of Patterson Belknap Webb & Tyler LLP, can be reached directly by telephone at (917) 854-2310 or by email at gpotter@pbwt.com.  Franklin Monsour, of Squire Patton Boggs (US) LLP, can be reached directly by telephone at (646) 526-5587 or by email at franklin.monsour@squirepb.com.

Assistance Program ("MAP"), a charitable program Gilead created and funds to provide eligible uninsured persons with free medication to help protect them from becoming infected with HIV.

Through data analysis, multiple whistleblower reports, surveillance and its own investigation, Gilead has just uncovered two interconnected networks of affiliated clinics, prescribers, medical laboratories and pharmacies that have been systematically stealing from the MAP on an enormous scale.  Their schemes share a common *modus operandi*:  Defendants recruit and pay people who earn low incomes or are homeless to become "patients," and then prescribe them medically unnecessary, inappropriate, and often unwanted PrEP medication. Defendants then enroll these recruits in the MAP under false pretenses and obtain substantial reimbursement payments from Gilead to which they are not rightfully entitled.  Next, in violation of FDA regulations and Gilead's trademark rights, Defendants repackage Gilead's medication in generic bottles that lack the essential patient safety information, lot numbers, and required container-closure system included with Gilead's authentic product.  This repackaged medication is dispensed to the recruits, usually just as a formality, and then often purchased back from them at a fraction of its actual value, to be either illegally redispensed as part of Defendants' ongoing schemes or sold on the black market.

Defendants have purportedly dispensed more than 30,000 bottles of PrEP medication to MAP enrollees through these schemes, securing ***more than $43 million in illicit profits*** in the process—entirely at Gilead's expense.  Given the lucrative nature of Defendants' schemes, it is no surprise that Defendants are actively seeking to expand their operations, with several Defendants opening new clinics in the past two months, and one Defendant disclosing plans to soon expand its operations to Georgia.  But the harm from Defendants' schemes is not merely financial.  The individuals whom Defendants manipulate as part of their schemes are being

2

dispensed unlawfully repackaged medication, shorn of vital safety warnings, without proper medical examinations or supervision to ensure that the medication will be safe and effective for them.  To the extent any of the recruits actually want and need PrEP medication, Defendants' illegal buyback practices deprive those recruits of effective protection against HIV, and place the recruits' intimate partners—and the broader community—at risk of infection as well.  Finally, Defendants' practices compromise the integrity of Gilead's free-drug program, which people across the country rely upon for potentially life-saving treatment.

The TRO and preliminary injunctive relief that Gilead seeks is therefore crucial—but also extremely narrow.  The requested relief will (1) prohibit Defendants from participating in the MAP and other Gilead-sponsored free-drug programs that they are abusing on an ongoing basis; (2) require Defendants to disclose all of their affiliates and employees so they cannot avoid the injunction and Gilead can monitor their compliance; (3) prohibit Defendants from dispensing illegally repackaged and mislabeled Gilead medication; and (4) prevent Defendants from destroying or concealing documents relating to their schemes.  Lastly, to prevent further diversion of Gilead's PrEP medication, the proposed order would also (5) require Defendants to turn over to Gilead all PrEP medication in their custody and control that either (a) is no longer in its original, unopened container, or (b) had previously been filled or dispensed.

The prerequisites for injunctive relief are all readily satisfied.  Gilead is highly likely to succeed on the merits of its fraud, deceptive practices, trademark, and other claims for relief. Gilead would suffer irreparable harm absent an injunction, including irreversible injury to its reputation and goodwill by virtue of Defendants' distribution of inferior, compromised medication under Gilead's trademarks.  The balance of equities overwhelmingly favors Gilead, as the narrow injunction that Gilead requests would impose no cognizable harms on Defendants

whatsoever—it would merely exclude them from participating in a charitable program in which they have no right to participate, and prevent them from engaging in conduct that is already illegal.  Gilead has the unilateral right to exclude any healthcare provider from participating in its charitable program, and it would have been able to exercise that right but for the evasive and secretive tactics Defendants have been using to continually shift their operations to avoid detection.  Moreover, dispensing or selling repackaged PrEP medication is a federal crime, and so enjoining those sales merely prohibits illegal activity and mitigates damages.  Nothing in the proposed relief limits Defendants' ability to practice medicine or to prescribe any medication. Instead, the relief Gilead seeks serves merely to curtail Defendants' ongoing exploitation of the MAP and other Gilead free-drug programs for profit and to protect vulnerable Floridians against Defendants' further abuses.  Finally, the public interest cries out for an injunction here, as Defendants' schemes pose a serious health threat to their recruits, their broader communities, and thousands of others who rely on Gilead's free-drug programs.

In addition to granting Gilead's proposed TRO and preliminary injunction, the Court should also grant Gilead's proposed expedited discovery order.  First, expedited discovery will help Gilead mitigate the growing irreparable harm that Defendants' schemes are causing with each passing day.  Gilead needs immediate discovery to uncover the full scope of the schemes to stop them.  Second, expedited discovery is necessary to develop a factual record that will assist the Court in timely deciding Gilead's motion for a preliminary injunction.  Indeed, expedited discovery is routinely granted in such circumstances.

Finally, this Court should enter Gilead's proposed HIPAA protective and confidentiality order.  Uncovering Defendants' unlawful schemes will necessitate the disclosure of individuals' protected health information.  Good cause exists for entry of the proposed order to ensure that all

4

disclosures comply with federal law; that individuals' privacy remains protected; and that sensitive business information is safeguarded.

Defendants are perpetrating massive and ever-expanding frauds that threaten Gilead's hard-earned reputation and goodwill, along with the safety of the vulnerable Floridians whom Defendants are using to carry out their schemes, and the broader communities in which they live. Gilead's proposed relief is narrowly tailored to put an end to the ongoing fraud. Accordingly, the Court should grant Gilead's motion in full.

## STATEMENT OF FACTS

The facts relevant to this motion are fully laid out in the declarations of John DeVitto, Joel Gallant, Emilio Garcia, Carey Nakamura, Geoffrey Potter, Donna Quan, Annette Sebastiani, Gretchen Stroud, and their accompanying exhibits, all filed concurrently herewith. Gilead's complaint also alleges those facts in detail. They are summarized here.

### A.      Gilead's Life-Saving HIV Medication and Related Intellectual Property

Gilead is the first—and until recently, the only—company that manufactures FDA-approved therapies to protect individuals at risk of being exposed to HIV from contracting the virus—a drug regimen known as pre-exposure prophylaxis, or "PrEP." (Gallant Decl. ¶¶ 8-9.) Gilead's groundbreaking PrEP medications are called TRUVADA for PrEP® and DESCOVY for PrEP® (together, "PrEP medication"). When taken as indicated, each drug is highly effective at preventing HIV infection in individuals exposed to the virus. (Gallant Decl. ¶ 9.) Studies have shown that taking PrEP medication daily reduces the risk of contracting HIV from sex by about 99%. (Gallant Decl. ¶ 9.) Gilead's PrEP medication has been instrumental in controlling the spread of HIV in the United States and has saved countless lives. (*Id.*)

Gilead also owns a family of registered trademarks that appear on the packaging, tablets, and accompanying labeling of its PrEP medication (collectively, the "Gilead Marks"), and uses distinctive packaging (the "Gilead Dress") to distinguish its PrEP medication in the marketplace. (Stroud Decl. ¶¶ 4-8.)  Those marks, and evidence of their registration, extensive promotion, and famousness, are set forth in the accompanying declaration of Gretchen Stroud.  (Stroud Decl. ¶¶ 9-13.)

### B.    Gilead's Advancing Access® Patient Support Program

### 1.    Gilead Provides Free HIV Medication to Individuals in Need

In an effort to support individuals who have been prescribed PrEP medication and other critical, life-saving Gilead therapies, Gilead established the charitable Advancing Access® Patient Support Program in 2004.  (Sebastiani Decl. ¶ 7.)  Through Advancing Access®, Gilead voluntarily provides free medication to eligible uninsured individuals who have limited financial resources and are unable to access alternative funding sources.  (Sebastiani Decl. ¶¶ 8-10.)  The Advancing Access® free-drug program for HIV *treatment* medication (*i.e.*, for patients who have already contracted HIV) is called the Patient Assistance Program ("PAP").  (Sebastiani Decl. ¶ 9.)  Gilead's free-drug program for HIV *prevention* medication (*i.e.*, TRUVADA for PrEP® or DESCOVY for PrEP®) is called the Medication Assistance Program ("MAP").  (*Id.*)

Since 2005, the programs have helped tens of thousands of uninsured eligible individuals obtain free, life-saving Gilead medications that they need.  (Sebastiani Decl. ¶ 11.)  Gilead has also paid hundreds of millions of dollars to third parties to administer various aspects of the Advancing Access® Patient Support Program, such as processing enrollments and managing the cards that enrollees present to pharmacies to obtain their free medication.  (Sebastiani Decl. ¶ 12.)

### 2. Healthcare Providers Play an Essential Role in Prescribing PrEP Medication and Enrolling Individuals in the MAP

Like all prescription medications, PrEP medication is not appropriate for everyone. Thus, an individual's enrollment in, and receipt of medication through, the MAP requires the participation and careful oversight of a healthcare provider to ensure that PrEP medication is and remains appropriate and medically necessary for the individual. (Gallant Decl. ¶¶ 14, 27, 30; Sebastiani Decl. ¶ 23.)

According to guidelines issued by the U.S. Centers for Disease Control and Prevention ("CDC"), before prescribing PrEP medication, a healthcare provider must assess whether an individual is at risk of acquiring HIV. (Gallant Decl. ¶ 16.) If that assessment indicates that an individual is not at risk of HIV infection, then PrEP medication is not medically necessary, and the provider should not prescribe it. (Gallant Decl. ¶ 19.)

Healthcare providers must also conduct certain tests to determine whether taking PrEP medication might pose risks to the individual. (Gallant Decl. ¶¶ 20-27.) For example, they must confirm that an individual is HIV negative before prescribing PrEP medication (and reconfirm it every three months), because an HIV-positive individual who takes PrEP medication risks allowing the virus to develop resistance to drugs used to treat HIV. (Gallant Decl. ¶ 21.) It is also essential that healthcare providers ascertain what other medications the individual is taking, as well as whether he or she has any pre-existing health issues that could cause an adverse reaction to PrEP medication. (Gallant Decl. ¶¶ 25, 28.) For example, an individual who is already taking one PrEP medication (*i.e.*, TRUVADA for PrEP®) should not take a second PrEP medication (*i.e.*, DESCOVY for PrEP®) at the same time, or else he or she may be at risk of overexposure to the drugs' active ingredients. (Gallant Decl. ¶ 28.) And individuals with hepatitis B may experience severe (and potentially fatal) exacerbation of their symptoms if they

7

begin taking PrEP medication and stop the regimen without medical supervision.  (Gallant Decl. ¶ 24.)

The CDC also instructs that healthcare providers may continue prescribing PrEP medication so long as the individual remains at risk of HIV infection, is willing and able to adhere to the prescribed dosing regimen, and shows no signs of medical risk to continued usage. (Gallant Decl. ¶ 30.)  But the individual's prescription should be discontinued if any of these things ceases to be true.  Thus, ongoing safe and effective use of PrEP medication requires ongoing close oversight by the healthcare provider.  (*Id.*)  In sum, the healthcare provider plays a vital role in ensuring that PrEP medication is and remains medically appropriate for each individual to whom it is prescribed.

Consistent with that vital role, when an individual applies for enrollment in the MAP, his or her healthcare provider must provide specific information and certify to Gilead that this information is true.  (Sebastiani Decl. ¶¶ 22-24.)  In particular, the provider must certify that: (1) the prescribed PrEP medication is for the applicant (and not for someone else); (2) the prescribed medication is medically necessary for the applicant; (3) the prescribed medication will be used as directed; (4) the prescriber will be supervising the applicant's treatment; (5) the applicant has been tested for HIV infection and found negative; (6) the applicant will be regularly tested for HIV as part of his or her care plan; and (7) the prescriber will periodically verify continued use of Gilead PrEP medication and resubmit current prescriptions.  (*Id.*)  These certifications are crucial aspects of a MAP application, as they provide assurance to Gilead that there is a bona fide need for PrEP medication and that the applicant will be taking the prescribed medication safely under the supervision of a credentialed healthcare provider.  (Sebastiani Decl. ¶¶ 25-27.)

### 3.   Gilead Pays Retail Pharmacies Fees and a Significant Reimbursement for Dispensing Free PrEP Medication to MAP Enrollees

Once enrolled, MAP participants are entitled to receive MAP cards generated by TrialCard, one of the third-party vendors with which Gilead has contracted to administer Advancing Access®.  (Sebastiani Decl. ¶ 19.)  These cards contain BIN and PCN numbers[2] and a member identification number that enrollees can use at any U.S. retail pharmacy to obtain their PrEP medication for free.  (*Id.*)

When a MAP enrollee presents his or her card at a retail pharmacy, the pharmacy submits the enrollment information to TrialCard to request approval to dispense the medication to the enrollee.  (Sebastiani Decl. ¶ 28.)  If the claim (known as a "redemption") is approved, Gilead pays to the pharmacy a reimbursement for the medication that has been dispensed, along with a dispensing fee.  (*Id.*)

Importantly, Gilead reimburses pharmacies based on Gilead's wholesale acquisition cost ("wholesale price")—currently more than $1,800 per 30-tablet bottle of TRUVADA® or DESCOVY®—when PrEP medication is dispensed to MAP enrollees.  This is true even if, as is often the case, the pharmacy purchased the dispensed medication at a ***lower price*** from an authorized wholesaler (*e.g.*, due to various discounts that are frequent in the industry).  (Quan Decl. ¶¶ 13, 38-40.)  This is a function of practical necessity due to the retail pharmacy dispensing model:  Gilead could not efficiently or effectively administer the MAP through all retail pharmacies, and provide enrollees with immediate access to free medication, if it had to calculate each individual reimbursement payment based on the actual price the dispensing

---

[2] BIN and PCN numbers are necessary to process a prescription drug claim.  (Sebastiani Decl. ¶ 19); National Council for Prescription Drug Programs (NCPDP), *NCPDP Health Care Identification Card Fact Sheet*, https://www.ncpdp.org/NCPDP/media/pdf/NCPDP_pharmacy_id_card_fact_sheet.pdf (last revised Aug. 2014).

pharmacy paid for a particular bottle of PrEP medication (which is information to which Gilead does not have access).  (Quan Decl. ¶ 13.)  Accordingly, there may be—and often is—a substantial difference between the price a healthcare provider paid to acquire a bottle of PrEP medication and the reimbursement it receives for dispensing that same bottle to a MAP enrollee. (Quan Decl. ¶¶ 38-40.)  As discussed below, exploiting this price differential lies at the heart of Defendants' fraudulent schemes.

In the MAP, PrEP medication is dispensed in a proprietary Gilead bottle containing a 30-day supply of tablets; however, MAP enrollees are able to pick up a prescribed refill 21 days after receiving their original medication.  (Sebastiani Decl. ¶ 21.)  The MAP permits this early dispensing to ensure that enrollees have continuous access to their medication and do not need to wait until they run out before seeking a refill.  (*Id*.)

**C.     Defendants' Schemes to Defraud Gilead by Abusing the MAP**

Defendants in this case are two interconnected networks of Florida healthcare clinics (the "Clinic Defendants")[3], pharmacies (the "Pharmacy Defendants")[4], and lab testing facilities (the "Lab Defendants")[5], together with the individuals who own and operate them (the "Officer

---

[3] The Clinic Defendants are AJC Medical Group, Inc. ("AJC Medical"); Alliance Medical Center, Inc. ("Alliance Medical"); Allied Health Organization, Inc. ("Allied Health"); A Better You Wellness Center, LLC ("Better You Wellness"); Baikal Marketing Group, Inc. ("Baikal Marketing"); 3rd Step Recovery Group, Inc. d/b/a Continental Wellness Center ("Continental Wellness"); Community Health Medical Center LLC ("Community Health"); Doctors United, Inc. d/b/a Doctors United Group ("Doctors United"); Florimed Medical Center Corp. ("Florimed"); Juan Jesus Salina, M.D. Corp. ("Salina M.D. Corp."); Positive Health Alliance, Inc. ("Positive Health"); Priority Health Medical Center, Inc. ("Priority Health"); and Well Care LLC ("Well Care").

[4] The Pharmacy Defendants are Physician Preferred Pharmacy, Inc. ("Physician Preferred"), and United Pharmacy LLC ("United Pharmacy").

[5] The Lab Defendants are Labs4Less LLC ("Labs4Less"); Testing Matters Inc. ("Testing Matters"); and United Clinical Laboratory LLC ("United Labs").

Defendants")[6] and certain doctors, nurse practitioners, and physician assistants whom they employ (the "Prescriber Defendants").[7]  These two networks are referred to herein as the "Doctors United Defendants" and the "Positive Health Defendants."  Defendants have collectively stolen more than $43 million from Gilead through their schemes to defraud the MAP.  In the process, Defendants have wantonly endangered the health and safety of thousands of individuals who earn low incomes or are homeless whom Defendants are using to carry out their fraud, and placed Florida communities at an increased risk of exposure to HIV.

1.     **The Defendants And Their Relationships**

a.     ***Doctors United Defendants***

The Doctors United Defendants include (a) six clinics: Defendants Doctors United, AJC Medical, Allied Health, Better You Wellness, Florimed, and Salina M.D. Corp. ("Doctors United Clinic Defendants"); (b) four prescribers: Defendants Tamara Alonso, John Catano, Alexander Evans, and Ifeoma Nwofor ("Doctors United Prescriber Defendants"); (c) one lab testing facility: Testing Matters ("Doctors United Lab Defendant"); (d) one pharmacy: Physician Preferred ("Doctors United Pharmacy Defendant"); and (e) principals and officers of the foregoing entities ("Doctors United Officer Defendants").

The Doctors United Defendants are connected by a web of interlocking relationships, which enable their mutual cooperation in and execution of their fraudulent scheme.

---

[6] The Officer Defendants are Jean Alexandre; Chenara Anderson; Myriam Augustine; Twiggi Batista; Arsen Bazylenko; Michael Bogdan; Augustine Carbon; Jennifer John Carbon; Khadijah Carbon; Alejandro Castro; Jean Charlot; Shonta Darden; Maria Freeman; Shajuandrine Garcia; Barbara Gibson; Gary Kogan; Cora Mann; Nick Myrtil; Erik Joseph Pavao; Willie Peacock; Jean Rodney, Tatiana Rozenblyum; Juan Jesus Salina; Dimitry Shaposhnikov; Roman Shekhet; Kirill Vesselov; Mikhail Vesselov; and Tomas Wharton.

[7] The Prescriber Defendants are Tamara Alonso, Barbara Bryant, John Catano, Alexander Evans, Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Ifeoma Nwofor, Michael Pierce, Michel Poitevien, and Jean Rodney.

11

The following is a diagram of the connections among the Doctors United Defendants, based on information currently known to Gilead.  These connections are further detailed in the complaint and declarations of Emilio Garcia and Donna Quan.  (Garcia Decl. ¶¶ 11-44; Quan Decl. ¶¶ 7-8, Ex. A ¶ 3.)



b.    ***The Positive Health Defendants***

The Positive Health Defendants include (a) seven clinics: Defendants Alliance Medical, Baikal Marketing, Continental Wellness, Community Health, Positive Health, Priority Health, and Well Care ("Positive Health Clinic Defendants"); (b) nine prescribers: Defendants Barbara Bryant, Jesula Gabo, Kerline Joseph, Viergela Joseph, Andre Kerr, Cassandra Louissaint, Michael Pierce, Michel Poitevien, and Jean Rodney ("Positive Health Prescriber Defendants"); (c) two lab testing facilities, Defendants Labs4Less and United Labs ("Positive Health Lab Defendants"); (d) one pharmacy, Defendant United Pharmacy ("Positive Health Pharmacy Defendant"); and (e) principals and officers of the foregoing entities ("Positive Health Officer Defendants").

Like the Doctors United Defendants, the Positive Health Defendants are linked to one another through a web of overlapping connections, which facilitate their mutual cooperation in the fraudulent scheme.  The following is a diagram of the connections among the Positive Health Defendants, based on information currently known to Gilead.  These connections, too, are further detailed in the complaint and declarations of Emilio Garcia and Donna Quan. (Garcia Decl. ¶¶49-90; Quan Decl. ¶¶ 7, 9, 11, Ex. A ¶ 5.)

13



## Positive Health Defendants

c.      *Connections Between the Doctors United and Positive Health Defendants*

The Doctors United Defendants and Positive Health Defendants also share common contact points with one another (which discovery will further elucidate), indicating that both groups of Defendants are working in concert to defraud Gilead.  These connections include:

- Both groups of Defendants work with a common pharmacy to carry out their fraudulent schemes:  As one Doctors United employee told the Recruit Whistleblower,[8] a whistleblower who contacted Gilead about the schemes, ***"Doctors United and Positive Health and everybody else all use the same Pharmacy that delivers directly to their offices."***  (Garcia Decl. ¶ 110.)

- Numerous Doctors United Prescriber Defendants are listed as prescribers on redemptions associated with individuals enrolled in the MAP by Positive Health Clinic Defendants, and conversely, numerous Positive Health Prescriber Defendants are listed as prescribers on redemptions associated with individuals enrolled in the MAP by Doctors United Clinic Defendants.  Some prescribers, such as Defendants Barbara Bryant and Michel Poitevien, have enrolled individuals in the MAP on behalf of *both* the Doctors United Clinic Defendants and the Positive Health Clinic Defendants.  (Sebastiani Decl. ¶¶ 67-70.)

- Defendants' social media accounts show numerous connections between the Doctors United Defendants and Positive Health Defendants.  (Garcia Decl. ¶¶ 65, 77.)

2.      **Enrollment and Redemption Data Tips Gilead Off to Defendants' Fraud**

Concerns about Defendants' conduct first emerged when Gilead noticed that certain Prescriber Defendants and other prescribers associated with the Clinic Defendants were processing enormous volumes of MAP enrollments and redemptions.  (Quan Decl. ¶ 18.)  This output was grossly disproportionate to other healthcare providers in Florida and elsewhere.  By way of illustration, between January 2019 and August 2020, the average MAP prescriber in

---

[8] In light of the criminal nature of Defendants' schemes, this brief and the other materials filed by Gilead in support of its motion use pseudonyms in certain instances to protect the safety of whistleblowers. Where individual MAP enrollees are discussed, pseudonyms are also used to protect the enrollees' medical privacy.

Florida prescribed approximately 10 bottles of PrEP medication per month. (Quan Decl. ¶ 16.) But certain prescribers employed by the Clinic Defendants—including Prescriber Defendants Tamara Alonso, Cassandra Louissaint, and Michel Poitevien—prescribed **between 30 and 50 times that amount** in multiple months during the same time period. (*Id.*)

### Bottles of Medication Prescribed by High-Volume Prescriber Defendants



Due to the disproportionate number of individuals that the Clinic Defendants have enrolled in the MAP, during the first five months of 2020, Defendants Positive Health and Doctors United accounted for **approximately 45 percent** of the all MAP redemptions originating from Florida. (Quan Decl. ¶ 17.)



The Clinic Defendants are also responsible for some of the highest monthly MAP redemption numbers among all prescribers nationwide.  In March 2020, for example, the Clinic Defendants alone were responsible for more than 15% percent of the nationwide redemptions paid under the MAP.  (Quan Decl. ¶ 17.)

After noticing these red flags, Gilead investigated Defendants' conduct.  That investigation uncovered numerous instances of fraudulent enrollment and redemption practices.  (Quan Decl. ¶¶ 18-36.)  For instance, Gilead identified many occasions where the Clinic and Prescriber Defendants had written multiple prescriptions for PrEP medication for the same MAP enrollee, and submitted multiple redemptions for that enrollee only days apart, and much sooner than 21 days after the preceding redemption.  (Quan Decl. ¶¶ 20-26.)  To take one example, between January and April 2020, Defendant Tamara Alonso of Defendant Doctors United and Defendant Ifeoma Nwofor of Defendant AJC Medical claimed to have dispensed PrEP medication through the MAP ***seven times to the same individual over a period of less than three months***, as shown in the table below.  (Quan Decl. ¶ 21.)

17

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United |
| 98847236409 | 6-Apr-20 | 24 | Ifeoma Nwofor | AJC Medical |
| 98847236409 | 14-Apr-20 | 8 | Tamara Alonso | Doctors United |

Likewise, in November and December 2019, Defendant Barbara Bryant of Defendant Positive Health purportedly dispensed PrEP medication through the MAP *four times to the same individual over a period of six weeks*, as shown in the table below.  (Quan Decl. ¶ 22.)

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation |
|---|---|---|---|---|
| 98846759309 | 1-Nov-19 | n/a | Barbara Bryant | Positive Health |
| 98846759309 | 20-Nov-19 | 19 | Barbara Bryant | Positive Health |
| 98846759309 | 4-Dec-19 | 14 | Barbara Bryant | Positive Health |
| 98846759309 | 13-Dec-19 | 9 | Barbara Bryant | Positive Health |

Defendants have sought to avoid scrutiny of this improper practice by alternating prescribers, clinics, and pharmacies when purportedly dispensing multiple bottles of PrEP medication over a short time period to a single MAP enrollee.  (Quan Decl. ¶ 23.)   For instance, when prescribing and dispensing four refills over the course of 42 days to a single individual [ID #98853569809] (an average rate of refill every 14 days), Defendant Andre Kerr (of Defendant Baikal Marketing) and another prescriber at Defendant Doctors United alternated writing the prescriptions, and Defendants United Pharmacy and Physician Preferred took turns submitting redemptions for the medication purportedly dispensed to this individual, as shown in the table below.  (*Id.*)

18

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Pharmacy |
|---|---|---|---|---|---|
| 98853569809 | 6-Dec-19 | n/a | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 11-Dec-19 | 5 | Andre Kerr | Baikal Marketing | United Pharmacy |
| 98853569809 | 30-Dec-19 | 19 | Chelsia Binns | Doctors United | Physician Preferred |
| 98853569809 | 17-Jan-20 | 18 | Andre Kerr | Baikal Marketing | United Pharmacy |

Redemption data also showed that Defendants have alternated between prescribing TRUVADA for PrEP® and DESCOVY for PrEP® for the same MAP enrollee, thereby allowing Defendants to accelerate the rate of refills.  (Quan Decl. ¶ 24.)   For example, Defendant Michael Pierce of Defendant Continental Wellness and Defendant Michel Poitevien of Defendant Alliance Medical alternated between prescribing TRUVADA for PrEP® and DESCOVY for PrEP® for a single individual *four times over the course of a six-week period* in February and March 2020, as shown in the table below.  (*Id.*)  This practice is medically inappropriate and potentially dangerous.  (Gallant Decl. ¶ 28.)

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 96228786408 | 11-Feb-20 | n/a | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 24-Feb-20 | 13 | Michel Poitevien | Alliance Medical | DESCOVY® |
| 96228786408 | 10-Mar-20 | 15 | Michael Pierce | Continental Wellness | TRUVADA® |
| 96228786408 | 20-Mar-20 | 10 | Michel Poitevien | Alliance Medical | DESCOVY® |

Similarly, redemption data shows that Defendant Tamara Alonso (of Defendant Doctors United) and Defendant Ifeoma Nwofor (of Defendant AJC Medical) alternated between prescribing TRUVADA® and DESCOVY® for a single individual five times over the course of a six-week period, as shown in the table below.  (Quan Decl. ¶ 24.)

19

| MAP Card | Date | Days Since Last Refill | Prescriber | Clinic Affiliation | Medication |
|---|---|---|---|---|---|
| 98847236409 | 28-Jan-20 | n/a | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 17-Feb-20 | 20 | Tamara Alonso | Doctors United | DESCOVY® |
| 98847236409 | 21-Feb-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |
| 98847236409 | 9-Mar-20 | 17 | Ifeoma Nwofor | AJC Medical | DESCOVY® |
| 98847236409 | 13-Mar-20 | 4 | Tamara Alonso | Doctors United | TRUVADA® |

Although these suspicious enrollment and redemption practices raised numerous questions regarding Defendants' conduct, it was only after receiving credible and consistent reports of fraud from multiple whistleblowers, including some of Defendants' own current and former employees, that Gilead uncovered the true nature and scope of Defendants' fraudulent schemes.  (Quan Decl. ¶ 18; Sebastiani Decl. ¶ 32.)

### 3.    Subsequent Investigation Confirms the Mechanics of Defendants' Fraudulent Schemes

Through its investigation, Gilead learned that Defendants' anomalous enrollment and redemption practices are the result of large-scale, ongoing schemes in which Defendants use Floridians who are homeless or struggling financially to defraud Gilead out of tens of millions of dollars.  The mechanics of those schemes are detailed below.

The Clinic Defendants employ a team of van drivers who patrol the streets of Florida in an effort to recruit individuals who appear to earn low incomes or are homeless ("recruits") whom the Clinic and Prescriber Defendants can fraudulently enroll in Gilead's MAP. (Sebastiani Decl. ¶¶ 34-35, 40-43, 57-58; Garcia Decl. ¶¶ 95-98.)  Many of these van drivers have extensive criminal records.  For example, Positive Health van driver LeShawna Randall has prior convictions for aggravated battery and robbery.  (Garcia Decl., Ex. 61.)  Defendant Erik Joseph Pavao, Ms. Randall's supervisor and a Manager of Defendant Community Health, has prior convictions for burglary, grand theft, and larceny.  (Garcia Decl., Ex. 44.)

20

Photos taken by a Gilead investigator of some of the Clinic Defendants' vans at recruiting locations are shown below.[9]  As the photos show, the Clinic Defendants' vans often bear the Positive Health logo:





The van drivers offer the recruits small amounts of money (about $10), gift cards, food, and/or cigarettes on the condition that they agree to be brought to one of the Clinic Defendants' clinics for a purported "wellness check" that includes an HIV test.  (Sebastiani Decl. ¶¶ 34, 41,

---

[9] Defendants devote considerable resources to this van operation.  For example, Positive Health owns at least nine large passenger vans that are used by the company's drivers.  (Garcia Decl., Ex. 35.)

57; Garcia Decl. ¶¶ 96-98.)  Below is a photo of one of the gift cards Defendant Positive Health

gave to the Recruit Whistleblower,[10] a homeless man who called Gilead to report the fraud:



The Clinic Defendants deliberately target persons who earn low incomes or are homeless

because they know such persons are likely to qualify for the MAP if they are prescribed PrEP

medication, and because they know the recruits' personal situations may make them more likely

to go along with the scheme.[11]  (Sebastiani Decl. ¶¶ 42-43; Garcia Decl. ¶ 93.)

The Clinic Defendants pay the van drivers a bounty for each recruit they manage to bring

to one of their clinics; as a result, one driver told the Recruit Whistleblower, the drivers

sometimes travel as far as 50 miles hunting for new recruits.  (Sebastiani Decl. ¶¶ 44-45.)  The

van drivers also enlist the recruits themselves to assist in identifying new persons willing to go to

Defendants' clinics in exchange for payment.  On one occasion, a van driver told the Recruit

Whistleblower, "If you find me people, I'll give you $5 a head for everyone you put in this van."

(Sebastiani Decl. ¶ 44.)  The van driver subsequently paid the Recruit Whistleblower $45 after

he identified nine people who were willing to be brought by the driver to a clinic.  (*Id.*)  The

---

[10] Several of the Clinic Defendants have recruited, enrolled, and repeatedly prescribed PrEP medication to the Recruit Whistleblower.

Clinic Defendants' recruitment efforts are not limited to persons who are homeless or earn a low income.  The Clinic Defendants also task their employees with identifying other individuals who may be willing to go to Defendants' clinics in exchange for compensation.  As a result, the Clinic Defendants' employees have recruited family, friends, and acquaintances to come to Defendants' clinics for "wellness checks," irrespective of medical need.  (Sebastiani Decl. ¶¶ 57-58.)

Once at the Clinic Defendants' clinics, recruits are subjected to a blood test.  (Sebastiani Decl. ¶¶ 34, 41, 57; Garcia Decl. ¶ 98.)  These blood tests are conducted by the Lab Defendants, which know that these tests are necessary to enroll recruits in the MAP, as healthcare providers must verify that an individual is HIV negative before prescribing PrEP medication and enrolling that individual in the MAP.

The recruits also receive a cursory consultation with one of the Clinic Defendants' doctors or nurse practitioners, which the Recruit Whistleblower described as a "joke." (Sebastiani Decl. ¶ 46.)  These are not legitimate medical examinations, but rather, a pretext to enroll recruits in the MAP, irrespective of medical need.  (Sebastiani Decl. ¶¶ 41, 46; Garcia Decl. ¶ 98.)  During these "wellness checks," the Clinic Defendants' doctors and nurse practitioners generally do not assess whether recruits want PrEP medication or are in fact at risk of HIV infection.  Nor do they ask recruits about preexisting medical conditions that could be exacerbated by taking PrEP medication, or whether the recruits are taking other drugs that interact with PrEP medication in potentially unsafe ways.  (*Id.*)  Instead, the Clinic Defendants' prescribers—including the Prescriber Defendants—indiscriminately prescribe PrEP medication to **all** recruits without regard to whether the prescription is medically necessary or safe for the recruit.  (Sebastiani Decl. ¶¶ 35-36, 47, 82; Garcia Decl. ¶¶ 98, 103.)  Indeed, the Prescriber and

Clinic Defendants enroll recruits and prescribe PrEP medication even when the recruits directly state they do not want the medicine or will not take it.  As one whistleblower—an employee of Defendant Doctors United—reported, recruits inform the Clinic Defendants' personnel, "I did the lab work because you guys are offering me a $10 gift card, but I don't want the meds." (Sebastiani Decl. ¶ 35.)

The Prescriber and Clinic Defendants then enroll these recruits in the MAP, even if the recruits make clear they do not plan to take the PrEP medication.  (Sebastiani Decl. ¶¶ 35-36, 47, 82.)  For instance, when the Clinic Defendants first enrolled the Recruit Whistleblower in the MAP, he told the examining nurse practitioner that he did not fall into any of the risk groups for HIV, and did not intend to take the PrEP medication that was being prescribed.  In response, the nurse practitioner told the Recruit Whistleblower that he would not receive the $10 he had been promised if he did not sign up for the MAP and asked the Recruit Whistleblower whether he was going to be a "good patient and comply."  (Garcia Decl. ¶ 103.)  Only at this point did the Recruit Whistleblower, who is homeless and desperately in need of money, agree to enroll.  (*Id.*)

To obtain the recruits' compliance, the Clinic Defendants advise recruits that they do not have to take the PrEP medication prescribed to them at all, and that if they do, they are not required to take the tablets daily.  (Sebastiani Decl. ¶ 82.)  The latter advice is contrary to CDC guidelines for safe and effective use of PrEP medication.  (Gallant Decl. ¶¶ 29-30.)

For each recruit subjected to the blood test and "wellness check," the Clinic and Prescriber Defendants then submit a fraudulent MAP application to Gilead.  In doing so, the Clinic and Prescriber Defendants falsely certify to Gilead that (1) the prescribed medication is actually for the recruit, and not someone else (as discussed below, the medication is seldom, if ever, intended for the recruit); (2) the prescribed medication is medically necessary for the

recruit; (3) the prescribed medication will be used by the recruit as directed; (4) the prescriber will be supervising the recruit's use of PrEP medication; and (5) the prescriber will verify continued use of the PrEP medication being prescribed.  (Sebastiani Decl. ¶¶ 22-24.)

Even when recruits refuse to go along with Defendants' schemes, the Clinic and Prescriber Defendants enroll them in the MAP anyway, often forging the recruits' signatures on the enrollment paperwork.  (Sebastiani Decl. ¶ 53; Garcia Decl. ¶ 104.)  Gilead's investigation has uncovered numerous instances where enrollee signatures have been forged on sections of the MAP application concerning (1) financial and insurance information for the applicant, which Gilead relies on to determine MAP eligibility; and (2) the applicant's HIPAA release authorizing Gilead to use and disclose the applicant's personal health information, which Gilead also relies on to process MAP applications.  (Sebastiani Decl. ¶ 53.)  These forged applications include applications purportedly signed by the Recruit Whistleblower, who has confirmed that the forms do not bear his actual signature.  (Garcia Decl. ¶ 104.)  By forging recruits' signatures in this manner, the Prescriber and Clinic Defendants make additional false certifications to Gilead and commit criminal violations of HIPAA.

The Clinic Defendants have gone so far as to forge *prescriber* signatures to fraudulently enroll recruits in the MAP and write their prescriptions.  For example, the whistleblower employed by Defendant Doctors United reported to Gilead that Doctors United kept an otherwise blank MAP enrollment form that had been signed by a nurse practitioner who was previously employed by the clinic.  (Sebastiani Decl. ¶ 38.)  According to the whistleblower, Doctors United staff made copies of that form and used them to try to enroll recruits in the MAP even after the nurse practitioner whose signature appeared on the form, Chelsia Binns, had been terminated.  (*Id.*)  Similarly, another whistleblower, employed by Defendant Priority Health,

reported that the Priority Health clinic where she had worked had no doctors on site.  Instead, the clinic had office staff who are not lawfully authorized to prescribe PrEP medication writing out prescriptions for recruits.  (Sebastiani Decl.. ¶ 59.)

More recently, some of the Clinic Defendants have shifted to enrolling recruits in the MAP or PAP without even going through the formality of subjecting recruits to a "wellness check" at one of their clinics.  For example, in October 2020, the Recruit Whistleblower was recruited at a bus terminal by an employee of Defendants Better You Wellness and Allied Health, who offered the Recruit Whistleblower $10 if he agreed to provide a name, social security number, and birth date to the employee and also agreed to have his photograph taken. (Garcia Decl. ¶ 112.)  The Whistleblower Recruit agreed to do so and provided a false identity. (*Id.*)  Later that day, Defendant Allied Health submitted a form to enroll the Recruit Whistleblower—using the alias that he had provided—in the PAP in connection with a prescription for DESCOVY® for HIV treatment.  (Sebastiani Decl. ¶ 53.)  The enrollment form bore a forged signature for the Whistleblower Recruit and included a fake photo identification that had been manufactured by Better You Wellness—which the identification card falsely represented as operating a homeless shelter—using the photograph the recruiter had taken of the Recruit Whistleblower.  (Sebastiani Decl. ¶ 87.)

After fraudulently enrolling recruits in the MAP, the Clinic and Prescriber Defendants give them a bottle of PrEP medication that has been dispensed by one of the co-conspirator Pharmacy Defendants.  (Sebastiani Decl. ¶¶ 51, 54-55; Garcia Decl. ¶ 109.)  The medication that the Pharmacy Defendants dispense and that the Clinic and Prescriber Defendants provide to recruits bears multiple Gilead Marks, including on the bottles and the tablets themselves.

(Stroud Decl. ¶¶ 4-8.)  However, the product dispensed to recruits is different from genuine PrEP medication in several critically important respects.

For example, genuine PrEP medication is dispensed in specially engineered, FDA-mandated bottles, with features including airtight seals and in-bottle desiccants that are necessary to prevent the moisture-sensitive tablets from coming into contact with atmospheric moisture and degrading.  (Nakamura Decl. ¶¶ 10-13.)  The required bottles are opaque and extra thick to keep moisture from degrading the medicine.  (Nakamura Decl. ¶ 11.)  The labels of genuine PrEP medication bottles also contain vital, FDA-required information such as lot number, expiration date, storage temperature limitations, and the number of tablets.  And affixed to each genuine bottle is a folded-up paper "package insert" containing extensive FDA-mandated safety warnings and instructions for use.  (Nakamura Decl. ¶¶ 16-20.)  By contrast, Defendants dispense PrEP medication to their recruits in generic translucent plastic pharmacy bottles not produced by Gilead.  These generic bottles lack the FDA-mandated safety and labeling features of Gilead's genuine bottles; are missing the FDA-required safety warnings and instructions for use; and lack required bottle label information such as lot number and expiration date.  (Sebastiani Decl. ¶ 51; Garcia Decl. ¶ 109; Nakamura Decl. ¶¶ 6, 15, 21; DeVitto Decl. ¶¶ 8, 11-12.)  Below is a comparison of a bottle of DESCOVY® dispensed to the Recruit Whistleblower and the FDA-approved packaging for authentic DESCOVY®:

**DESCOVY® Dispensed to the Recruit Whistleblower**



**FDA-Approved DESCOVY® Bottle with Package Insert**

  

Defendants' unauthorized modifications to Gilead's FDA-approved packaging and

labeling render the PrEP medication that Defendants dispense "misbranded" under the Federal

28

Food, Drug, and Cosmetic Act ("FDCA"), and therefore unlawful to possess, sell, or distribute. (Nakamura Decl. ¶¶ 8, 15); *see* 21 U.S.C. §§ 331 (prohibiting the adulteration or misbranding of a drug in interstate commerce, or introducing into interstate commerce, receipt, or delivery of an adulterated or misbranded drug); *id.* § 352 (recognizing that a drug is deemed misbranded if, *inter alia*, it lacks adequate directions for use and warnings on the label, lacks special packaging and labeling for deteriorative drugs, or is otherwise marketed and sold with labeling other than that which the FDA has approved).  The sale of these misbranded drugs is a strict-liability federal crime.  *See id.*  The "repackaging, sale, delivery, or holding or offering for sale" of a "misbranded" drug is also a felony under Florida law.  *See* Fla. Stat. § 499.005(1); *see also* Fla. Stat. § 499.005(9) (providing that it is a crime to "alter[]" or "remov[e] … the whole or any part of the labeling of a drug" or "do[] any other act" that renders it misbranded "while the drug … is held for sale"); Fla. Stat. § 499.0051(a) (similar).

After recruits receive their misbranded PrEP medication, the van drivers introduce the recruits to their associates, who offer between $10 and $40 in cash—a fraction of the medication's actual value—to purchase the PrEP medication back from the recruit.  (Sebastiani Decl. ¶ 48; Garcia Decl. ¶¶ 101-02.)  The van drivers encourage recruits to sell their PrEP tablets, telling them: "You probably don't want to take that medication, but if you want to sell it, I'll buy it."  (Garcia Decl. ¶ 101.)  In some instances, the drivers themselves offer to purchase the medication back from recruits.  (Sebastiani Decl. ¶ 48; Garcia Decl. ¶¶ 101-02.)  For example, the Clinic Defendants' drivers and their associates have bought PrEP medication from the Recruit Whistleblower on multiple occasions, just after the Clinic Defendants dispensed it to him.  (Garcia Decl. ¶¶ 101-02.)  Sometimes, the recruits are further pressured into returning their PrEP medication by foreboding references to supposed "side effects" of the medication.  (Garcia

Decl. ¶ 101.)  Because most recruits either do not have an actual medical need for the PrEP medication prescribed to them, or are deterred by these references to "side effects," they either (a) sell their PrEP medication to the van drivers or their associates, as requested; (b) keep the PrEP medication to sell later themselves; or (c) discard the PrEP medication, rather than taking it as directed.  (Sebastiani Decl. ¶ 48; Garcia Decl. ¶¶ 101-02.)

Once this fraudulent process is complete, the van drivers offer recruits an additional $10 (or similarly small payment) if they agree to be brought to another of the Clinic Defendants' affiliated clinics to start the process over.  (Sebastiani Decl. ¶ 49; Garcia Decl. ¶ 97.)  At the next clinic, the Clinic Defendants once again subject the recruits to a "wellness check," prescribe them medically unnecessary PrEP medication, and submit additional fraudulent (and redundant) MAP enrollments to Gilead.  (Sebastiani Decl. ¶ 49; Garcia Decl. ¶ 97.)

The Clinic Defendants arrange for refills of recruits' PrEP medication to be sent directly to one of Defendants' clinics and encourage recruits to return to pick up those refills, reminding them that the Clinic Defendants will pay them $10 each time they return.  (Garcia Decl. ¶ 100.) This allows the Clinic and Prescriber Defendants to continue to dispense medically unnecessary PrEP medication to the same recruits, thereby enabling the Pharmacy Defendants to seek additional fees and reimbursements from Gilead for dispensing that PrEP medication. (Quan Decl. ¶¶ 43-47.)  It also enables the Clinic, Prescriber, and Pharmacy Defendants to create a misleading audit trail that would suggest recruits are actually taking the prescribed PrEP medication when they are not.

The Clinic, Prescriber, and Pharmacy Defendants follow this refill practice without regard to whether the recruit is actually taking the prescribed Gilead medication.  Indeed, the Clinic and Pharmacy Defendants will purport to "dispense" these refills and submit redemptions

to Gilead even when recruits refuse to return to the Clinic Defendants' clinics to pick up their prescriptions.  Because many recruits do not actually pick up the refills that have purportedly been dispensed (notwithstanding the Clinic Defendants' offer to pay recruits $10 each time they do), and because the Clinic Defendants often buy the medication back from the recruits once it has been dispensed, the Clinic and Pharmacy Defendants have amassed an enormous stockpile of unused PrEP medication for which Gilead has already paid reimbursements through the MAP. (Sebastiani Decl. ¶¶ 39, 50; Garcia Decl. ¶¶ 101-02.)  As the whistleblower employed by Defendant Doctors United reported, her clinic had a "room full of medication that patients don't want."  (Sebastiani Decl. ¶ 39.)  The Clinic and Pharmacy Defendants dispense this excess medication to other recruits and fraudulently claim duplicative reimbursements for each such bottle dispensed, or simply sell the medication on the black market.  (Quan Decl. ¶¶ 43-47.) These practices, too, are criminal.  *See, e.g.*, Fla. Stat. § 499.005(27) (stating that it is unlawful to "[d]istribut[e] a prescription drug that was previously dispensed by a licensed pharmacy"); Fla. Stat. § 499.0051(h) (similar).

### 4.    Defendants' Ability to Profit from Their Fraudulent Schemes

Defendants have secured enormous profits from their fraud, at Gilead's expense, by taking advantage of their participation in the federal government's 340B Drug Pricing Program ("340B Program").  (Quan Decl. ¶¶ 37-47.)  Under the 340B Program, drug manufacturers participating in Medicaid—such as Gilead—agree to make their drugs available at significantly reduced prices to covered entities enrolled in the program.  (Quan Decl. ¶¶ 6, 37-40.) Defendants Allied Health, Continental Wellness, Doctors United, Florimed, and Positive Health are all registered 340B covered entities and, as such, are able to procure Gilead medications at

steeply discounted 340B prices.[12]  (Quan Decl. ¶ 7.)  The Pharmacy Defendants are "contract pharmacies" for clinics operated by these Defendants, meaning they receive and dispense drugs purchased by 340B entities at discounted 340B Program prices.  (Quan Decl. ¶¶ 8-9.)  By virtue of this relationship, the Clinic Defendants can order PrEP medication from a wholesaler at the discounted 340B price for delivery to their co-conspirator Pharmacy Defendants, which then dispense the medication to the Clinic Defendants purportedly on behalf of their recruits, as described above.  (Quan Decl. ¶¶ 37-40.)

Upon filling each bottle of PrEP medication, the Pharmacy Defendants submit a redemption to Gilead to receive payment for dispensing the medication.  (Quan Decl. ¶¶ 4, 13.)  As discussed above, out of administrative necessity, Gilead reimburses pharmacies for dispensed PrEP medication at the wholesale price of more than $1,800, even though Defendants pay significantly less to purchase the medication from the wholesaler.  (Sebastiani Decl. ¶¶ 28, 30.)  On top of that, Gilead also pays the dispensing pharmacy a dispensing fee for each bottle of PrEP medication purportedly dispensed to a MAP enrollee.  (Quan Decl. ¶¶ 13, 40.)  The Pharmacy Defendants retain the dispensing fees, and are supposed to remit the reimbursement received for the medication to the 340B covered entity Defendants.  (*Id.*)  For each bottle of PrEP medication fraudulently dispensed and reimbursed in this manner, Defendants earn a ***total profit of more than $1,000***, consisting of the price differential and the dispensing fee.  (Quan Decl. ¶ 40.)

---

[12] Not all Clinic Defendants are registered in the 340B Program; thus, the 340B Clinic Defendants use their registered status to procure PrEP medication at the 340B price to dispense to all Clinic Defendants' MAP enrollees.

**Defendants Capture Most of the Payment from Gilead as Profit After Subtracting Their Cost of Acquiring the PrEP Medication They Dispense**



It is highly improper—not to mention fraudulent and illegal—for the Defendants to exploit the price differential between the reimbursement amount paid by Gilead and the 340B acquisition price by issuing and filling prescriptions to individuals who neither want nor need PrEP medication, while falsely certifying the opposite to Gilead.  (Quan Decl. ¶¶ 30, 35.)

Here, Defendants have fraudulently exploited this price differential on a grand scale: since February 2018, Defendants have purported to dispense more than 30,000 bottles of PrEP medication to recruits, few if any of whom had a genuine medical need for the medication. (Quan Decl. ¶ 41.)  Based on the payments they have received from Gilead through the MAP, this corresponds to *a profit of more than $43 million* for Defendants at Gilead's expense—with a cost to Gilead far exceeding that amount, given the millions of dollars in administrative fees that Gilead also pays in connection with each redemption.  (Quan Decl. ¶ 42.)  In addition to this illicit profit, Defendants are able to capture additional profits from PrEP medication that they illegally repurchase from recruits and either (a) redispense to other recruits in connection with a duplicative reimbursement claim to Gilead for that same bottle, or (b) sell on the black market. (Quan Decl. ¶¶ 43-47.)

33

### 5.    The Role Each Defendant Plays in the Schemes

Each Defendant plays an instrumental role in carrying out Defendants' multifaceted

schemes.  In particular:

- The Clinic Defendants (i) identify and fraudulently enroll recruits in the MAP, (ii) acquire heavily discounted PrEP medication via the 340B Program for the Pharmacy Defendants to dispense, and (iii) purchase already-dispensed PrEP medication back from recruits so it can be redispensed or resold.  (Sebastiani Decl. ¶¶ 34-39, 41-50, 57-61; Garcia Decl. ¶¶ 95-98, 101-02.)

- The Prescriber Defendants (i) perform the sham "wellness checks" that serve as the Clinic Defendants' pretext for recruiting homeless and low-income individuals to enroll in the MAP, and (ii) use their medical licenses and prescribing credentials to fraudulently enroll recruits in the MAP and improperly write recruits medically unnecessary and inappropriate prescriptions (and refills) for PrEP medication.  (Sebastiani Decl. ¶¶ 41, 48, 62; Garcia Decl. ¶¶ 95-98, 103, 105.)

- The Lab Defendants, knowing their work is being done to further the fraudulent schemes, provide blood testing servicers in connection with the Clinic Defendants' fraudulent MAP enrollments, which require prescribers to confirm that MAP applicants are HIV negative.  (Sebastiani Decl. ¶¶ 34, 41, 46, 57; Garcia Decl. ¶¶ 98, 109.)

- The Pharmacy Defendants submit fraudulent redemptions and receive significant fees and reimbursements from Gilead, which the Pharmacy Defendants then share with the other Defendants to secure their participation in the fraudulent schemes and fund their expansion.  (Quan Decl. ¶¶ 13, 44-45.)

- The Officer Defendants, by virtue of their control of the entity Defendants, devise, implement, and enforce policies and business practices that enable the entity Defendants to carry out the fraud.  (Sebastiani Decl. ¶ 36, 58; Garcia Decl. ¶¶ 15-44, 49-90.)

Notably, complex healthcare schemes like these are not new to Defendants, some of

whom are convicted felons.  In fact, just two years ago, federal prosecutors charged Defendant

Jennifer John Carbon—Defendant Doctors United's co-founder and former President, and the

wife and mother of Doctors United's two current officers—with conspiracy to commit healthcare

fraud in connection with a scheme that closely resembles Defendants' schemes to defraud

Gilead.  In the factual proffer accompanying her ensuing guilty plea, Mrs. Carbon admitted that,

in exchange for kickbacks, she "***agreed to arrange for and provide medically unnecessary prescriptions***" for patients whom her co-conspirators had referred to a clinic owned by Mrs. Carbon and her husband, Defendant Augustine Carbon.  (Garcia Decl. ¶ 22; *see United States v. Carbon*, No. 1:18-cr-20690, ECF No. 27 (S.D. Fla. Filed Aug. 20, 2018))  Mrs. Carbon further admitted that, in exchange for kickbacks, she "arranged for and provided prescriptions" to a co-conspirator who would then dispense medically unnecessary medication to patients that Mrs. Carbon had "personally recruited."  (*Id.*)  Mrs. Carbon was sentenced to a prison term in connection with her conviction.  (Garcia Decl. ¶ 22.)  Mrs. Carbon, her family, and the entities they control are now reprising substantially the same scheme, leveraging their criminal experience to defraud Gilead.

### D.     Defendants Circumvent Gilead's Anti-Fraud Safeguards

Gilead has adopted numerous measures in an attempt to stop Defendants' schemes, while at the same time ensuring that bona fide MAP enrollees are able to continue receiving their medication.  Defendants, however, are pivoting their tactics in an attempt to overcome Gilead's new safeguards.  As discussed below, given the adaptability of Defendants' schemes and Defendants' determination to continue them, self-help is no longer practicable for Gilead. Judicial intervention has therefore become urgently necessary.

### 1.     Gilead's Efforts to Stop Defendants' Fraud

First, Advancing Access® program specialists attempted to contact MAP enrollees who had been prescribed PrEP medication at Defendants' clinics.  The purpose of this outreach was to perform additional validation checks and confirm that these enrollees are real people with a bona fide need for PrEP medication.  In most instances, however, the program specialists were not able to contact the enrollees in question.  As a result, between May and September 2020, Gilead

provisionally suspended approximately 10,800 PAP and MAP cards associated with individuals enrolled by Defendants.  (Quan Decl. ¶ 28; Sebastiani Decl. ¶ 74.)

These enrollees were eligible to have their cards reactivated, but only after contacting Gilead and going through simple validation checks.  In particular, such enrollees were required to provide proof of identification and speak directly with a program specialist who would confirm that the enrollee actually wanted the medication that had been prescribed. (Sebastiani Decl. ¶ 75.)  Gilead expected that enrollees with a bona fide need for PrEP medication would complete this straightforward process.  (*Id.*)  However, only about 1,400 of the 10,800 suspended cards (less than 13%) have been reactivated.  This strongly suggests that the overwhelming majority of the Clinic and Prescriber Defendants' enrollees were improperly enrolled in the PAP and/or MAP.  (*Id.*)

Second, Gilead implemented enhanced validation checks for new PAP and MAP applicants being enrolled by healthcare providers known to be affiliated with Defendants.  As a result, these individuals could enroll in the PAP and MAP only if they provided valid identification and spoke with a program specialist who would verbally confirm the applicant's identity and whether he or she wanted to take PrEP medication.  (Sebastiani Decl. ¶ 76.)

Third, Gilead started blocking certain suspicious prescribers affiliated with Defendants—including the Prescriber Defendants—from enrolling new individuals in the PAP or MAP through Gilead's online enrollment portal.  The blocked prescribers can now enroll an applicant in the PAP or MAP only by contacting the Advancing Access® call center, speaking to a program specialist, and meeting the enhanced validation checks.  (Sebastiani Decl. ¶ 77.)

### 2. Defendants' Countermeasures to Overcome Gilead's Anti-Fraud Safeguards

Rather than discouraging Defendants, Gilead's anti-fraud safeguards have only emboldened them to multiply their deceptions in order to keep their fraudulent schemes going.

The Clinic Defendants have undermined Gilead's enhanced validation process by coaching recruits through the validation checks when they speak on the phone to Advancing Access® program specialists.  (Sebastiani Decl. ¶¶ 79, 82.)  This coaching includes instructing recruits to tell the program specialists that they want to take PrEP medication and that they have not already been prescribed PrEP medication by any other healthcare provider, even when one or both of those statements are not true.  (Garcia Decl. ¶ 99.)  For example, on an October 16, 2020 recorded call with a Gilead program specialist, an employee of Defendant Better You Wellness, while placed on hold, coached multiple recruits through the validation process by feeding them answers and offering to write down the correct responses for them to provide to the specialist to get past the validation checks.  (Sebastiani Decl. ¶ 82.)

Even more brazenly, the Clinic Defendants' employees are falsely posing as MAP applicants when recruits are unwilling to go through Gilead's enhanced validation check themselves.  As the whistleblower employed by Defendant Priority Health reported, "When I heard them get on the phone and act like they [were] the patient I was like, oh no, . . . this bad. The Feds are coming in on that.  People go to jail behind that, that's fraud.  That's medical fraud." (Sebastiani Decl. ¶ 80.)  Indeed, Defendant Priority Health used this tactic to enroll the whistleblower herself in the MAP without her knowledge or consent.  (Sebastiani Decl. ¶ 81.)

The Clinic Defendants have also sought to circumvent the enhanced validation process by creating fake identification cards for recruits.  For example, homeless shelter identification cards are one form of acceptable identification for recruits seeking to validate their MAP enrollment.

(Sebastiani Decl. ¶ 87.)  Defendant Better You Wellness has begun taking pictures of recruits and then manufacturing identification cards for those recruits that falsely claim that Better You Wellness operates a "shelter" where those recruits live.  (*Id.*)

Furthermore, after Gilead blocked certain high-volume prescribers, including many of the Prescriber Defendants, from enrolling individuals in the PAP and MAP through the online enrollment portal, Defendants began using new, unblocked prescribers to process large volumes of new MAP enrollments—even though the blocked prescribers actually write those new enrollees' prescriptions for PrEP medication.  This tactic requires making false and fraudulent statements to Gilead because the healthcare provider completing the MAP application is required to certify that *he or she* (and not some other prescriber) has determined that the prescription is medically appropriate and that *he or she* (and not some other prescriber) will supervise the course of treatment.  (Quan Decl. ¶ 35; Sebastiani Decl. ¶¶ 23-24.)

For example, Defendant Alexander Evans, a prescriber at Defendant Allied Health, was the *enrolling* prescriber for 1,177 individuals in the MAP over a four-month period in mid-2020.  This sudden spike in enrollments was remarkable, as Evans had enrolled only 157 individuals in the MAP in the sixteen months preceding that period.  (Quan Decl. ¶ 33.)  In connection with each of those 1,177 enrollments, Defendant Evans represented that *he* had determined that the prescriptions were medically appropriate and that *he* was supervising the course of treatment.  However, during that same four-month span, Defendant Evans did not actually *write* a single prescription for any of those enrollees.  Instead, the prescriptions were written by dozens of different prescribers, including several of the Prescriber Defendants and other prescribers who were blocked from enrolling new applicants in the MAP through the online portal.  (Quan Decl.

¶ 34.)  Therefore, Defendants' statements in connection with these 1,177 MAP enrollments were knowingly false.

Finally, particular Clinic Defendants that have attracted scrutiny from Gilead appear to have shifted their enrollment activity to other Clinic Defendants.  For example, after Gilead took steps in May 2020 to restrict certain prescribers associated with Defendant Doctors United from enrolling individuals in the PAP and MAP through the online portal, the volume of enrollments from Defendant Allied Health, an affiliate of Doctors United, abruptly skyrocketed, largely due to the enrollments processed by Defendant Alexander Evans.  (Quan Decl. ¶ 36.)



### E.     Defendants Are Actively Expanding Their Fraudulent Schemes

Even as they take countermeasures to avoid Gilead's anti-fraud safeguards, Defendants are actively expanding the scope of their schemes, both in Florida and elsewhere.  For example, Defendant Positive Health currently operates fourteen clinics registered with the 340B Program, with six of those clinics having opened in just the past two months.  (Quan Decl., Ex. A ¶ 5.) The Positive Health website also announces that the company's operations are expanding outside of Florida, with an Atlanta location "coming soon."  (Garcia Decl. ¶ 54, Ex. 36.)  Similarly, five of the eleven clinics operated by Defendant Allied Health were registered with the 340B Program in the past two months, thereby giving Allied Health even more access to the discounted PrEP medication that is a linchpin of Defendants' schemes.  (Quan Decl., Ex. A ¶ 1.)

### F.     Defendants' Schemes Threaten Public Health and Safety

It would be troubling enough if Defendants' schemes were merely defrauding Gilead out of tens of millions of dollars.  But their fraud also poses a serious and ongoing threat to health and safety—not just the health of the vulnerable homeless and low-income recruits that Defendants' schemes directly exploit, but also the broader public health.

First, the Clinic Defendants' medically improper prescribing practices threaten the safety of recruits.  As described above, the Clinic and Prescriber Defendants are prescribing PrEP medication for recruits without determining whether the recruits have preexisting conditions that could be exacerbated (with potentially fatal results) by taking PrEP medication, or whether the recruits are taking other medications that interact with PrEP medication in potentially unsafe ways.  (Gallant Decl. ¶¶ 25, 28.)  Indeed, in many instances, the Clinic Defendants are illegally prescribing recruits PrEP medication without an examination by a licensed healthcare provider at all.  In addition, Gilead has identified hundreds of instances in which the Clinic and Prescriber

40

Defendants have prescribed recruits *both* TRUVADA® *and* DESCOVY® at the same time in an attempt to capture even greater profits.  If the recruits take both medications, they will consume more than the FDA-recommended daily dosage of tenofovir, which can result in life-threatening side effects.  (Gallant Decl. ¶ 28.)

Second, the Clinic and Pharmacy Defendants' illegal repackaging and distribution of misbranded PrEP medication also poses a substantial risk to the health of recruits.  As explained above, the Clinic and Pharmacy Defendants are dispensing PrEP tablets that have been removed from their specially engineered, FDA-mandated original bottles, handled by unknown individuals, and placed in generic pharmacy bottles that lack the protective features of Gilead's authentic bottles.  This puts recruits at risk of consuming PrEP tablets that have become degraded by premature exposure to atmospheric moisture or contaminated by unsanitary handling practices.  (Nakamura Decl. ¶¶ 10-13; DeVitto Decl. ¶ 10.)  In addition, the Clinic and Pharmacy Defendants are dispensing PrEP tablets to recruits without the FDA-mandated package insert, which contains critical safety warnings and instructions for use—thereby placing recruits at risk of unanticipated side effects, drug-drug interactions, and improper dosage or other misuse.  (Nakamura Decl. ¶¶ 19-20; Gallant Decl. ¶ 11.)  Moreover, the Clinic and Pharmacy Defendants' repackaging practices results in PrEP tablets being dispensed to recruits without critical tracking information (*i.e.*, Gilead's original lot numbers), which poses a threat to recruits' health in the event that the PrEP tablets they receive are subject to a recall.  (DeVitto Decl. ¶¶ 11-12.)

Third, to the extent that any of Defendants' recruits may have a genuine need for PrEP medication, Defendants' practice of dissuading them from taking the medication and taking the dispensed PrEP medication back from recruits deprives those individuals of potentially life-

saving medication that would otherwise protect them against contracting HIV.  (Gallant Decl. ¶ 9.)  Even if a recruit does not give back his or her PrEP medication, Defendants' foreboding discussion of harmful "side effects" may keep him or her from using it.  (Garcia Decl. ¶ 101.)

Fourth, in addition to threatening the health and safety of thousands of vulnerable recruits, Defendants' schemes endanger the public health of the broader community, both in Florida and beyond.  Any recruits who contract HIV as a result of Defendants' unlawful and improper buyback practices may spread the virus to others in their communities.  Because Defendants' recruits are homeless or earn little income, any recruits who become ill as a result of Defendants' practices and require treatment may receive that treatment at the public expense, thereby placing additional burden on the already strained public health system at the local, state, and federal levels.  Any repackaged and misbranded PrEP medication that Defendants sell on the black market jeopardizes the health and safety of potentially unsuspecting third parties to whom the medication is eventually dispensed.  (Nakamura Decl. ¶¶ 6, 15-16, 21; DeVitto Decl. ¶¶ 6, 8, 10-12.)  Finally, Defendants' fraud threatens the viability and integrity of Gilead's charitable MAP, on which tens of thousands of uninsured, low-income people across the United States depend for lifesaving medication, and necessitates additional safeguards that temporarily may make it more difficult for bona fide patients to obtain free medication to protect them from contracting a potentially fatal disease.  (Sebastiani Decl. ¶¶ 11, 14.)

### G.   Defendants' Schemes Injure Gilead's Intellectual Property Rights and Consumer Goodwill

In addition to causing Gilead direct financial harm and threatening public health and safety, Defendants' schemes also harm Gilead's intellectual property rights and threaten to undo the goodwill that Gilead has built up over decades.  The Clinic and Pharmacy Defendants, by repackaging and dispensing TRUVADA® and DESCOVY® outside their original packaging and

without the FDA-required labeling and package inserts, directly harm that goodwill.  Medical

professionals and consumers rely on Gilead medication to be safe and effective for use according

to their labeling.  (Gallant Decl. ¶ 11.)  But as discussed above, the Clinic and Pharmacy

Defendants' dispensing of those medications without their original, FDA-approved packaging,

and stripped of their FDA-required labeling, threatens the safety and efficacy of the products and

renders them "misbranded" under federal law.  (Nakamura Decl. ¶¶ 6, 15-16, 21; DeVitto Decl.

¶¶ 6, 8, 10-12.)  By introducing misbranded and inferior PrEP medication into the market,

Defendants are diminishing the reputation of TRUVADA® and DESCOVY® and diluting the

value of Gilead's Marks, Dress, and brand.  (Stroud Decl. ¶¶ 12-13.)

## ARGUMENT

### I.      GILEAD IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

A movant is entitled to a temporary restraining order or a preliminary injunction upon

showing "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be

suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief

would inflict on the non-movant; and (4) that entry of the relief would serve the public interest."

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam).

"These factors can operate as a sliding scale, such that if one factor weighs heavily in favor of a

party, the other factors may become less important."  *Energy Prof'ls, LLC v. Pomella*, 2015 WL

10960876, at *3 (M.D. Fla. Oct. 29, 2015) (citing *Louis v. Meissner*, 530 F. Supp. 924, 925 (S.D.

Fla. 1981)).  "For example, where 'the balance of equities weighs heavily in favor of granting the

[injunction],' the movant[s] need only show a substantial case on the merits.'"  *Faculty Senate of

Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007) (quoting *Gonzalez v. Reno*,

2000 WL 381901 (11th Cir. Apr. 19, 2000)).

Gilead easily satisfies this standard.  Importantly, at this stage, Gilead seeks narrowly tailored relief to restrain Defendants and their affiliates from participating in the PAP and MAP, and from continuing their dangerous and unlawful practices of dispensing PrEP medication without the FDA-mandated bottle and labeling and redispensing or selling PrEP medication that has already been dispensed to someone else.  Gilead does *not* currently seek to prohibit Defendants from prescribing PrEP medication outside the auspices of Gilead's charitable free-drug programs or otherwise restrain Defendants' practice of medicine.

The evidence of Defendants' fraudulent and illegal practices is already "substantial"—indeed, it is overwhelming.  Absent this temporary and preliminary injunctive relief, Gilead will continue to suffer irreparable harm to its finances, intellectual property, and goodwill, and Defendants' recruits and the broader community will continue to suffer irreparable harm to their health and safety.  An injunction would impose no cognizable hardship on Defendants because they have no legal right to participate in the PAP and MAP—charitable programs that Gilead offers at its own discretion—and, *a fortiori*, no legal right to commit fraud or violate federal laws meant to ensure pharmaceutical safety.  And for all of these reasons, this is a situation in which the public interest calls out for prompt injunctive relief.

### A.      Gilead Has a Substantial Likelihood of Success on the Merits

The first criterion, substantial likelihood of success on the merits, "requires a showing of only likely or probable, rather than certain, success." *Modern Pharmacy, LLC v. McKesson Corp.*, No. 18-22242-CIV, 2018 WL 3413037, at *6 (S.D. Fla. June 12, 2018).  To obtain its requested relief, Gilead need only make this showing with respect to *one* of its causes of action. *See Charles Schwab & Co. v. Aviles*, 2007 WL 9702744, at *6 (S.D. Fla. Aug. 23, 2007).  Here, however, Gilead amply satisfies this standard as to *all* of its claims.

### 1.     Fraud Claims (First Claim for Relief)

First, Gilead's claims for fraud are likely to succeed.  The elements of fraud are "(1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the other person."  *Kerruish v. Essex Holdings, Inc.*, 777 F. App'x 285, 292 (11th Cir. 2019) (quoting *Gandy v. Trans World Comput. Tech. Grp.*, 787 So. 2d 116, 118 (Fla. 2d DCA 2001)).

### a.     *Defendants' Knowingly False Statements of Fact Intended to Induce Gilead's Reliance*

Gilead has shown that the Clinic and Prescriber Defendants knowingly made thousands of false representations to Gilead while enrolling applicants for the MAP.  (Quan Decl. ¶ 41.) They deliberately lied to Gilead by falsely certifying, as a component of each application, that (1) the prescribed PrEP medication was for the applicant, and not for someone else; (2) the prescribed medication was medically necessary for the applicant; (3) the prescribed PrEP medication would be used as directed; (4) the prescriber would be supervising the applicant's use of PrEP medication; and (5) the prescriber would periodically verify continued use of PrEP medication.  (Sebastiani Decl. ¶¶ 2324; Quan Decl. ¶¶ 30, 35; Complaint, Ex. C.)  The evidence overwhelmingly demonstrates that, when making these certifications, the Clinic and Prescriber Defendants knew the applicants, in fact, had no intention of taking PrEP medication as directed and/or had no medical need for it; that the medication would be bought back and redispensed or resold to others; and that the prescriber had no intention of supervising the applicant's use of the medication.  (*See* Complaint, Ex. C; Sebastiani Decl. ¶¶ 34-39, 41-50, 53, 57-62, 64-69, 79, 82; Garcia Decl. ¶¶ 98-99, 101-03, 105.)

Moreover, the Clinic Defendants also forged applicant signatures—and sometimes prescriber signatures—to churn out greater volumes of fraudulent enrollments.  (Sebastiani Decl. ¶¶ 38, 53.)  *See In re Larose*, 2008 WL 5636385, at *3 (Bankr. M.D. Fla. Oct. 14, 2008) (holding that a forged signature "constituted a false representation made with the intent to deceive"); *Fla. Bar v. Rose*, 607 So. 2d 394, 394 (Fla. 1992) (forged signature constitutes a "misrepresentation").  The Clinic and Prescriber Defendants also increased the number of fraudulent reimbursements by fraudulently prescribing refills before the prior prescriptions ran out, thereby enabling them to stack up and submit redemptions for unneeded and unwanted PrEP medication—in violation of their certifications on the MAP enrollment form that they would only write prescriptions through the MAP where medically necessary and consistent with the medication's directions for use.  *See supra* at 17-20.

The Recruit Whistleblower's experience illustrates how the Clinic and Prescriber Defendants violate each of these required certifications.  Prior to enrollment, he informed Defendant Positive Health that he was not at risk for HIV and did not intend to take the PrEP medication.  (Garcia Decl. ¶ 103.)  The Positive Health employee responded by instructing the Recruit Whistleblower that he would not receive the $10 he had been promised if he did not go through with the scheme and asked whether he would be a "a good patient and comply."  (*Id.*)  After the Recruit Whistleblower was enrolled in the MAP, Positive Health's employees bought his medication back from him, thereby violating Positive Health's and the prescriber's certifications that the prescribed medication was for the applicant and would be used as directed; that the prescriber would be supervising the applicant's use of PrEP medication and that the prescriber would periodically verify continued use.  On other occasions, the Recruit Whistleblower was enrolled in the MAP by Clinic Defendants without his knowledge (let alone

his consent).  (Garcia Decl. ¶¶ 104, 112.)  Instead, the clinics forged his signature on the financial-information and HIPAA-release sections of the enrollment forms, which Gilead relied upon in processing his applications.  (Garcia Decl. ¶¶ 104, 112; Sebastiani Decl. ¶ 53.)  Because of these fraudulent enrollments, Gilead paid thousands of dollars in redemptions associated with eight bottles of PrEP medication that the Recruit Whistleblower did not want or need.  As he told Gilead when reporting the fraud, he had "[a]bsolutely not" taken that medication, and "never will."  (Sebastiani Decl. ¶ 55.)

In addition to making misrepresentations and forging signatures on MAP enrollment forms, the Clinic Defendants have made or directed further false statements to Gilead during the enrollment validation process.  Specifically, their employees have falsely represented themselves to be MAP applicants on calls with Gilead's representatives and have coached recruits to lie to Gilead about their medical need for PrEP medication when program specialists call them to verify their identities and the legitimacy of their prescriptions.  (Garcia Decl. ¶ 99; Sebastiani Decl. ¶¶ 80-82.)

The Pharmacy Defendants, for their part, have made actionable misrepresentations to Gilead in two ways.  First, they have knowingly made actionable misrepresentations to Gilead by implication.  *See Souran v. Travelers Ins. Co.,* 982 F.2d 1497, 1506 (11th Cir. 1993) (holding implicit misrepresentations are actionable); *see also* Restatement (Second) of Torts § 526, comment f (recognizing misrepresentations can be made through implication from form, context, and circumstance).  Specifically, each of the Pharmacy Defendants' claims for reimbursement submitted to Gilead via the MAP entailed an implicit representation to Gilead, among other things, (1) that the PrEP medication at issue was dispensed pursuant to a valid practitioner-patient relationship; (2) that the Pharmacy Defendant had legitimately assessed the prescription

order for patient safety and appropriateness; and (3) that the medication at issue was in fact dispensed to the MAP enrollee in question.  (Sebastiani Decl. ¶¶ 22-24.)  These implicit representations arise from the manner in which Gilead's MAP program operates, of which the Pharmacy Defendants are well aware, as well as from background law and professional standards governing the practice of pharmacy, compliance with which is reasonable to assume.  *See, e.g.*, Fla. Stat. § 465.016(s) (pharmacists may not "[d]ispense any medical drug . . . when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship"); Fla. Stat. § 465.003(6) ("As an element of dispensing, the pharmacist shall, prior to the actual physical transfer, interpret and assess the prescription order for potential adverse reactions, interactions, and dosage regimen . . . ."); Fla. Admin. Code 64B16-27.1001(4) ("The pharmacist . . . shall not dispense to a third party.").

The Pharmacy Defendants have also defrauded Gilead by omission, by claiming tens of millions of dollars of reimbursement from Gilead despite knowing—but failing to disclose—that the prescriptions had been issued for individuals fraudulently enrolled in the MAP, who had no medical need or appropriate supervision for taking PrEP medication.  *See Woods v. On Baldwin Pond, LLC*, 634 F. App'x 296, 297–98 (11th Cir. 2015) ("Florida law recognizes that fraud can occur by omission." (quoting *ZC Ins. Co. v. Brooks*, 847 So. 2d 547, 551 (Fla. 4th DCA 2003))); Restatement (Second) of Torts § 551 (2)(b), (e) (1977) (a party to a business transaction is liable for fraud by omission by failing to disclose (i) "facts basic to the transaction," if he knows that the other party is mistaken as to those facts and would reasonably expect disclosure of them; or (ii) facts known to him if necessary to "prevent his partial or ambiguous statement of the facts from being misleading").

48

Here, the evidence shows that by virtue of their intimate familiarity with and involvement in Defendants' schemes, the Pharmacy Defendants knew that the individuals enrolled in the MAP by the Clinic Defendants were enrolled on fraudulent pretenses—namely, that the PrEP medication was being prescribed without regard to medical need, appropriate use, or adequate supervision, contrary to the enrolling prescriber's certifications. The Pharmacy Defendants also knew that the medication was being dispensed to the Clinic Defendants, rather than the enrollees themselves, and that even when the enrollees received the medication, they often sold it on the black market. The Pharmacy Defendants knew that these facts were material to Gilead's determination to fully reimburse the cost of prescribed PrEP medication, at a cost of more than $1,800 dollars, through the MAP, and they knew that if they had disclosed this information, Gilead would have refused to pay. (Sebastiani Decl.¶ 29.) The omission of these material facts was tantamount to supplying false information, because the affirmative submission of a claim for reimbursement through the MAP implies that the prescription was in fact dispensed to a legitimate enrollee consistent with the initial certifications accompanying enrollment. (*Id.*)

Gilead was entitled to receive this information from the Pharmacy Defendants. *Friedman v. Am. Guardian Warranty Servs., Inc*., 837 So. 2d 1165, 1166 (Fla. 4th DCA 2003) (a duty to disclose can exist where "one party has information which the other party has a right to know . . . because there is a fiduciary or other relation of trust or confidence between the two parties."). The scenario here is consistent with the "classic illustration of fraud" where "one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation." *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, No. 13-23998-CIV, 2017 WL 11103938, at *7-8 (S.D. Fla. June 26, 2017) (quotations removed) (plaintiffs successfully pleaded fraud by omission where defendants failed to inform plaintiffs they were

49

engaged in a criminal scheme to push fraudulent tax shelters; that they were not independent; and that they were receiving a portion of the fees they received from the plaintiffs with other participants in their scheme).  Accordingly, Gilead has shown Pharmacy Defendants' committed fraud through their implicit representations and misleading omissions.

   **b.**  ***Gilead's Reasonable Reliance to its Detriment***

   Gilead, in turn, reasonably relied on the Clinic and Prescriber Defendants' misrepresentations when validating enrollees' application for the MAP, and reasonably relied upon the Pharmacy Defendants' implied misrepresentations and omissions when paying reimbursement for each prescription of PrEP medication purportedly dispensed to MAP enrollees.  In connection with approving each enrollment, Gilead relies on the certification supplied by healthcare providers; the certification provides Gilead with its sole assurance that applicants have a bona fide need for PrEP medication and that their treatment will be properly supervised.  (Sebastiani Decl. ¶¶ 22-25.)

   Gilead also relies upon the validity of the redemption claims that pharmacies submit to Gilead in connection with prescription refills through the MAP, reasonably expecting that— consistent with basic medical ethics and background law—the pharmacies in question do not have reason to believe that the patients in question have been fraudulently enrolled in the MAP and that they lack any valid medical need for PrEP medication.  (Sebastiani Decl. ¶ 29; Gallant Decl. ¶ 31.)  Gilead is entitled to expect that pharmacies claiming redemptions through the MAP are acting in compliance with the law and their ethical obligations.  *See In re Computer Personalities Sys., Inc.*, No. 01-14231DWS, 2003 WL 22844863, at *6–7 (Bankr. E.D. Pa. Nov. 18, 2003) (plaintiff could justifiably rely upon fact that the defendant "would meet the minimum requirements of professionalism" for its industry and comply with its "common law dut[ies]");

*Mavilia v. Stoeger Indus.*, 574 F. Supp. 107, 110 n.3 (D. Mass. 1983) ("[E]veryone has a right to rely upon his fellow-men acting lawfully" and to "act[] upon the assumption that they will do so" (quoting Oliver Wendell Holmes, Collected Legal Papers 131-32 (1952))).

As a consequence of this reasonable and justified reliance, Gilead paid tens of millions of dollars to cover the cost of over 30,000 bottles of PrEP medication for individuals who had no genuine medical need for it—and in fact, either did not receive or did not use it.  *See* supra at 33. Gilead also paid millions of dollars in additional dispensing and administrative fees.  All told, Gilead paid well over $2,000 for each reimbursement claim it honored in reliance on Defendants' false statements and omissions.

Accordingly, Gilead is substantially likely to prevail on the merits of its fraud claims.

### 2.    Aiding and Abetting Fraud Claims (Second and Third Claims for Relief)

A plaintiff establishes a claim for aiding and abetting fraud by proving: "(1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud." *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097–98 (11th Cir. 2017) (internal quotation marks and alterations omitted).  A defendant provides "substantial assistance" when it "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling" the underlying fraud to succeed.  *Id.*

Gilead has shown that the Clinic, Prescriber, Lab, and Pharmacy Defendants gave substantial assistance to the fraudulent schemes discussed above.  Each of these Defendants played a critical and necessary role in the schemes:  The Clinic and Prescriber Defendants made thousands of false statements of material fact to improperly enroll individuals in the MAP. (Quan Decl. ¶ 41.)  The Lab Defendants provided blood testing services that were required for

the Clinic Defendants to enroll individuals in the MAP.  (Gallant Decl. ¶ 21.)  Finally, the

Pharmacy Defendants submitted thousands of redemptions to Gilead in connection with

enrollees who had been fraudulently enrolled in the MAP.  (Quan Decl. ¶¶ 26, 37-41.)  All of

these acts materially "advance[d] the commission of the fraud"—indeed, they were essential to

its success.  Thus, they readily qualify as "substantial assistance."  *See Sun Life Assurance Co. of*

*Canada v. Imperial Premium Fin*., LLC, 904 F.3d 1197, 1215 (11th Cir. 2018) (substantial

assistance requirement met where the defendant directed and incentivized the fraud); *Gilison v.*

*Flagler Bank*, No. 4D19-3379, 2020 WL 5033316, at *3 (Fla. 4th DCA Aug. 26, 2020)

(substantial assistance requirement met where the acts permitted the defendants to obtain

payment for their fraudulent scheme).

Furthermore, there are multiple compelling indications that all Defendants were aware of

the fraudulent schemes that they were assisting.  For starters, the flagrant and obvious nature of

the schemes and Defendants' evasive response to Gilead's anti-fraud measures, which included

impersonating and coaching enrollees, make it impossible to conclude that the Clinic

Defendants, Lab Defendants, and Pharmacy Defendants could have lacked knowledge of the

schemes they were perpetrating.  As the Priority Health Whistleblower explained to Gilead, it

was clear to her that the "Feds [were] going to come in sooner or later."  (Sebastiani Decl. ¶ 60.)

The many ties and connections between the Defendants also strongly suggest that each

Defendant was aware of the fraudulent scheme that he, she, or it was assisting in.  (*See* Garcia

Decl. ¶¶49-90; Quan Decl. ¶¶ 7, 9, 11, Ex. A ¶ 5.)  For example, while the performance of blood

tests by the Lab Defendants, in itself, may not necessarily entail knowledge of fraud, Defendant

United Labs was co-managed by Mikhail Vesselov, the owner of Defendant United Pharmacy

and co-founder of Labs4Less, and Kirill Vesselov, the manager of one of the Positive Health

Clinic Defendants.  (Garcia Decl. ¶¶ 69, 75, 86, 89.)  Accordingly, each of these Defendants knew that the Clinic Defendants were systematically making fraudulent enrollments, and United Labs knew that United Pharmacy was sharing its profits.  Similarly, the owner of Testing Matters, another Lab Defendant, lives with the owner of Physician Preferred, one of the Pharmacy Defendants.  (Garcia Decl. ¶¶ 40-44.)  Further, Defendant Labs4Less, another Lab Defendant, shares a location with one of Defendant Positive Health's clinics (and is also managed by Positive Health's current Executive Director), and thus would have seen and understood the fraud taking place before it.  (Garcia Decl. ¶¶ 73-76.)  And Defendant Jean Rodney is Medical Director for two of the Positive Health Clinic Defendants (Baikal Marketing and Alliance Medical), and a third (Defendant Priority Health) is registered under his medical license, suggesting that knowledge of the fraud stretched across management of all three. (Garcia Decl. ¶¶ 60, 64, 80.)  In sum, there is a substantial likelihood that Gilead will be able to show that each Defendant had actual knowledge of and assisted the underlying fraud.

Accordingly, Gilead is substantially likely to prevail on the merits of its claims for aiding and abetting fraud.

### 3. Trademark Claims (Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Seventeenth, and Eighteenth Claims for Relief)

Gilead is likely to succeed on its claims that the Clinic and Pharmacy Defendants' distribution and sale of misbranded TRUVADA® and DESCOVY® that is materially different from Gilead's authentic product violates Gilead's trademark rights under the federal Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and Florida state law, Fla. Stat. § 495.001 *et seq.*  Gilead has presented overwhelming evidence that it satisfies the elements of these claims, namely: that (1) Gilead has legally valid trademarks; and (2) Defendants' use of those trademarks is likely to cause confusion among consumers.  *See Dieter v. B & H Ind. of Southwest Fla., Inc.*, 880 F.2d

322, 326 (11th Cir. 1989); *see also Off Lease Only, Inc. v. Lakeland Motors, LLC*, --- F. App'x ----, 2020 WL 5553301, at *4 (11th Cir. Sept. 17, 2020) ("[Plaintiff's] federal trademark claim and its Florida trademark infringement claim are governed by the same test." (citation omitted)).

Notably, the governing standard does not require a trademark plaintiff to demonstrate that any *actual* confusion has in fact occurred—merely that confusion is "likely." *See* 15 U.S.C. § 1114 ("likely to cause confusion"); 15 U.S.C. § 1125 (same); *Davidoff & Cie., S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001); *Caterpillar, Inc. v. Nationwide Equip.*, 877 F. Supp. 611, 614 (M.D. Fla. 1994). Moreover, trademark infringement is a "strict liability" offense and does not require any showing of wrongful intent. *Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*, 2020 WL 3078531, at *18 (S.D. Fla. June 10, 2020); *River Light V, L.P. v. Tanaka*, 2018 WL 5778234, at *7 (S.D. Fla. Nov. 2, 2018).

### a.   *Gilead Has Legally Protectable Trademarks*

Gilead indisputably owns the Gilead Marks at issue, which are valid, protectable registered trademarks. (Stroud Decl. ¶ 4.) The certificates of registration submitted to the Court are "prima facie evidence of the validity of the registered mark and of the registration of the mark, of [Gilead's] ownership of the mark, and of [Gilead's] exclusive right to use the registered mark in commerce." 15 U.S.C. § 1057(b); *accord Queen's Harbour Yacht & Country Club Assoc., Inc. v. Lee*, No. 3:09-cv-1256, 2010 WL 11623421, at *3 (M.D. Fla. Aug. 25, 2010).

### b.   *Defendants' Use of Gilead's Marks Is Likely to Cause Consumer Confusion*

Defendants indisputably "use" the Gilead Marks in commerce in connection with their fraudulent schemes. As discussed above, the plastic pharmacy bottles that the Pharmacy Defendants dispense to the Clinic Defendants, and which the Clinic Defendants then dispense to the recruits or sell on the black market, bear the TRUVADA® and DESCOVY® trademarks. In

54

addition, the tablets contained within those bottles bear multiple registered Gilead Marks. (Stroud Decl. ¶ 4.)  Such dispensing and distribution plainly constitutes "use" of the Gilead Marks in commerce.

In addition, the evidence establishes that the Clinic and Pharmacy Defendants' use of the Gilead Marks in connection with their fraudulent schemes is likely to cause consumer confusion in two independent and legally cognizable ways: (1) by disseminating misbranded PrEP medication that is materially different from authorized PrEP medication distributed by Gilead; and (2) by interfering with Gilead's quality control processes for handling and distributing PrEP medication.

It is well-established that the unauthorized sale of "trademarked goods that are materially different than those sold by the trademark owner" creates a likelihood of consumer confusion— even if the core product itself is "genuine," in the sense that it was originally manufactured by the trademark owner and is not outright counterfeit.  *Davidoff & Cie.*, 263 F.3d at 1302 ("[W]hen an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner, . . . [the] materially different product is not genuine and therefore its unauthorized sale constitutes trademark infringement." (citing decisions from the First, Second, Third, Fifth, and Ninth Circuits)); *see also Moroccanoil, Inc. v. Perfumes World Com, Inc.*, 234 F. Supp. 3d 1026, 1030 (C.D. Cal. 2017) (citing cases for the proposition that "[m]aterial differences in labeling or packaging alone are sufficiently likely to cause consumer confusion").

The "material difference" inquiry examines whether "the public is likely to become confused or deceived as to which characteristics are properly associated with the trademark," leading to erosion of the goodwill associated with the mark.  *Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Name Beds, LLC*, 500 F. Supp. 2d 296, 312 (S.D.N.Y. 2007) (internal quotation

marks and citation omitted); *see also Zip Int'l Grp., LLC v. Trilini Imports, Inc.*, 09-CV-2437 (JG)(VVP), 2010 WL 648696, at *3 (E.D.N.Y. Feb. 22, 2010) ("[C]onsumers may unwittingly purchase the goods on the basis of the domestic markholder's reputation only to be disappointed when the [materially different] product does not meet their expectations.").

In analyzing whether a diverted product (*i.e.*, one not sold through the trademark owner's normal channels of distribution) is materially different from an authorized product, courts "apply a low threshold of materiality," requiring "no more than a slight difference which consumers would likely deem relevant when considering a purchase of the product." *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009); *Davidoff & Cie.*, 263 F.3d at 1302. "Because a myriad of considerations may influence consumer preferences," many types of differences, whether overt or subtle, can qualify as material, including differences in product quality, packaging, labeling, and/or handling. *TracFone Wireless, Inc. v. Pak China Group Co. Ltd.*, 843 F. Supp. 2d 1284, 1297 (S.D. Fla. 2012); *see also, e.g., Davidoff & Cie.*, 263 F.3d at 1303-04 (barely noticeable etching on back side of perfume bottles constituted a material difference); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 73 (2d Cir. 1987) (inability to register Cabbage Patch dolls for "adoption" with manufacturer, or inclusion of foreign-language "adoption certificates," constituted material differences); *R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99-C-1174, 2004 WL 1613563, at *2 (N.D. Ill. July 19, 2004) (cigarettes materially different because they "lacked loyalty program materials" and packaging had different color and style).

The PrEP medication that Defendants are purchasing and dispensing is materially different from Gilead's authentic product—and hence, likely to cause consumer confusion—in several ways.

### i.   PrEP Medication Disseminated in Bottles Other than Gilead's Special Container Closure System Is Materially Different from Authentic PrEP Medication

As discussed above, Defendants are dispensing TRUVADA® and DESCOVY® that has been repackaged in unauthorized bottles not produced or sold by Gilead.  This use of unapproved containers poses a substantial risk to product quality and integrity, and is thereby likely to cause consumer confusion regarding the quality and efficacy of Gilead's products.

PrEP tablets are susceptible to hydrolytic degradation, meaning they degrade in the presence of moisture.  (Nakamura Decl. ¶ 10.)  Exposure to unexpected moisture, such as by opening a bottle before final dispensation, can reduce the shelf life of PrEP tablets and impact their effectiveness.  (Nakamura Decl. ¶¶ 10, 15.)  This concern is particularly acute with respect to PrEP tablets that are dispensed in regions like South Florida that have hot, humid climates.

By law, therefore, TRUVADA® and DESCOVY® must be dispensed only in specially designed, FDA-approved containers that are engineered to reduce moisture intake and minimize the risk of degradation.  (Nakamura Decl. ¶¶ 10, 15.)  First, the walls of PrEP bottles are thicker than off-the-shelf pill bottles used by other suppliers.  This prevents the transmission of moisture through the bottle itself.  (Nakamura Decl. ¶ 11.)  Second, each bottle contains a silica gel desiccant, which absorbs unwanted moisture in the bottle.  (Nakamura Decl. ¶ 12.)  Third, the mouth of every authentic bottle is sealed with a polyethylene aluminum foil seal that is intended to remain in place until the moment the end user begins taking the medication.  The seal prevents premature degradation and ensures that the bottle both has not been tampered with and retains the correct number of authentic PrEP tablets.  (Nakamura Decl. ¶ 13.)  And finally, PrEP bottles each have a child-resistant cap that prevents children from opening the bottle and ingesting the tablets.  (Nakamura Decl. ¶ 14.)  Gilead subjects the bottle, desiccant, seal, and lid to stringent

testing and quality control to make sure the medication is and will remain safe to use. (Nakamura Decl. ¶¶ 9-15.)

By selling PrEP medication that has been removed from these specially designed containers and unlawfully repackaged in generic bottles, Defendants expose the tablets to risk of spoilage, which renders the medication ineffective and potentially dangerous. Moreover, selling PrEP medication without the safety seal and child-resistant caps invites tampering and puts children in danger. (Nakamura Decl. ¶¶ 9-10, 13-14, 21.) These differences, which render consumers unable to determine whether their TRUVADA® and DESCOVY® tablets have been tampered with, degraded, or diminished in quality, are quintessentially material. *See Zino Davidoff*, 571 F.3d at 246 ("It is a logical inference that consumers may regard a product whose packaging has been tampered as inferior and perhaps suspicious … or is defective and has been diverted from a recall, or is otherwise untrustworthy."); *Johnson & Johnson v. Advanced Inventory Mgmt., Inc.*, No. 20-cv-3471, 2020 WL 6119516, at *15-16 (N.D. Ill. Oct. 16, 2020) (granting preliminary injunction on material differences grounds where defendants' removal of medical devices from their authorized packaging jeopardized their sterility and effectiveness); *TracFone Wireless*, 843 F. Supp. 2d at 1297 (finding infringement where products were removed from original packaging and sold in packaging that was not approved by the plaintiff); *Rockwell Automation, Inc. v. Radwell Int'l, Inc.*, 2016 WL 7018531, at *4 (D.N.J. Nov. 30, 2016) (holding defendant's failure to follow plaintiff's procedures regarding moisture-controlled packaging was an actionable material difference).

> *ii.* **PrEP Medication Disseminated Without the Required Labeling and Package Insert Is Materially Different from Authentic PrEP Medication**

In compliance with FDA regulations, Gilead packages its PrEP medication with vital information on the bottle itself, and in the package insert that accompanies each bottle, to ensure proper use.  (Nakamura Decl. ¶¶ 16-20.)  For instance, the bottle label sets forth the manufacturing lot number, expiration date, storage temperature limitations, the number of tablets in the bottle, and the contents of each tablet.  (Nakamura Decl. ¶¶ 16, 19; DeVitto Decl. ¶ 11.)  In addition, Gilead accompanies every bottle of its PrEP medication with an FDA-approved and legally mandated package insert.  (Nakamura Decl. ¶¶ 19-20.)  This insert provides the patient with information critical to the safe and appropriate use of TRUVADA® and DESCOVY, such as indications and directions for use, side effects, and warnings.  *See Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 653 n.7 (S.D.N.Y. 2017) ("The purpose of patient labeling is 'to provide information when the FDA determines . . . that it is ***necessary to patients' safe and effective use*** of drug products.'" (quoting 21 C.F.R. § 208.1(b) (emphasis added)); *see also Colacicco v. Apotex, Inc.*, 521 F.3d 253, 258 (3d Cir. 2008) (FDA-approved drug labeling includes "the most clinically significant information . . . ***critical to safe use*** of the drug" (quoting 21 C.F.R. § 201.57(a)(10), (c)(6)(i)) (emphasis added)), *vacated on other grounds*, 556 U.S. 1101 (2009); FDA, *New Drug and Antibiotic Regulations*, 50 Fed. Reg. 7452-01, 7470 (Feb. 22, 1985) ("Drug labeling serves as the standard under which FDA determines whether a product is safe and effective.").

By removing the FDA-required labeling and instructions for use from the bottles of TRUVADA® and DESCOVY® that they dispense, Defendants deprive recipients of critical warnings and indications for use mandated by law, which puts their health at risk.  (Nakamura Decl. ¶¶ 17-21.)  Moreover, the removal of the FDA-required labeling renders the TRUVADA® and DESCOVY® that Defendants distribute "misbranded" as a matter of federal law.  The federal

Food, Drug and Cosmetics Act ("FDCA") specifically provides that selling prescription drugs with unauthorized changes to the packaging and without their package insert renders them "misbranded drugs," and that trafficking in misbranded drugs is a strict-liability *criminal* offense. 21 U.S.C. §§ 331, 333, 352. Indeed, the mere "receipt" of misbranded drugs violates the FDCA—and no reasonable consumer would wish to purchase PrEP medication that is unlawful to possess. *Id.* § 331(c). The same thing is true as a matter of Florida state law. *See, e.g.*, Fla. Stat. § 499.005(1); Fla. Stat. § 499.0051(a).

For these reasons, courts have repeatedly found that products sold without their FDA-required labeling—and in particular, prescription drugs and medical devices sold without their FDA-approved warnings and instructions for use—are materially different from authorized goods. *See, e.g.*, *Moroccanoil,* 234 F. Supp. 3d at 1030 (collecting cases); *Abbott Labs. v. Adelphia Supply USA,* No. 15-CV-05826, 2019 WL 5696148, at *3-6 (E.D.N.Y. Sept. 30, 2019) (granting preliminary injunction based on differences in labeling and Instructions for Use for medical devices); *Novartis Animal Health US, Inc. v. Abbeyvet Exprt Ltd.*, 409 F. Supp. 2d 264, 267 (S.D.N.Y. 2005) (granting preliminary injunction on material differences ground where gray-market pet medicine did not provide FDA-required information and labeling); *Johnson & Johnson*, 2020 WL 5880136, at *15-16 (preliminarily enjoining defendants' sale of medical devices without printed instructions for use, which rendered the devices materially different).

### iii.        Defendants' Unauthorized Distribution of PrEP Medication Interferes with Gilead's Quality Controls

Gilead's products and distributors are subjected to rigorous, ongoing quality control measures that ensure consumers can rely on products bearing Gilead's name and trademarks to be safe and effective. Defendants' actions, however, disrupt these supply chain controls,

creating material differences from authentic PrEP medication that remains in the authorized chain of distribution.

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986); *see also Four Seasons Hotels & Resorts BV v. Consorcio Barr, SA.*, 267 F. Supp. 2d 1268, 1328 (S.D. Fla. 2003), *rev'd in part without opinion*, 138 F. App'x 297 (11th Cir. 2005) (same); *Caterpillar*, 877 F. Supp. at 615 (same). A defendant who interferes with a trademark owner's quality control measures "subjects the trademark holder to the risk of injury to the reputation of its mark," and thereby commits infringement. *Zino Davidoff*, 571 F.3d at 243; *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir. 1996); *Four Seasons Hotels*, 267 F.Supp.2d at 1328 (same).[13] Therefore, "a trademark holder is entitled to an injunction against one who would subvert its quality control measures" upon showing: (1) that it has established, legitimate, substantial, and non-pretextual quality control measures; (2) that it abides by these procedures; and (3) sales of products that fail to conform to these procedures will diminish the value of the mark. *Zino Davidoff*, 571 F.3d at 244.

Gilead has made this showing in multiple ways. ***First***, Defendants are dispensing bottles of PrEP medication without critical tracking information, which is essential in the event of a product recall (*e.g.*, for tablets that have been determined to be defective or could pose a significant risk to patient health). In particular, Gilead ***only*** allows its products to be sold in labeling that bears lot and serialization numbers. (Nakamura Decl. ¶ 17; DeVitto Decl. ¶ 11.)

---

[13] When a defendant interferes with the trademark holder's quality control procedures, "the actual quality of the goods is irrelevant: it is the ***control*** of quality that a trademark holder is entitled to maintain." *Four Seasons Hotels & Resorts*, 267 F. Supp. 2d at 1328 (quoting *El Greco Leather Prods.*, 806 F.2d at 395) (emphasis added).

Gilead uses these numbers to monitor the quality of its products, track issues and complaints, and perform recalls. (DeVitto Decl. ¶¶ 11-12.) If Gilead identifies an issue with a particular product lot, it can make a targeted recall of the affected lot, rather than having to pull all of its product off the market. This is preferable from a quality assurance and public safety standpoint because a "market-wide" recall can confuse consumers, cause them to dispose of unaffected medication, create a market shortage, or otherwise endanger the very individuals that the recall was meant to protect. (DeVitto Decl. ¶ 11.)

Defendants' sale of PrEP medication without lot and serialization numbers undermines Gilead's quality control measures by disrupting Gilead's ability to effectively track and recall its products. (DeVitto Decl. ¶¶ 12-13.) Because recalled PrEP medication can pose significant risks to the health of consumers, the continued dispensing of PrEP medication without lot numbers and serialization numbers is detrimental to the public health and causes consumer confusion and injury to Gilead's reputation and its trademarks. *See Zino Davidoff*, 571 F.3d at 244-45 (affirming grant of preliminary injunction where sale of diverted products undermined trademark holder's ability to "remove the defective goods from the channels of commerce"); *Bel Canto Design Ltd. v. MSS HiFi, Inc.*, 837 F. Supp. 2d 208, 231-32 (S.D.N.Y. 2011) (finding trademark infringement where defendants' actions thwarted trademark holder's ability to identify defective components, track merchandise, remedy safety-related complaints, perform quality control, and institute "targeted recalls").

***Second***, Gilead does not allow PrEP medication to be sold without an expiration date clearly visible on the package. Accordingly, Gilead labels every bottle of PrEP medication with the expiration date, prohibits its authorized distributors from selling PrEP medication without it, and destroys expired product. (Nakamura Decl. ¶ 17; DeVitto Decl. ¶¶ 7-8, 11.) Expired PrEP

medication is susceptible to degradation and loss of efficacy, which poses significant risks to patient health—and, by extension, to Gilead's reputation for safety and quality.  It is therefore critical that recipients know when their product will expire.  ((DeVitto Decl. ¶ 8.)

Defendants' dispensation of PrEP medication without the expiration date undermines this policy and places materially different product into the hands (and bodies) of consumers.  By violating Gilead's legitimate, substantial, and clear practices (a) requiring all PrEP medication be accompanied by the expiration date and (b) prohibiting the sale of expired PrEP medication, Defendants infringe Gilead's trademarks.  *See Warner-Lambert Co.*, 86 F.3d at 5-7 (granting preliminary injunction against sale of expired cough drops where, as here, the trademark holder marked product with a shelf life date; informed wholesalers and retailers of the product shelf life; destroyed outdated product; and did not distribute expired cough drops); *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 642-43 (N.D. Tex. 2009) (granting permanent injunction prohibiting defendants from selling expired Mary Kay products); *PepsiCo, Inc. v. F & H Kosher Supermarket, Inc.*, 11-CV-0425, 2011 WL 6181907, at *4 (E.D.N.Y. Aug. 26, 2011), *adopted*, 2011 WL 6179269 (E.D.N.Y. Dec. 12, 2011) (finding infringement where diversion prevented plaintiff from rotating stale soda off retail shelves).

*Third*, to prevent tampering and contamination, Gilead also prohibits product that has already been dispensed to a consumer from being redispensed to another consumer and destroys all PrEP medication that has been returned by consumers.  (DeVitto Decl. ¶¶ 7, 10.)  But the Clinic and Pharmacy Defendants flout these restrictions.  In the course of Defendants' illegal buyback and redispensing operations, the PrEP medication that the Clinic and Pharmacy Defendants resell under the Gilead Marks is handled by numerous unknown individuals under uncontrolled conditions.  At a minimum, this includes recruits; Defendants' van drivers and/or

their associates; and non-medical professionals handling individual tablets and repacking them in unauthorized bottles to be dispensed again.  Between the time when the PrEP medication was initially dispensed and the time it was repurchased, the Clinic and Pharmacy Defendants (and those who eventually take the medication) do not know who else handled the medication, how it was handled, whether it was tampered with, or how it was stored.

Courts have repeatedly recognized that product removed from the authorized distribution chain and subjected to potential quality control issues in this fashion is materially different from authentic product.  *See, e.g.*, *RFA Brands*, 2014 WL 7780975, at *2-3, 6, 9 (granting summary judgment on plaintiff's trademark infringement claim where defendant sold plaintiff's products as "new" or "unused" when they had previously been opened, repackaged, and resold); *Standard Process, Inc. v. AVC Infinite, LLC*, 2020 WL 103841, at *1-2 (W.D. Wisc. Jan. 9, 2020) (enjoining defendant's unauthorized resale of nutritional supplements where defendant failed to comply with plaintiff's quality control measures and sold used, damaged, expired, and infringing products to consumers); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 137 (D. Colo. 1980) (permanently enjoining unauthorized distribution and sale of Coors products where unauthorized distributor did not maintain required refrigeration).

For these reasons, Gilead is likely to succeed on the merits of its federal and state trademark claims.

### 4.  Deceptive and Unfair Practices Claims (Sixth Claim for Relief)

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  FDUTPA allows "anyone" injured by such unlawful conduct, including "legitimate business enterprises" such as

Gilead, to bring an action for damages, attorney's fees and costs, and to seek declaratory and injunctive relief. *Id.* §§ 501.202(2), 501.211; *see also CWELT-2008 Series 1045 LLC v. PHH Corp.*, No. 1:20-CV-20334, 2020 WL 2744191, at *5 n.5 (S.D. Fla. May 27, 2020) (collecting Florida case law recognizing that "non-consumers can bring FDUTPA actions").

The elements of a FDUTPA claim are: "(1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1354 (S.D. Fla. 2015). The "deceptive act or unfair practice" element covers practices "likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment," *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 (Fla. 2003)), as well as practices that "offend[] established public policy" or are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1326 (S.D. Fla. 2017) (quoting *PNR*, 842 So. 2d at 777). FDUTPA therefore "sweep[s] far more broadly than the [common-law] doctrine of fraud." *Democratic Repub. of Congo v. Air Capital Grp., LLC*, 2013 WL 3223688, at *9 (S.D. Fla. June 24, 2013) (quoting *Hetrick v. Ideal Image Dev. Corp.*, 372 F. App'x 985, 992 (11th Cir. 2010)). Indeed, FDUTPA must be "construed liberally" to "protect the consuming public and legitimate business enterprises" from unfair or deceptive business practices. *Id.* § 501.202; *see also Pincus v. Speedpay, Inc.*, 161 F. Supp. 3d 1150, 1157 (S.D. Fla. 2015) ("Courts have regarded FDUTPA as 'extremely broad[.]'" (quoting *Day v. Le–Jo Enters., Inc.*, 521 So. 2d 175, 178 (Fla. 3d DCA 1988))).

Moreover, certain violations of other statutes constitute "per se" deceptive and unfair acts under FDUTPA. *See State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics &*

65

*Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018).  Such "per se" violations include violations of Florida's Patient Brokering Act, Fla. Stat. § 817.505 ("PBA"), and Anti-Kickback Statute, *id.* § 456.054 ("AKS"), which prohibit the solicitation, payment, or receipt of consideration in exchange for a patient referral to or from a healthcare provider.  *See State Farm*, 315 F. Supp. 3d at 1307.  Thus, by showing a PBA or AKS violation—or of any other statute "proscrib[ing] deceptive or unfair practices"—Gilead also establishes an actionable deceptive and unfair practice under FDUTPA.  *Id.* at 1306.

The Clinic, Prescriber, Lab, and Pharmacy Defendants repeatedly violated Florida's PBA and AKS, and in turn, repeatedly violated FDUTPA.  The PBA makes it illegal to "[o]ffer or pay a commission, benefit, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, . . . to induce the referral of a patient or patronage to or from a health care provider or health care facility."  Fla. Stat. § 817.505(1)(a).  Florida's AKS similarly prohibits "offering" and "paying" a "kickback, directly or indirectly, . . . for referring and/or soliciting patients."  Fla. Stat. § 456.054(2).

The Clinic Defendants violated both of these statutes, repeatedly, in several ways.  To begin with, they offered and paid money, gift cards, food, and cigarettes to recruits who earn low incomes or are homeless to entice them to come to their clinics, so that Defendants could enroll them in the MAP and prescribe them PrEP medication.  Moreover, the Clinic Defendants also offered and paid bribes to recruits to entice them to bring *additional* recruits to the clinics for purposes of enrolling them in the MAP.  (Sebastiani Decl. ¶ 44.)

The Clinic Defendants further violated the PBA and AKS by "receiv[ing]" kickbacks from the Pharmacy Defendants who dispensed prescriptions issued by the Clinic Defendants' prescribers—as did the Pharmacy Defendants by "paying" those kickbacks.  Fla. Stat.

§ 817.505(1)(b), Fla. Stat. § 456.054(2).  Specifically, as part of the Defendants' schemes, the

Clinic Defendants sent each recruit's prescription to one of the Pharmacy Defendants.  It cannot

seriously be disputed that sending a prescription to a pharmacy for dispensing qualifies as a

patient referral under the PBA and AKS.  *See United States v. Vernon*, 723 F.3d 1234, 1256

(11th Cir. 2013) (referrals for prescription-filling services within the scope of analogous

provision in the federal anti-kickback statute); *see also United States v. Patel*, 17 F. Supp. 3d

814, 827 (N.D. Ill. 2014), *aff'd,* 778 F.3d 607 (7th Cir. 2015) (holding that prescribing is

"referring" under analogous federal anti-kickback statute).  And in return, the Pharmacy

Defendants shared the proceeds of the fraudulent MAP redemptions with the rest of the

Defendants to perpetuate the schemes and give the Clinic Defendants their share of the illicit

profits.  (*See* Quan Decl. ¶¶ 37-41.)  That conduct violates the PBA and AKS.

In addition, the Clinic, Prescriber, Lab, and Pharmacy Defendants all violated the PBA

by "aiding, abetting, advising or otherwise participating in" the Clinic Defendants' and

Pharmacy Defendants' violations of the PBA.  *See* Fla. Stat. § 817.505(1)(c).  As described

above, each of the Defendants played a crucial role and meaningfully participated in the

fraudulent schemes.  *Supra* at 47–50; (*see also* Garcia Decl. ¶¶49-90; Quan Decl. ¶¶ 7, 9, 11, Ex.

A ¶ 5; Complaint, Ex. C.)   These actions enabled and furthered each Clinic Defendant's and

Pharmacy Defendant's repeated violations of the PBA.

The Clinic and Prescriber Defendants, by knowingly prescribing fraudulent prescriptions,

and the Pharmacy Defendants, by knowingly filling those fraudulent prescriptions, committed

yet further *per se* FDUPTA violations.  It is against the law for prescribers to write and "hold[]

out . . . as true" any false prescription with the intent to obtain the drug.  Fla. Stat. § 831.30.

Similarly, it is against the law for a pharmacist to dispense medication pursuant to an invalid or

medically improper prescription.  *See, e.g.*, Fla. Stat. § 465.016(s) (pharmacists may not "[d]ispense any medical drug . . . when the pharmacist knows or has reason to believe that the purported prescription is not based upon a valid practitioner-patient relationship"); Fla. Stat. § 465.003(6) ("As an element of dispensing, the pharmacist shall, prior to the actual physical transfer, interpret and assess the prescription order for potential adverse reactions, interactions, and dosage regimen . . . ."); Fla. Admin. Code 64B16-27.1001(4) ("The pharmacist . . . shall not dispense to a third party.").  The Clinic, Prescriber, and Pharmacy Defendants have violated these provisions thousands of times over.  These laws and regulations, designed to protect public health and safety, undoubtedly "proscribe[] . . . unfair, deceptive, or unconscionable acts or practices" and are thus *per se* FDUTPA violations as well.  Fla. Stat. § 501.203(3)(c); *cf. State Farm*, 103 F. Supp. 3d at 1354 (holding that "operating medical clinics" in violation of Florida law is a *per se* violation of FDUTPA).

Each of these *per se* FDUTPA violations inflicted significant harm on Gilead.  As described, Defendants' schemes have caused Gilead to pay tens of millions of dollars in fraudulent MAP reimbursements and associated fees.  (*See* Quan Decl. ¶¶ 42-47.)  Therefore, based just on the harm inflicted on Gilead by Defendants' *per se* violations of the FDUPTA, Gilead is likely to succeed on its FDUTPA claims.

But Gilead has also shown that the Clinic and Pharmacy Defendants violated the FDUTPA by infringing Gilead's trademarks and trade dress.  *See ATP Sci. Proprietary, Ltd. v. Bacarella*, No. 20-CV-60827, 2020 WL 3868701, at *3 (S.D. Fla. July 9, 2020) "[C]ourts routinely find . . . that trademark infringement under the Lanham Act can constitute a deceptive practice under FDUTPA."); *TracFone Wireless, Inc. v. GSM Grp., Inc.*, 555 F. Supp. 2d 1331, 1338 (S.D. Fla. 2008) ("Engaging in trademark infringement is an unfair and deceptive trade

practice that constitutes a violation of [FDUTPA].").  As explained above, the Clinic and

Pharmacy Defendants are dispensing TRUVADA® and DESCOVY® without their FDA-required

packaging and labeling, and at odds with Gilead's quality control measures, in violation of the

Lanham Act and state trademark law.  *See supra* at 27-29, 41.  This conduct, in addition to

confusing and harming the public, has caused damage to Gilead's business reputation and

goodwill.  *See TracFone Wireless*, 555 F. Supp. 2d at 1338 (holding that such damage suffices to

state a claim under FDUTPA).  Gilead, therefore, is likely to succeed on the merits of its

FDUTPA claims on this ground as well.

Finally, even if they did not violate any other statutes, Defendants' schemes violate

FDUTPA because they are "likely to mislead [consumers] acting reasonably in the

circumstances, to the consumer's detriment," and because they are "immoral, unethical,

oppressive, unscrupulous, or substantially injurious to consumers."  *Supra* at 24-29; *see Zlotnick*,

480 F.3d at 1284; *State Farm*, 278 F. Supp. 3d at 1326; *PNR*, 842 So. 2d at 777.  It is injurious

enough for purposes of FDUTPA that the Clinic and Prescriber Defendants forged recruits'

signatures on MAP enrollment forms to allow the release of recruits' protected health

information, and manufactured fake identification cards to enable recruits' enrollment.  *See*

*Neelu Aviation, LLC v. Boca Aircraft Maint., LLC*, No. 18-CV-81445, 2019 WL 3532024, at *5

(S.D. Fla. Aug. 2, 2019) (submission of forged form to charge plaintiff's credit card violates

FDUTPA); *Nazario v. Prof'l Account Servs.*, 2017 WL 1179917, at *5 (M.D. Fla. Mar. 29, 2017)

(defendant violated FDUTPA by attempting to collect on unpaid bills "in an illegal and/or

unscrupulous manner" by, *e.g.*, abusing plaintiff's "private health information").  But even

beyond that, as explained above, Defendants' schemes rely on the exploitation of vulnerable

persons in desperate need of money; directly jeopardize their health, the health of their loved

ones, and the health of the broader community; and defraud and undermine Gilead's MAP, a charitable program intended to help stem the spread of HIV. This constitutes an unfair and deceptive practice by any measure. For all of these reasons, Gilead is likely to succeed on the merits of its FDUTPA claims.

### 5. Unjust Enrichment Claim (Nineteenth Claim for Relief)

Gilead is also likely to succeed on its equitable claim of unjust enrichment because (1) Gilead has conferred a benefit on Defendants; (2) Defendants voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for Defendants to retain it. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park,* 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

As set forth above, Gilead has wrongfully been made to pay tens of millions of dollars in reimbursement payments and related dispensing and administrative fees due to Defendants' fraudulent statements and omissions. As a result, Defendants have improperly claimed and received millions of dollars from Gilead. Defendants have made additional illicit profits by buying back medication from enrollees for a small amount of cash and reselling those medications at a higher price. Moreover, as owners and officers of the Clinic, Lab, and Pharmacy Defendants that operate the fraudulent schemes, the Officer Defendants have been enriched by virtue of their ownership and control over each of the entities and the ill-gotten profits they have made off of Gilead's MAP.

Defendants' conduct, which includes infringing Gilead's trademarks and sullying Gilead's good name, has wrongly enriched Defendants at Gilead's expense, and Defendants have no right in law or equity to retain the proceeds of their fraudulent, infringing, and unlawful schemes. *See In re Vizcay*, No. 8:15-MC-122-T-33, 2015 WL 5522011, at *1 (M.D. Fla. Sept.

17, 2015) (awarding damages for unjust enrichment in fraud action where insurer alleged that health care clinics had fraudulent billing practices and failed to comply with applicable licensing requirements); *United States Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 710 (M.D. Fla. 2017) (finding unjust enrichment claim viable where defendant used false statements to obtain larger reimbursements through health insurance program than were actually owed).

Accordingly, Gilead is likely to succeed on the merits of its unjust enrichment claim.

### 6.  Civil Conspiracy Claims (Fourth, Fifth, Seventh, Eighth, Fifteenth, and Sixteenth Claims for Relief)

"Civil conspiracy under Florida law requires a showing that two or more persons have taken concerted action to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means." *Kee v. Nat'l Reserve Life Ins. Co*., 918 F.2d 1538, 1541 (11th Cir. Fla. 1990).  The elements of civil conspiracy are "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy."  *Pezold Air Charters v. Phoenix Corp*., 192 F.R.D. 721, 726 (M.D. Fla. 2000).

Here, Gilead has presented ample evidence that the Positive Health Defendants and Doctors United Defendants each agreed and conspired among one another to (among other things) defraud Gilead, violate trademark laws, and engage in unfair and deceptive practices. The common purpose and objective of each conspiracy was to profit by extracting reimbursements from Gilead for fraudulent and improper prescriptions, and by reselling PrEP medication on the black market.

Defendants' agreements to conspire against Gilead are plain from the evidence already amassed, demonstrating their careful coordination and necessary interdependence in order to execute their schemes.  Because co-conspirators do not typically announce their plans, and often

71

take steps to avoid detection, the requisite agreement to conspire may be inferred from facts and circumstances suggesting its existence. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991); *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987). As the Eleventh Circuit has acknowledged, "it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators." *Seagood Trading*, 924 F.2d at 1573.

Gilead has gathered a plethora of enrollment and redemption data, corroborated by multiple whistleblower statements, demonstrating that the Positive Health Defendants and the Doctors United Defendants orchestrated parallel conspiracies. The Defendants within each group, as evidenced by their coordinated, mutually beneficial conduct and close ties, agreed to participate in a conspiracy to generate redemptions from Gilead based on fraudulent MAP enrollments. *See United States v. Schwartz*, 541 F.3d 1331, 1361 (11th Cir. 2008) (civil conspiracy can be inferred "from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct").

As described above, *see supra* at 10-14, the evidence showing that the Clinic, Lab, and Pharmacy Defendants have overlapping and related ownership is evidence of a conspiracy. There is no innocent reason why Defendants would create such confusing and cryptic corporate structures intended to obscure the relationships between the various Defendants rather than seek to leverage the synergies of a single business brand. *See Solar City, Inc. v. Crystal Clear Concepts, LLC*, No. 8:19-CV-2538-T-33TGW, 2020 WL 127567, at *5 (M.D. Fla. Jan. 10, 2020) (citing defendants' status as related entities under common ownership as evidence of an actionable conspiracy); *Trudell Med. Int'l v. D R Burton Healthcare LLC*, No. 4:18-CV-9-H-KS, 2020 WL 4372133, at *2 (E.D.N.C. Mar. 23, 2020) (court inferred existence of a conspiracy

72

based on allegations that defendants were affiliated corporate entities with some common employees, officers, or ownership).  The evidence also reveals that this agreement was made for the purposes of committing fraud and other unlawful acts at Gilead's expense.

The Pharmacy Defendants' agreement to join the conspiracy is also plain from the schemes' funding mechanism.  Simply put, Defendants could not have profited from these schemes without the agreement and active participation of the Pharmacy Defendants.  To distribute the proceeds of the fraud to the other players in the schemes—and to perpetuate the schemes by bankrolling efforts to identify, attract, and perform wellness checks on new recruits—the reimbursements received from Gilead needed to flow from the Pharmacy Defendants back to the other Defendants.  This would necessarily have required an agreement for the Pharmacy Defendants to share proceeds of the schemes with the other Defendants.  In exchange, the Clinic Defendants continued to recruit new enrollees, and the Lab Defendants performed blood tests that were required for the fraudulent MAP enrollments.  And pulling the strings were the Officer Defendants, who, by virtue of their control of the Lab, Clinic, and Pharmacy Defendants, devise, implement, and enforce policies and business practices that enable Defendants to carry out the fraud.

Indeed, in the absence of such an agreement, Defendants' conduct is inexplicable.  *See Valderrama v. Rousseau*, No. 11-CIV-24637, 2012 WL 12925174, at *7 (S.D. Fla. Sept. 18, 2012) (agreement may be inferred if defendants committed acts that are unlikely to have been undertaken without an agreement).  Without such an agreement to explain their behavior, there is no plausible reason why the Clinic Defendants would hire and fund a fleet of van drivers, pay the drivers for each recruit reeled in, and send their drivers more than fifty miles away to hunt for new recruits to enroll in the MAP.  (Sebastiani Decl. ¶¶ 40-47.)  There is no plausible reason

why the Clinic and Prescriber Defendants would submit massive numbers of fraudulent MAP enrollments, and take evasive measures to continue doing so after Gilead attempted to block their efforts.  There is also no plausible, non-conspiratorial reason why the Clinic and Prescriber Defendants would routinely refill prescriptions at a faster rate than enrollees could safely take the medication—or why TRUVADA® and DESCOVY® were both dispensed to the same patient, when the drugs are potentially dangerous taken together.  (Gallant Decl. ¶ 28.)  Without the Pharmacy Defendants' agreement and participation, the Clinic and Lab Defendants would not receive compensation for any of these efforts, as the Pharmacy Defendants are the only ones who directly receive reimbursement through the MAP.

The "overt acts" element is also satisfied as to each group of Defendants.  As discussed above, the Clinic and Prescriber Defendants in both conspiracies have committed numerous overt acts in furtherance of their schemes, including submitting thousands of fraudulent MAP enrollments, paying recruits to enroll in the MAP, improperly repurchasing dispensed PrEP medication from recruits, and reselling that diverted and misbranded PrEP medication.  (*See, e.g.*, Garcia Decl. ¶¶ 95-102; Sebastiani Decl. ¶¶ 34-39, 41-50, 53, 57-62, 64-69, 79, 82.)  The Lab Defendants provided testing services for thousands of recruits that were essential to the recruits' enrollment in the MAP.  Finally, the Pharmacy Defendants submitted thousands of redemptions for refills of PrEP medication that either were not medically necessary or were not truly dispensed to the recruits for whom they were prescribed, and improperly redispensed the medication after it had already been dispensed.  (*See, e.g.*, Garcia Decl. ¶¶ 98-99, 101-03; Quan Decl. ¶¶ 13, 41; Sebastiani Decl. ¶¶ 28-30.)

Finally, as a direct and proximate result of Defendants' conspiracy to engage in fraud, unfair business practices, and violations of the Lanham Act and state trademark law, Gilead has

suffered tens of millions of dollars in damages.  Accordingly, Gilead has demonstrated a

substantial likelihood of prevailing on its claims of civil conspiracy.

### B.      Injunctive Relief Is Necessary to Prevent Irreparable Harm to Gilead

With each passing day that their schemes persist, Defendants irreparably harm Gilead.

For starters, Defendants steal over $1,000 from Gilead on every fraudulent reimbursement

claim—money that Gilead is unlikely to be able to recover at the conclusion of this proceeding.

Moreover, Defendants' schemes inflict a variety of other harms on Gilead that cannot be

quantified or redressed through money damages.  Defendants prescribe PrEP medication in an

unsafe and ineffective manner, thereby injuring the commercial reputation for safety and

effectiveness that Gilead has worked for decades to build.  Defendants repurchase and resell

misbranded and adulterated TRUVADA® and DESCOVY® outside the authorized chain of

distributions, compromising the integrity of the products in a manner that further damages

Gilead's trademarks and reputation for quality.  And Defendants have developed numerous

tactics and countermeasures to evade Gilead's efforts to halt or mitigate the fraud through self-

help.  This unlawful conduct continuously and irreparably damages Gilead and Florida residents,

and can only be stopped by an immediate temporary restraining order followed by preliminary

and permanent injunctive relief.

### 1.      Defendants are Irreparably Harming Gilead's Reputation and Goodwill

Gilead faces irreparable harm to its reputation and goodwill from Defendants' illegal

conduct.  *See Ferrero v. Associated Materials Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991)

(affirming finding of irreparable harm based on loss of goodwill and customers); *Ferrellgas

Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) ("[G]rounds for irreparable

injury include loss of control of reputation, loss of trade, and loss of goodwill.").  Specifically,

Gilead's reputation and goodwill face irreparable damage from (1) Defendants' improper prescription of PrEP medication in a manner that undermines the medication's efficacy and safety; and (2) Defendants' sale of PrEP medication bearing the Gilead Marks, which has been repackaged in an unsafe and inferior manner.

When Defendants misprescribe PrEP medication in a manner that renders the medication unsafe and ineffective, they dilute the reputation for product quality that Gilead has spent decades building, and create safety risks that the public will wrongly associate with the Gilead name and the Gilead Marks. TRUVADA® and DESCOVY® are well-known and well-regarded for being effective and safe (Gallant Decl. ¶¶ 9, 20)—a stature that Defendants' fraudulent and reckless conduct severely endangers. Unless Defendants are immediately stopped, Gilead faces irreparable harm from the erosion of its reputation and goodwill. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998) (holding plaintiff would be irreparably harmed by defendant's "distribution of an allegedly inferior (and possibly dangerous) product" bearing plaintiff's name).

Gilead's goodwill and reputation face further irreparable harm from Defendants' infringing (and illegal) practices of dispensing PrEP medication in unauthorized, FDA-noncompliant generic bottles that have been stripped of their FDA-mandated labeling and reselling already-dispensed PrEP medication. The "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality" of the products being sold under its name and mark. *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 437 (N.D. Ill. 2019) (quoting *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001)). Thus, "a sufficiently strong showing of likelihood of confusion" in a trademark case can "by itself constitute a showing of a

substantial threat of irreparable harm." *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1263 (S.D. Fla. 2019) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *accord Bulgari, S.p.A. v. P'ships & Unincorporated Ass'ns Identified On Schedule "A,"* No. 14-CV-4819, 2014 WL 3749132, at *6 (N.D. Ill. July 18, 2014) (explaining that "[i]rreparable injury 'almost inevitably follows'" where, as here, a trademark plaintiff has shown a likelihood of confusion (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1332 (7th Cir. 1977))), *adopted*, 2014 WL 376854 (N.D. Ill. July 29, 2014).

In short, Defendants' unlawful schemes interfere with and disrupt Gilead's ability to control the safety and efficacy of its products and the reputation of its brand and its trademarks. Gilead's reputation and goodwill associated with its trademarks are invaluable, not precisely quantifiable, and impossible to recover once lost. Therefore, monetary damages cannot adequately compensate Gilead for its injuries, and injunctive relief is required. *See F&H Kosher Supermarket*, 2011 WL 6181907, at *8 ("If Defendant is allowed to continue to use the PEPSI marks, it may adversely affect Plaintiff's reputation and business in ways that may be difficult to quantify and that will not lend themselves easily to monetary compensation."); 5 J. Thomas McCarthy, McCarthy on Trademarks § 30:47 (4th ed. 2015) ("Like trying to un-ring a bell, trying to use dollars to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute fair or full compensation.").

### 2.    Defendants Continue to Conceal and Expand Their Ongoing Fraud

Defendants' conduct also makes clear that, unless legally restrained, they will continue to conceal and expand their ongoing fraud. As discussed above, Gilead's attempts to stop Defendants' fraud and abuse of the MAP have only emboldened Defendants, leading them to adopt countermeasures involving still further deceptions and fraudulent representations (*e.g.*,

77

posing on the telephone as actual patients).  *Supra* at 37-40; (Sebastiani Decl. ¶¶ 80-82.)  Indeed, the Positive Health Defendants are even planning to expand their scheme outside of Florida into neighboring states.  (Garcia Decl. ¶ 54.)

"[C]ourts have recognized than an injunction properly issues to stop an ongoing fraudulent scheme" like Defendants'.  *BellSouth Telecommunications, Inc. v. Mintz*, No. 04-CV-3586-CC, 2005 WL 8155198, at *2 (N.D. Ga. Mar. 4, 2005).  Indeed, absent injunctive relief, there is a high likelihood that Defendants will continue to expand their schemes and continuously evade Gilead's enforcement efforts.  Gilead would need "to stop this fraudulent scheme piecemeal in lawsuit after lawsuit," *id.*, and "[i]f a plaintiff can receive legal relief only through a multiplicity of lawsuits, plaintiff has suffered irreparable harm sufficient to warrant a preliminary injunction," *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991).

### C.      The Balance of Equities Weighs Decisively in Gilead's Favor

The balance of equities here not only "tips," but weighs heavily, in favor of Gilead. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008).  Indeed, every single equity in this case militates in favor of granting injunctive relief.  As described, Gilead will continue suffering substantial irreparable harm to its reputation and goodwill absent an injunction. Moreover, absent court intervention, Defendants' fraudulent schemes are likely to continue to proliferate, endangering the health of ever more innocent third parties.  *See supra* at 77-78.

On the other hand, the potential inequity to Defendants from the grant of Gilead's requested relief is nonexistent.  The injunctive relief that Gilead seeks in this motion is narrowly tailored to prevent the ongoing harms immediately at issue and would not preclude Defendants from doing anything they would otherwise have the legal right to do.  Specifically, Gilead seeks to enjoin Defendants and those working in concert with them from enrolling any individuals in

Gilead's MAP or PAP (as TRUVADA® and DESCOVY® can be obtained for free via either program); requesting or claiming any reimbursements for any TRUVADA® or DESCOVY® dispensed to any individual enrolled in the MAP or PAP; dispensing those products without the FDA-approved label, package insert, lot number, serialization number, or expiration date, or in packaging other than the original, unopened containers, as already prohibited by the FDA; selling, purchasing, or otherwise using TRUVADA® or DESCOVY® that has previously been filled or dispensed; and destroying or concealing evidence related to their wrongdoing.  Gilead's proposed injunction also seeks to require Defendants to turn over all TRUVADA® or DESCOVY® that is in their possession, custody or control and that either (a) is no longer in its original, unopened container from the manufacturer, or (b) that had previously been filled or dispensed, to be held by Gilead until further order of this Court.  The requested injunction would not interfere with Defendants' lawful practice of medicine or other lawful business operations in any way.

Because the MAP and PAP are charitable programs that Gilead offers at its own sole discretion, and can end whenever it wishes, Defendants have no legal right to participate in them. Moreover, Defendants have no legal obligation to dispense PrEP medication to MAP or PAP enrollees in the first place.  Accordingly, enjoining Defendants from seeking payment from Gilead through the MAP and PAP has no adverse impact on Defendants that they cannot themselves easily avoid.  Gilead has already attempted to terminate Defendants' participation in the program; it is only because of their ongoing fraudulent countermeasures that Defendants can continue to participate.

An injunction excluding Defendants from charitable programs that they have no legal right to participate in cannot cause them any cognizable hardship.  *Cf. In re Harper*, No. 06-

40567 LMK, 2007 WL 853334, at *2 (Bankr. N.D. Fla. Feb. 16, 2007) (holding that eviction was not a cognizable hardship for purposes of injunctive-relief calculus where party was "merely a tenant at sufferance with no colorable legal claim to title to the property"); *Kettle v. California Pub. Utilities Comm'n*, No. C-98-1638-CAL, 1999 WL 96014, at *5 (N.D. Cal. Feb. 5, 1999) (no cognizable hardship where party showed just an "alleged loss of a business opportunity" and not a "deprivation of any existing or pre-existing legal right").

Further, by prohibiting Defendants from dispensing or selling misbranded prescription drugs, or redispensing medication that has already been dispensed, the requested injunction would simply prevent Defendants from doing what the law already forbids. *See, e.g.*, 21 U.S.C. §§ 331(a), 333(a), 352(f). Defendants suffer no cognizable hardship by being prohibited from illegally selling PrEP medication that confuses consumers and interferes with Gilead's quality control measures. *See Mitchell Grp. USA LLC v. Udeh*, 14-cv-5745, 2014 WL 12837548, at *2 (E.D.N.Y. Oct. 7, 2014) ("[H]ardship to a defendant based on his or her own wrongful acts is not legally cognizable."); *Philip Morris USA, Inc. v. 5 Bros. Grocery Corp.*, 13-CV-2451, 2014 WL 3887515, at *6 (E.D.N.Y. Aug. 5, 2014) ("Absent an injunction, there will be further erosion of plaintiff's good will and reputation. Defendants, on the other hand, will be called upon to do no more than refrain from what they have no right to do in the first place."); *Garnett v. Zellinger*, 313 F. Supp. 3d 147, 159 (D.D.C. 2018) (finding that "[t]he balance of equities tilt[ed] in favor of granting injunctive relief" when requested injunction "impose[d] no burden on [Defendant] beyond what the statute already require[d]" it to do).

Nor do Defendants face any cognizable hardship by being required to turn over PrEP medication that is no longer in its original, unopened container, or that had previously been filled or dispensed. As shown above, such medication is a "misbranded drug" under federal and state

laws and illegal to sell or distribute.  Defendants are therefore already prohibited by law from selling or distributing any PrEP medication they would be required to turn over.  Moreover, Defendants' repackaging schemes have demonstrated that, if allowed to remain in possession of their stockpiles of misbranded PrEP medication, Defendants will continue to illegally distribute it, further harming Gilead and the public at large.  Courts have ordered defendants to turn over infringing property in far less pressing situations.  *See, e.g.*, *Niko Petroleum Retailers of Fla., LLC v. Miami VIP Tours LLC*, No. 14-21770-CIV, 2014 WL 12862297, at *10 (S.D. Fla. May 29, 2014) (ordering defendants to turn over all marketing materials and business forms that infringed luxury concierge company's trademarks).  That same relief is all the more critical here.

In sum, the serious harm to Gilead if no injunction were issued far outweighs any putative harm to Defendants resulting from their exclusion from a Gilead-sponsored charitable program they have no legal right to participate in, or their prohibition from unlawfully selling and redistributing misbranded PrEP medication that confuses and potentially endangers consumers.

###        D.        An Injunction Is In The Public Interest

Granting Gilead's requested relief would overwhelmingly advance the public interest. For starters, the public interest is "almost always" served by an injunction against actions that deceive consumers.  *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 730 (3d Cir. 2004); *see also Davidoff & Cie.*, 263 F.3d at 1304 ("[T]he public interest is served by preventing consumer confusion in the marketplace."); *Tiramisu Int'l LLC v. Clever Imps. LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010) ("[T]he public as a whole has a paramount interest not to be confused by defendant's infringement.").

But the public harm in this case goes far beyond ordinary consumer confusion.  As discussed above, Defendants' schemes violate federal and state law in multiple respects, and "[t]he public interest favors compliance with federal [and state] statutes."  *Chastain v. Nw. Ga. Hous. Auth.*, 2011 WL 5979428, at *13 (N.D. Ga. Apr. 28, 2011).  And even more importantly, Defendants' ongoing violations jeopardize the public health and safety every day they are allowed to continue.  Defendants' fraud undermines the integrity of the MAP and wrongly siphons resources from a charitable program meant to expand access to life-saving medication and fight the spread of HIV.  In doing so, Defendants divert resources and medication away from Americans with little income who are actually in need of PrEP medication to prevent HIV infection, thereby exacerbating the spread of a potentially fatal disease.

As discussed above, Defendants' schemes also directly jeopardize the health of the vulnerable recruits on whom they prey, and by extension, the broader communities in which those recruits live.  Defendants are prescribing PrEP medication in a manner that is potentially unsafe—for example, they are writing prescriptions without screening for important preexisting conditions, simultaneously prescribing TRUVADA® and DESCOVY® in a potentially hazardous manner, and refilling prescriptions at an excessive and unsafe rate.  *Supra* at 17-18, 23-26.  In addition, as discussed, Defendants are repackaging Gilead's medications in an inferior and unlawful manner that potentially compromises the tablets' safety and integrity and that removes FDA-mandated safety warnings and instructions for use.  *Supra* at 27-29, 41.  Finally, to the extent Defendants are actually enrolling individuals in the MAP who have a *bona fide* need for PrEP medication, Defendants' practice of repurchasing medication from their recruits deprives those individuals of crucial protection against contracting HIV, thereby increasing the risk that these recruits will contract HIV and spread it to their loved ones and in their communities.

82

Courts routinely hold that public health threats of this nature weigh heavily—if not dispositively—in favor of injunctive relief.  As the Second Circuit has observed, courts "have consistently held that the public interest is especially significant when health and safety concerns are implicated," as in cases involving drugs and medical devices.  *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193-94 (2d Cir. 1996) (citations omitted); *see also Morgenstern Chem. Co. v. G. D. Searle & Co.*, 253 F.2d 390, 393 (3d Cir. 1958) ("Prevention of confusion and mistakes in medicines is too vital to be trifled with"); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 198 (S.D.N.Y. 2020) (in case involving infringing COVID-19 respirators, holding that "[w]hen lives are at stake . . . , the public interest demands" a preliminary injunction).

Nor need there be any concern that, by cutting Defendants and their affiliates off from the MAP, the requested relief would keep qualifying individuals who legitimately need PrEP medication from obtaining it.  There are many clinics in Miami and elsewhere in South Florida that lawfully and non-fraudulently participate in the MAP program and prescribe and dispense PrEP medication to individuals with a legitimate medical need.  Floridians with a genuine need for PrEP medication can and should continue seeking free medication from these law-abiding clinics through the MAP, and Gilead will continue to voluntarily assume the costs.  By contrast, Defendants have shown a reckless disregard in dispensing PrEP medication to the individuals they enroll in the MAP.  An individual who needs PrEP medication and comes to Defendants will generally be worse off because Defendants do not follow proper prescribing practices, provide appropriate directions for use, or supervise treatment.  Therefore, cutting off the Defendants from the MAP program will improve, not impede, public access to PrEP medication.

Finally, putting an immediate stop to Defendants' schemes is particularly important to the public interest given the evidence that Defendants are aggressively expanding their operations in Florida and seeking to open clinics in other states.  Indeed, the website for Defendant Positive Health currently discloses that Positive Health will soon be expanding to new locations in Florida and Georgia.  If left unchecked, Defendants' schemes, and the harm they inflict on Gilead and on Florida communities, are certain to grow.

In short, the public interest demands injunctive relief in this case.  Indeed, under the "sliding scale" approach endorsed by this Circuit, the egregious threat Defendants' schemes pose to the public would support an injunction even if (contrary to fact) Gilead's showing as to the other preliminary injunction factors were merely modest.  *See supra* at 43.

## II.      A $25,000 TRO BOND IS ADEQUATE

To facilitate entry of its requested relief, Gilead proposes posting a TRO bond of $25,000—an amount that is adequate to protect Defendants in the highly unlikely event the issuance of Gilead's requested TRO turns out to have been improper.

Although Federal Rule of Civil Procedure 65(c) provides for the posting of adequate security, "over the past twenty years, federal courts have come to recognize that the district court possesses discretion over whether to require the posting of security."  *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 463 (S.D. Fla. 1998); *see Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd*., 112 F.3d 1125, 1127 (11th Cir. 1997) ("The amount of an injunction bond is within the second discretion of the district court.").

Here, no security is required, because the requested TRO would not prevent Defendants from doing anything they would otherwise have a legal right to do.  As discussed above, Defendants can suffer no legally cognizable harm from an order excluding them from a

voluntary charitable program that Gilead could terminate at any time and forbidding them from breaking federal and state law by selling misbranded drugs.

Nonetheless, Gilead is willing to post a $25,000 bond in order to avoid any dispute about the adequacy of security.  This will be more than sufficient to cover any incidental harms Defendants may allege that they sustain in the fourteen days that a TRO would remain in effect.

## III.    EXPEDITED DISCOVERY IS NECESSARY AND APPROPRIATE

Gilead also seeks an expedited discovery order so that it may quickly investigate, trace, and uncover the full extent of the Defendants' unlawful, sophisticated, and presently ongoing—and evolving—schemes.

Federal statute directs district courts to "expedite the consideration of . . . any action for temporary or preliminary injunctive relief."  28 U.S.C. § 1657.  To that end, Federal Rule of Civil Procedure 26(d) expressly allows for expedited discovery, with the Advisory Committee Notes specifically endorsing expedited discovery when a party seeks a preliminary injunction. *See, e.g.*, *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1066 (C.D. Cal. 2009) (citing Advisory Committee Notes to the 1993 amendments to Rule 26(d) and noting that "[d]iscovery before the Rule 26(f) conference 'will be appropriate in . . . cases . . . involving requests for a preliminary injunction'").  To enable such expedited discovery, the Federal Rules of Civil Procedure authorize the Court to grant leave to take depositions "before the time specified" elsewhere in the Rules, Fed. R. Civ. P. 30(a)(2)(A)(iii), and to order a "shorter" time for the production of documents than the rules otherwise provide, Fed. R. Civ. P. 34(b)(2)(A).

A party demonstrates its entitlement to expedited discovery upon a showing of "good cause."  *TracFone Wireless, Inc. v. Adams,* 304 F.R.D. 672, 673 (S.D. Fla. 2015).  "Good cause may be found where the need for expedited discovery, in consideration of the administration of

justice, outweighs the prejudice to the responding party." *Id.* (quoting *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275–76 (N.D. Cal. 2002)).

Here, Gilead has shown good cause for expedited discovery for at least two reasons. First, it will help Gilead mitigate against further irreparable harm to itself and to the public. *See TracFone Wireless, Inc.*, 304 F.R.D. at 673 (expedited discovery is warranted where it may mitigate additional irreparable harm caused by an ongoing scheme). To successfully bring an end to Defendants' fraudulent schemes, and protect the public against the threat they pose, Gilead must ascertain their full scope, the players and principals involved, and to what extent Defendants have introduced misbranded and potentially dangerous drugs into the black market. If Gilead can quickly discover these facts, it can use them to identify and block the prescribers and healthcare clinics associated with Defendants from submitting new enrollments, thereby mitigating future irreparable harm and protecting the public health and safety.

Second, expedited discovery is also routinely granted where it is necessary to create a factual record that will assist the court in deciding the plaintiff's motion for a preliminary injunction. *See SimplexGrinnell, L.P. v. Quality Commc'ns of Fla., Inc.*, No. 05-61309-CIV, 2005 WL 8154701, at *1 (S.D. Fla. Aug. 25, 2005); *see also Johnson & Johnson Vision Care, Inc., v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 169 (S.D.N.Y. 2004) (granting expedited discovery prior to preliminary injunction hearing on Lanham Act claim). The scope of Gilead's requested expedited discovery is narrow, and limited to documents necessary to create a record for the preliminary injunction hearing. *See Federal Express Corp. v. Federal Espresso, Inc.*, No. 97 CV 1219, 1997 WL736530, at *2 (N.D.N.Y. Nov. 24, 1997) (expedited discovery proper when " limited to requests" involving the "issues that will have to be determined at the

preliminary injunction hearing").  Specifically, as set forth in the accompanying proposed TRO, Gilead seeks three general categories of discovery:

*First*, to identify the conspirators, agents, and additional healthcare providers participating in these schemes, Gilead seeks production from each Defendant of documents sufficient to show the names, addresses, and contact information of all businesses that any Defendant has directly or indirectly owned or controlled since February 1, 2018, as well as the names, addresses, and contact information for all persons employed by these entities since February 1, 2018.  Expedited discovery targeted in this manner at identifying the participants in a fraudulent scheme is routinely granted.  *See, e.g.*, *Dentsply Sirona, Inc. v. L I K Supply, Corp.*, 2016 WL 3920241, at *9-10 (N.D.N.Y. July 15, 2016) (granting motion for expedited discovery of the identities of the sources and purchasers of the counterfeit products, and any participants in the unlawful conduct).

*Second*, Gilead seeks expedited production of documentation concerning all reimbursements or other remuneration received since February 1, 2018, by any Defendant or its affiliate entities for any TRUVADA® or DESCOVY® dispensed to any patient enrolled in Gilead's PAP or MAP.  Discovery of these payments is necessary to ensure that the full scope of Defendants' unlawful activities is identified and contained.  *See, e.g.*, *McGraw-Hill Global Educ. Holdings, LLC v. Khan*, 323 F. Supp. 3d 488, 493 (S.D.N.Y. 2018) (discussing court's preliminary injunction order directing defendants to locate all accounts connected to defendants' websites).  This information will also be critical to Gilead in the likely event that Defendants attempt to conceal their assets by shuttling them to other entities.

*Third*, Gilead seeks an order permitting it to serve document requests upon Defendants and nonparties returnable on five days' notice.  *See, e.g.*, *Wilkins v. Arthur J. Gallagher & Co.*,

No. MO-10-CV-40, 2010 WL 11652139, at *2 (W.D. Tex. Apr. 20, 2010) (granting requests for written discovery and production of documents prior to preliminary injunction hearing).  In addition, Gilead seeks an order permitting it to take the depositions of Defendants and nonparties on three days' notice.  In light of Defendants' efforts to conceal the connections between themselves, and the likelihood that Defendants' written documentation of their own fraudulent schemes will be incomplete or difficult to decipher, these orders are extremely important because much of the key information about the relationships between the Defendants will likely arise from depositions.

The abbreviated notice period strikes the appropriate balance between providing adequate notice to Defendants and nonparties, and permitting discovery to be completed in time for use at the hearing on Gilead's motion for a preliminary injunction.  Given the level of immediate and irreparable harm to which Defendants are exposing Gilead and the broader public, this hearing must take place before the expiration of a TRO, which will occur no more than 14 days after the TRO is entered absent further order from the Court.  *See* Fed. R. Civ. P. 65(b)(2).

## IV.    ENTRY OF A HIPAA PROTECTIVE AND CONFIDENTIALITY ORDER IS NECESSARY AND APPROPRIATE

This action, by its nature, will require the disclosure to the Court of "protected health information" generally protected under HIPAA, 45 C.F.R. § 160.103, as well the disclosure of other confidential information in discovery.  To permit the disclosure of that information in this litigation, Gilead respectfully seeks entry of a HIPAA protective and confidentiality order.

A qualified HIPAA protective order permits disclosure of otherwise protected health information "in the course of any judicial or administrative proceeding," 45 C.F.R. § 164.512(e)(1)(ii), so long as the information is used in connection with "the litigation or proceeding for which such information was requested," and provides for "the return to the

covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding." *Id.* § 164.512(e)(1)(v).  Courts regularly approve qualified HIPAA protective orders as striking an appropriate balance between permitting full discovery of relevant information ensuring that HIPAA's privacy standards are upheld.  *See State Farm Mut. Auto. Ins. Co. v. Kugler*, 840 F. Supp. 2d 1323, 1328 (S.D. Fla. 2011) ("[I]t is a purpose of [HIPAA] that health information which may eventually be used in litigation should be made available during the discovery phase.").

Here, Gilead's requested order fully abides by these strictures.  Consistent with applicable regulations, the proposed order permits the disclosure of protected health information only to the extent needed in relation to this proceeding, and requires the return or destruction of that information after this litigation ends.  Such an order will allow Gilead to uncover the full extent of Defendants' unlawful schemes while also complying with HIPAA requirements.

Likewise, good cause supports entry of an order protecting the confidentiality of materials exchanged in discovery.  *See* Fed. R. Civ. P. 26(c)(1).  Defendants' schemes involve unlawfully prescribing and distributing Gilead's PrEP therapies to many individuals.  Revealing the full extent and consequences of those schemes will necessitate the disclosure of many individuals' protected health information, as well as confidential business information.

Moreover, Gilead's proposed order is "narrowly drawn." *Corcel Corp. v. Ferguson Enterprises, Inc.*, 291 F.R.D. 680, 682 (S.D. Fla. 2013).  It allows parties to selectively mark certain sensitive documents that meet the standard for "confidential" treatment and protects the confidentiality of documents so marked.  Such documents include, among other things, information prohibited from disclosure by statute; information that reveals trade secrets; the

parties' confidential research, technical, commercial, or financial information; personal medical information; and personal identity information.

Courts regularly approve, and often encourage, protective orders just like the one Gilead proposes "to expedite the flow of discovery material, promote the prompt resolution of disputes over confidentiality, and facilitate the preservation of material deemed worthy of protections." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987); *see also Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1307 (11th Cir. 2001) (describing umbrella protective orders as "commonplace in the federal courts"); *Alarm Grid, Inc. v. Alarm Club.com, Inc.*, No. 17-80305-CV, 2018 WL 1175254, at *4 (S.D. Fla. Mar. 5, 2018) (such orders are "standard practice in many civil cases").

In sum, entry of Gilead's proposed HIPAA protective and confidentiality order will protect the parties' confidential information and promote an efficient discovery process.

## <u>CONCLUSION</u>

For the above-stated reasons, the Court should grant Gilead's expedited motions for a TRO, to be followed by a preliminary injunction; an order for expedited discovery; and a HIPAA protective order and confidentiality order; and should award any other and further relief that the Court may deem just and proper.  Given the expedited nature of these motions and the immediate relief sought, Gilead respectfully requests that its motions be heard on Tuesday, November 3, 2020, or as soon as possible thereafter, appreciating the burden this places on the Court in light of the current pandemic and national election.

DATED:      Miami, Florida
                November 2, 2020

RESPECTFULLY SUBMITTED,

90

SQUIRE PATTON BOGGS (US) LLP

/s/ P. Jan Kubicz
P. Jan Kubicz (FBN 84405)
jan.kubicz@squirepb.com
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
T.: (305) 577-7000
F.: (305) 577-7001

/s/ Franklin G. Monsour
Franklin G. Monsour (*pro hac vice pending*)
franklin.monsour@squirepb.com
1211 Avenue of the Americas, 26th Floor
New York, NY 10036
T.: (212) 872-9800


PATTERSON BELKNAP WEBB & TYLER LLP

/s/ Geoffrey Potter
Geoffrey Potter (*pro hac vice pending*)
Jonah Knobler (*pro hac vice pending*)
Joshua Kipnees (*pro hac vice pending*)
Timothy A. Waters (*pro hac vice pending*)
R. James Madigan III (*pro hac vice pending*)
Jared S. Buszin (*pro hac vice pending*)
Devon Hercher (*pro hac vice pending*)
Jacob Chefitz (*pro hac vice pending*)
 gpotter@pbwt.com
jknobler@pbwt.com
jkipnees@pbwt.com
twaters@pbwt.com
jmadigan@pbwt.com
jbuszin@pbwt.com
dhercher@pbwt.com
jchefitz@pbwt.com
1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc. and
Gilead Sciences Ireland UC*

91