**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

---

GILEAD SCIENCES, INC.; GILEAD SCIENCES
IRELAND UC,

                              Plaintiffs,

     v.

AJC MEDICAL GROUP, INC. et al.,

                              Defendants.

---

Civil Action No. 20-cv-24523-AMC

**Filed *Ex Parte* and Under Seal**

<br>

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTIONS FOR AN ORDER FREEZING CERTAIN ASSETS OF THE UNITED DEFENDANTS, PHYSICIAN PREFERRED DEFENDANTS, AND RELIEF DEFENDANTS AND FOR LEAVE TO AMEND THE COMPLAINT

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................... 2

RELEVANT FACTS .................................................................................................. 8

I.      OVERVIEW OF DEFENDANTS' MAP FRAUD ......................................... 8

        A.      The MAP .......................................................................................... 8

        B.      Defendants' Fraudulent Schemes .................................................... 10

II.     GILEAD FILES THIS SUIT AND OBTAINS PRELIMINARY INJUNCTIONS
        BARRING DEFENDANTS FROM THE MAP ........................................... 13

III.    THE UNITED DEFENDANTS ................................................................... 14

        A.      The PHA/United Pharmacy MAP Fraud ......................................... 15

                1.      Recruiting Patients with Illegal Cash Incentives. ............... 16

                2.      Enrolling Patients in the MAP Before They Were Evaluated by
                        Healthcare Providers. ........................................................ 17

                3.      Forging Signatures. ........................................................... 18

                4.      Enrolling ineligible patients. .............................................. 19

                5.      Unlawful arrangements with partner clinics. ...................... 20

                6.      PHA ran the same patient recruiting and enrollment scheme at
                        partner clinics. .................................................................. 21

        B.      The United Defendants Distributed Misbranded and Trademark-Infringing
                PrEP Medication .............................................................................. 23

i

**TABLE OF CONTENTS**
**(continued)**

Page

IV.    THE PHYSICIAN PREFERRED DEFENDANTS.................................................36

    A.    The DUG/Physician Preferred MAP Fraud .......................................37

        1.    The Physician Preferred Defendants Actively Participated in the DUG Scheme ...............................................................38

        2.    DUG Illegally Paid Patients to Enroll in the MAP ...............................39

        3.    DUG Enrolled Recruits in MAP Regardless of their Eligibility...............40

        4.    DUG forged prescriber signatures ...........................................41

        5.    Hundreds of the fraudulently-enrolled patients never picked up their PrEP medication ....................................................41

    B.    The Physician Preferred Defendants Continued Defrauding Gilead After Their Partnership with DUG Ended........................................41

**TABLE OF CONTENTS**
**(continued)**

**Page**

G. The Physician Preferred Defendants Intentionally Destroyed All Their
Emails and Attempted to Coverup Their Wrongdoing by Lying .........................49

ARGUMENT ....................................................................................................................53

I. THIS COURT HAS THE POWER TO RESTRAIN DEFENDANTS' ASSETS
TO PRESERVE GILEAD'S ABILITY TO OBTAIN EQUITABLE REMEDIES .........53

II. GILEAD IS ENTITLED TO A TRO AND PRELIMINARY INJUNCTION
RESTRAINING DEFENDANTS' ASSETS ....................................................................56

A. Gilead Is Likely to Succeed on the Merits of Its Claims for Equitable
Relief .............................................................................................................57

1. The Evidence Demonstrates That Defendants Were Unjustly
Enriched As a Result of Fraud ..................................................................58

2. It Is Undisputed That the United Defendants Distributed
Misbranded Medication in Violation of the Lanham Act .........................61

3. Gilead Is Likely to Succeed on its RICO Claims .....................................66

B. Without an Asset Freeze, Gilead's Ability to Obtain Restitution or
Disgorgement Will Be Irreparably Harmed .................................................70

C. The Balance of Hardships Decidedly Favors Gilead ............................................75

D. The Public Interest Is Served by the Requested Relief ........................................75

**TABLE OF CONTENTS**
**(continued)**

**Page**

E.      An *Ex Parte* TRO Is Necessary to Prevent Defendants from Immediately Concealing Assets ...................................................................................76

F.      A $50,000 Bond Is Adequate ..............................................................81

III.    THE COURT SHOULD GRANT LEAVE FOR GILEAD TO AMEND ITS COMPLAINT ..............................................................................................81

A.      Leave to Amend Should be Granted ....................................................82

B.      Gilead Should be Permitted to Add Claims Against the Relief Defendants..........84

C.      The Court Should Freeze the Relief Defendants' Assets.....................................87

CONCLUSION...........................................................................................88

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
   15-CV-5826 (CBA) (MDG), 2015 U.S. Dist. LEXIS 189555 (E.D.N.Y. Nov.
   6, 2015) ...................................................................................................................................61

*Abbott Labs v. Adelphia Supply USA*,
   No. 15-CV-5826 (CBA) (LB), 2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019).......................62

*Absolute Activist Value Master Fund Ltd. v. Devine*,
   No. 2:15-cv-328-FtM-29DNF, 2015 U.S. Dist. LEXIS 192006 (M.D. Fla. July
   1, 2015) ............................................................................................................................ *passim*

*Absolute Activist Value Master Fund Ltd. v. Devine*,
   No. 2:15-cv-328-FtM-29MRM, 2016 U.S. Dist. LEXIS 52263 (M.D. Fla.
   April 19, 2016)...............................................................................................................55, 68, 76

*ADG Concerns, Inc. v. Tsalevich, LLC*,
   No. 18-cv-00818-NC, 2018 U.S. Dist. LEXIS 155542 (N.D. Cal. Aug. 31,
   2018) .......................................................................................................................................64

*AIM Recycling, Fla., LLC v. Metals USA, Inc.*,
   No. 18-60292-CIV-Zloch/Hunt, 2018 U.S. Dist. LEXIS 159155 (S.D. Fla.
   Sept. 17, 2018) .................................................................................................................68, 75

*Allstate Ins. Co. v. Palterovich*,
   653 F. Supp. 2d 1306 (S.D. Fla. 2009) ...........................................................................66, 67, 69

*Animale Grp., Inc. v. Sunny's Perfume, Inc*,
   256 F. App'x 707 (5th Cir. 2007) ..........................................................................................53

*Bardfield v. Chisholm Props. Circuit Events, LLC*,
   No. 3:09cv232/MCR/MD, 2009 U.S. Dist. LEXIS 133889 (N.D. Fla. June 12,
   2009) .............................................................................................................................55, 67, 73-74

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*,
   425 F.3d 964 (11th Cir. 2005) ...............................................................................................80

*Bloomfield Institutional Opportunity Fund, LLC v. Allen Inv. Props., LLC*,
   No. 8:10-CV-1475-T-17MAP, 2010 U.S. Dist. LEXIS 88192 (M.D. Fla. Aug.
   9, 2010) .............................................................................................................................. *passim*

*Boyd v. United States*,
   556 U.S. 938, 946 (2009) .......................................................................................................66

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Burger King Corp. v. Mason*,
    855 F.2d 779 (11th Cir. 1988) ..................................................................................64

*Caterpillar, Inc. v. Nationwide Equip.*,
    877 F. Supp. 611 (M.D. Fla. 1994) ..........................................................................61

*Century Sr. Servs. v. Consumer Health Benefit Ass'n*,
    770 F. Supp. 2d 1261 (S.D. Fla. 2011) .....................................................57, 85-86

*CFTC v. Levy*,
    541 F.3d 1102 (11th Cir. 2008) ................................................................................52

*Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.*,
    814 F. Supp. 1084 (S.D. Fla. 1992) ..........................................................................68

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ....................................................................................75

*Davidoff & Cie, S.A. v. PLD Int'l Corp.*,
    263 F.3d 1297 (11th Cir. 2001) ................................................................................60

*Foman v. Davis*,
    371 U.S. 178 (1962) ..................................................................................................81

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ..........................................................................81, 82

*Goldberg v. Chong*,
    No. 07-20931-CIV-HUCK, 2007 U.S. Dist. LEXIS 49980 (S.D. Fla. July 11,
    2007) ....................................................................................................................57, 86

*Golden v. Woodward*,
    15 So. 3d 664 (Fla. 1st DCA 2009) ..........................................................................58

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers, Local No.*
    *70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) .......................................................79

*Graybill v. Kolb* (*In re Graybill*),
    No. 6:19-cv-799-Ori-40, 2019 U.S. Dist. LEXIS 230419 (M.D. Fla. Oct. 31,
    2019) ..........................................................................................................................54

*H.J., Inc. v. N.W. Bell Tel. Co.*,
    492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)......................................68

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hamilton Grp. Funding, Inc. v. Basel*,
    311 F. Supp. 3d 1308 (S.D. Fla. 2018) ............................................................................15, 59

*HPC US Fund 1, L.P. v. Wood*,
    No. 13-61825-CIV, 2013 U.S. Dist. LEXIS 202844 (S.D. Fla. Aug. 23, 2013) .........53, 70, 74

*Hudson Nat'l Bank v. Shapiro*,
    695 F. Supp. 544 (S.D. Fla. 1988) .........................................................................53, 74, 75

*Ingram v. Ault*,
    50 F.3d 898 (11th Cir. 1995) ..................................................................................................56

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
    176 F. Supp. 3d 137 (E.D.N.Y. 2016) ..................................................................................64

*Jackson v. Grupo Indus. Hotelero, S.A.*,
    No. 07-22046-CIV ............................................................................................................63, 64

*Kalberg Indus. LLC v. Auto. Experts, Inc.*,
    861 F. App'x. 321 (11th Cir. 2021) ......................................................................................57

*Lee v. Wiand*,
    603 B.R. 161 (MD. Fla. 2018) ..............................................................................................54

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
    51 F.3d 982 (11th Cir. 1995) ...........................................................................52, 54, 55, 56

*Levy v. Kozyak (In re Fin. Federated Title & Tr., Inc.)*,
    347 F.3d 880 (11th Cir. 2003) ..............................................................................................54

*Louis Vuitton Malletier, S.A. v. 1louissacpascher.com*,
    No. 13-20951-CV-COOKE/TURNOFF, 2013 U.S. Dist. LEXIS 206885 (S.D.
    Fla. May 24, 2013).................................................................................................................55

*Manheim Auto. Fin. Servs., Inc. v. Joey D's Auto Outlet Inc.*,
    No. 8:12-cv-00528-SCB-MAP, 2012 U.S. Dist. LEXIS 197653 (M.D. Fla.
    Mar. 14, 2012)........................................................................................................................75

*Estate of Marilyn Monroe Llc v. 123oilpainting*,
    Civil Action No. 1:21-cv-3824-MLB, 2021 U.S. Dist. LEXIS 212633 (N.D.
    Ga. Sep. 22, 2021).................................................................................................................55

## <u>TABLE OF AUTHORITIES</u>
### <u>(continued)</u>

<u>Page(s)</u>

*Mary Kay, Inc. v. Weber*,
  661 F. Supp. 2d 632 (N.D. Tex. 2009) ...................................................................63

*Mayoral v. Salin*,
  No. 1:21-cv-62074, 2021 U.S. Dist. LEXIS 197739 (S.D. Fla. Oct. 14, 2021) .....................53

*McGirr v. Rheme*,
  891 F.3d 603 (6th Cir. 2018) .........................................................................70

*Modern Pharm., LLC v. McKesson Corp.*,
  No. 18-22242-CIV-Moore/Simonton, 2018 U.S. Dist. LEXIS 100174 (S.D.
  Fla. June 12, 2018).................................................................................56

*Moroccanoil, Inc. v. Perfumes World Com., Inc.*,
  234 F. Supp. 3d 1026 (C.D. Cal. 2017) ...............................................................62

*Mpl Commc'ns Ltd. v. Jodie*,
  No. 20-CIV-61418-RAR, 2020 U.S. Dist. LEXIS 202195 (S.D. Fla. Aug. 19,
  2020) ..............................................................................................55

*Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*,
  217 F. App'x 899 (11th Cir. 2007) ...................................................................64

*Pelletier v. Zweifel*,
  921 F.2d 1465 (11th Cir. 1991) ......................................................................67

*Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*,
  7 F.4th 989 (11th Cir. 2021) ........................................................................81

*United States ex rel. Rahman v. Oncology Assocs.*,
  198 F.3d 489 (4th Cir. 1999) ........................................................................53

*Ramada Inns, Inc. v. Gadsden Motel Co.*,
  804 F.2d 1562 (11th Cir. 1986) ......................................................................64

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).................................................................................66

*RFA Brands LLC v. Beauvais*,
  No. 13-14615, 2014 WL 7780975 (E.D. Mich. Dec. 23, 2014) .............................................63

*Robinson v. True Value Food Stores, Inc.*,
  No. 21-cv-22847, ECF No. 18 (S.D. Fla. Sept. 24, 2021)................................................79, 80

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Roche Diagnostics Corp. v. Priority Healthcare Corp.*,
No. 2:18-CV-01479-KOB-HNJ, 2019 U.S. Dist. LEXIS 193454 (N.D. Ala.
Nov. 7, 2019) ................................................................................. 70-71, 76, 77, 79

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) ..................................................................56

*Schmuck v. United States*,
489 U.S. 705 (1989)..................................................................................67

*SEC v. Asset Recovery & Mgmt. Tr., S.A.*,
340 F. Supp. 2d 1305 (M.D. Ala 2004) ..................................................75

*SEC v. Cavanagh*,
445 F.3d 105 (2d Cir. 2006) .....................................................................83

*SEC v. ETS Payphones, Inc.*,
408 F.3d 727 (11th Cir. 2005) ............................................................52, 53

*SEC v. Nat. Diamonds Inv. Co.*,
No. 19-cv-80633, 2019 WL 2583863 (S.D. Fla. June 11, 2019).................83, 85, 86

*Shipner v. E. Air Lines, Inc.*,
868 F.2d 401 (11th Cir. 1989) .................................................................81

*Sharp v. Bowling*, 511 So. 2d 363
(Fla. 5th DCA 1987) .............................................................................57

*Sigman U.S.A., LLC v. Doe*,
No. 1:21-cv-2817 (AT), 2021 U.S. Dist. LEXIS 212893 (N.D. Ga. Aug. 24,
2021) ...................................................................................................55

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
982 F.2d 633 (1st Cir. 1992).....................................................................61

*United States ex rel. Stepe v. RS Compounding LLC*,
325 F.R.D. 699 (M.D. Fla. 2017).........................................................59, 60

*Tempay Inc. v. Biltres Staffing of Tampa Bay, Ltd. LLC*,
No. 8:11-cv-2732-T-27AEP, 2011 U.S. Dist. LEXIS 160314 (M.D. Fla. Dec.
13, 2011) ........................................................................................53, 70, 75

## <u>TABLE OF AUTHORITIES</u>
### <u>(continued)</u>

**<u>Page(s)</u>**

*TracFone Wireless, Inc. v. Pak China Grp. Co.*,
   843 F. Supp. 2d 1284 (S.D. Fla. 2012) ...................................................................61

*U.S. Surgical Corp. v. Hosp. Prods. Int'l Pty, Ltd.*,
   701 F. Supp. 314 (D. Conn. 1988)........................................................................64

*United States v. Askins & Miller Orthopaedics, P.A.*,
   924 F.3d 1348 (11th Cir. 2019) .......................................................................52, 70

*United States v. Blankenship*,
   382 F.3d 1110, 1130 (11th Cir. 2004) ..................................................................69

*United States v. Johnson*,
   440 F.3d 1286 (11th Cir. 2006) .............................................................................69

*United States v. Phillips*,
   647 F. App'x 917 (11th Cir. 2016) ........................................................................67

*In re Vizcay*,
   No. 8:15-MC-122-T-33, 2015 WL 5522011 (M.D. Fla. Sept. 17, 2015).........59, 60

*Williams v. Mohawk Indus., Inc.*,
   465 F.3d 1277 (11th Cir. 2006) ...............................................................65, 66, 69

*Williams v. Wells Fargo Bank, N.A.*,
   No. 11-21233-CIV, 2011 WL 4901346 (S.D. Fla. Oct. 14, 2011) ...................58, 59

*Yeti Coolers, LLC v. Individuals, Business Entities*,
   No. 21 cv-62008, 2021 U.S. Dist. LEXIS 197592 (S.D. Fla. Sept. 28, 2021) .................79, 80

*Zino Davidoff SA v. CVS Corp.*,
   571 F.3d 238 (2d Cir. 2009)...........................................................................61, 62

**Statutes**

15 U.S.C. § 1117......................................................................................................54, 63

18 U.S.C. § 1341............................................................................................................66

18 U.S.C. § 1343............................................................................................................66

18 U.S.C. § 1956(a), (c)......................................................................................66, 68, 69

18 U.S.C. § 1957......................................................................................................66, 69

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

18 U.S.C. § 1961(4) ...................................................................................................66

18 U.S.C. § 1964 ................................................................................................8, 82

21 U.S.C. § 331 ........................................................................................................25

21 U.S.C. § 333(a) ..................................................................................................25

21 U.S.C. § 352 ........................................................................................................25

Fla. Stat. § 456.054 ....................................................................................11, 21, 75

Fla. Stat. § 499.005 ................................................................................................25

Fla. Stat. § 772.11(1) ..........................................................................................8, 82

Fla. Stat. § 772.103 ................................................................................................69

Fla. Stat. § 772.104(1) ........................................................................................8, 82

Fla. Stat. § 817.505 ....................................................................................11, 21, 75

Fla. Stat. § 895.05(6) ..............................................................................................55

**Other Authorities**

21 C.F.R. Part 201 and § 314.170 ........................................................................25

Fifth Amendment .............................................................................................. *passim*

Fed. R. Civ. P. 15(a)(2) ..........................................................................................81

Fed. R. Civ. P. 65 ..........................................................................1, 7, 52, 56, 79, 80

Local Rule 5.4 ............................................................................................................1

Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead") respectfully move, pursuant to Federal Rule of Civil Procedure 65, for an *ex parte* temporary restraining order ("TRO") and preliminary injunction (a) freezing bank and investment accounts owned or controlled by Defendants United Clinical Laboratory, LLC, United Pharmacy, LLC, Community Health Medical Center, LLC, Roman Shekhet, Kirill Vesselov, and Mikhail Vesselov (together, the "United Defendants"); the bank accounts owned or controlled by Defendants Testing Matters, Inc., Physician Preferred Pharmacy, Inc., Michael Bogdan, and Twiggi Batista (together, the "Physician Preferred Defendants"); and the bank accounts owned or controlled by Relief Defendants Maggie's Pharmacy Inc.; Elena Vesselov; The Recovery Team, Inc.; United Construction Partners, LLC; KMG Holdings, LLC; Leonid Holding, LLC; UDT Software, LLC; The Haven Detox LLC; Indiana Center for Recovery, LLC; 215 West 4th Street QOF, LLC; Haven Health Management, LLC; United Dialysis Center, Inc.; RTS Entertainment LLC; N60AJ, LLC; United Clinical Laboratory of New Jersey, LLC; Prevent Rx3, LLC; Indiana Wellness Rx, LLC; Prevent Rx, LLC; Navigator Solutions Inc.; MyRX Systems, LLC; Maureen Bogdan; AJVS, LLC; and Ivan Hyppolite (together, "Relief Defendants"); and (b) enjoining the United Pharmacy Defendants, the Physician Preferred Defendants, and the Relief Defendants from selling, transferring, conveying, or otherwise disposing of the assets identified in Appendix A to this Memorandum of Law.  Additionally, Gilead moves *ex parte* for leave to file an amended complaint.[1]

---

[1] Pursuant to Local Rule 5.4 and CM/ECF Administrative Procedure 9C, because this document and those filed in support have been filed "ex parte," they are restricted from public view in their entirety unless otherwise directed by the Court.  Additionally, because certain of the papers filed in support of these Motions also contain information, including **HIPAA-protected patient identifying information and other "Attorneys' Eyes Only" information**, that has been designated as Confidential Information pursuant to the HIPAA Protective and Confidentiality Order dated November 30, 2020 [Dkt. 209] ("Protective Order"), to the extent the Court may

## **INTRODUCTION**

When Gilead filed this action in November 2020, the Court granted a TRO, later converted into preliminary injunctions, barring all Defendants from participating in Gilead's charitable Medication Assistance Program ("MAP"). The grounds for the TRO and preliminary injunctions included the well-supported findings that Gilead was likely to succeed on its claims for fraud, trademark infringement, and unjust enrichment, and that Gilead would be irreparably harmed if Defendants were permitted to continue submitting claims for reimbursement through the MAP, in part because "Gilead is unlikely to be able to recover" full restitution for Defendants' fraud "at the conclusion of this proceeding." (Dkt. 3-1 at 75). Defendants did not even contest these findings, stipulating or otherwise acquiescing to the entry of preliminary injunctions after the Court granted the TRO. (Dkts. 187-98, 212, 482).

Since Gilead's initial filing, discovery has revealed that Defendants' fraudulent schemes were carried out through two separate enterprises orchestrated by two small groups of Defendants: the United Defendants, led by Defendants Mikhail and Kirill Vesselov, and the Physician Preferred Defendants, led by Defendant Michael Bogdan (collectively, the "Kingpin Defendants"). The Kingpin Defendants set up parallel networks of clinics, labs, pharmacies, and doctors that separately conspired to (1) purchase PrEP medication from distributors at a steeply discounted price through the federal government's 340B Drug Pricing Program ("340B Program");[2] (2) employ a menu of fraudulent and illegal tactics to enroll individuals into the MAP

---

later wish to unseal part or all of this document or those filed herewith, Gilead respectfully requests that the Court first provide Gilead an opportunity to file a motion to seal the portions of the documents that qualify as Confidential Information under the Protective Order.

[2] Through the U.S. Health Resources and Services Administration ("HRSA")'s 340B Program, drug manufacturers that participate in Medicaid, such as Gilead, agree to make their drugs

*en masse* without regard for their eligibility; (3) write them prescriptions for PrEP medication— irrespective of medical necessity—to be filled at pharmacies affiliated with the Kingpin Defendants; and then (4) claim reimbursement from Gilead through the MAP for each bottle of PrEP medication dispensed.  This enabled the Kingpin Defendants to obtain tens of millions of dollars of reimbursements from Gilead through the MAP to which they were not entitled, all with reckless disregard for the safety of the individuals to whom they prescribed medication without proper evaluation or oversight.

The Defendant 340B clinics—principally, Defendants Positive Health Alliance ("PHA") and Doctors United Group ("DUG")—were at the frontlines of the fraudulent schemes, directly executing various unlawful practices to fraudulently enroll patients in the MAP.  Through a combination of discovery and an extensive forensic analysis of the Kingpin Defendants' finances, however,



The Kingpin Defendants' central role in the fraud is not surprising, since these Defendants controlled the pharmacies that directly received the MAP reimbursements from

---

available at significantly reduced prices to entities that are registered as covered entities by HRSA.

Gilead.  The money trail leads directly to the United Defendants and the Physician Preferred

Defendants.  To follow this trail, Gilead retained William Waldie, an experienced forensic

accounting expert with over thirty years' experience tracking money laundering and fraud, to

analyze the Kingpin Defendants' financial records to trace and (hopefully) locate Gilead's

reimbursement proceeds.  Mr. Waldie found that the United and Physician Preferred Defendants

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

        Critically to Gilead's motions, Mr. Waldie's analysis also revealed ███████████

███████████████████████████████████████████████

████████ Records show that the United Defendants received $41.5 million in reimbursements

from Gilead during the relevant time period, and the Physician Preferred Defendants received

$26.7 million. ████████████████████████████████████

███████████████████████████████████████████████

By the time Gilead obtained bank records, the United Pharmacy account into which these

reimbursements were transferred held only about ██████, and the Physician Preferred Pharmacy

account held less than ██████. (Waldie Decl. ¶¶ 13(b), 14(b)). ████████████████

███████████████████████████████████████████████

████████████████████

Instead, as Mr. Waldie details in his declaration filed herewith, the United Defendants and Physician Preferred Defendants ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Gilead's MAP is intended to help patients in need access and afford their HIV medications.  But the Vesselovs ████████████████████████████████████████ ██ a fleet of at least 24 luxury cars worth more than $4 million, including three Ferraris, four Rolls-Royces, four Bentleys, four Mercedes-Benzes, four BMWs, one Porsche, one Maserati, a Mayback, a Cadillac, and a Ford Explorer.  *Infra* at 34.  Mr. Bogdan has accumulated vehicles worth at least an estimated $1.9 million, including three Ferraris, a Bentley, and three Mercedes-Benzes.  *Infra* at 46.  The Vesselovs and Mr. Bogdan also ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████ T████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████.  The United Defendants and Physician Preferred Defendants have also dissipated millions of dollars on consumption items such as ██████████████████████████ ██████████████.  Indeed, Mr. Bogdan's spending has been so profligate that █████████████ ████████████████████████████████████████████████████████████ ███████████despite the tens of millions of dollars he misappropriated from Gilead.

In light of these findings, it is now clear that the irreparable harm for which injunctive relief was previously granted—that "Gilead is unlikely to be able to recover at the conclusion of this proceeding" for the full extent of Defendants' fraud (Dkt. 3-1 at 75)—has not been fully remedied by the prospective injunctions barring Defendants from further participation

in the MAP. ████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████        If the Kingpin Defendants are permitted to retain unrestricted control over their assets for the remainder of this litigation, Gilead's chances of obtaining restitution will be even further harmed.  Gilead brings this motion to mitigate this harm by freezing the United Defendants', Physician Preferred Defendants', and Relief Defendants' assets pending resolution of this litigation.

        Gilead moves for an *ex parte* TRO ████████████████████████████████

████████████████████████████████████████████████████████████████████████

        Meanwhile, the Physician Preferred Defendants admit to having destroyed all their relevant emails despite being on notice not to do so, evincing they will take whatever steps necessary to interfere with Gilead's pursuit of claims against them.  *Infra* at 48-52.

        If they receive notice of this motion, the United Defendants and Physician Preferred Defendants will understand that they face the possibility of an imminent Court order restraining their funds.  They will also learn for the first time that their co-conspirators have turned against them and revealed devastating evidence in their declarations. ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████  At the same time, the relief Gilead seeks *ex*

*parte* is limited in duration and narrowly tailored to abate this serious risk of dissipation.  The

requested *ex parte* TRO would freeze assets for, at most, 14 days, unless extended by the Court or

on consent.  This temporary relief will simply allow Gilead to ensure the status quo is preserved

until its motion for a preliminary injunction can be heard—a noticed motion that the Kingpin

Defendants will have a full opportunity to contest.  Accordingly, Gilead respectively seeks an *ex*

*parte* TRO to prevent irreparable harm before a full hearing on this motion.

As explained below, it is well-established that preliminary injunctions freezing

assets are available, and frequently granted, to prevent parties from concealing and dissipating the

proceeds of fraud.  *See infra* at 52-55, 70-71 (collecting cases).  The standards for granting such

injunctions are the familiar standards for granting TROs and preliminary injunctions under Rule

65: likelihood of success on the merits, irreparable harm, balance of hardships, and the public

interest.  The Court has already found—and Defendants did not contest—that these standards are

met with respect to Defendants' ***prospective*** participation in the MAP.  For the reasons explained

below, the evidence that is now available shows that these factors are also met with respect to the

Kingpin Defendants' retention of the proceeds of their past MAP fraud.  Gilead respectfully

requests that the Court issue an order freezing the Kingpin Defendants' liquid assets and the real

and personal property that is traceable to the proceeds of their fraud.  ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  The accounts of the Relief

Defendants ██████████████ should also be frozen.  The accounts and assets over which an asset freeze is sought are identified in Appendix A to this Memorandum of Law.

Finally, Gilead moves *ex parte* for leave to amend the Complaint to (1) add claims under the federal and state Racketeer Influenced and Corrupt Organization Act ("RICO") and (2) name as parties the Relief Defendants, ███████████████████████ ██████.  As set forth below, Defendants' elaborate scheme to defraud Gilead through a network of business entities is the epitome of a RICO enterprise.  Gilead therefore seeks to add RICO claims and to name the Relief Defendants as parties in its Proposed First Amended Complaint ("PFAC").  Moreover, it is appropriate for Gilead to seek leave to amend *ex parte*, until the Kingpin Defendants' assets are frozen.  In light of the evidence that the Kingpin Defendants ████████ ████████████████████████████, there is a serious risk that these Defendants would ████████████████ of any remaining funds once exposed to liability for treble damages and attorney's fees as of right under the federal and state civil RICO statutes.  18 U.S.C. § 1964 (c); Fla. Stat. § 772.11(1); Fla. Stat. § 772.104(1).

## RELEVANT FACTS

## I.    OVERVIEW OF DEFENDANTS' MAP FRAUD

Gilead commenced this action when it discovered through whistleblower reports and internal data analyses that the United Defendants and the Physician Preferred Defendants, along with their co-conspirators, were siphoning vast amounts of money out of Gilead's Medication Assistance Program ("MAP").

### A.    The MAP

Through its charitable MAP, Gilead offers its groundbreaking, FDA-approved medications, TRUVADA for PrEP® and DESCOVY for PrEP® (together, "PrEP medication"),

for free to eligible low-income individuals.  These prophylactic pre-exposure medications protect individuals at risk of being exposed to HIV who have not contracted the virus but are at risk of being exposed to HIV.  When used as directed by appropriate individuals at risk, Gilead's PrEP medications are highly effective with a long-term established safety profile.  Ensuring that individuals at risk are able to access their prescribed PrEP medications is essential to protect the individual, to help communities impacted by HIV, and to help end the HIV epidemic.

Like any prescription medication, PrEP is not appropriate for everyone, and not everyone is eligible for the MAP.  To assess whether a person is eligible for the MAP, prescribing health care providers must perform an individualized consultation, ***prior to enrolling patients in the MAP***, to ensure that PrEP medication is appropriate and safe for them.  Before enrolling the patient in the MAP, the patient's prescriber must certify to Gilead that: (1) the prescribed medication is for the applicant, and not someone else; (2) it is medically necessary for the applicant; (3) it will be used as directed; (4) the prescriber will supervise the treatment; (5) the applicant had been tested for HIV infection and found to be negative; (6) the applicant will be regularly tested for HIV; and (7) the provider will periodically verify the enrollee's continued use of Gilead medication and resubmit current prescriptions.  (Kipnees Ex.[3] 41).  These certifications are critical components of a MAP enrollment, as they provide assurances to Gilead that there is a bona fide need for PrEP medication, that the applicant will be taking the prescribed medication under the supervision of a specific credentialed healthcare provider who will be accountable for the patient's care, and that the applicant has already been confirmed to be HIV-negative.  Gilead

---

[3] All references to "Kipnees Ex." are to exhibits annexed to the accompanying declaration of Joshua Kipnees dated March 14, 2022 ("Kipnees Decl.").  All references to "Potter Ex." are to exhibits annexed to the accompanying declaration of Geoffrey Potter dated March 14, 2022 ("Potter Decl.").

relies on the truth of these representations when it enrolls a new applicant in the MAP, and it would not permit anyone to enroll or remain enrolled absent his or her prescriber's certification of these representations.  (Dkt. 12, Declaration of Annette Sebastiani ("Sebastiani Decl.") ¶¶ 22-26).

During the relevant time period for this action, the MAP contained a feature that was exploited by unscrupulous healthcare providers such as Defendants.  For the convenience of patients enrolled in the MAP, Gilead permitted them to fill their prescriptions for PrEP medication at *any* retail pharmacy in the United States.  In addition to the dispensing fee, Gilead reimbursed the dispensed medication at Gilead's wholesale price—currently more than $1,800 per 30-tablet bottle of TRUVADA® or DESCOVY®.  Sometimes, however, certain pharmacies paid significantly less than the wholesale acquisition cost for PrEP medication in accordance with their participation in the federal government's 340B Program, through which Gilead offers PrEP medication at a discounted price to health-care providers serving low-income patients.  Pharmacies that were able to obtain PrEP medication through the 340B Program could thus capture a significant profit margin on PrEP medication by dispensing bottles through the MAP.

### B.    Defendants' Fraudulent Schemes

Defendants in this action exploited the structure of the MAP to defraud Gilead on a large scale.  They did this through separate but similar schemes that varied in their details but shared a common framework.  Defendants (1) purchased PrEP medication at a steeply discounted price through their participation in the federal government's 340B Program; (2) fraudulently enrolled low-income and vulnerable individuals into the MAP *en masse* without regard for their eligibility; (3) wrote them prescriptions for PrEP medication—irrespective of medical necessity— to be filled at Defendants' pharmacies; and then (4) claimed reimbursement through the MAP for each bottle of PrEP medication Defendants' pharmacies dispensed.  *See infra* at 14-23, 36-43.  By

integrating 340B clinics with their own pharmacies and artificially creating their patient populations through fraud, Defendants wrongfully obtained tens of millions of dollars of reimbursements from Gilead to which they were not entitled. They did so by exploiting low-income and homeless Floridians—enticing them with cash to come to Defendants' clinics for "wellness checks" as a pretext to automatically enroll them in the MAP, and to accept PrEP medication dispensed to them without proper medical evaluation or oversight.

Evidence obtained in discovery shows that the United Defendants, led by Kirill and Mikhail Vesselov through their United Pharmacy, and the Physician Preferred Defendants led by Michael Bogdan through his Physician Preferred Pharmacy, were the masterminds and chief beneficiaries of these schemes. The Vesselovs and Bogdan formed or enlisted 340B clinics to buy discounted PrEP medication and prescribe it to patient recruits, whom they illegally enticed with cash and VISA® cash cards and enrolled in the MAP without any legitimate effort to verify their need for PrEP or eligibility for the MAP. *See infra* at 15-20. All of the prescriptions were then filled through Defendants' pharmacies, controlled by the Vesselovs and Bogdan, respectively. This allowed Defendants to illegally pocket the reimbursement payments that Gilead provides for dispenses of PrEP medication to legitimate MAP enrollees. *Infra* at 29-30.

Defendants organized their enterprises so as to fraudulently exploit the MAP. Their 340B clinics hired "outreach" coordinators and paid them to find as many new "patients" as possible, illegally offering them bonus payments per head. *Infra* at 15-17. Defendants then illegally paid recruits with cash or cash cards after their first visit to the clinics, where the recruits were enrolled in the MAP. *Infra* at 15-17. These efforts ensured a constant stream of recruits for Defendants to enroll in Gilead's MAP, whether or not they had a bona fide need for PrEP or otherwise actually qualified to participate in the program. Defendants' payments to patients were

in gross violation of Florida's Patient Brokering Act, Fla. Stat. § 817.505 ("PBA"), and Anti-Kickback Statute, *id.* § 456.054 ("AKS"), which outlaw the solicitation, payment, or receipt of consideration in exchange for a patient referral to or from a healthcare provider, and strictly prohibit the payment of cash or cash equivalents to patients.

To be able to enroll as many people as possible, Defendants made multiple false representations to Gilead on the MAP enrollment forms on which Gilead relied—including falsely certifying, for each and every enrollee, that a prescriber had already verified that PrEP medication was clinically appropriate for the enrollee. *Infra* at 17-20. After enrolling recruits in the MAP, Defendants then prescribed the recruits PrEP medication whether or not they needed it or wanted it, and without providing the baseline clinical evaluation or ongoing oversight necessary to ensure their safety. Some Defendants set every patient's PrEP medication to auto-refill and claimed reimbursement from the MAP for each refill thus dispensed, thereby ensuring a steady stream of profits regardless of whether the patient ever even picked up their original prescription.

The ultimate function of Defendants' fraudulent prescription mills was to siphon tens of millions of dollars directly from Gilead by capturing as profit the difference between Gilead's reimbursement at wholesale acquisition cost and the discounted 340B price that they paid for their pharmacy supply of PrEP medication. Between February 1, 2018 and November 3, 2020, Gilead paid 21,906 claims for reimbursement for PrEP medication at wholesale price to Defendant United Pharmacy totaling $41,479,073, and paid 14,637 claims for reimbursement for PrEP medication to Defendant Physician Preferred Pharmacy totaling $26,658,165. (Declaration of Donna Quan dated March 14, 2022 ("Quan 2022 Decl.") ¶¶ 11-12) (Waldie Decl. ¶¶ 31, 75). Gilead would not have reimbursed any of these claims had it known about Defendants' fraudulent misrepresentations and unlawful recruiting practices.

## II.    GILEAD FILES THIS SUIT AND OBTAINS PRELIMINARY INJUNCTIONS BARRING DEFENDANTS FROM THE MAP

Gilead filed this action on November 3, 2020 along with an expedited motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") prohibiting Defendants from participating in the MAP.  (Dkts. 1, 3).  In its filings, Gilead presented evidence that Defendants had executed a years-long fraud against the MAP by bribing recruits from vulnerable populations and prescribing unnecessary medication to thousands of individuals to obtain reimbursement payments totaling tens of millions of dollars.

Gilead's TRO motion was supported with seven evidentiary declarations and accompanying exhibits.  (Dkts. 3, 5-8, 11-13).  Gilead became suspicious of Defendants when it noticed Defendants Positive Health Alliance and Doctors United accounted for a disproportionate number of prescriptions for which reimbursement was claimed from the MAP.  Gilead began to investigate these clinics and found numerous documented instances of fraudulent enrollment and redemption practices.  (Dkt. 11, Declaration of Donna Quan ("Quan 2020 Decl.") ¶¶ 18-36).  Gilead also discovered that the suspicious clinics were associated with the other defendants as part of two interlocking networks of healthcare providers, pharmacies, testing labs, and prescribers, organized to siphon money out of the MAP.  (Dkt. 7, Declaration of Emilio Garcia ("Garcia Decl.") ¶¶ 11-44) (Quan 2020 Decl. ¶¶ 8-11, Ex. A).  To put it in context, between February 2018 and November 2020, the 154 non-defendant pharmacies in Florida that participated in the MAP claimed and received, on average, about $1 million through the MAP.  By contrast, the two Defendant pharmacies together claimed and received more than $67 million through the MAP. (Quan 2022 Decl. ¶ 13).

In the course of its investigation, Gilead was contacted by multiple whistleblowers who were familiar with Defendants' fraudulent practices.  The whistleblowers explained to Gilead

13

that Defendants illegally paid bounties to drivers to recruit patients from homeless encampments and similar locations where indigent individuals could be found, and then illegally paid the patients to enroll in the MAP.  (Sebastiani Decl. ¶¶ 34-35, 40-43, 57-58) (Garcia Decl. ¶¶ 95-98).  The whistleblowers further explained that the patients were typically enrolled in the MAP without regard for their eligibility.  (Sebastiani Decl. ¶¶ 35-36, 47, 82) (Garcia Decl. ¶¶ 98, 103).  Often, patients were enrolled in the MAP *before* they were examined by a healthcare provider, which necessarily meant that the representations supporting their enrollment were false.

On the strength of Gilead's showing, the Court granted a TRO against each Defendant named in the Complaint.  (Dkt. 27).  The TROs were served on Defendants by Order to Show Cause, and they had the opportunity to contest Gilead's motion for a preliminary injunction.  None of the Defendants availed themselves of that opportunity.  Rather, every non-defaulting Defendant stipulated or otherwise declined to oppose the conversion of the TRO to a preliminary injunction, which the Court entered against them.  (Dkts. 187-98, 212, 482).

## III.    THE UNITED DEFENDANTS



**A.    The PHA/United Pharmacy MAP Fraud**

Discovery has demonstrated that PHA and associated clinics fraudulently enrolled patients in the MAP for the purpose of enabling United Pharmacy and the other United Defendants to obtain tens of millions of dollars of wrongful reimbursements from Gilead.  Every step of the clinics' process for enrolling patients in the MAP was permeated by fraud.  In many cases, the relevant witnesses exercised their Fifth Amendment rights against self-incrimination in response to questioning about this process, leaving the evidence undisputed and giving rise to an adverse inference that their conduct was wrongful.[4]  Indeed, Betty Celestin, the Head of Operations at PHA from mid-2019 through April 2020, exercised her Fifth Amendment rights against self-incrimination and refused to answer ***every single question*** about PHA's practices.  (Kipnees Ex. 42, Celestin Tr. 20:1-83:1).  Erik Pavao, who took over as Head of Operations at PHA from Betty Celestin, similarly pled the Fifth to dozens of questions about PHA's practices.  (Kipnees Ex. 50; Ex. 51).  Providers for PHA and PHA's partner sites wrote 21,906 prescriptions of PrEP medication (including refills) for which reimbursement was claimed from Gilead.  (Quan 2022 Decl. ¶ 11).  Beyond the massive financial fraud to Gilead, this process exploited thousands of vulnerable Floridians, whom Defendants used to multiply their enrollments, prescriptions, and reimbursement proceeds through the MAP.

---

[4] *See, e.g., Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1308, 1316 (S.D. Fla. 2018) (discussed in Section II(A)(1), *infra*).

1.              **Recruiting Patients with Illegal Cash Incentives.**

The foundation of the United Pharmacy's fraudulent scheme through PHA and its clinics was the illegal recruiting system.  Actively supervised by the Vesselovs (*see infra* at 26-28), PHA hired and paid a dedicated team of drivers to seek out and entice recruits who were indigent or experiencing homelessness.  The system relied on two levels of illegal cash incentives. First, as two former PHA drivers confirmed at their depositions, the drivers had quotas to fill (at least eight recruits a day) and were compensated based on the number of individuals that they brought in to PHA.  (Kipnees Ex. 43, Pinder Tr. 33:12-37:13; Ex. 84, Green Tr. 35:1-20, 47:4-11). Second, the recruits themselves were enticed with cash or cash-equivalent VISA® cards.



The documentary evidence indicates that these recruitment practices were responsible for virtually every patient that enrolled in MAP through PHA: in all, PHA purchased more than ▮▮▮ VISA® cash cards to distribute to recruits.  (Kipnees Ex. 46; Ex. 47). ▮▮▮

Numerous PHA witnesses were asked about PHA's recruitment practices at their depositions. Gilead questioned defendant Gary Kogan, the Executive Director and founder of PHA; Betty Celestin, a former Head of Operations at PHA; Erik Pavao, another former Head of Operations at PHA; and two former PHA drivers whether PHA paid patients cash in exchange for enrolling in MAP. *Every one* of these witnesses asserted their Fifth Amendment rights against self-incrimination and declined to answer Gilead's questions.[5]

### 2. Enrolling Patients in the MAP Before They Were Evaluated by Healthcare Providers.

Once they had lured individuals to its clinic with cash, the PHA clinics enrolled them in the MAP *en masse* without regard to their eligibility or desire for PrEP medication, making numerous false representations in the process. The clinics' most prolific lie was its certification on MAP enrollment forms that every individual had been evaluated by a prescriber who had determined they were HIV negative and that they needed PrEP medication. (Kipnees Ex. 41). In reality, the PHA clinics routinely signed and submitted the MAP enrollment forms for patients *before* the patient ever saw a prescriber, and thus before a prescriber could possibly have tested or evaluated the patient. In other words, the clinics' MAP certifications were fraudulent.

Discovery has confirmed that this fraudulent practice—which anonymous whistleblowers previously reported to Gilead—was in fact PHA's *modus operandi*. When Ms. Celestin, the former Head of Operations at PHA and a convicted felon, was asked about the clinics' enrollment practices, she took the Fifth in response to every single question. (Kipnees Ex. 42,

---

[5] *See, e.g.,* Kipnees Ex. 48, Rucker Tr. 17:14-20, 48:19-56:19, 63:7-65:11, 65:24-97:11; Kipnees Ex. 49, Randall Tr. 15:10-16:8, 25:20-29:7, 31:17-33:17, 37:20-38:14, 52:15-54:20, 55:3-18, 59:23-67:22, 68:13-73:9, 78:18-83:6; 83:18-87:25, 89:22-93:4; Kipnees Ex. 50, Pavao Tr. 48:19-22, 49;4-7, 50:15-18, 51:24-52:7, 55:11-14, 66:1-67:6, 77:7-12, 84:3-8; Kipnees Ex. 52, Kogan Tr. 139:12-145:19; Kipnees Ex. 42, Celestin Tr. 16:20-17:9, 25:13-26:8, 36:3-17, 38:24-39:11, 79:15-22, 81:17-22.

Celestin Tr. 20:1-83:1).   Mr. Pavao, a longtime associate of the Vesselovs who replaced Ms. Celestin as Head of Operations at PHA, confirmed under oath that it was the clinics' practice to "submit the paperwork for enrollment in the MAP program before the patient saw a prescriber." (Kipnees Ex. 50, Pavao Tr. 75:17-76:3).   Mr. Kogan, the Vesselovs' business partner and Executive Director and founder of PHA, acknowledged that Mr. Pavao had admitted this practice, commenting "I think it was just an administrative way to move people through quicker." (Kipnees Ex. 52, Kogan Tr. 107:22-108:11).   Mr. Kogan further acknowledged that Ms. Celestin and Mr. Pavao were more knowledgeable than he was regarding the PHA clinics' enrollment practices. (*Id.* 121:12-122:1).   These admissions alone establish that the PHA clinics made fraudulent misrepresentations on its MAP enrollment forms as a matter of policy, falsely representing that a healthcare provider had evaluated the enrollees and determined that they needed PrEP medication when in fact this did not occur.

The end result—and the clear intent—of this recruiting process was that virtually every individual who could be lured to the clinics ended up being enrolled in MAP and prescribed PrEP medication, irrespective of need, desire, or medical appropriateness that was then dispensed by United Pharmacy.   As one of the PHA drivers, Ike Green, testified at his deposition, every single person who went into a PHA clinic would get PrEP medication.   (Kipnees Ex. 84, Green Tr. 107:13-108:13).

### 3.        Forging Signatures.

PHA also forged patient and prescriber signatures on MAP enrollment forms. Former PHA prescriber Cassandra Louissaint testified that PHA used her prescriber credentials on many MAP enrollment forms without her knowledge or consent to enroll "patients" that she never saw.   (Potter Ex. 5, Louissaint Decl.).

18

████████████████████████████████████████████

███████████████████████████████████████  Similarly,

Mr. Green, a former PHA driver, testified at deposition ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████  And Ms. Celestin, the former PHA Head of Operations, took the Fifth when asked

whether she caused signatures to be forged on MAP enrollment forms at PHA.  (Kipnees Ex. 42,

Celestin Tr. 60:10-61:15).

### 4.    Enrolling ineligible patients.

After being automatically enrolled, recruits were subjected to a cursory wellness

check. ████████████████████████████  In many cases, PHA prescribed

PrEP medication to recruits *after* recruits told the prescriber that they did not fall into any of the

risk groups for HIV, did not want the medication, and did not intend to take the medication. ██████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████  As the PHA clinics' rubber-stamped medical records show,

their employees recorded every enrollee as high risk for HIV exposure regardless of their

circumstances.

To take just two examples out of many: PHA enrolled an individual, ██ in the MAP and prescribed them PrEP medication even though they had been abstinent for five years when PHA enrolled them and did not use injection drugs.  (Kipnees Ex. 55).  ██ therefore did not meet the CDC's guidelines for PrEP treatment.  (Dkt. 6, Declaration of Joel Gallant ("Gallant Decl.") ¶¶16-19).  And yet PHA prescribed PrEP medication to ██ over and over again—with no apparent concern that it was signing ██ up for a daily prescription drug with no benefit given their circumstances.  In total, PHA and the Vesselovs claimed reimbursements for five bottles of PrEP medication improperly prescribed to ██, thus manufacturing thousands of dollars of profits.  (Quan Ex. 1 at Rows 17146, 18691, 30014, 33051, 36130).

Likewise, PHA prescribed PrEP to a recruit, ██ who told their prescriber they only ever practiced safe sex using condoms, had never had an anonymous partner, and did not use IV drugs—all factors that the prescriber admitted lowered their risk of HIV exposure under CDC guidelines.  (Kipnees Ex. 56).  Indeed, the only supposed risk factor identified was that ██ was homeless.  Experiencing homelessness is *not* a sufficient basis to prescribe PrEP medication in and of itself.  (Dkt. 6, Gallant Decl. ¶ 19).  Yet PHA still enrolled them in the MAP and prescribed them PrEP medication, on the pretext that they engaged in "inconsistent condom use" (which was not what ██ had stated) and needed additional HIV education—clearly demonstrating that PHA's clinical threshold for handing out PrEP prescriptions was non-existent.

### 5.    Unlawful arrangements with partner clinics.

██████████████████████████████████████████████

██████████████████████████████████████████████



These payment arrangements are blatant violations of Florida's Patient Brokering Act, Fla. Stat. § 817.505 ("PBA"), and Anti-Kickback Statute, *id.* § 456.054 ("AKS"), which prohibit the solicitation, payment, or receipt of consideration in exchange for a patient referral to or from a healthcare provider.  Not surprisingly, Mr. Kogan, Mr. Pavao, and Ms. Celestin repeatedly invoked the Fifth Amendment when asked about these referral arrangements.[6]

### 6.     PHA ran the same patient recruiting and enrollment scheme at partner clinics.

Defendants expanded the PHA/United fraudulent scheme by setting up a number of partner clinics on the same fraudulent business model.

---

[6] *See* Kipnees Ex. 52, Kogan Tr. 146:14-150:14; Kipnees Ex. 51, Pavao Tr. 38:8-41:1; 44:12-16; 81:19-82:4; Kipnees Ex. 42, Celestin Tr. 31:12-32:13.



The same fraudulent scheme was implemented at Continental Wellness, another PHA partner site. According to the clinic's president, Maria Freeman, van drivers recruited homeless and low-income individuals to the clinic; clinic staff enrolled each recruit ***before*** they saw a prescriber, falsely certifying that the recruit qualified for PrEP medication; and the clinics paid recruits cash or cash equivalents (first cash and later Visa cash cards) both upon enrolling and upon return to pick up the PrEP medication. (Potter Ex. 6, Freeman Decl. ¶¶ 6-7). Dr. Michael Pierce, the main healthcare provider at Continental Wellness, states that PHA stole his credentials to enroll patients that he had never seen and for whom the clinic had no records and continued to do so after Continental Wellness parted ways with PHA. (Potter Ex. 7, Pierce Decl. ¶¶ 4-12). Specifically, PHA falsely listed Dr. Pierce as the certifying prescriber on at least 426 MAP enrollment forms. (*Id.* ¶¶ 8-9). United Pharmacy, in turn, claimed and received more than 1,000

reimbursement payments through the MAP for these 426 enrollees, collecting over $1.9 million in total—all at Gilead's expense.  (Kipnees Decl. ¶ 58).  On some of the forms submitted with Dr. Pierce's forged signature, Betty Celestin (then Head of Operations at PHA) signed on behalf of the patient.  (Potter Ex. 7, Pierce Decl. ¶ 9).  When asked about this practice, she pled the Fifth. (Kipnees Ex. 42, Celestin Tr. 60:10-61:9)

PHA also set PrEP prescriptions to auto-refill at the partner clinics, so that United Pharmacy could dispense refills whether or not the patient picked up the initial fill.  (Potter Ex. 6, Freeman Decl. ¶ 12) ███████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████  With this simple step, Defendants ensured repeat prescriptions and reimbursements—and a corresponding flow of profits—for each patient regardless of whether they ever returned to the clinic.  Early in this action, Gilead recovered a stockpile of hundreds of bottles of PrEP medication from the clinics affiliated with the United Defendants, which included multiple prescription refills for the same individuals. (Dkt. 237, November 24, 2020 Declaration of Joshua Kipnees ¶¶ 21-22 ("Kipnees 2020 Decl.")).  This stockpile of medication corresponds to hundreds of thousands of dollars in reimbursements from Gilead to United Pharmacy for supposedly dispensed PrEP medication that was never dispensed to the person to whom it had been prescribed.

**B.    The United Defendants Distributed Misbranded and Trademark-Infringing PrEP Medication**

In addition to pervasive enrollment fraud, the PHA/United Pharmacy scheme involved dispensing misbranded PrEP medication, thereby infringing Gilead's trademarks and violating federal law.  This is undisputed.  In its responses to interrogatories, Defendant United Pharmacy conceded that before dispensing PrEP medication to patients, it took the medication out

23

of its FDA-approved packaging and placed it into generic plastic bottles devoid of PrEP medication's specially designed container-closure system, directions for use, health and safety warnings, tracking information, and expiration dates. (Kipnees Ex. 66). This was contrary to PrEP medication's FDA-approved label, which instructed pharmacists to "Dispense only in original container." (When confronted with this fact, Mr. Pavao took the Fifth.) (Kipnees Ex. 50, Pavao Tr. 96:20-97:2).



---

[7] As discussed in more detail below, Mr. Triggs has played a role in multiple Vesselov enterprises. He recently pled guilty to felony charges related to conduct remarkably similar to the schemes described herein. *See infra* at 27-28.

███████████████████████████████████████████████████

████████████████████████████  The United Defendants' undisputed practice of distributing repackaged and misbranded medication is a strict liability violation of the Lanham Act and a violation of federal and state law.  21 U.S.C. §§ 331, 333(a), 352; 21 C.F.R. Part 201 and § 314.170; Fla. Stat. §§ 499.005(1) and (9).

By routinely removing PrEP medication from its original packaging, United Pharmacy amassed a stockpile of empty bottles of PrEP medication.  According to public reports, Gilead and other manufacturers have recently been alerted to multiple instances where empty bottles of HIV medication are refilled with foreign pills, thus endangering the lives of patients.[8] At his deposition, Mr. Pavao—who answered many of Gilead's questions and took the Fifth only to a selected subset of questions—took the Fifth when asked what happened to the United Defendants' empty PrEP bottles, and when asked whether they were refilled with counterfeit medication.  (Kipnees Ex. 50, Pavao Tr. 97:3-21).

### C.  The Vesselovs Orchestrated the PHA/United Pharmacy Scheme

As noted above, the financial engine of the PHA clinic's fraudulent scheme was the submission of MAP reimbursement claims to Gilead through Defendant United Pharmacy, which is owned and controlled by Defendants Kirill and Mikhail Vesselov.  ████████████████████

████████████████████████████████████████████████████████████████████████████████████████████

---

[8] Gilead, Gilead Announces Actions to Remove Counterfeit HIV Medications from U.S. Supply Chain, GILEAD.COM (Jan. 19, 2022), https://www.gilead.com/news-and-press/company-statements/gilead-announces-actions-to-remove-counterfeit-hiv-medications-from-us-supply-chain.

### 1. The Vesselovs Funded United/PHA's Fraud and Kept the Profits

Although the Vesselovs purport to be independent from PHA, they founded its

fraudulent enterprise.  Prior to 2019, PHA did not participate in the MAP.  (Kipnees Ex. 19).  Then,



### 2. The Vesselovs Actively Supervised the Fraudulent Activities at the Clinics

Once the Vesselovs had the scheme up and running at the clinics, they actively

oversaw its execution.  As noted above, Vesselov employees were installed as staff at PHA,

including long-time Vesselov associate Erik Pavao as PHA's Head of Operations.  (Kipnees Ex.

50, Pavao Tr. 28:21-30:14; 36:3-20).







mere weeks ago, in a just-unsealed criminal case, Mr. Triggs pled guilty to conspiring to violate the federal Anti-Kickback Statute while consulting for another pharmacy shortly before working for the Vesselovs.  (Kipnees Ex. 71; Ex. 86).  Mr. Triggs admitted to orchestrating a scheme with striking similarity to the Vesselovs'—i.e., engineering referrals for prescriptions for "highly expensive but medically unnecessary" medications in exchange for kickbacks, so that the pharmacy could receive reimbursements from federal health care programs totaling more than $34 million.  (*Id.*).

### 3.    The Vesselovs Set Up a Partner Clinic That Referred Patients to PHA to Be Fraudulently Enrolled in MAP

After setting up the fraud at PHA, the Vesselovs created their own clinic to feed into the fraudulent scheme and grow its illegal profits.  In October 2019, Kirill Vesselov opened Community Health Medical Center in the same strip mall as United Pharmacy.  (Kipnees Ex. 52, Kogan Tr. 176:12-176:15) (Garcia Decl. ¶¶ 66-69).  Mr. Pavao, the Vesselov operative, was placed in charge of Community Health before moving to PHA.  (Kipnees Ex. 50, Pavao Tr. 44:13-44:18).  At his deposition, Mr. Pavao invoked his Fifth Amendment rights

28

against self-incrimination when asked about Community Health (as he did for all the PHA partner clinics), including for questions about paying for patient referrals, paying patients with cash or cash cards, writing prescriptions for patients who do not want or need PrEP medication, and generating prescriptions for the purpose of defrauding Gilead. (*Id*. 50:20-54:9). He also invoked the Fifth Amendment when asked whether Kirill Vesselov knew about these practices. (*Id.* 48:24-49:7).



the United Defendants received over **$41 million** from Gilead



<hr />

[9] Individuals with the HLA-B*5701 allele have a genetic make-up associated with allergic reactions to abacavir. *See* U.S. Food & Drug Administration, Abacavir: Highlights of Prescribing Information, FDA.GOV (June 2018), https://www.accessdata.fda.gov/drugsatfda_docs/pepfar/077844PI.pdf. Patients are typically tested for abacavir before they first start taking regimes that contain it. *Id.* But unlike certain



### 1.    The United Defendants Provided Inaccurate Financial Disclosures

For many months, the United Defendants actively hindered Gilead's ability to gain access to their financial information in the course of this litigation.  Even though Defendants were ordered to make financial disclosures at the outset of this case, the United Defendants' disclosures continually proved to be false and had to be corrected—always after, never before, Gilead pointed out the inaccuracies to the United Defendants.  (Kipnees Decl. ¶¶ 10-25).  A detailed record of the United Defendants' serially inaccurate financial disclosures is set forth in the accompanying declaration of Joshua Kipnees.  It was not until after months of inaccurate disclosures and resistance to discovery that the United Defendants finally agreed to turn over financial records that enabled Gilead to trace the path of the money misappropriated from it.  (Kipnees Decl. ¶¶ 15-20).

To analyze the financial accounts of the Vesselovs and the other United Defendants (as well as those of the Physicians Preferred Defendants, as discussed *infra*), Gilead retained William Waldie, a forensic account with over thirty years of experience as a fraud and money

---

regimens for patients infected with HIV, *see id.*, neither Truvada nor Descovy contains abacavir. *See* Dkt. 8, Declaration of Cary Nakamura ("Nakamura Decl.") Ex. 1 at 18-19; *Id.*, Ex. 2 at 21.

laundering expert at the FBI, PriceWaterhouseCoopers, and Alvarez & Marsal.  (Waldie Decl. ¶¶ 1-4).  Mr. Waldie's analysis was extensive, ████████████████████████████

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████









## IV.         THE PHYSICIAN PREFERRED DEFENDANTS

The second major fraudulent scheme at issue in this case was orchestrated by the

Physician Preferred Defendants: Michael Bogdan, his wife, Twiggi Batista, their pharmacy

Physician Preferred Pharmacy, and their laboratory testing operation Testing Matters, Inc.  Like

the Vesselovs, the Physician Preferred Defendants partnered with 340B clinics to fraudulently enroll patients in the MAP, prescribe PrEP medication the enrollees did not need or want, and submit false reimbursement claims to Gilead at great profit.  These Defendants first implemented the fraud at an existing 340B clinic, Doctors United Group ("DUG").  They then opened their own clinic, Allied Health, and deceived a neighboring 340B clinic (Florimed) into giving them access to the 340B Program before they obtained a 340B license.  ████████████████████████████
████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████  Notably, Gilead has discovered these facts without the benefit of the Physician Preferred Defendants' business communications, which the Physician Preferred Defendants destroyed to avoid producing them in this litigation.

### A.     The DUG/Physician Preferred MAP Fraud

The Physician Preferred Defendants received most of their fraudulent reimbursements through DUG, a 340B clinic run by Jennifer Carbon, including while she was serving time in prison for Medicaid fraud.  The Physician Preferred Defendants partnered with DUG from at least January 2019 through May 2020, during which time Physician Preferred Pharmacy obtained approximately $26.7 million in reimbursements from Gilead for PrEP medication fraudulently prescribed at DUG.  Ms. Carbon has provided a sworn declaration describing her experience working with the Physician Preferred Defendants.  (Potter Ex. 1, J. Carbon Decl.).  Ms. Carbon's husband Augustin, the co-founder of DUG, has also provided a declaration corroborating Ms. Carbon's statements.  (Potter Ex. 2, A. Carbon Decl.).

1.      **The Physician Preferred Defendants Actively Participated in the DUG Scheme**

As Ms. Carbon explains in her declaration, the Physician Preferred Defendants spearheaded and funded the MAP fraud at DUG.  (Potter Ex. 1, J. Carbon Decl. ¶¶ 6-19).  Mr. Bogdan and his wife Twiggi Batista owned and operated two pharmacies—Defendant Physician Preferred Pharmacy and Maggie's Pharmacy—with access to reimbursements from the MAP.  Ms. Carbon states that she met Mr. Bogdan in 2018, at the time DUG was considering enrolling in the 340B program.  (*Id.* ¶¶ 5-7).  Mr. Bogdan encouraged the Carbons to enroll DUG in the 340B program and participate in Gilead's MAP, pitching her on the idea of a partnership between DUG and the "package deal" of Physician Preferred Pharmacy and his testing lab, Testing Matters.  (*Id.*)  Ms. Carbon agreed to partner with Mr. Bogdan's companies, and Physician Preferred became DUG's contract pharmacy.[12]  (*Id.* ¶ 8).  Mr. Bogdan provided the seed money for the operation, advancing over $100,000 to the Carbons through Testing Matters so that DUG could get its operations up and running. (*Id.* ¶ 18).  He then actively participated in the management of the enterprise, and was fully aware of DUG's recruiting and patient-paying business model.  (*Id.* ¶¶ 18, 23).  As Ms. Carbon described the business relationship in a January 2019 email and confirmed in her declaration, ██████████████████████████████████████████████████████ ██████████████████████████████████.  (*Id.* ¶ 12; *id.*, Ex. 1).

In her declaration, Ms. Carbon provides numerous examples of Mr. Bogdan's active participation in DUG.  For example, Mr. Bogdan terminated DUG's 340B administrator and installed himself in that role, conveniently gaining access to heavily discounted PrEP medication.  (Potter Ex. 1, J. Carbon Decl. ¶ 14).  Mr. Bogdan controlled all the purchasing of

---

[12] A contract pharmacy for a 340B entity provides pharmacy services to that entity and the individuals to whom the entity provides healthcare services.  (Quan 2020 Decl. ¶ 6).

PrEP medication using DUG's credentials (often on his personal American Express). (*Id.* ¶ 17). Mr. Bogdan was listed as the purchasing agent and accounts payable contact for DUG in the agreement between DUG and its pharmaceutical supplier. (Kipnees Ex. 73). Bogdan listed himself as the Chief Operating Officer and manager of various DUG clinics on written contracts and in filings with HRSA. (Potter Ex. 1, J. Carbon Decl. ¶ 19). He had his attorney draft new DUG employment agreements for the staff. (*Id.* ¶ 16). Finally, Mr. Bogdan set up and controlled DUG's website and personnel email accounts. (*Id.* ¶¶ 24-29). This fact became significant in this litigation, because, as discussed below, Mr. Bogdan hid, destroyed or deleted all his emails and those of his companies, and has not produced any emails in this litigation. *Infra* at 48-52. Because of this, Mr. and Ms. Carbon of DUG were also unable to produce relevant emails about DUG's operations, including numerous communications with Mr. Bogdan, during the time that Mr. Bogdan had control of DUG's email servers. (Potter Ex. 1, J. Carbon Decl. ¶¶ 45-49; Potter Ex. 2, A. Carbon Decl. ¶¶ 11-14).

### 2.    DUG Illegally Paid Patients to Enroll in the MAP

Under the leadership of Mr. Bogdan and the Carbons, DUG operated a fraudulent PrEP prescription mill using similar techniques as those described above with respect to PHA and the United Defendants. *Supra* at 36-43. Jennifer Carbon states in her declaration that DUG employed "outreach" staff to recruit a steady stream of new "patients" to their clinics to prescribe PrEP medication and increase the profits received from Gilead reimbursements. (Potter Ex. 1, J. Carbon Decl. ¶ 23). DUG paid their outreach staff incentive pay based on the number of patients they referred to DUG. (*Id.* ¶¶ 23, 25). The outreach staff convinced "recruit[s]" to come to DUG's clinics and obtain PrEP medication with promises of cash or cash cards. (*Id.*)

39



### 3.     DUG Enrolled Recruits in MAP Regardless of their Eligibility

Because its overriding purpose was to maximize reimbursement revenue from Gilead, DUG enrolled all its recruits in the MAP and prescribed them PrEP medication without regard to whether they met the MAP eligibility requirements or actually needed or wanted PrEP medication.

40

### 4.    DUG forged prescriber signatures

DUG enrolled patients in MAP and prescribed them PrEP medication after forging prescriber signatures on enrollment forms.  Former DUG prescriber Dr. John Catano has submitted a sworn declaration stating that DUG used his signature without his knowledge or consent on ***over 1000*** MAP enrollment forms.  Some of these were submitted ***after*** he resigned from DUG in November 2019.  (Potter Ex. 3, Catano Decl. ¶¶ 7-10).  To take just two examples, Gilead reimbursed Physician Preferred for PrEP medication purportedly prescribed by Dr. Catano for patients ███ and ███ in December 2019, whom he had purportedly enrolled.  (*Id.* ¶¶ 19, 27).  Dr. Catano confirmed that he had not seen either of those patients.  (*Id.*).  All told, Physician Preferred Pharmacy claimed and received more than $2.2 million for dispenses of PrEP medication to patients that had been fraudulent enrolled in Dr. Catano's name.  (Kipnees Decl. ¶ 50.)

### 5.    Hundreds of the fraudulently-enrolled patients never picked up their PrEP medication

Because they were fraudulently enrolled and prescribed PrEP medication, many of the recruits never came back to DUG to pick up their medication that was dispensed by the pharmacy and delivered to DUG.  As a result, already dispensed PrEP medication piled up at the clinic unclaimed.  After Gilead instituted this action, it recovered more than 300 bottles of PrEP medication from DUG—much of it prescribed over a year earlier—corresponding to half a million dollars in reimbursement payments received from Gilead through the MAP.  (Dkt. 237, Kipnees 2020 Decl. ¶¶ 21-22).

### B.    The Physician Preferred Defendants Continued Defrauding Gilead After Their Partnership with DUG Ended

In early 2020, Mr. Bogdan's relationship with the Carbons broke down and DUG severed ties with Physician Preferred Pharmacy.  (Potter Ex. 1, J. Carbon Decl. ¶ 42).  After the

demise of the DUG partnership, Bogdan opened his own clinic, Allied Health. ███████████

███████████████████████████████████████████████████████████████████████

███████████ Allied Health followed the fraudulent template established by DUG and PHA. Like DUG and PHA, Allied Health paid patients with cash to come to the clinic. (Garcia Decl. ¶ 112). Indeed, Mr. Bogdan and Mr. Castro bragged about how successful Allied Health was in rounding up recruits from populations of homeless and impoverished individuals, and offered to deliver patients from homeless communities to their business partners in exchange for a headhunting fee. (Potter Ex. 8, Socorro Decl. ¶ 12). ███████████████████████

███████████████████████████████████████████████████████ Allied Health's Medical Director, Dr. Alexander Evans, enrolled over one thousand individuals in the MAP on behalf of Allied Health, certifying that he had confirmed PrEP was medically necessary for these individuals and that he would continue to supervise their care. (Quan 2020 Decl. ¶ 34). Yet Dr. Evans did not actually write the prescriptions for any of the patients he enrolled, nor is he listed as the treating physician on a single Allied Health patient record. (*Id.*)  Dr. Evans' certifications to Gilead on more than a thousand enrollment forms that indicate that he had personally evaluated the applicant for PrEP candidacy, and determined it was medically necessary for the applicant were therefore demonstrably false.  Allied Health claimed and received a total of more than $2.1 million in reimbursements through the MAP for PrEP medication purported dispensed to the individuals Dr. Evans had fraudulently enrolled. (Kipnees Decl. ¶ 51).

In addition to fraudulently enrolling patients, Allied Health also defrauded Gilead by misappropriating a different clinic's 340B credentials.  When it first opened, Allied Health was not a qualified 340B clinic and did not have access to discounted PrEP medication. (Kipnees Ex.

82).  To access these discounts for Allied Health, Bogdan stole the credentials of a 340B clinic, Defendant Florimed.  As Florimed's president, Dr. Wharton, states in a sworn declaration, he only learned through this litigation that Bogdan had ordered over **_ten times_** the amount of PrEP medication that Florimed had prescribed to its patients without Florimed's knowledge or consent. (Potter Ex. 4, Wharton Decl. ¶ 12).  In total, Bogdan ordered over 1,800 bottles of PrEP medication using Florimed's credentials that Florimed neither prescribed nor dispensed to its patients.  (*Id.* ¶ 11).  Unbeknownst to Dr. Wharton, Allied Health was prescribing this extra medication purchased at the 340B price to MAP patients—medication it had no right to purchase at the heavily discounted 340B price—so that it could capture a significant profit from the MAP.





44



45





47



### G. The Physician Preferred Defendants Intentionally Destroyed All Their Emails and Attempted to Coverup Their Wrongdoing by Lying

For the reasons explained in the Argument section below, these facts are more than sufficient to warrant an order freezing Physician Preferred Defendants' assets in order to preserve Gilead's ability to obtain a return of its money through this litigation.  Preliminary relief is especially critical, however, in light of disturbing evidence that to avoid their discovery obligations, the Physician Preferred Defendants destroyed business records that are highly relevant to this litigation.  This evidence raises serious concerns about Gilead's ability to obtain an honest accounting from the Physician Preferred Defendants at the conclusion of this case and reinforces the need for preliminary relief in the form of an asset freeze.

To this day, the Physician Preferred Defendants have failed to produce a ***single email*** in discovery.  (Kipnees Decl. ¶¶ 29-30).  The reason for this, they now admit, is that they deleted all their emails and then, for good measure, smashed their email server and threw it in the trash.  (Kipnees Decl. ¶¶ 29-43 & Ex. 32, Bogdan Tr. 73:10-24, 130:7-10, 133:20-134:5).  But before admitting these facts, the Physician Preferred Defendants stonewalled Gilead's discovery efforts for months with an increasingly incredible series of blatant misrepresentations.  Initially, the Physician Preferred Defendants falsely represented that they did not use email.  The Physician Preferred Defendants represented on April 20, 2021 that they had "no responsive text messages or emails."  (Kipnees Ex. 27 at 2).  When asked "Does Testing Matters, Physician Preferred, or your

individual clients conduct any of their business over email, text, or fax?" counsel responded that they did not: "Usually telephone calls and then ***anything needing to be reduced to writing*** would be done through a written agreement." (Kipnees Declaration ¶ 34 & Ex. 27 at 1) (emphasis added).

This false excuse tanked within a matter of days. Documents produced by other defendants included responsive and relevant emails sent by the Physician Preferred Defendants. (Kipnees Decl. ¶ 35 & Ex. 28). Indeed, Mr. Bogdan subsequently admitted at deposition that, contrary to counsel's prior misrepresentation, Testing Matters employees did, in fact, use text and email for business. (Kipnees Ex. 32, Bogdan Tr. 33:20-23, 40:23-41:1, 41:11-16, 54:21-25). Confronted with evidence that they had lied, the Physician Preferred Defendants came up with a new and contradictory excuse for their failure to produce emails, which also proved to be false. Counsel now stated that they "had been cleaning old emails with an automatic sweep after ***90 days*** so they may be limited as to what hasn't been swept into the trash and deleted." (Kipnees Ex. 28) (emphasis added). The Physician Preferred Defendants have never provided any documentation or other evidence that this "automatic sweep" actually existed, and Mr. Bogdan could provide no details about it in deposition. (Kipnees Ex. 32, Bogdan Tr. 82:24-85:18, 88:23-91:4).

The Physician Preferred Defendants' suggestion that they had an orderly policy of automatic email deletion after 90 days soon fell apart. In May 2021, DUG, the Physician Preferred Defendants' former business partner, produced a May 2020 letter DUG's counsel had sent to the Physician Preferred Defendants—nearly six months prior to the commencement of this lawsuit—demanding that Testing Matters and Physicians Preferred "***preserve all records relevant to DUG.***" (Kipnees Decl. ¶ 36 & Ex. 31). When confronted with this letter, Physician Preferred Defendants' counsel—who also represented them at the time of their dispute with DUG—admitted that the Physician Preferred Defendants had ignored the letter and deleted emails despite knowing they

50

were relevant to anticipated litigation, stating "I doubt I ever sent that email to the clients. We follow record keeping rules per state law not per [DUG's attorney] and her convicted clients." (Kipnees Decl. ¶ 40 & Ex. 30).

If the Physician Preferred Defendants automatically deleted their emails after 90 days, where were the emails from the last 90 days before the lawsuit? The Physician Preferred Defendants needed a new excuse for their failure to produce these emails. In a June 21, 2021 email, counsel abandoned the prior representation that the Physician Preferred Defendants had been "cleaning out old emails with an automatic sweep after 90 days," and instead stated that the sweep occurred on a "monthly" basis and that it was now somehow inadvertent; "they didn't realize [the monthly sweep] was on." (Kipnees Decl. ¶¶ 37, 47, 49 & Ex. 34). But of course, the Physician Preferred Defendants could not produce even a single month of emails. This is because, as counsel represented for the first time on June 21, her clients' email "***server broke and had to be replaced***." (Kipnees Ex. 34) (emphasis added). The Physician Preferred Defendants had never mentioned this supposed server malfunction in the previous two months during which the parties had been vigorously disputing Defendants' failure to produce emails. (Kipnees Decl. ¶¶ 29-43).

In subsequent interrogatory responses, the Physician Preferred Defendants represented that the server was broken when it "sustained irreparable water damage" in "late summer or early fall" of 2020, "several weeks prior to November 3, 2020." (Kipnees Ex. 38). This too proved to be untrue. Mr. Bogdan testified at his deposition that the server was damaged around "Halloween" (October 31) 2020, not in "late summer or early fall" as previously represented, and, conveniently, just days before this lawsuit was filed. (Kipnees Ex. 32, Bogdan Tr. 73:10-24). Mr. Bogdan further testified that he could not retrieve the purportedly damaged server for forensic analysis because he had "slammed" it to the ground and smashed it, then threw

it in bulk trash. (*Id.* 73:10-24, 130:7-10, 133:20-134:5). According to Mr. Bogdan, the server damage required his business to shut down for several days. (*Id*. 79:2-4). But despite the purported seriousness of the incident, Mr. Bogdan could not recall how long it took to resolve, the cost to repair the damage, or whether he was invoiced for those repairs. (*Id.* 79:19-24, 124:16-22, 126:18-25). Mr. Bogdan also testified that before he smashed his server, he had been regularly deleting his emails. (*Id.* 83:2-85:10, 140:10-12).

Notably, this is not the first litigation in which Mr. Bogdan's documents have gone missing. In 2019, Mr. Bogdan faced a sanctions motion in a case against him in a Florida civil lawsuit for his failure to produce responsive text messages. (Kipnees Ex. 39). Mr. Bogdan sidestepped the motion by representing that he had lost the phone containing the messages months after the filing of the lawsuit, and therefore could not produce them. (Kipnees Ex. 40; Ex. 90). Somehow, the experience of facing a motion for sanctions for spoliation in 2019 did not deter Mr. Bogdan from continuing to destroy business records in 2020, even in the face of explicit document preservation notices.

The above evidence leaves no room for doubt that the Physician Preferred Defendants, knowing that their business communications related to DUG and the MAP fraud would be the subject of litigation, intentionally destroyed these documents to obstruct justice and avoid incriminating themselves. This brazen litigation misconduct reinforces the need for a Court order preventing the Physician Preferred Defendants from further concealing and dissipating their assets to avoid being subject to equitable remedies.

## ARGUMENT

**I.  THIS COURT HAS THE POWER TO RESTRAIN DEFENDANTS' ASSETS TO PRESERVE GILEAD'S ABILITY TO OBTAIN EQUITABLE REMEDIES**

It is well-established that federal courts have the power under Federal Rule of Civil Procedure 65 to issue TROs and preliminary injunctions restraining financial assets where, as here, doing so is necessary to preserve the ability to obtain a permanent equitable remedy.  *See, e.g., United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1358 (11th Cir. 2019) (because plaintiff sought "equitable relief" the district court had the power to issue asset freeze); *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005) (an "asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement"); *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) (same); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief.").  In *ETS Payphones*, the Eleventh Circuit held that an "asset freeze [was] justified as a means of preserving funds for [an] equitable remedy" even where, as here, the plaintiff had also sought money damages.  408 F. 3d at 734; *accord United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 498 (4th Cir. 1999).[13]

As described above, the Kingpin Defendants fraudulently misappropriated tens of millions of dollars in funds directly from Gilead.  To obtain a return of its money, Gilead seeks equitable remedies including disgorgement, restitution, and the imposition of a constructive

---

[13] The other circuits to address this issue have similarly concluded that preliminary injunctions freezing assets are available to preserve equitable monetary remedies.  *See Animale Grp., Inc. v. Sunny's Perfume, Inc*, 256 F. App'x 707, 709 (5th Cir. 2007) (collecting cases showing that the Fourth, Seventh, Eighth, Ninth, and Eleventh Circuits have all held that asset freezes are available to preserve equitable remedies).

trust[14]—and seeks this asset freeze in order to avoid irreparable harm to its ability to obtain these remedies after trial.   Numerous Florida federal courts have issued TROs and preliminary injunctions restraining the proceeds of fraud in similar circumstances.  *See, e.g., Mayoral v. Salin*, No. 1:21-cv-62074, 2021 U.S. Dist. LEXIS 197739, at *1 (S.D. Fla. Oct. 14, 2021) (granting TRO to restrain the proceeds of fraud); *HPC US Fund 1, L.P. v. Wood*, No. 13-61825-CIV, 2013 U.S. Dist. LEXIS 202844, at *6-7 (S.D. Fla. Aug. 23, 2013) (granting TRO restraining the proceeds of fraudulent activity and imposing a constructive trust on the proceeds); *Tempay Inc. v. Biltres Staffing of Tampa Bay, Ltd. LLC*, No. 8:11-cv-2732-T-27AEP, 2011 U.S. Dist. LEXIS 160314, at *5 (M.D. Fla. Dec. 13, 2011) (granting TRO to restrain the proceeds of fraud); *Bloomfield Institutional Opportunity Fund, LLC v. Allen Inv. Props., LLC*, No. 8:10-CV-1475-T-17MAP, 2010 U.S. Dist. LEXIS 88192, at *17-19 (M.D. Fla. Aug. 9, 2010) (granting preliminary injunction restraining proceeds of fraud where "a substantial likelihood exists that Defendants will attempt to dispose of or hide the money . . . which rightly belongs to [plaintiff]"); *Hudson Nat'l Bank v. Shapiro*, 695 F. Supp. 544, 549-50 (S.D. Fla. 1988) (issuing preliminary injunction restraining "funds that were fraudulently obtained . . . under a theory of constructive trust" and noting that "Florida has recognized such a trust where the monies in a bank account were wrongfully obtained and where such funds can be traced to that particular account.")

█████████████████████████████████████████████████████████

████████████████████████████████████ Florida courts recognize "constructive trusts [as] an appropriate remedy to prevent unjust enrichment" by restraining real property that is acquired by fraud or using fraudulent funds.  *Graybill v. Kolb* (*In re Graybill*), No. 6:19-cv-799-Ori-40,  2019 U.S. Dist. LEXIS 230419, at *14 (M.D. Fla. Oct. 31, 2019); *see Levy v. Kozyak* (*In*

---

[14] *See* PFAC at 165-167.

*re Fin. Federated Title & Tr., Inc.)*, 347 F.3d 880, 881 (11th Cir. 2003) (affirming imposition of constructive trust and equitable lien where "Appellants purchased their home with fraudulently obtained funds"); *Lee v. Wiand*, 603 B.R. 161, 176 (MD. Fla. 2018) (affirming constructive trust over homestead that was purchased with fraudulent funds). Constructive trusts or equitable liens on real property obtained with the proceeds of fraud are "a recognized exception to Florida's homestead exemption" and can be imposed on a homestead purchased, improved, or invested in with funds obtained through fraud. *Graybill*, 2019 U.S. Dist. LEXIS 230419 at *15; *accord Levy.,* 347 F.3d at 881.

In addition to seeking restitution and the imposition of a constructive trust, Gilead seeks disgorgement of the United Defendants' profits under the Lanham Act,[15] which expressly authorizes that remedy. *See* 15 U.S.C. § 1117 (available remedies include "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action"). In *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* the Eleventh Circuit affirmed a preliminary injunction granting an asset freeze to ensure permanent relief in the form of disgorgement of the defendants' profits acquired through violations of the Lanham Act. 51 F.3d 982, 987-88 (11th Cir. 1995). Consistent with this, Eleventh Circuit district courts regularly issue orders restraining assets in Lanham Act cases. *See, e.g., Mpl Commc'ns Ltd. v. Jodie*, No. 20-CIV-61418-RAR, 2020 U.S. Dist. LEXIS 202195, at *11 (S.D. Fla. Aug. 19, 2020); *Louis Vuitton Malletier, S.A. v. 1louissacpascher.com*, No. 13-20951-CV-COOKE/TURNOFF, 2013 U.S. Dist. LEXIS 206885, at *20 (S.D. Fla. May 24, 2013); *Sigman U.S.A., LLC v. Doe*, No. 1:21-cv-2817 (AT), 2021 U.S. Dist. LEXIS 212893, at *9 (N.D. Ga. Aug. 24, 2021); *Estate of Marilyn Monroe Llc v. 123oilpainting*, Civil Action No. 1:21-cv-3824-MLB, 2021 U.S. Dist. LEXIS 212633, at *10 (N.D. Ga. Sep. 22, 2021).

---

[15] *See* PFAC ¶ 481 & p.167.

Finally, discovery has demonstrated that Defendants carried out their MAP fraud through a complex and sophisticated business organization that epitomizes a RICO enterprise. As a result, Gilead is filing a concurrent motion to amend its complaint to assert federal and Florida RICO claims against Defendants, including the United Defendants and the Physician Preferred Defendants. The law is clear that Florida's RICO statute "authorizes [the] entry of a temporary restraining order and/or preliminary injunction limiting a defendant's right to dispose of assets during the pendency of [a] litigation." *Absolute Activist Value Master Fund Ltd. v. Devine,* No. 2:15-cv-328-FtM-29MRM, 2016 U.S. Dist. LEXIS 52263, at *19 (M.D. Fla. April 19, 2016) (citing Fla. Stat. § 895.05(6)); *see also Bardfield v. Chisholm Props. Circuit Events, LLC*, No. 3:09cv232/MCR/MD, 2009 U.S. Dist. LEXIS 133889, at *4 (N.D. Fla. June 12, 2009) ("Florida state and federal courts have used this statutory basis to place prejudgment restrictions on a defendant's right to dispose of assets."). Gilead's PFAC also adds certain "Relief Defendants"— a series of entities, owned or controlled by the United Defendants or Physician Preferred Defendants, ██████████████████████████████████████████████████ ██████████████████████████████████.

## II.   GILEAD IS ENTITLED TO A TRO AND PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS' ASSETS

A motion for a TRO or preliminary injunction restraining assets is governed by the standards for obtaining injunctions under Rule 65, which require the movant to show (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict upon the non-movant; and (4) that entry of the relief would serve the public interest. *See Levi Strauss*, 51 F.3d at 985; *accord Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir.

2005); *see also Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995) (applying the same elements to a motion for a TRO). Gilead makes all of these showings.

### A.    Gilead Is Likely to Succeed on the Merits of Its Claims for Equitable Relief

"A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain success." *Modern Pharm., LLC v. McKesson Corp.*, No. 18-22242-CIV-Moore/Simonton, 2018 U.S. Dist. LEXIS 100174, at *15 (S.D. Fla. June 12, 2018). Here, the probable success of Gilead's claims cannot be seriously disputed. Indeed, this Court has already granted a TRO against each of the United Defendants and Physician Preferred Defendants on the strength of Gilead's Complaint and supporting evidence, having determined that Gilead had shown a likelihood of success on the merits of its claims. The United Defendants and Physician Preferred Defendants had the opportunity to contest the Court's findings but chose not to do so. Instead, each stipulated to an entry of a preliminary injunction. (Dkts. 90, 92-96).

Gilead has since unearthed a wealth of details corroborating and amplifying the Complaint's key allegations against these Defendants. The evidence submitted with this motion demonstrates to a certainty that the United Defendants and Physician Preferred Defendants have funded, managed, and operated a years-long fraudulent enterprise through which they exploited vulnerable individuals and have been unjustly enriched and received tens of millions of dollars of Gilead's money. Moreover, it is undisputed that the United Defendants distributed misbranded and trademark-infringing PrEP medication—strict liability offenses under the Lanham Act—and secured profits on each bottle.

1.        **The Evidence Demonstrates That Defendants Were Unjustly Enriched As a Result of Fraud**

The current version of the Complaint asserts claims for unjust enrichment against the United Defendants and Physician Preferred Defendants.[16]  The Court has already determined that Gilead is likely to succeed on these claims.  (Dkt. No. 27).  Gilead has since discovered still more evidence confirming that the elements of a claim for unjust enrichment are satisfied here: "(1) that [Gilead has] conferred a benefit on the [Kingpin Defendants], who ha[ve] knowledge of the benefit; (2) that the [Kingpin Defendants] voluntarily accepted and retained the benefit conferred; and (3) that the circumstances are such that it would be inequitable for the [Kingpin Defendants] to retain the benefit without paying the value of it to the plaintiff." *Century Sr. Servs. v. Consumer Health Benefit Ass'n*, 770 F. Supp. 2d 1261, 1266-67 (S.D. Fla. 2011).

Importantly, "[n]either wrongdoing, nor fraud nor mistake are a requirement for a finding of unjust enrichment.  Rather, the Court simply needs to examine whether 'in equity and good conscience,' the [plaintiff] is entitled to reimbursement." *Goldberg v. Chong*, No. 07-20931-CIV-HUCK, 2007 U.S. Dist. LEXIS 49980, at *26 (S.D. Fla. July 11, 2007) (quoting *Sharp v. Bowling*, 511 So. 2d 363, 365 (Fla. 5th DCA 1987)); *see also Kalberg Indus. LLC v. Auto. Experts, Inc.*, 861 F. App'x. 321, 323 (11th Cir. 2021) (rejecting argument that there is a requirement of "conscious wrongdoing" for an unjust enrichment claim).  As Florida courts recognize, "the doctrine of unjust enrichment is a recognition that a person is accountable to another on the ground that if the former were not required to do so, he would unjustly benefit, or the other would unjustly suffer loss." *Golden v. Woodward,* 15 So. 3d 664, 669 (Fla. 1st DCA 2009) (internal quotations omitted).

---

[16] Complaint ¶¶ 461-468.

**United Defendants**.



39, 43-49).  *See Williams v. Wells Fargo Bank, N.A.,* No. 11-21233-CIV, 2011 WL 4901346, at

*15 (S.D. Fla. Oct. 14, 2011) (recognizing that payments are "direct benefits" even if they pass

through an intermediary as part of an improper scheme).

Defendants' conduct, which

includes defrauding the MAP and infringing Gilead's trademarks as set forth above, has wrongly

enriched the United Defendants at Gilead's expense.  Defendants exploited vulnerable populations

of Floridians, prescribing them PrEP medication with no regard as to whether the individuals

wanted or needed it and without evaluating whether it was medically appropriate or safe.  The

United Defendants have no right in law or equity to retain the proceeds of their fraudulent,

infringing, and unlawful schemes.  *See In re Vizcay,* No. 8:15-MC-122-T-33, 2015 WL 5522011,

at *1 (M.D. Fla. Sept. 17, 2015) (awarding damages for unjust enrichment in fraud action where

insurer alleged that health care clinics had fraudulent billing practices); *United States ex rel. Stepe*

59

*v. RS Compounding LLC*, 325 F.R.D. 699, 710 (M.D. Fla. 2017) (finding basis for unjust enrichment claim where defendant used false statements to obtain larger reimbursements through health insurance program than were owed).

Although Gilead does not need to establish wrongdoing or fraud to succeed on the merits of its unjust enrichment claim, it has done so by confirming the United Defendants' role in funding and overseeing the fraud at PHA and the partner clinics and in running fraudulent operations out Community Health. *See supra*. Both Gary Kogan and Erik Pavao—the top two employees in charge of operations at PHA—pled the Fifth when asked about the Vesselovs' knowledge of the fraudulent recruitment and enrollment practices at PHA and the partner clinics. "The Court will . . . infer that the answers to questions to which Defendant invokes his right not to testify against himself would not be favorable to Defendant." *Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1308, 1316 (S.D. Fla. 2018). There is no justification that the United Defendants could advance that would allow them to keep the undeserved windfall of Gilead's reimbursements resulting from their fraudulent practices.

**Physician Preferred Defendants.** Gilead conferred a benefit of $26.7 million to the Physician Preferred Defendants in reimbursements as a direct result of their fraudulent mass enrollment scheme,

The Physician Preferred Defendants' conduct, which includes defrauding Gilead's charitable MAP by paying patients to obtain PrEP medication in violation of state and federal law and by forging credentials, has wrongly enriched them at Gilead's expense and at the expense of the safety of the vulnerable population that they exploited.  It would be inequitable for the Physician Preferred Defendants to retain any of the $26.7 million that Gilead conferred on Physician Preferred.  *See In re Vizcay,* 2015 WL 5522011, at *1; *United States ex rel Stepe*, 325 F.R.D.  at 710.  In light of the evidence Gilead amassed confirming Defendants' fraud, there is no justification that the Physician Preferred Defendants can advance that would allow them to keep this undeserved windfall.

### 2. It Is Undisputed That the United Defendants Distributed Misbranded Medication in Violation of the Lanham Act

The Court has already determined that Gilead is likely to succeed on its Lanham Act claims against the United Defendants.  (Dkt. 27). ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ This is a strict liability violation of the Lanham Act, which prohibits use in commerce of Gilead's trademarks in connection with a "materially different" product.  *See Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001) ("a trademarked product that has been altered" is "not genuine and therefore its unauthorized sale constitutes trademark infringement"). ████████████████████████████ ████████████████████████████ Gilead is certain to prevail on its Lanham Act claims against them.

The threshold for what constitutes a material difference is "quite low," and a presumption of consumer confusion exists when a defendant distributes or sells materially

different product.  *See, e.g., Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992) (holding that material differences "create[] a presumption of consumer confusion"); *Abbott Labs. v. Adelphia Supply USA*, 15-CV-5826 (CBA) (MDG), 2015 U.S. Dist. LEXIS 189555, at *46 (E.D.N.Y. Nov. 6, 2015) (material differences and quality-control tests are "proxies for the fundamental question under the Lanham Act: whether consumer confusion is likely"); *Caterpillar, Inc. v. Nationwide Equip.*, 877 F. Supp. 611, 616 (M.D. Fla. 1994) (same).

As set forth above, the United Defendants removed PrEP medication from Gilead's FDA-approved containers—clearly marked with a FDA-approved instruction—"Dispense only in original container"—and repackaged it in generic vials.  (*See* Nakamura Decl. ¶ 17). The United Defendants' misbranded product is materially different from Gilead's authentic PrEP medication in a number of well-established ways.

**First,** the repackaged product poses a risk to product quality and effectiveness and stands to create confusion among consumers as to the quality and efficacy of Gilead's products. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009) ("It is a logical inference that consumers may regard a product whose packaging has been tampered as inferior and perhaps suspicious . . . or is defective and has been diverted from a recall, or is otherwise untrustworthy"); *TracFone Wireless*, *Inc. v. Pak China Grp. Co.,* 843 F. Supp. 2d 1284, 1297–98 (S.D. Fla. 2012) (finding infringement where products were removed from original packaging and sold in packaging not approved by plaintiff).  Gilead's FDA-approved container closure system protects PrEP medication against hydrolytic degradation from moisture that could render it less effective. (Nakamura Decl. ¶ 10).  The United Defendants' repackaged product lacks these safeguards.

**Second,** the repackaged product deprives recipients of critical health and safety warnings, putting their health and Gilead's marks and goodwill at risk.  *See Moroccanoil, Inc. v.*

*Perfumes World Com., Inc.*, 234 F. Supp. 3d 1026, 1030 (C.D. Cal. 2017) (collecting cases holding that material differences in labeling are likely to cause confusion); *Abbott Labs v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2019 WL 5696148, at *3–6 (E.D.N.Y. Sept. 30, 2019) (granting summary judgment for Lanham Act claims based on differences in labeling and instructions for use for medical devices).   The repackaged medication does not include the prescribing information that the FDA requires that Gilead append to every single bottle of PrEP medication that it distributes.   (Nakamura Decl. ¶¶ 16-18).   These instructions include critical safety and dosing information, for example, that a person must be HIV-negative before and while taking the medication, the importance of not missing doses, the need for adherence to a list of medication to avoid while taking PrEP medication, and important information about potential side effects.   (*Id.* at 18).

**Third,** the repackaging interferes with Gilead's quality control measures by removing critical tracking information that is essential in the event of a product recall (e.g., lot numbers), and thereby risks potential injury to patients and to Gilead's well-known and highly regarded reputation.   (DeVitto Decl. ¶¶ 11-13) (outlining Gilead's quality control and recall measures).   *See Zino Davidoff*, 571 F.3d at 244–45 (affirming grant of injunction where sale of diverted products undermined trademark holder's ability to "remove the defective goods from the channels of commerce").

**Fourth,** the repackaged product lacks an expiration date, which is critical to ensuring that medication is not distributed that has degraded or lost efficacy.   (DeVitto Decl. ¶ 8). *See Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 642–43 (N.D. Tex. 2009) (granting injunction prohibiting defendants from selling expired products).

**Lastly,** the repackaging interferes with Gilead's quality control measures because Gilead prohibits any redispensing of product and destroys any PrEP medication that is returned by consumers. (DeVitto Decl. ¶¶ 11).  The United Defendants admitted to re-distributing medication to patients that had already been dispensed, then **returned** to United Pharmacy, with no regard to the risks created for the recipient of taking medication that has not been properly stored, that has passed through the hands of any number of individuals, and that may have been tampered with or altered. (Kipnees Ex. 66; Ex. 88).  *See, e.g., RFA Brands LLC v. Beauvais*, No. 13-14615, 2014 WL 7780975, at *2–3, 6, 9 (E.D. Mich. Dec. 23, 2014) (granting summary judgment on trademark infringement claim where defendant sold products as "new" or "unused" after they had previously been opened, repackaged, and resold).

Gilead is entitled to disgorgement of the United Defendants' profits from their trademark-infringing dispenses in the amount of $41.5 million:[17] *i.e.*, Defendants' ill-gotten profits from distributing misbranded PrEP medication.[18]  *See* 15 U.S.C. § 1117 (available remedies include "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action"); *Ramada Inns, Inc. v. Gadsden Motel Co*., 804 F.2d 1562, 1564 (11th Cir. 1986); *see also ADG Concerns, Inc. v. Tsalevich, LLC*, No. 18-cv-00818-NC, 2018 U.S. Dist. LEXIS 155542

---

[17] ██████████████████████████████████  Gilead doubts the veracity of this assertion, but even if it were assumed to be true, the disgorgeable profits recoverable on Gilead's trademark claims would still total more than ████████

[18] Gilead can recover all of the United Defendants' profits from the infringing period and need only show the reimbursement payments it paid to the United Defendants through the MAP in that time; it is these Defendants' burden to prove any costs or deductions incurred in generating those profits. *Jackson v. Grupo Indus. Hotelero, S.A.*, No. 07-22046-CIV Huck/O'Sullivan, 2009 U.S. Dist. LEXIS 116770, *44–45 (S.D. Fla. Apr. 28, 2009).  The United Defendants have no basis to argue that "at least some of these profits flow from [their] own merit rather than" from the infringing conduct, and Gilead expects to recover all the profits from the infringing period. *Id.*

64

(N.D. Cal. Aug. 31, 2018), adopted by 2018 U.S. Dist. LEXIS 224801 (N.D. Cal. Oct. 31, 2018) (awarding defendants' profits for infringing sales of materially different products).  In the Eleventh Circuit, plaintiffs can recover defendants' profits for trademark infringement in any of three circumstances: (1) where the defendant's conduct was willful and deliberate, (2) where the defendant was unjustly enriched, or (3) where the award is necessary to deter future conduct. *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007).  All three circumstances exist here.

███████████████████████████████████████████████████████
██████████████████████████████████████████████ *See, e.g.,* *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 173 (E.D.N.Y. 2016) (willful infringement found where defendant knowingly engaged in tampering with and relabeling product); *U.S. Surgical Corp. v. Hosp. Prods. Int'l Pty, Ltd.*, 701 F. Supp. 314, 351 (D. Conn. 1988) (evidence of repackaging is part of evidence of willful infringement).  Moreover, the United Defendants' profits are derived entirely from the reimbursements that Gilead provided through its charitable program with the expectation that the United Defendants would provide life-saving medication to vulnerable patients in legitimate need.  Instead, they distributed misbranded medication lacking many of the FDA-required safety and quality control features.  *See Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988) ("[A]n award of profits based on either unjust enrichment or deterrence [is not] dependent upon a higher showing of culpability on the part of defendant, who is purposefully using the trademark").  Disgorgement is necessary to prevent the United Defendants from benefiting from their reckless behavior and to deter others from trying the same.  The equities are firmly in Gilead's favor; every dollar that the United

Defendants made in profit from dispensing misbranded PrEP medication came directly from Gilead and should be returned.

### 3.    Gilead Is Likely to Succeed on its RICO Claims

Discovery has brought into focus the relationship among Defendants in their respective conspiracies and confirmed that the clinics, pharmacies, and laboratories (along with their officers) knowingly cooperated to defraud Gilead's MAP.  As such, Gilead is concurrently moving to amend its Complaint to add federal and state RICO claims against the United and Physician Preferred Defendants.  *See infra* 80-87.  The evidence overwhelmingly demonstrates that Gilead will succeed on these claims.

The requirements for state and federal civil RICO claims are essentially the same: (1) the existence of an enterprise; (2) a pattern of racketeering activity (i.e., two or more related predicate acts in a 10-year span reflecting conduct of a continuing nature); and (3) a resulting injury.  *Williams v. Mohawk Indus.*, *Inc.,* 465 F.3d 1277, 1282-83 (11th Cir. 2006) (describing elements of RICO claim); *Absolute Activist Value Master Fund Ltd. v. Devine*, No. 2:15-cv-328-FtM-29DNF, 2015 U.S. Dist. LEXIS 192006, at *60 (M.D. Fla. July 1, 2015) ("The Florida RICO statute is patterned after its federal counterpart, and the analysis under both statutes is generally the same.")  Gilead easily meets these requirements.

**Enterprise.**  Both sets of Defendants operate as a quintessential RICO enterprise: they are "an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate" acts and shares a common goal.  *Williams*, 465 F.3d at 1284 (citing 18 U.S.C. § 1961(4)).   An enterprise is defined by its purpose rather than by its structure and, in this case, Defendants' purpose and common goal is crystal clear: to defraud the MAP of tens of millions of dollars through a fraudulent mass enrollment scheme.  *Boyd v. United*

*States,* 556 U.S. 938, 946 (2009); *see also Williams*, 465 F.3d at 1284 (explaining that the "common purpose of making money" through particular conduct is sufficient under RICO); *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1316 (S.D. Fla. 2009) (concluding that defendants were an enterprise "because each consisted of a group of individuals that associated together for the purpose of engaging in a course of conduct").

The United Defendants formed an enterprise with each other—United Clinical Laboratory, United Pharmacy, Community Health, the Vesselovs, and Roman Shekhet—and with PHA and its officers.  The Physician Preferred Defendants did the same:  Mr. Bogdan and Ms. Batista ran the fraud out of their pharmacy, Physician Preferred, and testing lab, Testing Matters, but worked with DUG as well as with Mr. Bogdan and Mr. Castro's clinic, Allied Health, and their officers and employees to recruit patients and funnel them through the MAP enrollment process. Each entity and individual had a role to play, as set forth in detail above, and "participate[d] in the operation and management" of the enterprise, and a consequence, received a portion of the profits. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

**Pattern of Racketeering.**  To execute their MAP fraud, Defendants engaged in a number of related predicate acts over the course of the years-long fraud, including thousands of acts of wire and mail fraud (18 U.S.C. §§ 1341 & 1343), ███████████████ ████████████████████████████████████████████ ███████

The elements of wire and mail fraud are identical and occur "when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme."  *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.

1991).[19]  As set forth above, the United Defendants and Physician Preferred Defendants knowingly defrauded Gilead of tens of millions of dollars through their mass enrollment schemes, in which they made thousands of misrepresentations to Gilead to ensure the enrollment of unqualified patients.  In the process of doing so, they used both mail and wires.  Most significantly, the clinics faxed and electronically submitted recruit enrollment forms to Gilead and the pharmacies electronically fraudulently submitted claims for (and received) reimbursements from Gilead. (Sebastiani Decl. ¶¶ 18, 28).  *Schmuck v. United States*, 489 U.S. 705, 715 (1989); *see also United States v. Phillips*, 647 F. App'x 917, 918 (11th Cir. 2016).  Gilead relied on the material misrepresentations in the MAP enrollment forms and the requests for reimbursement to its detriment.  (Sebastiani Decl. ¶¶ 22-27); *see Bardfield*, No. 3:09cv232/MCR/MD, 2009 U.S. Dist. LEXIS 133889, at *8 (concluding that plaintiff had substantial likelihood of success on Florida RICO claim based on evidence that plaintiff relied on misrepresentations made by phone or email to wire money to defendant); *Allstate Ins. Co.*, 653 F. Supp. 2d at 1316 (upholding RICO mail fraud claims where defendants had submitted fraudulent claim forms to insurance plaintiff knowing that bills and supporting documents would go through the mail).

Defendants' conduct clearly constituted a continuous pattern of related acts of mail and wire fraud that lasted from 2018 to 2020.  The acts were related because they involved the same purpose, results, participants, and victims, *Pelletier,* 921 F.2d at 1496, and they were continuous as they occurred over a several year period.  *See H.J., Inc. v. N.W. Bell Tel. Co.,* 492 U.S. 229, 242, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989); *AIM Recycling, Fla., LLC v. Metals USA, Inc.*, No. 18-60292-CIV-Zloch/Hunt, 2018 U.S. Dist. LEXIS 159155 (S.D. Fla. Sept. 17,

2018) (concluding that plaintiff stated RICO claim based on a multi-year theft scheme); *Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc*., 814 F. Supp. 1084, 1094 (S.D. Fla. 1992) (finding a two-year period was a "substantial period of time" to commit "numerous acts of racketeering activity" for the purpose of establishing closed-ended continuity).





**Injury to Gilead.**  Defendants' mail and wire fraud directly caused Gilead's injuries.  *Williams*, 465 F.3d at 1282.  But for Defendants' fraudulent misrepresentations, Gilead would not have reimbursed Defendants the tens of millions of dollars that they pocketed as profit. Indeed, had Gilead known that Defendants were paying patients and lying on enrollment forms, they would not have been allowed to participate in the MAP at all.

**B.      Without an Asset Freeze, Gilead's Ability to Obtain Restitution or Disgorgement Will Be Irreparably Harmed**

Courts recognize that irreparable harm occurs where there is no adequate remedy for a plaintiff who cannot collect what it is owed.  *See McGirr v. Rheme,* 891 F.3d 603, 614 (6th

Cir. 2018) (preliminary injunctive relief is meant "to allow a victory by [the plaintiffs] to be meaningful.")   (internal quotation marks omitted).   "Equity courts have long recognized 'extraordinary circumstances,' including the likelihood that a defendant will never pay, as one way to give rise to the irreparable harm necessary for a preliminary injunction" because "most courts sensibly conclude that a damage judgment against an insolvent defendant is an inadequate remedy." *U.S. v. Askins*, 924 F.3d at 1359 (internal quotation marks and citations omitted).



Irreparable harm is "neither remote nor speculative" where "a substantial likelihood exists that Defendants will attempt to dispose of or hide" money that a plaintiff has located and seeks to recover. *Bloomfield*, 2010 U.S. Dist. LEXIS 88192 at *18.





74

### C.    The Balance of Hardships Decidedly Favors Gilead

Absent the requested relief, the Physician Preferred and United Defendants will be permitted to spend, conceal, or abscond with millions of dollars that rightly belong to Gilead.  *See HPC US Fund 1, L.P.* 2013 U.S. Dist. LEXIS 202844, at *8-9 ("Where a Plaintiff seeks to enjoin the transfer of property fraudulently conveyed, and in contrast, a Defendant would simply be stripped of the ability to enjoy the fruits of its fraudulent activities, the balance of equities falls in favor of the Plaintiff.").  Meanwhile, the order that Gilead seeks would not impose undue hardships on these Defendants.  Gilead does not seek to freeze assets in an amount greater than the reimbursement proceeds it provided to Defendants and thus does not seek to prevent Defendants from paying their ordinary personal or business expenses with their other sources of income.

Gilead's proposed preliminary injunction would merely prevent the proceeds of fraud and profits of trademark infringement from being further concealed or dissipated until a judgment in this action is rendered.  The equities clearly favor preserving Gilead's ability to be made whole over permitting the Kingpin Defendants to transfer at will the proceeds of their fraud.  Gilead will post a bond in the unlikely event that the Kingpin Defendants suffer damages as a result of the injunction.

### D.    The Public Interest Is Served by the Requested Relief

Finally, preliminary injunctive relief does not disserve the public interest here because the public interest is served "by preventing Defendants from dissipating the fraudulently obtained monies."  *Bloomfield,* 2010 U.S. Dist. LEXIS 88192, at *21.  Indeed, "[i]t is in the public interest to protect against fraud and to make victims of fraud whole, while preventing wrongdoers

75

from benefitting from their deceit." *SEC v. Asset Recovery & Mgmt. Tr., S.A.*, 340 F. Supp. 2d 1305, 1311 (M.D. Ala 2004); *see also Absolute Activist,* 2015 U.S. Dist. LEXIS 192006, at *72–73 ("[I]t is in the public interest to protect against fraud and to make victims of fraud whole. Accordingly, entry of a TRO in this matter would serve the public interest and should therefore be granted."); *AIM Recycling*, 2018 U.S. Dist. LEXIS 159155, at * 12-13 (concluding asset freeze based on plaintiff's RICO and unjust enrichment claims was not against the public interest). Moreover, "where there is a statute prohibiting the activity at issue"—as is the case here where Defendants' conduct is prohibited by the Lanham Act, the RICO Act, and Florida's Patient Brokering Act, Fla. Stat. § 817.505, and Anti-Kickback Statute, *id.* § 456.054—"that statute is considered a strong factor in favor of a preliminary injunction" in the public interest. *Hudson Nat'l Bank,* 695 F. Supp. at 549-50.

### E.   An *Ex Parte* TRO Is Necessary to Prevent Defendants from Immediately Concealing Assets

An immediate *ex parte* TRO temporarily restraining the transfer of assets is justified where there is evidence that a defendant has already attempted, and will continue to attempt, to conceal, or dissipate the proceeds of a fraudulent scheme. *See, e.g.*, *Manheim Auto. Fin. Servs., Inc. v. Joey D's Auto Outlet Inc*., No. 8:12-cv-00528-SCB-MAP, 2012 U.S. Dist. LEXIS 197653, at *4 (M.D. Fla. Mar. 14, 2012); *Tempay Inc.,* 2011 U.S. Dist. LEXIS 160314, at *4–6. Courts recognize evidence of past efforts to conceal assets as a basis to issue an asset freeze. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (holding previous "misconduct and attempts to conceal assets," including "history of fraudulent intra-family transfers [and] refusal to disclose asset information in defiance of court order," supported finding likelihood of concealment or dissipation).







Gilead expects that upon receipt of this motion, the Physician Preferred and United Defendants will conceal, dissipate, or abscond with their remaining assets. The motion is supported by declarations from numerous Defendants who have provided damming evidence against the United and Physician Preferred Defendants, including: the co-founders of Doctors United Group, Defendants Jennifer and Augustine Carbon; former Doctors United employee and prescriber, Defendant John Catano; founder and president of former Clinic Defendant Florimed Defendant Thomas Wharton; former Positive Health Alliance employee and prescriber, former Defendant Cassandra Louissaint; founder and president of Continental Wellness Center, Defendant Maria Freeman; medical director and prescriber for Continental Wellness Center, Defendant Michael Pierce; as well as a declaration from a non-party, Defendant Michael Bogdan's former business associate Ezequiel Socorro. To Gilead's knowledge, prior to this motion, the Physician Preferred and United Defendants were unaware that any of these declarants had provided sworn testimony supporting Gilead's allegations and supplying evidence that the Physician Preferred and United Defendants engaged in and directed the fraudulent scheme against Gilead. (Potter Decl. ¶ 2).

As a court in this Circuit astutely noted, "[i]n today's financial environment, a person can electronically wire funds anywhere on the planet in a matter of a few seconds and a few keystrokes." *Roche,* 2019 U.S. Dist. LEXIS 193454, at *9. Given Defendants' complete disregard for this Court's rules—as exhibited by their misconduct in discovery, including the Physician Preferred Defendants' destruction of key evidence—and the enormous liability that they face, it is likely that they will hide and dissipate any remaining funds once they realize the strength of Gilead's case against them. Thus, as set forth above and in the Waldie and Kipnees Declarations, immediate and irreparable harm will result to Gilead if the Kingpin Defendants' assets are not frozen, and if notice to these Defendants was required before such a TRO is entered. (Waldie Decl. ¶¶ 74, 105) (Kipnees Decl. ¶ 66). *See* Fed. R. Civ. P. 65(b)(1);

Finally, the temporary relief Gilead seeks *ex parte* is properly limited to ensuring the Kingpin Defendants do not seek to conceal or squander their assets until Gilead's motion for a preliminary injunction is heard on notice. *Ex parte* TROs freezing assets are appropriate when, as here, they are "'restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.'" *Yeti Coolers, LLC v. Individuals, Business Entities*, No. 21 cv-62008, 2021 U.S. Dist. LEXIS 197592, at *8 (S.D. Fla. Sept. 28, 2021) (granting ex parte TRO restraining defendants' financial accounts and setting noticed hearing on motion for preliminary injunction) (quoting *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers, Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974)); *Robinson v. True Value Food Stores, Inc.*, No. 21-cv-22847, ECF No. 18 (S.D. Fla. Sept. 24, 2021) (same). The *ex parte* TRO Gilead seeks will be in effect for no more than 14 days (unless extended by the Court or on consent), *see* Fed. R. Civ. P. 65(c)(2)—and for a shorter duration if the Court so chooses. It is intended only to restrain the Kingpin Defendants and Relief

Defendants from disposing of certain assets until a full hearing can be held on Gilead's motion for a preliminary injunction.  The fleeting imposition of a two-week restraint (or shorter) on these assets is more than outweighed by the need to abate the serious risk that these Defendants will squander the assets if given notice of Gilead's TRO application.

### F.     A $50,000 Bond Is Adequate

Gilead proposes posting a TRO bond of $50,000, an amount that is more than adequate to protect Defendants in the event a TRO turns out to be wrongly issued.  The Federal Rule of Civil Procedure 65(c) requires the posting of adequate security, and "it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all."  *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal quotation marks and alterations omitted).  A $50,000 bond is more than adequate to cover any incidental harms Defendants may allege that they suffer while the TRO would remain in effect.  *See Yeti Coolers, LLC*, 2021 U.S. Dist. LEXIS 197592, at *8 (ordering $10,000 bond to secure asset freeze TRO); *Robinson*, No. 21-cv-22847, ECF 18 at 7 (ordering $25,000 bond to secure asset freeze TRO).

## III.     THE COURT SHOULD GRANT LEAVE FOR GILEAD TO AMEND ITS COMPLAINT

Gilead seeks to amend its complaint by adding claims under federal and state RICO statutes and naming as "Relief Defendants" certain entities owned or controlled by the United or Physician Preferred Defendants that ███████████████████████████████████.

(*See* Mot. to Amend, Exs. A-B (hereinafter, "PFAC")).[20]  Rule 15(a)(2) provides that courts should

---

[20] The Relief Defendants are: Maggie's Pharmacy Inc.; Elena Vesselov; The Recovery Team, Inc.; United Construction Partners, LLC; KMG Holdings, LLC; Leonid Holding, LLC; UDT Software, LLC; The Haven Detox LLC; Indiana Center for Recovery, LLC; 215 West 4th Street QOF, LLC; Haven Health Management, LLC; United Dialysis Center, Inc.; RTS Entertainment

"freely give leave [to amend] when justice so requires."  "While allowing an amendment is a discretionary decision," the Eleventh Circuit has "explained that district courts should generally exercise their discretion in favor of allowing amendments to reach the merits of a dispute." *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1000 (11th Cir. 2021); *see also Shipner v. E. Air Lines, Inc.*, 868 F.2d 401, 406–07 (11th Cir. 1989) (explaining Rule 15's policy of "liberally permitting amendments").  "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." leave to amend should be provided.  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

A.    **Leave to Amend Should be Granted**

Leave to amend is warranted here.  It is only through discovery and extensive

████████████████████████████████████████████████████████████

████████████████ Thus, Gilead has not delayed or acted in bad faith in moving to amend at this juncture. Gilead's proposed pleading is its first amendment and Defendants will not suffer any undue prejudice by permitting amendment.  Defendants' deadline to answer the Complaint has not expired, and each of the Relief Defendants are owned and/or controlled by, or closely affiliated with, existing parties in this Action.  Further, most of the Relief Defendants have already been the subject of discovery requests.  Thus, the Relief Defendants will not be surprised or suffer undue

LLC; N60AJ, LLC; United Clinical Laboratory of New Jersey, LLC; Prevent Rx3, LLC; Indiana Wellness Rx, LLC; Prevent Rx, LLC; Navigator Solutions Inc.; MyRX Systems, LLC; Maureen Bogdan; AJVS, LLC; and Ivan Hyppolite.

prejudice.  The factual underpinnings of Gilead's RICO claims are almost identical to the original Complaint, except augmented by additional facts Gilead has learned in discovery that support its allegations.  (*See* Mot. to Amend Ex. B).  And as discussed above, Gilead has shown their RICO claims are likely to succeed on the merits; in so doing, Gilead has also demonstrated that amendment would not be futile.  (*See supra* at 65-69; *see also* PFAC ¶¶ 506-554).  Accordingly, leave to amend should be granted.  *See Garfield*, 466 F.3d at 1270 (explaining that district courts should generally exercise their discretion in favor of allowing amendments and listing limited reasons to deny leave).

Moreover, Gilead should be permitted to move *ex parte* to seek leave to amend.  As demonstrated herein, there is overwhelming evidence that Defendants have ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮that it seeks to name as Relief Defendants entities controlled or affiliated with Defendants to which Gilead has ▮▮▮▮▮▮▮▮; and that Gilead seeks an order restraining Defendants' assets and accounts. Moreover, the PFAC adds claims under the federal and state RICO statutes, which award treble damages and attorney's fees to prevailing plaintiffs as of right.  18 U.S.C. § 1964; Fla. Stat. § 772.11(1); Fla. Stat. § 772.104(1). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**B.      Gilead Should be Permitted to Add Claims Against the Relief Defendants**



theory, as well as pursuant to the Court's equitable authority to disgorge the profits of Defendants' fraud.   As courts in this district have explained, "relief" or "nominal" defendants have "no ownership interest in the property that is the subject of litigation but may be joined in the lawsuit to aid the recovery of relief."   *SEC v. Nat. Diamonds Inv. Co.*, No. 19-cv-80633, 2019 WL 2583863, at *5 (S.D. Fla. June 11, 2019) (citing *SEC v. Cavanagh*, 445 F.3d 105, 109 n.7 (2d Cir. 2006)).   "A relief defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds." *Id.*







Gilead is also entitled to recover against the Relief Defendants pursuant to an unjust enrichment theory.  As set forth above, a valid unjust enrichment claim requires "(1) that [Gilead] has conferred a benefit on the [Relief Defendants], who ha[ve] knowledge of the benefit; (2) that the [Relief Defendants] voluntarily accepted and retained the benefit conferred, and (3) that the circumstances are such that it would be inequitable for the [Relief Defendants] to retain the benefit without paying the value of it to the plaintiff."  *Century Sr. Servs.*, 770 F. Supp. 2d at 1266-67.

[REDACTED]

Finally, it would be inequitable for the Kingpin Defendants—either directly or through the Relief Defendants they control—to retain the funds misappropriated from Gilead or [REDACTED]. The Court need not find wrongdoing, fraud, or even mistake by the Relief Defendants to conclude they were unjustly enriched. *See Goldberg*, 2007 U.S. Dist. LEXIS 49980, at *26. Instead, the Court examines "whether in equity and good conscience, the [plaintiff] is entitled to reimbursement." *Id.* [REDACTED]

[REDACTED]

## C.   The Court Should Freeze the Relief Defendants' Assets

Gilead is entitled to an asset freeze against the Relief Defendants. As noted above, to obtain equitable relief against such defendants—including asset freezes—Gilead need only

[REDACTED]



**<u>CONCLUSION</u>**

For the foregoing reasons, the Court should grant Gilead's *ex parte* motion for a TRO and preliminary injunction as set forth in the attached Proposed Order. The Court should further grant Gilead's *ex parte* motion to amend and award any other and further relief that the Court may deem just and proper.

DATED:      Miami, Florida
            March 14, 2022

                              Respectfully submitted,

                              STEARNS   WEAVER   MILLER   WEISSLER
                              ALHADEFF & SITTERSON

                              */s/ Jay Brian Shapiro*
                              Jay Brian Shapiro (FBN 776361)
                              jshapiro@stearnsweaver.com
                              Museum Tower
                              150 W Flagler Street, Suite 2200
                              Miami, FL 33130
                              T.: (305) 789-3229
                              F.: (305) 789-3395

                              PATTERSON BELKNAP WEBB & TYLER LLP

                              */s/ Geoffrey Potter*

Geoffrey Potter (*admitted pro hac vice*)
Aron Fischer (*admission pending*)
Joshua Kipnees (*admitted pro hac vice*)
Lachlan Campbell-Verduyn (*admitted pro hac vice*)
Devon Hercher (*admitted pro hac vice*)
Maxwell Weiss (*admission pending*)
Amanda First (*admitted pro hac vice*)
gpotter@pbwt.com
afischer@pbwt.com
jkipnees@pbwt.com
lcampbellverduyn@pbwt.com
dhercher@pbwt.com
maweiss@pbwt.com
afirst@pbwt.com
1133 Avenue of the Americas
New York, NY 10036
Telephone: (917) 854-2310
Facsimile: (212) 336-2222

*Attorneys for Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**Appendix A**

**Kingpin Defendants' Bank Accounts and Assets**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

